CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

02/28/2018

JULIA C. DUDLEY, CLERK
BY:    s/ F. COLEMAN
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG, CHARLOTTESVILLE, AND HARRISONBURG DIVISION

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 6:17-cv-84 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 5.63 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 6:17-cv-85 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 19.76 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 6:17-cv-89 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 2.58 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

-1-

ATLANTIC COAST PIPELINE, LLC,

          *Plaintiff,*

v.

1.40 ACRES, MORE OR LESS, IN CUMBERLAND COUNTY, VIRGINIA, *ET AL.*,

          *Defendants.*

CASE NO. 6:17-cv-92

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

---

ATLANTIC COAST PIPELINE, LLC,

          *Plaintiff,*

v.

1.29 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

          *Defendants.*

CASE NO. 6:17-cv-93

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

          *Plaintiff,*

v.

2.66 ACRES, MORE OR LESS, IN CUMBERLAND COUNTY, VIRGINIA, *ET AL.*,

          *Defendants.*

CASE NO. 6:18-cv-7

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

       *Plaintiff,*

v.

4.95 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

       *Defendants.*

CASE NO. 6:18-cv-12

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

       *Plaintiff,*

v.

5.15 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

       *Defendants.*

CASE NO. 6:18-cv-13

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

       *Plaintiff,*

v.

1.16 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

       *Defendants.*

CASE NO. 6:18-cv-14

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

       *Plaintiff,*

v.

4.86 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

       *Defendants.*

CASE NO. 6:18-cv-16

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

      *Plaintiff,*

v.

1.74 ACRES, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

      *Defendants.*

CASE NO. 6:18-cv-18

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

      *Plaintiff,*

v.

5.07 ACRES, MORE OR LESS, IN CUMBERLAND COUNTY, VIRGINIA, *ET AL.*,

      *Defendants.*

CASE NO. 6:18-cv-19

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

      *Plaintiff,*

v.

0.07 ACRE, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

      *Defendants.*

CASE NO. 6:18-cv-20

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

      *Plaintiff,*

v.

0.94 ACRE, MORE OR LESS, IN BUCKINGHAM COUNTY, VIRGINIA, *ET AL.*,

      *Defendants.*

CASE NO. 6:18-cv-21

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

        *Plaintiff,*

v.

4.61 ACRES, MORE OR LESS, IN CUMBERLAND COUNTY, VIRGINIA, *ET AL.*,

        *Defendants.*

CASE NO. 6:18-cv-22

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

        *Plaintiff,*

v.

0.07 ACRE, MORE OR LESS, IN NELSON COUNTY, VIRGINIA, *ET AL.*,

        *Defendants.*

CASE NO. 3:18-cv-6

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

ATLANTIC COAST PIPELINE, LLC,

        *Plaintiff,*

v.

5.47 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*,

        *Defendants.*

CASE NO. 5:17-cv-116

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATLANTIC COAST PIPELINE, LLC,

        *Plaintiff,*

v.

11.16 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*,

        *Defendants.*

CASE NO. 5:18-cv-9

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-12 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 0.23 ACRE, MORE OR LESS, IN HIGHLAND COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-13 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 0.17 ACRE, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-19 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 4.63 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-20 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 0.21 ACRE, MORE OR LESS, IN HIGHLAND COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-26 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 2.86 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-31 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 5.49 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-32 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 27.85 ACRES, MORE OR LESS, IN BATH COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

*************************************

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 5:18-cv-34 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 0.47 ACRE, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | |
| *Plaintiff,* | CASE NO. 5:18-cv-35 |
| v. | |
| 1.72 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *ET AL.*, | MEMORANDUM OPINION |
| *Defendants.* | JUDGE NORMAN K. MOON |

These condemnation cases involve the Atlantic Coast Pipeline, a gas pipeline planned to run through West Virginia, Virginia, and North Carolina. The plaintiff is Atlantic Coast Pipeline, LLC ("ACP") and the defendants are landowners of various parcels (and the parcels themselves) within counties in south-central and western Virginia. The cases are before the Court on ACP's motions for partial summary judgment and for a preliminary injunction granting it immediate possession of the properties. ACP claims it needs immediate possession by March 1, 2018 to complete tree felling before that activity is foreclosed in mid-March 2018 by the Migratory Bird Act. Otherwise, claims ACP, pipeline construction would be delayed.[1]

ACP filed these cases between December 2017 and February 2018. In late January 2018, ACP began requesting expedited hearings on its motions, although several Landowners had not yet been served or appeared. The Court granted an expedited hearing, reserving issues of notice and related procedural matters for the hearing. The evidentiary hearing and oral argument were held on February 26–27, 2018. Prior to the hearing, some Landowners entered appearances through counsel and engaged in expedite discovery after obtaining leave of court. Other Landowners did not make an appearance at the hearing, either through counsel or *pro se*.

---

[1] ACP and the Landowners in the following cases have stipulated to immediate access: *5.15 Acres in Buckingham County (Allen)*, No. 6:18-cv-00013; *0.07 Acre in Nelson County (Fenton Inn)*, No. 3:18-cv-00006; *11.16 Acres in Augusta County (Reed)*, No. 5:18-cv-00009; *0.21 Acre in Highland County (Kelk)*, No. 5:18-cv-00020. These stipulations moot ACP's motions for summary judgment and immediate possession in those cases.

In this Omnibus Memorandum Opinion, I address together arguments raised by various Landowners, making note of case- or parcel-specific arguments or facts when necessary. After considering the parties' evidence and arguments, the Court finds that ACP's motions for summary judgment and immediate possession in several cases should be deferred for lack of sufficient notice and opportunity to heard by certain Landowners. The motions, however, should be granted either in whole or in part as to other parcels and Landowners.

## I.     DUE PROCESS AND PROCEDURAL ISSUES

At outset of the hearing, these cases were called by the Clerk. No Landowner without counsel identified himself or herself as present. During the hearing, the Court on multiple occasions invited any unrepresented Landowner present to examine the witnesses or make statements. No unrepresented Landowner spoke up or otherwise identified himself or herself. Throughout, ACP submitted documentation and elicited testimony that goes to its motions in each of these cases. But before turning to the merits, the Court must address the extent to which the Fifth Amendment's Due Process Clause and various procedural rules circumscribe the ability to rule on ACP's motions, at least currently for some of the cases.

"It is a principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (citing *Hansberry v. Lee,* 311 U.S. 32, 40 (1940)); *Ensor v. Rollins*, 952 F.2d 395 (4th Cir. 1991) (unpublished) (affirming dismissal of claims against defendant who was not served). Thus, the Court cannot enter summary judgment or an injunction against a party who has not yet been served. *See also infra* (explaining Fourth Circuit law in condemnation context requiring determination of substantive right to condemn before granting injunction for immediate

possession); Fed. R. Civ. P. 65(a)(1) (requiring "notice to the adverse party" before granting preliminary injunction).

But due process requires more than bare notice. *Nelson v. Adams USA, Inc.*, 539 U.S. 460, 467 (2000). "A primary purpose of the notice required by the Due Process Clause is to ensure that the opportunity for a hearing is meaningful." *City of W. Covina v. Perkins*, 525 U.S. 234, 240 (1999). The point of such notice is "to apprise the affected individual of, *and permit adequate preparation for*, an impending hearing." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14–15 (1978) (emphasis added); *see Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (An "elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice" reasonably calculated to, *inter alia*, "afford [the party] an opportunity to present [its] objections."). The notice "must afford a reasonable time for those interested to make their appearance." *Mullane*, 339 U.S. at 314.

Building upon these principles, the Fourth Circuit has recently summarized the preconditions for summary judgment.

> [B]efore granting summary judgment, a court must afford the losing party notice and an opportunity to be heard. *See [Allstate Ins. Co. v. Fritz,* 452 F.3d 316, 323 (4th Cir. 2006)]. The court must give notice to ensure that the party is aware that it must "come forward with all of [its] evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Once such party has sufficient notice, the party also needs an "adequate opportunity" to present its case and "demonstrate a genuine issue of material fact." *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989). These requirements serve to provide the party with a "full and fair opportunity to present its case." *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 235 (4th Cir. 2002).

*Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 222 (4th Cir. 2016).

These authorities, then, present the question of how much advanced notice is needed to afford the Landowners "adequate preparation" time and ensure the opportunity to be heard is "meaningful." *Perkins*, 525 U.S. at 240; *Craft*, 436 U.S. at 14–15. The question is relevant here

because either all or some Landowners in certain cases were served with the complaints and motions against them only a few days before the hearing. There is no ironclad rule governing every situation: Due process "'is not a technical conception with a fixed content unrelated to time, places and circumstances,' it is 'flexible and calls for such procedural protections as the particular situation demands.'" *United States v. Timms*, 664 F.3d 436, 452 (4th Cir. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).

There are also closely related concerns about adherence to procedural rules for case administration. For instance, the procedural rule governing a landowner's response to a condemnation lawsuit gives him 21 days to answer the complaint. Fed. R. Civ. P. 71.1(e). At least as to some recently-served Landowners, a grant of summary judgment against them would occur before their time to answer has expired. There is a shortage of caselaw on the wisdom of that course, but the leading treatise on federal procedure observes that courts have discretion to proceed in that fashion. 10A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2728 (4th ed. 2017); *see* Fed. R. Civ. P. 56(a) (party may file a motion for summary judgment "at any time until 30 days" after discovery closes); *see also Stein v. Oshinsky*, 348 F.2d 999, 1000–01 (2d Cir. 1965) (Friendly, J.) (holding that motion for summary judgment was not premature when filed after "a pre-answer rule 12(b) motion"); *GE Grp. Life Assur. Co. v. Turner*, No. CIV. A. 3:05-342, 2009 WL 150944 (W.D. Pa. Jan. 20, 2009) (granting summary judgment when defendant had not answered plaintiff's complaint nor responded to its motion).

The Court exercises that discretion judiciously, especially against the backdrop of *Nelson v. Adams USA, Inc.*, 539 U.S. 460 (2000), which—although not holding procedural rules were *per se* due process requirements, *id.* at 467—reversed an entry of judgment before a party's prescribed time to respond has expired. *Id.* at 465–66 (finding due process violated by

simultaneously making new defendant a party and subjecting him to a pre-existing judgment, which defeated the 10-day period to respond to an amended pleading under Rule 15). Caution is also warranted by this Court's local rules, which ordinarily provides a party served with a motion 14 days to respond. W.D. Va. Local Civ. R. 11(c)(1).

After considering all these authorities, the Court holds that more than 10-days advanced notice of the hearing and the motions is required to the Landowners. *See, e.g., Goodrich v. Ferris*, 214 U.S. 71, 81 (1909) (ten-days notice constitutional); *Roller v. Holly*, 176 U.S. 398, 408, 413 (1900) (five-days notice unconstitutional); *In re Ctr. Wholesale, Inc.*, 759 F.2d 1440, 1450 (9th Cir. 1985) (one-day notice unconstitutional). Thus, summary judgment will not be entered against any Landowner who was not served before February 16, 2018. That period offers Landowners a fair chance to adequately prepare their defense—*e.g.*, gather their evidence, conduct research, seek representation, file any motions or briefs, and the like. A shorter period would not be sufficient.[2] In making this determination, the Court also considers that these cases concern real property, which the law considers unique and deserving of solicitous treatment. *E.g.*, *Ndeh v. Midtown Alexandria, L.L.C.*, 300 F. App'x 203, 207–08 (4th Cir. 2008) (compiling Virginia cases referring to real property's unique status).

This 10-day notice period results in three classes of Landowners. The first, those have not yet been served, are referred to in this opinion as "un-served" Landowners. The second, those who received notice only 10 days or less before the hearing, are called "late-served" Landowners. And the third, those who received more than 10-days notice, are called "served" Landowners.

With those definitions in tow, the Court turns to cataloging the cases before it with at

---

[2] The Court observes that the 10-day window included two weekends and a federal holiday, Washington's Birthday.

least one un-served or late-served Landowner.

### A. Cases with Only Un-served or Only Late-Served Landowners

In *5.47 Acres in Augusta (Black)*, No. 5:17-cv-116,[3] the sole personal defendant, Benham M. Black, has not been served. As ACP acknowledged at oral argument, the Court cannot enter summary judgment without violating the Constitution. The Court will therefore defer any ruling on summary judgment (and thus on the preliminary injunction) in that case. ACP may bring the matter to the Court's attention after service has been accomplished, proof thereof filed, and an adequate time for Landowner Black to respond has passed.

In *0.07 Acres in Buckingham (Seay)*, No. 6:18-cv-20, the sole personal defendant, Shawn B. Seay, was served on February 16, 2018. (Dkt. 12). In accordance with the analysis above, the Court will not enter summary judgment against him at this time. If Shawn B. Seay does not file a response or otherwise appear by March 5, 2018, ACP may file a notice with the Court asking for a ruling.

In *4.61 Acres in Cumberland (Huddleston)*, No. 6:18-cv-22, ACP represents to the Court that the parties are involved in discussions to resolve the case. The Landowners (now represented by counsel) were served on February 19, 2018, meaning that they would be late-served in any event. For those reasons, the Court defers decision on the motions in that case.

### B. Case with Only Un-served and Late-Served Landowners

In *0.94 Acres in Buckingham (Dunnavant)*, No. 6:18-cv-21, there are three remaining named, individual defendants—Natalie P. Dunnavant, Mora Lee Seay, and Warrant L. Dunnavant, Jr.—all of whom were late-served. Additionally, the Unknown Heirs of Johnson Seay are un-served, with ACP having represented to the Court that service by publication is in

---

[3] The citation form in this Opinion to the cases before the Court is as follows: [*Parcel size*] *in* [*County*] *(Lead defendant-owner)*, No. [case number].

progress. A ruling on this case is thus deferred. ACP may file a notice requesting a ruling after service has been accomplished, proof thereof filed, and an adequate time for the Unknown Heirs of Johnson Seay to respond has passed.

### C. Case with Both Un-Served and Served Landowners

One case has both (and only) un-served and served Landowners. In *1.74 Acres in Buckingham (Holland)*, No. 6:18-cv-18, Landowners Blanche Holland and Wallace Holland were served, and summary judgment will be entered against them. The Unknown Heirs of William M. Holland, however, remain un-served. ACP represents to the Court that service by publication is in progress. ACP may file a notice requesting a ruling after service has been accomplished, proof thereof filed, and an adequate time for the Unknown Heirs of William M. Holland to respond has passed.

This is a natural point to explain how the Court is proceeding in cases where summary judgment is currently proper against at least one Landowner of a parcel but not against all Landowners of that parcel. The short version is that the Court is granting summary judgment solely as to the served Landowner(s) and deferring the preliminary injunction request for immediate access until the remaining un-served and late-served Landowner(s) have received adequate notice.

The Fourth Circuit's *Sage* decision requires summary judgment be entered (*i.e.*, the establishment of ACP's legal right to the land) before immediate possession can be given to ACP. *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823–25, 828 (4th Cir. 2004). And as explained earlier, it would violate due process to grant relief (including immediate possession) against un-served or late-served Landowners. These principles mean that the Court (1) can presently grant summary judgment against a served Landowner of a parcel, but (2) cannot grant

immediate possession—even as against the served Landowner—an account from the un-served or late-served Landowner. Put differently, granting immediate possession is an all-or-nothing affair. Were the Court to give ACP immediate possession of a parcel with an un-served or late-served Landowner, that Landowner's due process right to notice and an opportunity to challenge ACP's legal entitlement to the land would be violated. To get immediate possession, ACP must first obtain summary judgment against each landowner, *see Sage*, 361 F.3d at 823–25, 828, and before getting *that* each Landowner must receive due process.

At oral argument, ACP advanced an alternative approach. ACP argued that as long as due process has been met for one Landowner of a parcel, there is no problem with granting immediate possession. To illustrate its position, ACP pointed to *5.07 Acres in Cumberland (Wiley)*, No. 6:18-cv-19. According to ACP, the Unknown Heirs of Willie Goode, Jr. (who are un-served) have only a 0.56% "estimated ownership interest" in the parcel. So, we needn't worry because—after all—it's only a small interest and ACP really needs the property now. 2/27/18 Oral Arg. Hr'g Rough Tr. at 41–42 (arguing remaining heirs "only represent a small fraction of the ownership . . . to the extent we haven't been able to get the heirs served or the time is still pending we believe it would still be appropriate to enter injunctive [relief] and to set a bond"). There are both evidentiary and legal problems with this argument.

First, there is no evidence before the Court substantiating ownership shares in each parcel. ACP did provide the Court with a "Bond Spreadsheet" aggregating various data about each parcel. But—unlike, *e.g.*, data on initial appraisals and final offers—there simply is no evidentiary basis in the current record to support the ownership interests reference in the spreadsheet. Second and relatedly, the Bond Spreadsheet itself calls the ownership stakes in each property an "estimated" percentage. Third, unlike ACP's example of *5.07 Acres in*

*Cumberland (Wiley)*, un-served or late-served Landowners in other cases have significantly greater estimated interests in the land (were the extent of ownership a relevant consideration, which it isn't). *E.g.*, *1.74 Acres in Buckingham (Holland)*, No. 6:18-cv-18 (un-served, unknown heirs with 71.43% estimated ownership share); *1.72 Acres in Augusta (Guerrier)*, No. 5:18-cv-35 (only two owners, one late-served and one served).

More centrally, APC's assertion is legally unsupported. Its stance—absent Landowners have no due process right to challenge (or even have notice of) ACP's effort to take their land— was not mentioned in the numerous pre-hearing briefs filed by ACP. It was advanced for the first time in closing argument at the hearing. No caselaw or citation to authority has been provided to support it. And ACP's position violates Rule 71.1(c)(4)'s command that notice "must be served on *all* defendants." (emphasis added). Simply put, ACP cannot piggyback on served Landowners in order to deprived un-served or late-served Landowners of their interests in the land without due process.[4] *E.g.*, *In re Paxton*, 440 F.3d 233, 234, 236 (5th Cir. 2006); *Scheafnocker v. C.I.R.*, 642 F.3d 428, 434, 436 (3d Cir. 2011), *vacated for lack of standing,* 2012 WL 1854183 (3d Cir. Apr. 24, 2012); *In re Graves*, 156 B.R. 949, 953 (E.D. Pa. 1993). "For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (holding statute permitting repossession of personal property, even temporarily, without pre-deprivation notice and

---

[4]     Even if the Court considered using an entitlement to summary judgment against served Landowners as a fulcrum for an immediate access injunction against un-served and late-served Landowners, the absence of due process would weigh decisively against such relief: "[U]pholding constitutional rights served the public interest," and ACP has no legitimate interest in procuring a constitutional violation. *Newsom ex rel Newsome v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *see Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011).

opportunity to heard violated due process); *Connecticut v. Doehr*, 501 U.S. 1 (1991) (law providing for "prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances" does not provide due process); *id*. at 16 (finding plaintiff's interests in favor of "*ex parte* attachment" were minimal because he "had no existing interest" in the real estate at that time); *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1301–02, 1306–08 (4th Cir. 1992) ("governmental eviction of a public housing tenant without prior notice and an opportunity for a hearing was violative of the due process clause," absent "exigent circumstances"); *Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (statute providing police summary authority to destroy personal property violates due process).

The fact that ACP thinks it ultimately will prevail on summary judgment against un-served or late-served Landowners is no excuse.[5] It "is no answer to say that in [a] particular case due process of law would have led to the same result because [a party] had no adequate defense upon the merits." *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 424 (1915); *Fuentes*, 407 U.S. at 87 ("The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing."). "[J]udicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords every party against whom a claim is stated." *Nelson*, 529 U.S. at 471.

### D. Cases with a Mix of Un-Served, Late-Served, and Served Landowners

Four cases have a mix of un-served, late-served, and served Landowners.[6] In each of

---

[5]   In closing argument, ACP claimed that all that was before the Court was the question of immediate possession. That's incorrect, and if it was correct, then ACP would definitely not be entitled to immediate possession under *Sage*. As stated elsewhere, ACP must first establish its substantive right to the land.

[6]   In one such case—*5.49 Acres in Augusta (Wright)*, No. 5:18-cv-31—ACP represents that a stipulation of immediate access is pending. Nothing has yet been filed on the docket to that effect. Galen H. Campbell is un-served. Davis E. Campbell and Stacy Bridge are late-served.

these cases, the Court will enter summary judgment against the served Landowner(s), but defer a ruling on summary judgment as to the remaining Landowners and on the preliminary injunction motion for immediate access. Once service has been accomplished, proof thereof filed, and an adequate time to respond has passed for all Landowners in a given case, ACP may request a ruling in that case by filing a notice to that effect.

In *4.86 Acres in Buckingham (Osborne)*, No. 6:18-cv-16, Vivian Funn and the Unknown Heirs of Burla M. Osborne are un-served, and George Richmond Fles, Jr. is late-served. Vernon Funn was served on February 7, 2018, so summary judgment will be entered as to him only.

In *5.07 Acres in Cumberland (Wiley)*, No. 6:18-cv-19, David L. Wiley, Esther Wiley Price, Otis Wiley, Raymond Wiley, Novey Wilbert Wiley, Shirley Wiley Jones, Gregory P. Moore, Sr., and Yolanda L. Moore were served, making summary judgment appropriate against them. Miles D. Moore is late-served. The Unknown Heirs of Willie Goode, Jr. are un-served. Lastly, Andre' Wiley is un-served, and the Court will grant ACP's motion for service by the U.S. Marshal as to him, on the ground that he resides on a military facility to which access is restricted. ACP must pay the Marshal's fees.

In *2.66 Acres in Cumberland (Wiley)*, No. 6:18-cv-7, Esther Wiley Price, Otis Wiley, Raymond Wiley, Novey Wilbert Wiley, Shirley Wiley Jones, Gregory P. Moore, Sr., and the Unknown Heirs of Willie Goode, Jr. (by publication) have been served. David L. Wiley, Miles D. Moore, and Yoland L. Moore are late-served. Andre' Wiley is un-served, and the Court will grant ACP's motion for service by the U.S. Marshal as to him, on the ground that he resides on a military facility to which access is restricted. ACP must pay the Marshal's fees.

---

The remaining Landowners have been served. Given the circumstances of this case, the Court will defer a ruling on all motions. ACP is free to request a ruling as to the served Landowners if it cannot reach a stipulation of access.

### E. Cases with (Asserted) Late-Served and Served Landowners

Two cases have served Landowners and purportedly late-served Landowners. Consistent with other cases, the Court will enter summary judgment against the served Landowner(s), but defer a ruling on summary judgment as to the remaining Landowners and on the preliminary injunction motion for immediate access.

In *1.4 Acres in Cumberland (Price)*, No. 6:17-cv-92, Craig Williams, Sara Watkins, Schwann T. Watkins, and Carl W. Watkins were served. ACP represents to the Court that Nakia A. Slowe, Nathan A. Slowe, and Rodney Edwards Watkins, Jr. were served by publication on February 23, 2018. However, the docket does not reflect the required certificate and documentation to establish this. *See* Fed. R. Civ. P. 71.1(d)(3)(B); dkts. 9, 13. Regardless of whether these Landowners are un-served or late-served, the Court will not enter summary judgment against them at this time.

In *1.72 Acres in Augusta (Guerrier)*, No. 5:18-cv-35, Steven W. Guerrier was served. Nancy L. Guerrier, however, was late-served on February 23, 2018, just two days before the hearing. A ruling as to her is deferred. If Nancy Guerrier does not file a response or otherwise appear by March 9, 2018, ACP may file a notice with the Court asking for a ruling as to her and as to the immediate possession motion.

## II. MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This determination is based on the totality of the evidence. *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013) (citing Fed. R. Civ. P. 56). A

genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a genuine issue of material fact exists, a party may not rest upon his own mere allegations or denials. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rather, the party must "proffer[] sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). To this end, a district court has an "affirmative obligation . . . to prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

### B.   Analysis

Under the Natural Gas Act, 15 U.S.C. § 717f(h):

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line . . . , it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located . . . .

15 U.S.C. § 717f. ACP is an interstate natural gas company, as defined under 15 U.S.C. § 717a(6), and holds a certificate of public convenience and necessity from the Federal Energy Regulatory Commission ("FERC") to construct the Atlantic Coast Pipeline through parts of West Virginia, Virginia, and North Carolina. *See* 161 FERC ¶ 61,042, Docket Number CP15-554-000, *et al.*, (Oct. 13, 2017) ("FERC Order").

"[A] plaintiff must satisfy three requirements to exercise eminent domain under § 717f(h): (1) it holds a valid FERC certificate; (2) the easements it seeks are necessary; and (3) it has been unable to acquire easements by agreement." *Mtn. Valley Pipeline, LLC v. Easements to Construct, Operate, & Maintain a Nat. Gas Pipeline Over Tracts of Land*, No. 7:17-CV-

00492, 2018 WL 648376, at *8 (W.D. Va. Jan. 31, 2018) (hereinafter "*MVP*") (citing *Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline*, No. 3:07-cv-28, 2007 WL 2220530, at *3 (W.D. Va. July 31, 2007)). For those Landowners who have not received service or sufficient advanced notice, ACP's motion for partial summary judgment will be deferred. *See supra* Section I. For the remaining Landowners, ACP has met the requirements set forth above and its motions for partial summary judgment will be granted.

### 1. ACP holds a valid FERC certificate of convenience and public necessity

First, ACP must show that "it is a holder of a certificate of public convenience and necessity." *Transcon. Gas Pipe Line Co. LLC v. Permanent easement totaling 2.322 acres*, No. 3:14-CV-00400-HEH, 2014 WL 4365476, at *4 (E.D. Va. Sept. 2, 2014); *see also MVP*, 2018 WL 648376, at *8. It is undisputed that on October 13, 2017, a FERC certificate of public convenience and necessity was issued to ACP, granting its application and bestowing upon ACP "the requested authorizations, subject to conditions." FERC Order at 3.

The fact that a FERC certificate is subject to conditions does not preclude summary judgment. *MVP*, 2018 WL 648376, at *10 (collecting cases). While there are a variety of conditions placed on ACP (*e.g.,* obtaining permits, conducting environmental studies or mitigation evaluations, *etc.*), none of them limit ACP's eminent domain authority. *See Mid Atl. Express, LLC v. Baltimore Cty., Md.*, 410 F. App'x 653, 657 (4th Cir. 2011) (reversing district court when FERC order *did* condition plaintiff's authority to condemn). Further, "a challenger may not collaterally attack the validity of a prior FERC order in a subsequent proceeding. Moreover, the prohibition on collateral attacks applies whether the collateral action is brought in state court . . . or federal court." *Williams Nat. Gas Co. v. City of Okl. City*, 890 F.2d 255, 262

(10th Cir. 1989) (citations omitted); *see also Cty. of Jackson v. Duke Energy Carolinas, LLC*, 670 F. Supp. 2d 442, 453 (W.D.N.C. 2009).

Some Landowners contend that several legal challenges to ACP's eminent domain authority give the Court a reason to stay its hand. *See, e.g.*, *Appalachian Voices, et al. v. Va. State Water Control Bd., et al.*, Case No. 18-1077 (4th Cir. filed Jan. 18, 2018); *Bold Alliance, et al. v. Fed. Energy Regulatory Comm'n, et al.*, Case No. 1:17cv1822 (D.D.C. filed Sept. 5, 2017). This argument is mistaken. "The filing of an application for rehearing [to FERC] . . . *shall not*, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings [in the proper Court of Appeals] *shall not*, unless specifically ordered by the court, operate as a stay of the Commission's order." 15 U.S.C. § 717r(c) (emphasis added). Only FERC or the appropriate U.S. Court of Appeals can stay the FERC Order. Here, no such stay has been issued, and the validity of the FERC certificate is not in peril.

Therefore, ACP has met its burden as to the first element.

## 2. The easements are necessary

Second, ACP must show that "the property to be condemned is necessary for the construction, operation, and maintenance of the" Atlantic Coast Pipeline. *Transcon. Gas Pipe Line Co.*, 2014 WL 4365476, at *4 (E.D. Va. Sept. 2, 2014); *see also MVP*, 2018 WL 648376, at *8. Simply looking to the FERC certificate itself is sufficient to determine that the easements are necessary. *Columbia Gas Transmission Corp.*, 2007 WL 2220530, at *3; *Mountain Valley Pipeline*, 2018 WL 648376, *12. ACP has also provided in each case a declaration from its Project Manager, stating that each respective parcel is required for the project. (*See* Project Manager Decl. ¶¶ 10, 22). Ultimately, no Landowner has offered any evidence raising a genuine

dispute as to the necessity of their respective easements.

Some Landowners argue that ACP continues to change the pipeline's route on their land. Yet the landowners provide no affidavit, testimony, or other evidence setting forth such a contention for their specific property.[7] To be clear, to the extent this Court grants ACP immediate possession to the Landowners' properties, such possession is limited only to the FERC approved route. ACP's possession of land outside what has been deemed necessary by FERC, as noted in the approved plats, would be *ultra vires*.

At the February 26, 2018 hearing, the Landowners in *4.95 Acres in Buckingham (Laikin)*, No. 6:18-cv-00012, argued that ACP has previously negotiated with the Landowners for more property rights than were necessary (*i.e.*, sought to purchase additional access for ingress and egress on the land and did not specify the width of the pipeline).[8] Here, however, ACP has stated that it "seeks to condemn property only within this approved route and seeks no more rights than those authorized by FERC." No. 6:18-cv-00012, (Dkt. 26 at ECF 4). Additionally, the final offer letters provided by ACP show that they sought to purchase the necessary easements in accordance with the FERC approved route. (*See* Pl. Ex. 6). Thus, the landowner's argument is without merit.

Therefore, ACP has met its burden as to the second element.

---

[7]     Indeed, ACP readily admits that: "Atlantic incorporated 201 route variations into its proposed route to accommodate landowner requests and to avoid sensitive resources. *Those variations preceded, and were approved by the issuance of the FERC Certificate.*" *See 19.76 Acres in Buckingham*, No. 6:17-cv-00085, (Dkt. 26 at ECF 7 (citations omitted) (emphasis added)).

[8]     It is worth noting that, in many cases, negotiations regarding these easements spanned several years, pre-dating the final approval and specification issued by FERC. (*See* Pl. Ex. 3). In Laikin's case, the Easement Agreement at issue was from 2015—two years before the pipeline project was even approved. *Id.* Notwithstanding the gap in time, what is pertinent for the purposes of this analysis is that ACP seeks only the easement approved by FERC.

### 3. ACP has been unable to acquire the land by agreement

Third, and lastly, ACP must show that "it has been unable to acquire the necessary property interest from the owner" by agreement. *Transcon. Gas Pipe Line Co.*, 2014 WL 4365476, at *4 (E.D. Va. Sept. 2, 2014); *see also Mountain Valley Pipeline*, No. 7:17-CV-00492, 2018 WL 648376, at *8. ACP provided an affidavit from its Land Manager in each case that states ACP has been unable to reach an agreement with the landowners for the easements. Further, ACP has provided to the Court final offer letters for each parcel at issue. (*See* Pl. Ex. 6). These final offer letters contained ACP's determined "market value" for the property, ACP's final offer amount for the land, and the FERC approved plat. *Id.* No landowner has disputed the receipt of such letter or that negotiations have taken place.[9]

The Court finds that "good faith" negotiations are not required by statute or rule to satisfy this element under the Natural Gas Act. *See MVP*, 2018 WL 648376, at *9 ("Although [the pipeline] has not cited to a case from the Fourth Circuit rejecting a 'good faith' requirement, the overwhelming lower court authority does, and there is no firm basis for it in the statute."); *see also Hardy Storage Co., LLC v. Prop. Interests Necessary to Conduct Gas Storage Operations in Oriskany Sandstone Subterranean Geological Formation Beneath*, No. CIV. A. 2:07CV5, 2009

---

[9]  Landowners in *4.95 Acres in Buckingham (Laikin)*, No. 6:18-cv-00012, argued at the hearing that they did not receive a true offer for the easement in question—only one final offer letter in 2017 that included a general offer and a copy of the FERC approved plat. (*See* Pl. Ex. 6). Contrary to his contention, prior to filing its Complaint, ACP made a final offer to Mr. Laikin, almost four times ACP's alleged "market value" for the easement, and included a plat containing all the vital information regarding the easement—*e.g.*, the location of the pipeline (including latitudinal and longitudinal coordinates); the pipeline's width (42"); the measurements, in square feet, of both the permanent and temporary easements; and the boundaries of the parcel). *Id.* The plat filed in the instant condemnation proceedings for the Laikin property is the exact same plat accompanying the final offer letter. (*Compare* Pl. Ex. 6 *with* Dkt. 1-4). The argument that no offer for the easement sought in these proceedings is hence without merit.

WL 689054, at *5 (N.D.W. Va. Mar. 9, 2009); *Sabal Trail Transmission, LLC v. Estate*, No. 4:16-CV-102, 2016 WL 3248367, at *4 (M.D. Ga. June 10, 2016); *E. Tenn. Nat. Gas, LLC v. 1.28 Acres in Smyth Cty., Va.*, No. CIV.A. 1:06-CV-00022, 2006 WL 1133874, at *10 (W.D. Va. Apr. 26, 2006). *But see Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 550 F.3d 770, 777 (9th Cir. 2008) (citing *Nat'l Fuel Gas Supply Corp. v. 138 Acres of Land in Vill. of Springville*, 84 F. Supp. 2d 405, 416 (W.D.N.Y. 2000).[10] Even if "good faith" negotiations were required, which I believe they are not, ACP has attempted to negotiate an agreement with the landowners, in many cases, for several years making offers that exceed what it believes to be "market value" for the easements. (*See* Pl. Ex. 6; *see generally* Land Manager's Decl.). Plainly stated, evidence before the Court satisfies the supposed "good-faith" requirement.

Accordingly, the third element is satisfied.

### 4. Granting immediate possession does not violate the separation of powers

Several Landowners dedicated significant briefing to the argument that the constitutional separation of powers restrains the Court from granting ACP's motions seeking partial summary judgment and immediate position. This argument relies on the following propositions: (1) the power to authorize the exercise of eminent domain rests with the legislature; (2) Congress can only authorize the power of quick-take condemnation via statute; (3) quick-take power has not been granted to private companies (only governmental entities); and (4) without such authorization by Congress, private companies should not be permitted to exercise quick-take power via the Federal Rules of Civil Procedure (*i.e.*, Rule 65). This argument in effect asks the

---

[10]     The outlier cases imposing a "good faith" requirement all trace back to *Transcon. Gas Pipe Line Corp. v. 118 Acres of Land*, 745 F. Supp. 366, 369 (E.D. La. 1990). In *Trascon*, the district court stated that federal law required "good faith" negotiations, but then cited exclusively Louisiana law in support. Taken together with the wealth of recent case law to the contrary, the Court does not find a "good faith" requirement exists.

Court to ignore *Sage*, a binding Fourth Circuit authority.

The crux of this argument is that the Fourth Circuit in *Sage* gave non-governmental plaintiffs quick-take condemnation power in usurpation of Congress's unique role, violating the separation of powers doctrine. That is incorrect. *Sage* was not a quick-take case. It was well aware of the distinction between traditional condemnation under Federal Rule of Civil Procedure 71.1 (like in these cases) and quick-take authority conferred by congressional statute. Indeed, the Fourth Circuit plainly stated: "The Natural Gas Act, like most statutes giving condemnation authority to government officials or private concerns, contains no provision for quick-take or immediate possession." *Sage*, 361 F.3d at 822.[11] The court then went on to address the argument now raised by the Landowners, albeit without using the words "separation of powers":

> The landowners argue that Congress does not intend for gas companies to gain immediate possession because it has not granted statutory quick-take power to gas companies as it has to government officers who condemn property in the name of the United States. *This argument overlooks the preliminary injunction remedy provided in the Federal Rules of Civil Procedure that were adopted with the tacit approval of Congress.*

*Sage*, 361 F.3d at 824 (emphasis added). Moreover, the Fourth Circuit has recently and explicitly rejected the Landowners' separation of powers argument, stating:

> [T]he Landowners' cross-appeal is meritless because *Sage*, as a published opinion, is binding on this panel. The Landowners argue that *Sage* is distinguishable because it did not mention the words "separation of powers." However, we stated that "the Constitution does not prevent a condemnor from taking possession of property before just compensation is determined and paid." *Sage*, 361 F.3d at 824. In addition, we rejected the *Sage* landowners' argument "that only Congress can grant the right of immediate possession." *Id.* . . . [W]e

---

[11]    The Court further noted:

> Thus, the specific question raised before the district court, and now presented on appeal, is whether a court may use its equitable powers to grant a preliminary injunction allowing immediate possession when there is no provision for that relief in the NGA or Rule [71.1].

*Sage*, 361 F.3d at 823.

are bound to follow this Court's published opinions, *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016).

*Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford Ctys., Md.*, 701 F. App'x 221, 231 n.7 (4th Cir. 2017).

Although the Landowners have identified one case supporting their position, *Transwestern Pipeline Co., LLC v. 9.32 Acres*, 544 F. Supp. 2d 939, 948-49 (D. Ariz. 2008) *aff'd sub nom. Transwestern Pipeline Co. v. 17.19 Acres*, 550 F.3d 770 (9th Cir. 2008), this Court must adhere to Fourth Circuit precedent. Summary judgment will be entered against all Landowners in these cases with adequate notice and opportunity to be heard.

## III.     PRELIMINARY INJUNCTION

ACP moved for immediate possession of the parcels pursuant to Federal Rule of Civil Procedure 65 and the Fourth Circuit's decision in *Sage*. Following *Sage*, the Court will grant ACP immediate possession because it has satisfied the standard for injunctive relief. Although the Court considers each of the *Winter* factors, the Court finds it particularly important that ACP will suffer irreparable harm if it does not receive access to the properties to cut trees before March 15, 2018.

### A.     Legal Standard

"[O]nce a district court determines that a gas company has the substantive right to condemn property under the NGA, the court may exercise equitable power to grant the remedy of immediate possession through the issuance of a preliminary injunction." *Sage*, 361 F.3d at 828. Although a specific rule of civil procedure in federal courts governs condemnation actions, *see* Fed. R. Civ. P. 71.1, the remainder of the federal rules apply "except as [Rule 71.1] provides otherwise," *see* Fed. R. Civ. P. 71.1(a). Because Rule 71.1 is silent with respect to preliminary injunctive relief, Rule 65 applies. *See Sage*, 361 F.3d at 822-24. To obtain a preliminary

injunction under Rule 65, a movant must show: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008).[12]  Each of these four requirements must be satisfied. *Id.*  Finally, when dealing with a mandatory injunction, rather than a prohibitory one, the Court applies a heightened, and "even more searching," standard of review. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013).

**B.      Analysis**

Injunctive relief must always be tailored to the particular interests at stake.  *Winter*, 555 U.S. at 32.  Here, ACP seeks immediate possession of the properties so that it may begin cutting trees before a March 15, 2018 deadline that has been negotiated with the United States Fish and Wildlife Service and the Virginia Department of Game and Inland Fisheries.  I address each of the *Winter* factors *seriatim* and conclude that ACP is entitled to immediate possession of the properties so that it can meet this deadline.

**1.      Likelihood of success on the merits**

As discussed in Section Two, ACP will succeed on the merits of its motions for partial summary judgment in those cases where it has provided landowners with sufficient notice.  By granting partial summary judgment, this Court has given ACP "an interest in the landowners' property," and these substantive rights can "be protected in equity."  *Sage*, 361 F.3d at 828.

---

[12]      I note that *Sage* was decided under a different, and now overruled, preliminary injunction standard.  *See* 361 F.3d at 820 (relying on *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig*, 550 F.2d 189 (4th Cir.1977)).  However, *Sage* still supports the general proposition that injunctive relief, under the appropriate standard, can be used alongside Rule 71.1 in condemnation proceedings even where Congress has not granted "quick-take" authority.  *See supra* Section II.  Despite the Landowners' arguments that *Sage* was wrongly decided, this Court is bound by that precedent.

Ongoing appeals or petitions for rehearing do not undermine this interest. *See, e.g., In re Algonquin Nat. Gas Pipeline Eminent Domain Cases*, No. 15-CV-5076, 2015 WL 10793423, at *7 (S.D.N.Y. Sept. 18, 2015) ("[V]arious interested parties have filed Requests for Rehearing with FERC but, absent a stay by FERC, those Requests for Rehearing neither prohibit these proceedings from going forward nor affect Algonquin's substantive right to condemn or the need for immediate possession."). Accordingly, the first *Winter* factor, whether ACP is "likely to succeed on the merits," 555 U.S. at 20, strongly favors ACP. *See Sage*, 361 F.3d at 829–30 ("[The pipeline] has a determination on the merits that it has a right to condemn the landowners' property . . . . Success on the merits for [the pipeline] is therefore apparent.").

### 2. Likelihood of irreparable harm in the absence of preliminary relief

The crux of the parties' disagreement concerns whether ACP will suffer irreparable harm in the absence of immediate access. The Court finds that ACP it "is likely to suffer irreparable harm in the absence of preliminary relief," and so this *Winter* factor also cuts in ACP's favor. *Winter*, 555 U.S. at 20.

ACP's main evidence of its irreparable harm was produced through the testimony of Brian Wright, the project director for ACP. He testified about four categories of economic harm that ACP is likely to incur if it does not have the ability to cut down the trees by March 14, 2018. The Landowners raise a threshold question of whether these financial harms to ACP can even be considered to be "irreparable." The Landowners argue that they cannot, because they are purely monetary. The Court considers this question before moving on to ACP's categories of economic harm.

"A [party seeking an injunction] must overcome the presumption that a preliminary injunction will not issue when the harm suffered *can be remedied by money damages at the time*

*of judgment.*" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (emphasis added).

Contrary to the Landowners' arguments and loose language throughout some of the caselaw, this language does not mean that a harm cannot be irreparable purely because it is monetary.[13] The real focus must be on whether any monetary loss will ever be remedied. *C.f. id.* ("*The possibility that adequate compensatory or other corrective relief will be available at a later date . . .* weighs heavily against a claim of irreparable harm." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))).

In cases where one party either will or will not recover against the other, like the contract dispute in *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691 (4th Cir. 1994), this presumption against injunctions to prevent monetary harm is at its strongest. *See id.* at 694 ("Monetary relief typically may be granted as easily at judgment as at a preliminary injunction hearing, and a party does not normally suffer irreparable harm simply because it has to win a final judgment on the merits to obtain monetary relief."). Contrast that with this case, where ACP will not be able to recover the economic harm it will incur at final judgment. *See Sampson*, 415 U.S. at 90 ("[I]t seems clear that the temporary loss of income, *ultimately to be recovered*, does not usually constitute irreparable injury." (emphasis added)). The Landowners, of course, cannot be held liable for these costs at the end of the suit; they have no duty to the pipeline arising out of tort, contract, or any other source of law. Accordingly, although monetary, the harms to ACP are "[i]ncapable of being rectified, restored, remedied, cured, regained, or repaired." Black's Law Dictionary (10th ed. 2014). In short, the Court finds that

---

[13]     Many of the cases discussing the principle are ultimately rooted in the D.C. Circuit's opinion in *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958). This influential opinion was discussed by the Supreme Court in *Sampson v. Murray*, 415 U.S. 61 (1974), and from there its analysis and language grew into caselaw around the country and in the Fourth Circuit. *Di Biase*, 872 F.3d at 230. This case is entirely consistent with the analysis that follows.

they qualify as "irreparable."  *See Mountain Valley Pipeline, LLC*, 2018 WL 648376, at \*16 (collecting cases considering financial harm).

I now address the four categories of economic harm focused on by Wright.  The first would arise if ACP is required to "skip" a property.  Wright testified that it is safest and most efficient for ACP to build a pipeline in a linear fashion.  *See also* Pl. Ex. 3.  ACP has various crews that each have different tasks (*i.e.,* "the survey crew," "the clearing crew," "the grading crew," *etc.*).  *Id.* at 2.  These crews follow each other along the pipeline in a sequential order. Wright testified that ACP has acquired approximately 80% of the properties along the route.  It plans to begin this linear construction in May 2018.

However, Wright also testified that ACP has reached a state-wide agreement with the U.S. Fish and Wildlife Service and the Virginia Department of Game and Inland Fisheries that ACP will not cut down any trees in Virginia from March 15, 2018 until November 15, 2018. Wright testified that the agreement prevents tree-cutting in all of the properties in the state, regardless of the birds present on any specific piece of property.  This agreement is referred to as the *Migratory Bird Plan*, and was designed "to avoid, minimize, and mitigate potential impacts on migratory birds."  *See* Def. Ex. 3 at 2.  FERC required a plan of this sort.  FERC Order, ¶ 242, Appx. A ¶ 19.  All of the properties in these matters have at least some trees that ACP would need to clear, *see* Pl. Exs. 10, and so ACP would not be able to engage in construction on these properties if the trees remain after March 14, 2018.[14]

Without injunctive relief allowing it to cut the trees before March 14, ACP would be required to "skip" these properties.  Wright testified that a "skip" involves going around a

---

[14]     Landowners argue that this March 14, 2018 requirement is only a recommendation, and so the date is not a true deadline.  But ACP was required by FERC to create one of these plans. Having done so, they are required to follow their obligations to the Fish and Wildlife Service and the Virginia Department of Game and Inland Fisheries.

property that has remaining trees. It involves disassembling the pipeline machinery, loading it onto trailers, backtracking to the nearest access road, driving around to the other side, reassembling the machinery, and then continuing. Each of the crews has to do this. These "skips" are obviously inefficient; significant time is spent driving and reassembling the machinery. The separation and joining of large machinery can also lead to worker injuries. Finally, they are also very expensive. Wright testified that ACP would be charged contractual damages of approximately $1.4 million from its contractor for each of these "skips."

The Landowners argued that ACP is unlikely to pay this fee because of a force majeure clause in its agreement with its contractor. *See* Def. Ex. 2. The agreement potentially excuses performance when various "Force Majeure" events, including "court orders or injunctions," occur. *Id.* The Court finds that this clause of the agreement would not apply to the "skips" at issue here. A court's refusal to enter an order or injunction expediting ACP's construction is fundamentally different from a court issuing an order or injunction stopping ACP from proceeding. This contractual clause concerns the latter and not the former. Accordingly, ACP would not be able to use to clause to avoid the contractual damages it stipulated to elsewhere.

In contrast, ACP established injuries it would incur from a "skip" through Wright's testimony about the efficiency, safety, and financial harms that would occur if the injunction is not granted. Similar damages arising from the inability to engage in sequential construction were contemplated in the *Sage* court's irreparable harm analysis. 361 F.3d at 829. And even if it was able to get out of the $1.4 million of contractual damages, the "skips" would slow down construction. Accordingly, the first category of harm discussed by Wright independently demonstrates that ACP will be irreparably harmed if it is unable to access these properties to cut down the trees before March 14, 2018.

Wright's second, third, and fourth categories of economic harm are related to the first. Wright's second category encompasses the costs of going back and finishing the skipped properties out of sequence. Wright, in conjunction with ACP, estimated that cost to be roughly $2 million per mile. This cost consisted of the overhead costs for the contractor and ACP, extra costs related to constructing the pipeline during the winter, and financing costs related to the extension of the project. Wright was unable to detail what portions of this $2 million lump sum corresponded to which of these components. Preliminary injunction hearings are "often conducted under pressured time constraints, on limited evidence and expedited briefing schedules," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003), and so the Court understands that the parties did not have the opportunity to gather the detailed evidence one would expect at a trial. Still, this testimony was too vague and speculative for the Court to rely too deeply on the $2 million number itself.

But the general point made by Wright here is obviously true: ACP will incur costs by having to return to properties that were skipped. And these returns will be more costly than linear construction. In particular, if ACP is unable to fell these trees until November 2018, it will be forced to do large parts of the construction during the winter months. Other courts have considered the impact of pushing construction into the winter months in their irreparable harm analysis. *See, e.g., Columbia Gas Transmission, LLC v. 252.071 Acres More or Less*, No. CV ELH-15-3462, 2016 WL 1248670, at *1 (D. Md. Mar. 25, 2016) (citing weather as a basis for irreparable harm). Whether the monetary value of these and related costs end up being exactly $2 million or not is not determinative, ACP has demonstrated a concrete economic harm that it would suffer if the Court did not grant it injunctive relief.

Wright's third category of economic harm is an estimate of the damages that would arise from a delay of the in-service date of the pipeline. This is the date when ACP anticipates that it will be able to begin shipping gas to consumers. Wright testified that ACP currently has shipment contracts to provide customers with gas, and ACP will lose money each month that it is not shipping gas to these customers. Wright estimates that ACP would lose $70 million per month of delay. Wright testified that this amount consisted of overhead and interest on the pipeline's financing, but was unable to provide a more specific breakdown. Accordingly, I will not give much weight to the specific number put forward by Wright, although there is again no dispute that ACP will generally suffer this category of harm if it is delayed. *See Sage,* 361 F.3d at 829 (recognizing an analogous harm). And so I consider this irreparable harm, even without clarity on the exact magnitude of the harm.

The fourth and final category of economic harm also relates to ACP's agreement with its contractor. Wright testified that this agreement contains a clause that requires ACP to pay its contractor a pro-rated portion of $40 million for segments along the pipeline that remain "unfinished" on April 1, 2018. ACP did not provide further evidence of what was required to be "finished" by this date, construction itself is not scheduled to start until May 2018 and will not have begun by this point. Additionally, ACP never entered the underlying contract into evidence. Accordingly, the Court does not give Wright's testimony about this further contractual cost any weight.

Having addressed ACP's arguments in favor of irreparable harm, I now briefly address a few counterarguments raised by the Landowners. First, the Landowners argue that ACP will be able to meet the FERC deadline without injunctive relief. This is at least potentially true— Wright testified that ACP could complete that pipeline in twenty-four months, and so ACP could

theoretically complete the pipeline by the end of 2020 by waiting for the tree-felling window to reopen in November 2018 *if* no further delays arise. But there are a few important responses. First, injunctive relief would be required at some point—there are many trials on valuation before the Court and they are likely to be scheduled throughout the coming years. Waiting until all of them have finished almost certainly would push ACP beyond the FERC deadline. *Mountain Valley Pipeline*, 2018 WL 648376, at *16 ("[I]n other condemnation cases involving large numbers of properties, the proceedings can take more than three years to complete."). Second, ACP will suffer real harms because of the delay, even if they fall short of total failure of the project. As discussed above, these harms can be irreparable even though they're monetary. And third, ACP's desire for some cushion in its schedule is necessary. It is impossible *ex ante* for ACP, or this Court, to know what possible issues may arise during the midst of construction. But issues will arise, whether they comes from the weather, problems with machinery, or any of multiple other sources. And failing to budget time for any margin would almost certainly lead ACP to miss the FERC deadline. Indeed, the eight-month delay that would result in ACP losing the most productive construction time of the year. The Court will not undue ACP's planned schedule now.

The Landowners' second argument is that ACP has no employees and so cannot demonstrate that it, instead of Dominion Energy or other related entities, will suffer injury. However, ACP has demonstrated, both through its contractual damages and more general responsibility for the project, that it stands to be harmed as an entity. While I am again sympathetic to the abbreviated briefing and discovery schedule, the Landowners have not pointed to any law about the relevance of ACP's lack of employees. And its relationship to its parent company is largely irrelevant to this inquiry; only ACP is before the Court. *Mountain*

*Valley Pipeline, LLC*, 2018 WL 648376, at *16 ("[T]he court will not consider arguments about corporate structure when evaluating the issue of harm."); *id.* at *16 n.20 (noting that the FERC certificate rejected similar arguments).

The third argument is unique to the Landowners of the Wilderness property. *27.85 Acres in Bath (The Wilderness LLC)*, No. 5:18-cv-32. Robert Koontz, a resident and owner of the property, testified at the hearing. He spoke about the historic farm and property that he shares with his wife. The home on this property was established shortly after the Revolutionary War and the property contains forests that have never been timbered. The property was added to the National Register of Historic Places in August 2017. Def. Ex. 4. The Virginia Department of Historic Resources deemed the property a "Virginia Treasure" and added it to the "Virginia Landmarks Register." *Id.*

Because of this history, the property is specifically mentioned in the FERC certificate. FERC Order ¶ 267. The certificate states that "the property will continue to be considered as part of staff's ongoing consultations under the National Historic Preservation Act." *Id.* The National Historic Preservation Act "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation . . . to administer the Act." *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C.Cir.2003) (internal quotation marks omitted). The certificate also imposes the following pre-construction condition: "An assessment of effects and proposed mitigation for the historic property is required to be completed before project construction." FERC Order ¶ 267.

The Wilderness Landowners argue that ACP cannot establish irreparable harm because ACP has not finished satisfying its requirement under the FERC certificate. But this argument ultimately is simply a more detailed version of the same argument disposed of in Section Two of

this opinion. This is a pre-construction, not pre-eminent domain, condition. *Cf. Mid Atl. Express, LLC v. Baltimore Cty., Md.*, 410 F. App'x 653, 657 (4th Cir. 2011) ("Mid–Atlantic shall not exercise eminent domain authority . . . until . . . ."). Because of this, ACP must only satisfy this condition before it engages in construction, not before pre-construction tree felling. *MVP*, 2018 WL 648376, at *17 ("Cases that have addressed this argument, though, have repeatedly held that challenges to the FERC conditions or allegations that a pipeline has failed to satisfy them, or will fail to satisfy them, are not proper subjects for an NGA condemnation proceeding, even in the context of considering a preliminary injunction."); *see also* FERC Order App'x. A ¶ 62 (imposing condition "[p]rior to construction, but following tree clearing . . . ."). ACP can satisfy this condition in many ways, and many of those options do not require the pipeline's path to be moved. Mr. Wright testified that ACP both planned to build along the existing route and satisfy all pre-construction conditions. Ultimately, whether ACP has satisfied its requirements to FERC, and whether FERC has satisfied its requirements under the National Historic Preservation Act, are not questions that this Court is tasked with answering. ACP has demonstrated that it would be harmed by not cutting down the trees that are on its now-existing route before March 15 because failure to cut those trees will significantly delay construction.

More generally, the other Landowners argue that there is insufficient causation between the need for possession and the above harms because ACP may not meet its other pre-construction conditions. If it fails to meet those conditions, it will not be able to build the pipeline in any event. This argument fails for a factual reason and a legal reason. First, all of the evidence before the Court demonstrates that ACP *will* be able to meet those conditions. Wright testified that ACP expected to do so, and there was no evidence to contradict him on this point. Second, this argument has been routinely rejected by other courts. *Mountain Valley Pipeline,*

*LLC*, 2018 WL 648376, at \*17 ("Cases that have addressed this argument, though, have repeatedly held that challenges to the FERC conditions or allegations that a pipeline has failed to satisfy them, or will fail to satisfy them, are not proper subjects for an NGA condemnation proceeding, even in the context of considering a preliminary injunction."). Courts have rejected this argument because it inevitably leads to debates about whether pre-construction conditions have been met and collateral attacks on the order itself. These are issues for the Landowners to discuss with FERC, not this Court.

The Landowners have failed to undermine ACP's arguments in favor of immediate possession. This Court joins the many courts throughout this country that have held pipelines are irreparably harmed by being required to wait to access easements until after a trial on just compensation.

### 3. The Balance of Equities Tips in ACP's Favor

ACP must also demonstrate "that the balance of equities tips in [its] favor." *Winter,* 555 U.S. at 20. As discussed above, ACP has demonstrated that it would be irreparably harmed if injunctive relief was denied. But some of the Landowners have asserted competing interests. I address those now.

First, the Wilderness Landowners have raised the specter that there are ongoing archaeological digs on their property. But even with the loosened evidentiary rules that govern this proceeding, *Heideman*, 348 F.3d at 1188, their evidence was insufficiently authenticated to be probative. Mr. Koontz testified that he received one page of a multi-page document that stated that some unknown people found artifacts on the Wilderness property. He also testified that he attempted to verify these reports, but was unable to find the artifacts. He also discussed the existence of ongoing "Phase II" archaeological digs. Again, the Court is sympathetic to the

hurried nature of these proceedings, and the interests at stake to these landowners, but there was insufficient description of when these studies were going to happen and what exactly they are. The Court has no evidence to distinguish "Phase II" studies from any other sort of study: it could mean anything. The little that Mr. Koontz did say about them was that they were not yet scheduled and would take a long time. Accordingly, while the Court respects Mr. Koontz's testimony, it was not specific enough to counterbalance the needs established by ACP.

Second, Ms. Irene Ellis testified about the cattle farming on her property. *19.76 Acres in Buckingham (Ellis)*, No. 6:17-cv-85. While some of the injuries she described were focused on the route, others were directly related to the timing of entry. As she stated during ACP's cross-examination, she would like more time to put up fencing around the area that the pipeline will traverse so that her cattle will not wonder into the excavation. However, construction will not begin until May 2018, or April at the earliest, and so Ms. Ellis should have time to erect a fence. Admittedly, doing so may be costly, but she will be appropriately compensated. Her concerns about the diminution of value to her property will also be addressed through the posting of a bond, and eventually through the trial on fair compensation. In sum, Ms. Ellis raised interests that do implicate the timing of ACP's access, but I find both that she will be able to mitigate the effects of ACP's immediate access and that ACP's need to begin construction on time outweighs her interests.

These harms, and the harms the unrepresented Landowners will face, are real. However, the Court is confident that they will be at least partially "blunted by [the landowners'] right to draw down the money" posted by ACP. *Sage*, 361 F.3d at 829. The Landowners' harms must be balanced with the equally real harms that ACP will face if its construction is delayed. I find the balance of the equities tips in ACP's favor.

### 4.    An injunction is in the public interest

Finally, ACP must demonstrate "that an injunction is in the public interest." *Winter,* 555 U.S. at 20. "Congress passed the Natural Gas Act and gave gas companies condemnation power to ensure that consumers would have access to an adequate supply of natural gas at reasonable prices." *Sage*, 361 F.3d at 830. FERC utilized that power in deciding to allow construction of the pipeline to proceed. FERC Order ¶ 78 ("Thus, through this balancing process we make findings that support our ultimate conclusion that the public interest is served by the construction of the proposed project."). In doing so, it weighed whether the public's interest in more natural gas with the various costs associated with the pipeline. The political branches, and their delegees, are specifically equipped to make these sorts of determinations. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 735 (2010) ("[A]s a matter of custom and practice, these are matters for the political branches—the legislature and the executive—not the courts."). And, more specifically, "[t]he NGA does not allow landowners to collaterally attack the FERC certificate in the district court, it only allows enforcement of its provisions." *Transwestern Pipeline Co. v. 17.19 Acres*, 550 F.3d 770, 778 n.9 (9th Cir. 2008). The Court must give great weight FERC's determination that the pipeline is in the public interest.

The Wilderness Landowners argued that an injunction would harm the public interest in their unique property. The designations by the United States and Virginia both demonstrate that the Wilderness property is indeed a pubic treasure. Likewise, there is a public interest in preserving any artifacts that may be in the easement. But the FERC certificate clearly anticipated and considered these very interests possessed by the public. FERC Order ¶ 267. Likewise, other Landowners' more general concerns about whether this pipeline was in the

public interest were all considered by FERC. This Court may not second guess FERC's weighing of those interests.[15]

*     *     *     *

ACP prevails on each of the *Winter* prongs, so the Court will grant ACP immediate access to the properties. This Court "fully understand[s] that condemnation often forces landowners to part with land that they would prefer to keep for many reasons, including sentimental ones." *Sage*, 361 F.3d at 829. The Supreme Court has framed these losses "as part of the burden of common citizenship." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949). But as the evidence before the Court demonstrated, this burden can be heavy. While the Court cannot repay the Landowners for these personal associations with their property, a bond will be set and a fund will be established to allow the Landowners to be compensated, subject to a final determination of value after trial.

## IV.  SECURITY REQUIREMENTS

While the Constitution does not require compensation paid in advance of access to condemned property, "it does require that there be a process in place to give the owner 'reasonable, certain, and adequate provision for obtaining compensation before his occupancy is disturbed.'" *MVP*, 2018 WL 648376, at *19 (quoting *Cherokee Nation v. S. Kan. Ry. Co.*, 135 U.S. 641, 659 (1890)); *see Sage*, 361 F.3d at 824 (4th Cir. 2004). Rule 65(c) also requires that ACP, to receive an injunction, provide "security in an amount" necessary to pay a wrongfully enjoined non-movant. The burden of establishing appropriate assurances is on ACP. *MVP*, 2018 WL 648376, at *19–20. A cash deposit of the appraised value (or a multiple thereof) of the

---

[15]     Contrary to some Landowners' suggestions, the ongoing challenges to the FERC certificate do not provide any backdoor for this Court to begin reevaluating the merits. Unless one of those courts of appeals stays the FERC order, those challenges do not warrant a halt to these proceedings.

condemned interest, along with the posting of an injunction bond, typically suffices to protect a property owner. *MVP*, 2018 WL 648376, at *21 (citing *Sage*, 261 F. 3d at 824, 826).

Courts often do not require demanding proof for purposes of estimating the value on a property to be used for security. *See Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline Across Properties in Greene Cty.*, No. CIV. 3:07CV00028, 2007 WL 2220530, at *4 (W.D. Va. July 31, 2007) ("Plaintiff is hereby ordered to post a bond in the amount of its estimate of just compensation that will be due Defendants."); *Columbia Gas Transmission Corp. v. Burke*, 768 F. Supp. 1167, 1173 (N.D.W. Va. 1990) ("The Court requested at the end of [a] hearing that each party submit suggestions as to the bond in this case."); *Columbia Gas Transmission, LLC v. 252.071 Acres More or Less*, No. CV ELH-15- 3462, 2016 WL 1248670, at *18 (D. Md. Mar. 25, 2016) ("At the hearing, [Plaintiff] submitted [an Exhibit], which suggests [] amounts for a bond as to each property, to which no objections were lodged."). But where a party fails to establish a reliable estimate of value, the Court may deny immediate access or condition it upon production of sufficient proof. *MVP*, 2018 WL 648376, at *24–26 & n.30.

The evidence here is sufficient for the Court to reach a reasonable estimated value that will provide assurances, through a deposit and a bond, that just compensation to the Landowners will be paid.

At the hearing, in addition to submitting its final offer letters, ACP introduced appraisals for each parcel from 2017 and 2018—one before the FERC Order and one after. (Pl. Exs. 8 & 9). Three witness—David Amen, Corey Sell, and Wayne Horbath—testified as to the methodology of the appraisals. Sell and Horbath, qualified appraisal experts, testified as to their appraisals. They used a before-and-after methodology, considering the highest and best use of

the land. They viewed the properties from public right-of-ways; consulted alignment sheets, plats, satellite images of the properties, and the pipeline route; considered comparable properties; and performed background research through publically available sources. The resulting appraisals are thus sufficient for present purposes.

The one exception is the appraisal in *27.85 Acres in Bath (The Wilderness LLC)*, No. 5:18-cv-32. Corey Sell appraised that 1000-acre property, but his appraisal contains some shortcoming. As mentioned above, the Landowner, Robert Koontz, testified as to the unique historical and geographical features of the property. Koontz bought the land in 2002 for roughly $3 million, and it contains a historical home built by a Revolutionary War general. It has vast swaths of forest, two streams, beaver ponds, and several storage buildings. Many of the trees are hundreds of years old and, as discussed previously, the whole property has been designated a historic landmark.

Sell's assessment does not adequately account for the property's unique nature. On cross-examination, Sell testified that he was unaware of the property's historical designations and thus did not take them into account. Instead, he assumed the land was recreational and agricultural based on Google satellite images. Sell also does not have experience appraising historic properties. Finally, he stated it was his opinion that the existence of the pipeline on this historic property would not diminish its value *at all*. This conclusion is reflected in his 2017 and 2018 assessments, both of which stated that "damages to the remainder" of the land were "$0." (Pl. Ex. 8 at 4; Pl. Ex. 9 at 3). Given that the appraisal does not reflect any damage to the residue—which the Court feels is apparent and appears significant—Sell's appraisal of the Wilderness property falls short. Perhaps recognizing this, ACP offered five times the appraisal value, over $228,000. Out of an abundance of caution, the Court will set $300,000 as the deposit

amount for the Wilderness Property.  If either party objects to this determination by Friday, March 2nd, the Court will reconsider.  The Court will also set a bond at three times that amount, $900,000.

The Court applies the following formula in setting a deposit amount and bond.  As proposed by ACP, the deposit for a particular parcel will be the amount of ACP's final offer. The bond amount will be three times that amount.  ACP will be required to submit to the Clerk (1) a single aggregated deposit for the accessed parcels, and (2) a single aggregated bond.  By way of illustration, if ACP was granted immediate possession of two properties—one offered at $10,000 and another offered at $50,000—then the deposit would be $60,000 and the bond value would be $180,000.

## SUMMARY

The Court will enter an order effectuating the rulings in this opinion.  The order will also detail the process by which ACP should make a deposit and post a bond for the cases in which immediate access is granted.  ACP must complete this process before it can access the relevant parcels.  For cases with an un-served or late-served Landowner, the Court will defer a decision on both summary judgment and immediate access—except for served Landowners, against whom summary judgment (but not an injunction) will be granted.

Entered this ___28th___ day of February, 2018.

_Norman K Moon_
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE