# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

ATLANTIC COAST PIPELINE, LLC,

                *Plaintiff,*

    v.

0.07 ACRE, MORE OR LESS, IN NELSON COUNTY,
VIRGINIA, et al.,

                *Defendants.*

Case No. 3:18-cv-00006-NKM-JCH

---

**ATLANTIC COAST PIPELINE, LLC'S SUPPLEMENTAL EXPERT DISCLOSURE
PURSUANT TO RULE 26(e)(2)**

    Plaintiff Atlantic Coast Pipeline, LLC ("Atlantic"), by counsel and pursuant Federal Rules of Civil Procedure 26(e)(2), makes the following supplemental disclosure to Defendant Fenton Family Holdings, LLC ("Defendant").

    Atlantic has disclosed all retained/specially employed experts as defined under Rule 26(a)(2)(B). All experts may use or refer to exhibits at trial including, but not limited to, the pleadings and memoranda filed in this matter, documents produced in discovery, and deposition testimony. The opinions of each expert (retained or otherwise) are to a reasonable degree of professional certainty.

    The following supplemental disclosure is a general overview of the opinions of the disclosed expert and shall not serve as a limitation of that expert's testimony. The expert reserves the right to elaborate upon or modify the opinions stated pending review of any further depositions or trial testimony of parties or witnesses, documents produced in discovery by any party, and other information that might be provided. Atlantic reserves the right to call as an

expert witness any expert designated by any defendant in this matter, and to the extent these opinions are consistent with or support Atlantic's theories or the testimony or opinions of Atlantic's expert, these opinions are incorporated herein.

Atlantic discloses the following:

**William C. Harvey, II, CCIM, MAI**
William C. Harvey and Associates, Inc.
1146 Walker Road, Suite H
Great Falls, Virginia 22066-1838
(703) 759-6644 (office)
(703) 759-4112 (fax)

A report setting forth (i) all of Mr. Harvey's opinions and the basis and reasons for those opinions; (ii) the facts or data considered by Mr. Harvey in forming those opinions; (iii) any exhibits that will be used to summarize or support those opinions; (iv) Mr. Harvey's qualifications, including a list of all publications authorized in the previous 10 years, (v) a listing of cases from at least the past 4 years in which Mr. Harvey has testified as an expert at trial or by deposition; and (vi) a statement of Mr. Harvey's compensation to be paid for the study and testimony in this case is attached hereto as **Exhibit A**.

Mr. Harvey is expected to testify to the value of the easements at issue in this litigation and just compensation due to Defendants. A complete statement of Mr. Harvey's opinions and the bases and reasons for his opinions are set forth in the expert report attached hereto as **Exhibit A**. Mr. Harvey is expected to testify consistent with the appraisal report to a reasonable degree of his professional certainty.

In reaching his opinions, Mr. Harvey reviewed the documents, facts and data described and supplemented in the attached expert report and appraisal report attached to the expert report. Mr. Harvey's expert report and appraisal report identify and attach any exhibits that will be used to summarize his opinions. Mr. Harvey reserves the right to further supplement and/or amend

2

his opinions and any information contained within the attached expert report in accordance with the Federal Rules of Civil Procedure or the Court's Pretrial Order.

Dated:  April 17, 2019                    Respectfully submitted,


                                          ATLANTIC COAST PIPELINE LLC
                                          By Counsel

                                          /s/ Keith J. Minson
                                          Richard D. Holzheimer, Jr. (VSB No. 40803)
                                          M. Melissa Glassman (VSB No. 27526)
                                          John D. Wilburn (VSB No. 41141)
                                          N. Patrick Lee (VSB No. 78735)
                                          Brooks H. Spears (VSB No. 86391)
                                          James J. Holt (VSB No. 78601)
                                          Keith J. Minson (VSB No. 89417)
                                          McGUIREWOODS LLP
                                          1750 Tysons Boulevard, Suite 1800
                                          Tysons, VA  22102
                                          Phone: (703) 712-5000
                                          Fax: (703) 712-5050
                                          rholzheimer@mcguirewoods.com
                                          mglassman@mcguirewoods.com
                                          jwilburn@mcguirewoods.com
                                          plee@mcguirewoods.com
                                          bspears@mcguirewoods.com
                                          jholt@mcguirewoods.com
                                          kminson@mcguirewoods.com

                                          Godfrey T. Pinn, Jr. (VSB No. 43106)
                                          Franklin D. McFadden, Jr. (VSB No. 84187)
                                          HARRELL & CHAMBLISS LLP
                                          707 East Main Street, Suite 100
                                          Richmond, VA  23219
                                          Phone: (804) 643-8401
                                          Fax: (804) 648-2702
                                          gpinn@hclawfirm.com
                                          fmcfadden@hclawfirm.com

                                          *Counsel for Atlantic Coast Pipeline, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document

has been sent by first-class mail and electronic mail on this April 17, 2019:

Brian G. Kunze
Blake Alan Willis
Russell Gregory Terman
WALDO & LYLE, P.C.
301 West Freemason Street
Norfolk, VA 23510
Telephone: (757) 622-5812
Facsimile: (757) 622-5815
bgk@waldoandlyle.com
baw@waldoandlyle.com
rgt@waldoandlyle.com


*s/ Keith J. Minson*
Keith J. Minson

4

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 3:18-cv-00006 |
| ) | |
| FENTON FAMILY HOLDINGS, LLC, *et al.,* ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

## EXPERT REPORT:

CONCERNING 0.07 ACRE, MORE OR LESS, LOCATED ON
PARCEL IDENTIFICATION NO. 19-3-2A, NELSON COUNTY, VIRGINIA

## DATE OF THE REPORT:

ORIGINAL - SEPTEMBER 14, 2018

SUPPLEMENTAL - APRIL 17, 2019

## PREPARED BY:

WILLIAM C. HARVEY, II, CCIM, MAI
WILLIAM C. HARVEY AND ASSOCIATES, INC.
1146-H WALKER ROAD
GREAT FALLS, VIRGINIA 22066-1838

# TABLE OF CONTENTS

**Page**

Rule 26 Disclosures ........................................................................................................... 1

Intended Users of the Appraisal ........................................................................................ 5

Intended Use of the Appraisal ........................................................................................... 5

Interests Valued ................................................................................................................. 5

Purpose of the Assignment ................................................................................................ 5

Type and Definition of Value ............................................................................................ 6

Extraordinary Assumptions ............................................................................................... 6

Hypothetical Conditions .................................................................................................... 7

Jurisdictional Exceptions ................................................................................................... 7

General Assumptions and Limiting Conditions ................................................................. 7

Effective Date of Appraisal ............................................................................................... 9

Date of the Report .............................................................................................................. 9

Scope of Work ................................................................................................................... 10

Summary Description of the Real Estate Appraised .......................................................... 12

Highest and Best Use Analysis .......................................................................................... 21

Valuation Process .............................................................................................................. 28

Land Valuation "Before the Taking" ................................................................................. 30

Improved Property Valuation "Before the Taking" ........................................................... 32

Permanent Easement Valuation ......................................................................................... 40

Land Valuation "After the Taking" .................................................................................... 44

Improved Property Valuation "After the Taking" .............................................................. 45

Temporary Easement Valuation ......................................................................................... 46

## TABLE OF CONTENTS (CONT.)

Reconciliation and Final Value Conclusion.................................................................47

Statement of Certification........................................................................................48

Appraiser's Qualifications........................................................................................50

**<u>ADDENDA</u>**

Exhibit 1 – Subject Property Plat

Exhibit 2 – Subject Property Land Valuation "Before the Taking"

Exhibit 3 – Subject Property Building Permit and Plan Review Comments

Exhibit 4 – Subject Building Improvement Blue Prints

Exhibit 5 – Subject Property Existing Improvements Summary

Exhibit 6 – ACP Partial Taking Plat of the Subject Property

Exhibit 7 – Subject Property Cost Approach "Before the Taking"

Exhibit 8 – Subject Property Income Capitalization Approach "Before the Taking"

Exhibit 9 – Subject Property Sales Comparison Approach "Before the Taking"

Exhibit 10 – Easement Valuation Matrix

Exhibit 11 – Underground Gas Transmission Lines Paired Sales Analysis Summary

Exhibit 12 – Subject Property Land Valuation "After the Taking"

Exhibit 13 – Subject Property Cost Approach "After the Taking"

Exhibit 14 – Subject Property Income Capitalization Approach "After the Taking"

Exhibit 15 – Subject Property Sales Comparison Approach "After the Taking"

# RULE 26 DISCLOSURES

**OPINIONS**

I have been asked to opine as to the current fair market value "before and after the partial taking" of the fee simple interest of the subject property located on Parcel Identification No. 19-3-2A, Nelson County, Virginia (the "Property") and owned by Fenton Family Holdings, LLC. The Property is located at 29 Shelton Laurel Trail, Roseland, Virginia 22967.

As a result of my inspection and analysis, it is my opinion that the fair market value "before and after the partial taking" of the fee simple interest in the Property, *subject to the definitions, certifications, assumptions and limiting conditions, and scope of work set forth in this report,*" as of January 31, 2018, was:

| Property Identification | FMV "Before" | FMV "After" | Difference |
|---|---|---|---|
| Subject Property (Parcel Identification No. 19-3-2A) | $1,045,000 | $915,000 | $130,000 |
| Plus: Temporary Easement Value | | | 300 |
| Just Compensation | | | $130,300 |

**BASES AND REASONS FOR OPINIONS**

The bases and reasons for my opinions are fully set forth in this report that conforms to FRCP Rule 26(a)(2)(B) and USPAP Standards Rules 2-2(a). As such, it presents sufficient information to enable the client and other intended users, as identified, to understand it properly.

**QUALIFICATIONS**

My appraiser qualifications, including a list of all publications I have authored within the preceding ten years, appears on page 50 of this report.

**COMPENSATION**

I am being compensated for the professional services and testimony in this matter at $525.00 per hour.

**OTHER CASES IN WHICH I HAVE TESTIFIED WITHIN THE LAST FOUR YEARS**

1.   *Atlantic Coast Pipeline, LLC v. SMJB Realty, LLC*
     United States District Court for the Eastern District of Virginia
     Case No. 2:18-cv-00329
     November 2018
     Deposition Testimony

1

2.  *1417 Belmont Community Development, LLC v. District of Columbia*
    Superior Court of the District of Columbia
    Case No. 2010 CA 007158 B
    June 2018
    Deposition Testimony

3.  *District of Columbia v. SW Land Holder, LLC, et al.*
    Superior Court of the District of Columbia
    Case No. 2015 CA 007569
    May 2018
    Deposition and Trial Testimony

4.  *Hershey Chocolate of Virginia, Inc. v. County of Augusta, Virginia*
    Circuit Court for Augusta County, Virginia
    Case No. CL14-2172
    February 2018
    Deposition Testimony

5.  *McKee Foods Corp. v. County of Augusta, Virginia*
    Circuit Court for Augusta County, Virginia
    Case No. CL14-1126
    December 2017
    Deposition and Trial Testimony

6.  *John S. McNulty, et al. v. Robert A. Casero, Jr., et al.*
    United States District Court for the District of Maryland
    Case No. 1:16-cv-02426
    November 2017
    Deposition Testimony

7.  *Commissioner of Highways v. HPT TA Properties Trust, et al.*
    Circuit Court of Botetourt County, Virginia
    Case No. CL14000067-00
    October 2017
    Deposition Testimony

8.  *Army Navy Country Club v. City of Fairfax, Virginia*
    Circuit Court of Fairfax County, Virginia
    Case No. CL2015-17941
    July 2017
    Deposition and Trial Testimony

9. *Violet Hill Assoc., LLC, et al. v. County of Albemarle, Virginia*
Circuit Court of Albemarle County, Virginia
Case No. CL14-135
May 2017
Deposition and Trial Testimony

10. *National Railroad Passenger Corp. (Amtrak) v. CASCO Second Street, LLC*
United States District Court for the District of Columbia
Case No. 1:15-cv-01021
May 2015
Deposition Testimony

11. *Waverley View Investors, LLC, v. United States.*
United States Court of Federal Claims
Case No. 15-371L
January 2017
Deposition and Trial Testimony

12. *Commissioner of Highways v. Woodbridge Ford Property, LLC*
Circuit Court of Prince William County, Virginia
Case No. CL14008014-00
August 2016
Deposition Testimony

13. *Grace M. Goodeagle et al., v. United States.*
United States Court of Federal Claims
Case Nos. 12-431L, 12-592L & 13-51X
July 2016
Deposition Testimony

14. *William Haag, et al., v. Griffith Energy Services, Inc., et al.*
Circuit Court of Frederick County, Maryland
Case No. 10-C-15-000502 CN
June 2016
Deposition Testimony

15. *Commissioner of Highways v. N. Cherok, LLC*
Circuit Court of Loudoun County, Virginia
Case No. CL00090343-00
June 2016
Deposition Testimony

16. *RECP IV WG Land Investors, LLC v. Capital One Bank (USA), N.A.*
    Circuit Court of Fairfax County, Virginia
    Case No. 2015-09182
    April 2016
    Deposition Testimony

17. *Commissioner of Highways v. Terry L. Shreve, et al.*
    Circuit Court of Fairfax County, Virginia
    Case No. 2014-09624
    February 2016
    Deposition Testimony

18. *Army-Navy Country Club v. City of Fairfax*
    City of Fairfax Board of Equalization
    Tax Parcel No. 58-1-02-005
    December 2015
    Hearing Testimony

19. *Shirley Rettig, et al.  v. City Council of Alexandria*
    Circuit Court of the City of Alexandria, Virginia
    Case No. CL 2014-004535
    November 2015
    Deposition Testimony

20. *City of Chesapeake, VA v. Clear Sky Car Wash, LLC*
    Circuit Court of the City of Chesapeake, Virginia
    Case No. CL12002185-00
    August 2015
    Deposition Testimony

21. *Commissioner of Highways v. Elkins 418 Garrisonsville, LLC, et al.*
    Circuit Court of Stafford County, Virginia
    Case No. CL13-1418
    July 2015
    Deposition and Trial Testimony

22. *Lord & Taylor, LLC, et al. v. White Flint, LP, et al.*
    United States District Court for the District of Maryland
    Case No. 8:13-cv-01912-RWT
    July 2015
    Deposition Testimony

## INTENDED USERS OF THE APPRAISAL

The intended users of this appraisal are the client, Atlantic Coast Pipeline, LLC (the "ACP"), the client's counsel, McGuireWoods LLP (the "Attorney"), and the United States District Court for the Western District of Virginia, Charlottesville Division (the "Court").

## INTENDED USE OF THE APPRAISAL

The intended use of this appraisal by the client and other intended users is for litigation purposes.

## INTERESTS VALUED

The property rights I appraised consist of the fee simple interest in the Property and the partial interests taken by ACP.

The owner reported that no written lease was in effect on the Property; however, it should be noted that a related business entity (Fenton Inn, LLC) operates the Property and filed separate tax returns that include rent deductions, which implies an oral lease may exist. The value of the leased fee estate has not been reflected in this appraisal.

*Easement* is defined as "the right to use another's land for a stated purpose."[1]

*Fee simple interest* is defined as "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."[2]

*Partial interest* is defined as "divided or undivided rights in real estate that represent less than the whole (a fractional interest) such as a tenancy in common, easement, or life interest."[3]

*Permanent easement* is defined as "an easement that lasts forever."[4]

*Temporary easement* is defined as "an easement granted for a specific purpose and applicable for a specific time period. A construction easement, for example, is terminated after the construction of the improvement and the unencumbered fee interest in the land reverts to the owner."[5]

## PURPOSE OF THE ASSIGNMENT

The purpose of this appraisal is to estimate the retrospective fair market value "before and after the partial taking" of the Property.

---

[1] Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed., (Chicago: Appraisal Institute, 2015), 71.
[2] *Ibid.*, 90.
[3] *Ibid.*, 168.
[4] *Ibid.*, 170.
[5] *Ibid.*, 231.

## TYPE AND DEFINITION OF VALUE

This appraisal is based on the following terms and definitions.

*Appraisal* is defined as (noun) "the act or process of developing an opinion of value; an opinion of value; (adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services."[6]

*Fair market value* is defined as "what a willing buyer would pay in cash to a willing seller at the time of the taking."[7]

The value opinions expressed herein reflect the Property's sale price in terms of cash or financial terms equivalent to cash.

*Report* is defined as "any communication, written or oral, of an appraisal or appraisal review that is transmitted to the client upon completion of an assignment."[8]

*Scope of the project rule* is defined as "a rule used in the establishment of just compensation. Any decrease or increase in the fair market value of real property, prior to the date of valuation, caused by the public improvement for which the property is to be acquired, or by the likelihood that the property would be acquired for the improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property."[9]

## EXTRAORDINARY ASSUMPTIONS

*Extraordinary assumption* is defined as "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions."[10]

This appraisal is based upon an extraordinary assumption that assumes the duration of the temporary construction easement is five (5) years. If this assumption were false, then the value indications in this appraisal might be affected.

This appraisal is also based upon an extraordinary assumption that assumes Nelson County will issue a Certificate of Use and Occupancy for the Property's existing building improvement per Building Permit #97-2011 and the plan review comments without undue delay or cost. If this assumption were false, then the value indications in this appraisal might be affected.

---

[6] Appraisal Standards Board, Uniform Standards of Professional Appraisal Practice, 2018-2019 ed., (Washington: The Appraisal Foundation, 2018), 3.
[7] *Kirby Forest Industries, Inc. v. United States*, 467 US 1 (1984).
[8] Uniform Standards of Professional Appraisal Practice, 2018-2019 ed., 5.
[9] The Dictionary of Real Estate Appraisal, 6th ed., 209; Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970 [P.L. 91-646] 42 USC §4651 (3)).
[10] Uniform Standards of Professional Appraisal Practice, 2018-2019 ed., 4.

## HYPOTHETICAL CONDITIONS

***Hypothetical condition*** is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis."[11]

As required by the scope of the project rule, this appraisal is based, in part, upon a hypothetical condition that values the Property before the taking by disregarding the taking and the effects of the public project on value. If this condition were false, then the value indications in this appraisal might be affected.

## JURISDICTIONAL EXCEPTIONS

***Jurisdictional exception*** is defined as "an assignment condition established by applicable law or regulation, which precludes an appraiser from complying with a part of USPAP."[12]

In conformance with the scope of the project rule, I have invoked the Jurisdiction Exception Rule of USPAP in developing and reporting this appraisal as it relates to Standards Rule 1-4(f). As such, I have disregarded any decrease or increase in the fair market value of the Property prior to the effective date of appraisal caused by the public improvement project for which the Property will acquired, or by the likelihood that the Property would be acquired for such improvement, other than that due to physical deterioration within reasonable control of the owner.

## GENERAL ASSUMPTIONS AND LIMITING CONDITIONS

General assumptions and limiting conditions are those assumptions and conditions that are applicable to any assignment.

This appraisal is based on the following general assumptions and limiting conditions:

1.  No responsibility is assumed for the legal description provided or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

---

[11] *Id.*
[12] *Ibid., 5.*

5.  All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging engineering studies that may be required to discover them.

7.  It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, defined, and considered in the report.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been identified, described, and considered in the report.

9.  It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10. It is assumed that the utilization of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11. Unless otherwise stated in this report, the existence of hazardous substances, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of such substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no condition on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

12. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

13. Any value estimates provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the value estimate, unless such proration or division of interests has been set forth in the report.

14. Possession of this report, or a copy thereof, does not carry with it the right of publication.

8

15. The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or be in attendance in court with reference to the property in question unless arrangements have been previously made.

16. Disclosure of the contents of the report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

17. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraisers.

18. There is no accountability or liability to any third party by William C. Harvey & Associates, Inc., its associate appraisers, and/or its employees, and liability to the client is limited to the amount of the appraisal fee for this assignment.

## EFFECTIVE DATE OF APPRAISAL

The effective date of this appraisal is January 31, 2018. The value opinions reflect a retrospective perspective of market conditions.

A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the market after the effective date of the appraisal. Data subsequent to the effective date may be considered in developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or seller as of that date. The appraiser should determine a logical cut-off because at some point distant from the effective date, the subsequent data will not reflect the relevant market. This is a difficult determination to make. Studying the market conditions as of the date of the appraisal assists the appraiser in judging where he or she should make this cut-off.  In the absence of evidence in the market that data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser.[13]

For the purposes of this report, I selected January 31, 2018, which is the effective date, as the logical cut-off date for data I considered in developing this appraisal.

## DATE OF THE REPORT

The date of the original report is September 14, 2018 and the supplemental report is dated April 17, 2019.

---

[13] Appraisal Standards Board, *Advisory Opinion 34* (AO-34) to the Uniform Standards of Professional Appraisal Practice, 2018-2019 ed., (Washington: The Appraisal Foundation, 2018), 164.

## SCOPE OF WORK

The scope of work refers to the precise extent of the appraisal process completed in the assignment.

In preparing this appraisal, I:

1. Made a personal inspection of the Property that involved a physical examination of the subject land on a "walk-through" basis and, at the request of the owner, a "limited interior" and "complete exterior" inspection of the existing improvements.

2. Relied upon my visual observations and public records for information regarding the Property's governmental approvals and physical characteristics.

3. Referred to the generally accepted appraisal practices, procedures, rules, and standards set forth in the Uniform Standards of Professional Appraisal Practice, 2018-2019 ed. (Washington: The Appraisal Foundation, 2018).

4. Referred to accepted texts and course materials published by nationally recognized professional appraisal organizations, including but not limited to, The Appraisal of Real Estate, 14th ed., (Chicago: Appraisal Institute, 2013), Appraising Partial Interests, (Chicago: Appraisal Institute, 1998), Appraising the Tough Ones: Creative Ways to Value Complex Residential Properties, (Chicago: Appraisal Institute, 1996), Condemnation Appraising: Principles and Applications, (Chicago: Appraisal Institute, 2019), Corridor Valuation: An Overview and New Alternatives, (Chicago: Appraisal Institute, 2019), The Dictionary of Real Estate Appraisal, 6th ed., (Chicago: Appraisal Institute, 2015), Hotel Market Analysis and Valuation: International Issue and Software Applications, (Chicago: Appraisal Institute, 2012), Real Estate Damages: Applied Economics and Detrimental Conditions, 2nd ed., (Chicago: Appraisal Institute, 2008), Real Estate Valuation in Litigation, 2nd ed., (Chicago: Appraisal Institute, 1995), Rural Property Valuation, (Chicago: Appraisal Institute, 2017), Scope of Work, 2nd ed., (Chicago: Appraisal Institute, 2016), The Student Handbook to The Appraisal of Real Estate, 14th ed., (Chicago: Appraisal Institute, 2014) and Valuation by Comparison, 2nd ed., (Chicago: Appraisal Institute, 2018).

5. Referred to peer-reviewed appraisal treatises published by national professional appraisal organizations on specialized topics relevant to this assignment.

6. Gathered general and specific data on the Property and market area. Said data were collected from electronically transmitted and printed data services, including but not limited to Defendant's Objections and Answers to Plaintiff's First Interrogatories to Fenton Family Holdings, LLC, CAAR-MLS, CoStar, InnShopper.com, Nelson County's public records and website, Nelson County Circuit Court's Remote Access System, newspapers, and other sources that are referenced in this report. Geographic information system (GIS) data for the Property were obtained from ACP, ArcGIS, Nelson County, and Google Earth. My research was focused on Nelson County as a whole with a concentration on the Roseland-Nellysford-Wintergreen submarkets.

7.  Reviewed ACP's Right of Way Exhibit for the Property dated December 1, 2017 that shows the partial taking.

8.  Read the deposition transcripts for the following individuals: a) William Fenton dated January 17, 2019, February 5, 2019 and April 9, 2019, b) Mark D. Pitts, CPE, dated March 25, 2019, c) Matthew P. Ray, MAI, dated February 17, 2019, and d) Paykon Sarmadi dated February 25, 2019.

9.  Completed a survey of the subject market noting supply and demand factors and development trends in the subject market area.

10. Analyzed the subject larger parcel and highest and best use of the Property.

11. Collected, verified, and analyzed comparable land and improved sales.

12. Collected and analyzed capitalization and investment rates for short-term investments.

13. Based this appraisal, in part, upon an extraordinary assumption that assumes the duration of the temporary construction easement for the Property is five (5) years. If this assumption were false, then the value indications in this appraisal might be affected.

14. Based this appraisal, in part, upon an extraordinary assumption that assumes Nelson County will issue a Certificate of Use and Occupancy for the Property's existing building improvement per Building Permit #97-2011 and the plan review comments without undue delay or cost. If this assumption were false, then the value indications in this appraisal might be affected.

15. Based this appraisal, in part, upon a hypothetical condition that values the Property before the taking by disregarding the taking and the effects of the public project on value in conformance with the scope of the project rule. If this condition were false, then the value indications in this appraisal might be affected.

16. Invoked the Jurisdiction Exception Rule of USPAP in developing and reporting this appraisal as it relates to Standards Rule 1-4(f) in conformance with the scope of the project rule. As such, I have disregarded any decrease or increase in the fair market value of the subject property before the taking caused by the public improvement project for which the property will acquired, or by the likelihood that the property would be acquired for such improvement.

17. Developed the cost, income capitalization and sales comparison approaches using the *before-and-after* method to value the permanent easement taken on the Property.

18. Developed the income capitalization approach to value the temporary easement taken on the Property.

11

19. Relied upon William D. O'Donnell and Joseph C. Harvey, associates with William C. Harvey & Associates, Inc., who assisted me in collecting, verifying and analyzing the data and valuing the Property.

20. Reconciled the value indications into final estimates of value for the Property.

21. Communicated the assignment results to the client and other intended users in this report.

## SUMMARY DESCRIPTION OF THE REAL ESTATE APPRAISED

### IDENTIFICATION OF REAL ESTATE APPRAISED

The Property that is subject to ACP's partial taking is identified as "that certain tract of land described as Parcel Identification No. 19-3-2A, composed of 2.922 acres, more or less, located in Rockfish Magisterial District, Nelson County, Virginia and being more particularly described as "Composite Plat Showing a Portion of the property of William O. Jr. & Janet R. Shelton" in that plat of survey by P. Massie Saunders, Jr., L.S., recorded in Plat Cabinet 3, Slide 577A, of the public records of said County (the "Property")."[14]

The Property is located at 29 Shelton Laurel Trail, Roseland, Virginia 22967.

Parcel Identification No. 19-3-2A is illustrated on the plat in the Addenda (see **Exhibit No. 1**).

### PROPERTY DESCRIPTION

A summary of the Property's identification, address and land area along with the other properties owned by Fenton Family Holdings, LLC is presented below.

| Identification | Address | Area (Ac.) |
|---|---|---|
| Parcel Identification No. 19-3-2A | 29 Shelton Laurel Trail | 2.922 |
| Parcel Identification No. 19-3-2B | 20 Shelton Laurel Trail | 5.383 |
| Parcel Identification No. 19-3-2C | 39 Shelton Laurel Trail | 12.610 |

Source: Nelson County Commissioner of the Revenue and GIS

Note: Above data is used later in this report for the larger parcel analysis.

Title to the Property is held by Fenton Family Holdings, LLC by virtue of a deed recorded on August 2, 2012 among the land records of Nelson County, Virginia in Instrument No. 120002282. There was no indicated consideration as this conveyance was between related parties and exempt from recordation taxes pursuant to §58.1-811(A)(10) of the Code of Virginia.

Title to the Parcel Identification No. 19-3-2B is also held by Fenton Family Holdings, LLC by virtue of a deed recorded on August 2, 2017 among the land records of Nelson County, Virginia in Instrument No. 1170001876. There was no indicated consideration as this conveyance was

---

[14] Complaint in Condemnation filed January 31, 2018, 2 (ECF No. 1).

between related parties and exempt from recordation taxes pursuant to §58.1-811(A)(10) and §58.1-811(C)(1) of the Code of Virginia.

Title to the Parcel Identification No. 19-3-2C is also held by Fenton Family Holdings, LLC by virtue of a deed recorded on August 2, 2017 among the land records of Nelson County, Virginia in Instrument No. 1170001877. There was no indicated consideration as this conveyance was between related parties and exempt from recordation taxes pursuant to §58.1-811(A)(10) and §58.1-811(C)(1) of the Code of Virginia.

Parcel Identification No. 19-3-2B was part of a prior transaction that was recorded on March 11, 2015 as evidenced by the deed of partition among the land records of Nelson County, Virginia in Instrument No. 150000571. The indicated consideration was $180,000 and an 100% interest in 17.834 acres of land was conveyed to William and Lilia Fenton, which was equivalent to a unit price of $10,093/ac.

Parcel Identification No. 19-3-2B was also part of another prior transaction that was recorded on November 4, 2015 as evidenced by the deed of partition among the land records of Nelson County, Virginia in Instrument No. 150002954. There was no indicated consideration as this conveyance was between related parties and exempt from recordation taxes. The plat associated with this transaction was prepared by P. Massie Saunders, Jr. and dated March 9, 2015. The plat was recorded in Plat Cabinet 9, Slide 36C-36D in the Clerk's Office of the Nelson County Circuit Court and shows the residue allotted to William and Lilia Fenton for Parcel Identification No. 19-3-2B contained 5.383 acres.

Research of public records and private data services revealed there have been no other transfers of the Property during the past three years from the effective date of appraisal (i.e., January 31, 2015 through January 31, 2018) and that the Property is not under current agreement or option and is not offered for sale on the open market.

## Zoning

The Property is zoned Agricultural A-1 District and is subject to, but not limited to, the following regulations:

- Definitions:

  1. *Accessory use or structure:* A subordinate use or building customarily incidental to and located upon the same lot occupied by the main use or building.

  2. *Bed and Breakfast, Class A:* A use composed of transient lodging provided by the resident occupants of a dwelling that is conducted within said dwelling and/or one or more structures that are clearly subordinate and incidental to the single family dwelling, having not more than six (6) guest rooms in the aggregate, and having not more than twelve (12) transient lodgers in the aggregate, and which also may include rooms for dining and for meetings for use by transient lodging guests of the class A bed and breakfast, provided that the dining and meeting rooms are accessory to the class A bed and breakfast use.

13

3.  *Bed and Breakfast, Class B:* A use composed of transient lodging provided within a single family dwelling and/or one or more structures that are clearly subordinate and incidental to the single family dwelling, having not more than ten (10) guest rooms in the aggregate, and having not more than twenty-four (24) transient lodgers in the aggregate, and which also may include rooms for dining and for meetings for use by transient lodging guests of the bed and breakfast provided that the dining and meeting rooms are accessory to the bed and breakfast use.

4.  *Dwelling, single-family detached:* A building arranged or designed to contain one (1) dwelling unit.

5.  *Family:* One (1) or more persons occupying a premise and living in a single dwelling unit, as distinguished from an unrelated group occupying a boardinghouse, hotel, or motel.

6.  *Restaurant:* Any building in which for compensation, food or beverages are dispensed for consumption on the premises, including among other establishments cafes, tea rooms, confectionery shops, or refreshment stands. Dancing by patrons shall be considered as entertainment accessory to a restaurant, provided the space made available for such dancing shall not be more than one-eighth of that part of the floor area available for dining. Provisions for dancing made available under this definition shall be subject to the permit requirements of Nelson County.

7.  *Transient:* A guest or boarder; one who stays for less than thirty (30) days and whose permanent address for legal purposes is not the lodging or dwelling unit occupied by that guest or boarder.

8.  *Transient lodging:* Lodging in which the temporary occupant lodges in overnight accommodations for less than thirty (30) consecutive days.

9.  *Use, accessory:* A subordinate use, customarily incidental to and located upon the same lot occupied by the main use.

10. *Winery:* An establishment where wine is made, bottled, and/or stored for distribution and which may contain accessory facilities for retail sales and tastings.

- The purpose of the Agricultural A-1 District is to accommodate farming, forestry, and limited residential use. While it is recognized that certain desirable rural areas may logically be expected to develop residentially, it is the intent, however, to discourage the random scattering of residential, commercial, or industrial uses in this district.[15]

- Uses permitted by right in the Agricultural A-1 District include agricultural processing facility, agritourism activity, automobile graveyards, bed and breakfasts, communication towers, cluster housing developments, farm breweries, farm wineries, intentional communities, manufactured homes, small wind energy systems, temporary travel trailers and

---

[15] Nelson County Zoning Ordinance adopted January 11, 1977 and as amended through November 16, 2017, Article 4, Statement of Intent.

14

vacation houses. Additional uses are permitted by approval of a special use permit, including but not limited to, a farm winery permanent remote retail establishment and restaurant.[16]

- Improvements shall be started, reconstructed, enlarged, or altered only after a zoning permit has been obtained from the Planning and Zoning Director.[17]

- In the event of a proposed expansion or other material change to improvements for which a zoning permit has been issued previously, the Planning and Zoning Director may approve an amended Minor Site Plan or Final Site Plan, as the case may be, in accordance with Section 13-2 of this Chapter.[18]

- No Special Use Permit shall be approved unless the proposal has been reviewed by the Commission. The Commission shall conduct at least one (1) public hearing in accordance with State law. Following the public hearing, the Commission shall prepare and by motion, adopt its recommendations, which may include changes in the applicant's original proposal, and shall report such recommendations, together with any explanatory material, to the Board of Supervisors.[19]

- Before approving a Special Use Permit, the Board of Supervisors will hold at least one (1) public hearing in accordance with State law, after which such Board may make appropriate changes to or impose appropriate conditions upon the proposed special use. Nothing herein shall preclude the Board from holding a joint public hearing with the Commission. Unless a longer period is agreed to by the applicant, the Board shall act within one (1) year of the official submission of the application.[20]

- A site plan shall be required for any development on any site, in all zoning districts, in any case in which construction or a change in use of the existing site increases the number of on-site parking spaces or anything that causes a visible change in the site. A "visible change" includes grading, removal of vegetation in preparation for future development of the site, mining, digging, and riverbank removal, addition to a building that changes the traffic circulation on the site, or any other change which the Planning and Zoning Director determines to cause a significant impact to the public health, safety and welfare of the citizens of the county.[21]

## Site Data

Ingress and egress to the Property is by way of Shelton Laurel Trail, which is a two-lane privately maintained service road that intersects with the south side of Beech Grove Road (State Route 664).

Existing easements on the Property include the following:

---

[16] *Ibid.*, Article 4, Sections 4-1, 4-1-16a & 4-1-34a.
[17] *Ibid.*, Article 12, Section 12-1-1.
[18] *Ibid.*, Article 12, Section 12-1-3.
[19] *Ibid.*, Article 12, Section 12-3-5a.
[20] *Ibid.*, Article 12, Section 12-3-6.
[21] *Ibid.*, Article 13, Section 13-1-1.

1.  Easement Agreement to Central Virginia Electric Cooperative, a Virginia corporation recorded in Instrument No. 030000878 on February 21, 2003.

2.  Declaration of Road Maintenance to William O. Shelton and Janet R. Shelton, husband and wife recorded in Instrument No. 010003414 on September 27, 2001.

3.  Declaration of Road Maintenance to Walter R. Potter and Limberly B. Arris-Potter, husband and wife recorded in Instrument No. 010001907 on June 7, 2001.

4.  Right of Way Easement to Central Virginia Electric Cooperative, a cooperative corporation recorded in Deed Book 465, Page 707 on July 17, 2000.

5.  Declaration of Road Maintenance to Glenn Meadows Farm. Inc., a Virginia corporation recorded in Instrument No. 980004442, Deed Book 431, Page 142 on December 7, 1998.

6.  Right of Way Easement to Central Virginia Electric Cooperative, a cooperative corporation recorded in Deed Book 296, Page 770 on February 21, 1991.

7.  Right of Way Easement to Central Virginia Electric Cooperative, a cooperative corporation recorded in Deed Book 296, Page 765 on February 21, 1991.

8.  General Warranty Deed and Right of Way to The United States of America recorded in Deed Book 238, Page 444 on October 10, 1986.

9.  General Warranty Deed and Right of Way to The United States of America recorded in Deed Book 238, Page 437 on October 10, 1986.

10. Right of Way to State Highway Transportation Commissioner Virginia recorded in Deed Book 158, Page 8 on October 5, 1977.

11. Certificate and Right of Way to State Highway Transportation Commissioner Virginia recorded in Deed Book 157, Page 157 on August 23, 1977.

12. Certificate and Right of Way to State Highway Transportation Commissioner Virginia recorded in Deed Book 156, Page 66 on June 27, 1977.

13. Certificate and Right of Way to State Highway Transportation Commissioner Virginia recorded in Deed Book 156, Page 68 on June 9, 1977.

14. General Warranty Deed and Right of Way to Commonwealth of Virginia recorded in Deed Book 153, Page 450 on February 17,1977.

15. Certificate and Right of Way to State Highway Transportation Commissioner Virginia recorded in Deed Book 153, Page 299 on February 8, 1977.

16.  General Warranty Deed and Right of Way to Commonwealth of Virginia recorded in Deed Book 85, Page 23 on October 24, 1952.

17.  Right of Way to Commonwealth of Virginia recorded in Deed Book 66, Page 528 on December 29, 1938.

18.  Right of Way to Commonwealth of Virginia recorded in Deed Book 66, Page 531 on December 29, 1938.[22]

The Property is served with cable, electric, septic system and well.

Existing site improvements on the Property include a gravel driveway, parking apron and picnic area, brick walkways and retaining walls, landscaping and wood fencing. The total disturbed area contains approximately 38,328 square feet.

Parcel Identification No. 19-3-2A is more fully described on the Land Appraisal Report presented in the Addenda (see **Exhibit No. 2**).

**Improvement Data**

The existing building improvement on the Property is a two-story plus basement frame transient lodging. The existing building improvement was constructed in 2015. The structure contains approximately 10,004 square feet of gross building area.[23]

Nelson County issued Building Plan Review Permit #97-2011 on June 7, 2011 to William Fenton subject to the development and use conditions that read as follows:

> "Proprietor occupied bed and breakfast and other transient boarding facilities not more than three stories above grade plane in height, *that are also occupied as the residence of the proprietor, with a maximum of 5 guest room sleeping units provided for the transient occupants* are permitted in this USE group R-5, designed and built under the Virginia Residential Code - (VCC) section 310.1 exception# 2 (emphasis added)."[24]

The Property's building permit and plan review comments are presented in the Addenda (see **Exhibit No. 3**).

According to Charles Miller, Building Official, Nelson County Building Inspection Department, the structure's final inspection was completed but a Certificate of Use and Occupancy has never been issued to the Property. Based on a review of the Property's file, Mr. Miller confirmed that issuance of a Certificate of Use and Occupancy is reasonably probable but that an additional final inspection would need to be performed before any such certificate could be issued due to the length of time that has elapsed since the last inspection. Mr. Miller also confirmed that any change in use would

---

[22] Amended Supplemental Limited Title Report by Doyle Land Services, Inc., dated April 4, 2018.
[23] *See* Deposition of Paykon Sarmadi dated February 25, 2019, page 153, lines 5 through 7.
[24] Building Plan Review Permit #97-2011 issued on June 7, 2011 by the Nelson County Building Official.

require that the owner first apply for a change in the Certificate of Use and Occupancy, submit a Special Use Permit and site plan depending on the requested new use(s), undergo a physical inspection, and possibly have a public hearing.

Exterior walls are primarily painted stucco with storefront windows. The roof cover is asphalt shingles. Interior finish includes drywall partitions, carpeted and hardwood floors. Heating and cooling is provided by multi-zoned thru-wall units and multi-zoned packaged units.

The main floor layout includes a lobby with fireplace, office, and six (6) guest rooms identified as the Butterfly Room, Captain's Quarters, Poplar Room, Hummingbird Room, Swallow's Nest with gas fireplace, and Wilhelm's House with gas fireplace.[25]

The lower level layout includes a kitchen with eating area, exercise room, spa room, media room, and gift shop.

The basement level layout includes a laundry room, dining/meeting room and the proprietor's living quarters.

According to Thomas G. Eick, Senior Environmental Health Specialist, with the Nelson County Health Department, an owner who resides at the Property can serve meals throughout the day to transient guests as a result of recently enacted legislation (i.e., HB 552 effective July 1, 2018). Based on a review of the Property's file, Mr. Eick confirmed that a permit application was summitted by the owner on February 27, 2017 to allow a food establishment. Mr. Eick informed the owner that they would need to apply for a change in the Certificate of Use and Occupancy, submit a Special Use Permit and site plan, undergo a physical inspection, and have a public hearing in order for the permit application to allow a food establishment to move forward. Thereafter, the owner withdrew the permit application to allow a food establishment in March 2017.

The blue prints for the Property's existing building improvement are presented in the Addenda (see Exhibit No. 4).

According to Sandy Shackelford, Director, Nelson County Planning and Zoning Department, the existing building improvement is permitted as a proprietor-occupied transient lodging subject to conditions that limits the use of the structure to a maximum of 5 guest room sleeping units for the transient occupants but appears to be functioning as a Bed and Breakfast, Class A facility, which is a permitted use in the A-1 District. Based on a review of the Property's file, Ms. Shackelford confirmed that a change in the Property's use to a Bed and Breakfast, Class A facility would require that the owner first apply for a change in the Certificate of Use and Occupancy and undergo a physical inspection.

The existing building improvement is specially designed as a Bavarian-style village and has many unique, hand-crafted features. For purposes of this appraisal, I consider the existing building improvement to be a special-purpose property.

---

[25] Occupancy of the Property's six guest rooms is currently limited to no more than five guest rooms on any given day due to the development and use conditions contained on Building Plan Review Permit #97-2011.

*Special-purpose property* is defined as "a property with a unique physical design, special construction materials, or a layout that particularly adapts its utility to the use for which it was built; also called a special-design property."[26]

A summary of the existing improvements is presented in the Addenda (see **Exhibit No. 5**).

## Assessment and Taxes

The Nelson County Commissioner reassesses all real property within the county at fair market value. Property taxes are calculated using the assessed value and the tax rate.

The Property's 2018 assessments and taxes are presented below.

| Identification | Land | Imps. | Total | Taxes |
|---|---|---|---|---|
| Parcel Identification No. 19-3-2A | $83,000 | $858,100 | $941,100 | $6,775.92 |

Source: Nelson County Commissioner of the Revenue

Based on my analysis, the 2018 assessments provide a meaningful indication of the Property's fair market value.

## Partial Taking

The partial taking of the Property consists of a permanent easement and a temporary easement in connection with the ACP's Atlantic Coast Pipeline Project (the "ACP Project"). Said project involves the construction and laying of an approximately 600-mile underground pipeline and related facilities for the purpose of transporting natural gas from West Virginia to Virginia and North Carolina. The ACP Project's underground gas transmission line (the "UGTL") will measure approximately 42 inches in diameter in West Virginia and Virginia, and 36 inches in diameter in North Carolina. Certain extensions of the ACP Project will measure 20 inches in diameter from Northampton County, North Carolina to the City of Chesapeake, Virginia and 16 inches in diameter in Brunswick County, Virginia and Greensville County, Virginia.

A summary of the partial taking of the Property is presented below.

| Property Identification | Permanent (Ac.) | Temporary (Ac.) |
|---|---|---|
| Parcel Identification No. 19-3-2A | 0.04 | 0.03 |

Source: ACP Right of Way Exhibit dated December 1, 2017

The ACP Easements Exhibit for the Property, dated December 1, 2017, that shows the partial taking is presented in the Addenda (see **Exhibit No. 6**).

---

[26] The Dictionary of Real Estate Appraisal, 6th ed., 217.

19

For purposes of this appraisal, I have assumed that the rights granted to ACP in connection with the permanent easement taken on the Property include the right to:

1)  Construct, operate, maintain, replace, repair, remove or abandon the ACP Project and appurtenant equipment and facilities, as well as the right to change the location of the installed pipeline within the area of the permanent easement as may be necessary or advisable, and

2)  Fell trees and clear brush or other vegetation as necessary or convenient for the safe and efficient construction, operation, or maintenance of the ACP Project or to maintain safe and efficient access to and from the ACP Project.

3)  Provide ingress and egress to and from and through the easements and the right to transport pipe, vehicles, machinery, persons, equipment, or other materials to and from and through the easements, and the right of access through any existing roads on the Property.[27]

For purposes of this appraisal, I have further assumed that the rights granted to ACP in connection with the temporary easement taken on the Property include the right to:

1)  Construct the ACP Project and engage in restoration or clean-up activities.

2)  Commence as of the date of authorized entry onto the Property and their use is required until all work, including restoration, is complete.

3)  Be effective and condemned for a period not to exceed five (5) years following ACP's possession of the easements.

4)  Provide ingress and egress to and from and through the easements and the right to transport pipe, vehicles, machinery, persons, equipment, or other materials to and from and through the easements, and the right of access through any existing roads on the Property.[28]

For purposes of this appraisal, I have further assumed that the rights retained by the owner include the right to:

1)  Use the Property in any manner that will not interfere with the use and enjoyment of ACP's rights under the easements.

2)  Specifically, the owner shall not, without the prior written consent of ACP:

    a)  Change the depth of cover or otherwise undertake earthmoving or construction within the easements;

---

[27] Complaint in Condemnation filed February 9, 2018, 4 (ECF No. 1).
[28] *Ibid.*, 5.

20

b) Place or permit to be placed any temporary or permanent structure or obstruction of any kind, including but not limited to buildings, swimming pools, sheds, concrete pads, mobile homes, trees, telephone or electric poles, water or sewer lines, or similar structures, within the easements;

c) Store or operate any heavy equipment in the easements, except the use of typical farming equipment; and

d) Construct ponds or lakes in a manner that would flood the easements.[29]

## HIGHEST AND BEST USE ANALYSIS

*Highest and best use* is defined as "the reasonably probable and legal use of property that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity."[30]

The concept of highest and best use of property as improved pertains to the use that should be made of an improved property in light of the existing improvements and the ideal improvement described at the conclusion of the analysis of highest and best use as though vacant. In market value appraisals of improved property, appraisers consider a number of alternative uses of the existing improvements:

- Demolish the existing improvements and redevelop the site.
- Convert, renovate, or alter the existing improvements to enhance the current use or change the use of the property to a more productive use.
- Retain the existing improvements and continue the current use. The existing improvements represent an interim use that helps defray the cost of carrying the property and demolition costs until all approvals have been obtained and actual construction may begin.

The principle of consistent use holds that land cannot be valued based on one use while improvements are valued based on another. An improved site is always valued as though vacant and available for its highest and best use. Existing improvements that do not conform with the ideal improvement may be an interim use (i.e., not the highest and best use) that contributes some value or no value or even reduces value if the costs to remove the improvements are substantial.[31]

For the purposes of this appraisal, I have considered all of the uses which might reasonably have been made of the Property in light of the existing conditions and circumstances, as of the effective date of appraisal. In this respect, I have also considered all of the natural advantages and disadvantages of the Property as well as the characteristics and needs of the surrounding community that existed at the time of the partial acquisition. The uses to which the Property is adaptable are those that are reasonably probable so as to have an effect on its fair market value. I have not considered imaginative or speculative uses.

---

[29] *Id.*
[30] The Dictionary of Real Estate Appraisal, 6th ed., 109.
[31] Appraisal Institute, The Appraisal of Real Estate, 14th ed., (Chicago: Appraisal Institute, 2013), 354.

## MARKET ANALYSIS

Market analysis, coupled with marketability analysis, has two basic functions in appraisal. The first is to provide the data and analysis to identify the highest and best use of a property in terms of:

- property use
- market support (economic demand) and timing (absorption rates)
- market participants (probable users and buyers).

The second major function of market analysis and marketability analysis in appraisal is to provide the data and analysis used in identifying the key factors of the highest and best use that underlie the application of the three approaches to value. Market analysis and marketability analysis and in turn highest and best use conclusions provide the criteria for the selection of comparables, the calculation of adjustments, and the forecasting of income streams, and those analyses make it possible to identify the effective demand for, and competitive supply of, a particular property type in a specific location at a specific time.[32]

The various levels of analysis that may be appropriate range from relatively general techniques to increasingly complex ones. Two broad categories of analysis are identified by the terms *inferred analysis* and *fundamental analysis*.[33]

Fundamental analysis of real estate markets is based on the principle that real estate value is tied to the economic utility that the real estate provides. Fundamental analysis is a technique that determines a property's economic demand based only on a direct study of the users of the space.

Another accepted level of study to determine a property's future rents and occupancy is called inferred analysis. The term inferred analysis refers to a study based on historical trends in absorption and occupancy of similar property types.

The practice of market analysis is commonly segmented into four levels of progressive depth and complexity: Level A, Level B, Level C and Level D. In this organizational scheme, Level A and Level B studies typically involve inferred demand analysis while Level C and Level D analyses look at fundamental demand.[34]

I conducted a Level A analysis for purposes of this appraisal. A Level A analysis is appropriate in this case since: (a) the market is stable; (b) the property is simple, small, and of a similar size to comparable developments in the submarket; and (c) the timing of use of the property is now based on nearby comparable sales and development projects located in the subject submarket.

---

[32] Stephen F. Fanning, MAI, Market Analysis for Real Estate: Concepts and Applications in Valuation and Highest and Best Use, 2nd ed., (Chicago: Appraisal Institute, 2014), 6.
[33] Ibid., 17.
[34] The Appraisal of Real Estate, 14th ed., 312.

22

The Level A market analysis consists of a six-step market analysis process:

- Define the product (property productivity analysis)
- Market (market area and competitive area) delineation
- Demand analysis
- Supply analysis (survey and forecast of competition)
- Analyze the interaction of supply and demand
- Forecast subject capture (market penetration concepts).[35]

Again, in some markets market data relating to special-purpose (or limited-market) properties is not organized, and market analysis is difficult. Often, these markets are so specialized that there are few buyers and sellers, and market analysis is statistically insignificant because of the lack of data. In many appraisals of special-purpose properties, there is no active resale market, and a change in use is required to develop an opinion of market value. Market analysis will then be focused on the property use that is economically viable and has a resale market. It is important to remember that if there is no market for these properties, there is no market value.[36]

Based on the data I collected and analyzed, the Property's market characteristics are as follows:

| | |
|---|---|
| Product: | Small and simple transient lodgings. On a basic level, a B&B is a residential-type property, frequently historic but not always, and typically boasting six to 15 guest rooms. Inns tend to have fewer rooms. B&Bs also offer just one meal-breakfast. Inns are less defined by food; some offer meals, others don't.[37] |
| | B&Bs can be considered special-purpose properties because they tend to be properties with a unique physical design or layout that particularly adapts its utility to the use for which it was built.[38] |
| Market: | The Property's market area is Nelson County as a whole and the Property's competitive area is along the Blue Ridge Mountains. |
| Demand: | Nelson County reported an increase in revenue from lodging taxes in 2018 due to short-term rentals throughout the county. Reports show a steady increase in revenue from short-term rental taxes from 2016 through 2018. |
| Supply: | The B&B industry has an estimated worth of $3.4 billion, according to the Professional Association of Inkeepers International (PAII), and there are an estimated 17,000 B&B in the U.S. alone. |
| | The Nelson County Commissioner of the Revenue reports 189 short-term rentals listed throughout the county and around an additional 200 in Wintergreen Resort. |

---

[35] *Ibid.*, 301.
[36] Appraisal Institute, The Student Handbook to The Appraisal of Real Estate, 14th ed., (Chicago: Appraisal Institute, 2014), 157.
[37] Steve Bergsman, "B&B&B: Bed and Breakfast and Beyond," *Valuation* (First Quarter 2013): 19-21
[38] Appraisal Institute, "Tips for Appraising Bed & Breakfast Properties," *Opinions of Value* (May 9, 2013): 1-2

I identified eights B&Bs within Nelson County:

| No. | Property Identification | Use | Distance to Fenton Inn |
|-----|------------------------|-----|------------------------|
| 1 | Acorn Inn<br>Faber, VA 22938 | B&B | 7.07 Miles E |
| 2 | Afton Mountain<br>Afton, VA 22920 | B&B | 9.05 Miles NE |
| 3 | Farmhouse at Veritas<br>Afton, VA 22920 | B&B | 10.51 Miles NE |
| 4 | Harmony Hill<br>Arrington, VA 22922 | B&B | 15.53 Miles S |
| 5 | Le Bleu Ridge<br>Afton, VA 22920 | B&B | 7.73 Miles E |
| 6 | Nellysford Country Inn<br>Nellysford, VA 22958 | B&B | 6.90 Miles E |
| 7 | Orchard House<br>Lovington, VA 22949 | B&B | 10.95 Miles SE |
| 8 | The Mark Addy Inn<br>Nellysford, VA 22958 | B&B | 6.63 Miles E |
| *SP* | *Fenton Inn*<br>*Parcel ID 19-3-2A*<br>*Roseland, VA 22967* | *Transient Lodging* | - - - - |

Interaction:     PAII reports the following B&B characteristics for the South Atlantic region, which includes Virginia, in its most recent study:

| Element | South Atlantic |
|---------|----------------|
| Total Company Revenue | $180,000 |
| Occupancy Rate | 32.1% |
| Average Daily Rate (ADR) | $163 |
| Revue per Available Guest Room (RevPar) | $59 |

Source: Professional Associate of Inkeepers International

Airbnb, Inc.'s website shows prices range from $75 per night to $250 per night in different areas of Nelson County, including Wintergreen Resort.

According to Airbnb, Nelson County Airbnb owners made $506,100 total in 2018 and saw 4,000 guests through 2018.

Capture:     Published statistics suggest that there is demand for the Property's use based on market activity but the oversupply of short-term rentals will limit revenue.

Based on my inferred analysis of the historical trends in occupancy of similar property types, it is my opinion that there is immediate timing of use for the Property's transient lodging.

24

## LARGER PARCEL ANALYSIS

The concept of the *larger parcel* is an analytical premise unique to eminent domain valuation and has a direct bearing on the valuation of the Property per the *before-and-after* method under the federal rule.

The larger parcel is sometimes referred to as the *parent tract* or the *rule of joinder*.[39]

*Larger parcel* is defined as "in governmental land acquisitions and in valuation of charitable donations of partial interests in property such as easements, the tract or tracts of land that are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and best use. Elements for consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use. In most states, unity of ownership, contiguity, and unity of use are the three conditions that establish the larger parcel for the consideration of severance damages. In federal and some state cases, however, contiguity is sometimes subordinated to unitary use."[40]

The larger parcel may be all of one parcel, part of a parcel, or several parcels, depending to varying degrees on unity of ownership, unity of use, and contiguity.[41]

My analysis of the larger parcel is as follows:

Unity of Ownership

Title to Parcel Identification No. 19-3-2A, containing 2.922 acres, more or less, is owned by Fenton Family Holdings , LLC. Fenton Family Holdings , LLC also owns Parcel Identification Nos. 19-3-2B, containing 5.383 acres, more or less, and 19-3-2C, containing 12.610 acres, more or less. Thus, unity of ownership applies to all three parcels.

My search of the Nelson County Circuit Court land records and the Nelson County GIS system revealed no other real estate owned by Fenton Family Holdings , LLC.

Contiguity

Physical unity is considered within the context of integrated use rather than as a stand-alone test.

Parcel Identification Nos. 19-3-2A, 19-3-2B and 19-3-2C are contiguous. Therefore, contiguity applies to all three parcels.

---

[39] James D. Eaton, MAI, SRA, Real Estate Valuation in Litigation, 2nd ed., (Chicago: Appraisal Institute, 1995), 75.
[40] The Dictionary of Real Estate Appraisal, 6th ed., 127.
[41] Real Estate Valuation in Litigation, 2nd ed., 76.

Unity of Use

The unity of use test of the larger parcel requires that the parcel or parcels of land can be devoted to the same use as, or an integrated use with, the land from which the taking is made.[42]

For example, multiple noncontiguous tracts of land may all be under common ownership and may all be currently operated by the owner and used as a single farming unit. However, this common use is not market driven. Rather, it is by operator choice. If the same tracts were offered for sale on the open market, they would be offered separately in order to command the highest price. In other words, each separate parcel would stand alone as its own individual economic unit in the market.[43]

*Economic unit* is defined as "a portion of a larger (parent) parcel, vacant or improved, that can be described and valued as a separate and independent parcel. Physical characteristics such as location, access, size, shape, existing improvements, and current use are considered when identifying an economic unit. The economic unit should reflect marketability characteristics similar to other properties in the market area. In appraisal, the identification of economic units is essential in highest and best use analysis of a property."[44]

Parcel Identification Nos. 19-3-2A, 19-3-2B and 19-3-2C are all zoned Agricultural A-1 District. However, Parcel Identification No. 19-3-2A is improved with a structure designed and permitted to be used as a residential use group R-5 building subject to development and use conditions; whereas, Parcel Identification No. 19-3-2B is mostly vacant land that is underutilized and should be improved with a single-family detached residence and Parcel Identification No. 19-3-2C is improved with single-family detached residence used as private residence and a partially completed accessory structure permitted as an in-law suite only.

Moreover, the proprietor of the Property must reside onsite per the development and use conditions in place and in order to provide meals throughout the day to transient guests. Therefore, the contiguous single-family detached residence and mostly vacant land components are not necessary to operate the Property for transient guest purposes.

In my opinion, Parcel Identification No. 19-3-2A is a distinct economic unit that has a current use and physical and marketability characteristics that are dissimilar to Parcel Identification Nos. 19-3-2B and 19-3-2C, which comprise distinctly different economic units. The governmental approvals in place for Parcel Identification Nos. 19-3-2A and 19-3-2C and the adaptable uses that are reasonably probable for Parcel Identification Nos. 19-3-2A, 19-3-2B and 19-3-2C are not integrated uses.

---

[42] *Ibid.*, 84.
[43] Appraisal Institute, Real Property Valuation in Condemnation, (Chicago: Appraisal Institute, 2018), 66.
[44] The Dictionary of Real Estate Appraisal, 6th ed., 72.

26

Conclusion

Parcel Identification No. 19-3-2A, containing 2.922 acres, more or less, and Parcel Identification Nos. 19-3-2B and 19-3-2C containing 5.383 and 12.610 acres, respectively, have dissimilar current uses and physical and marketability characteristics that should not be considered as part of the same larger parcel. Therefore, I consider Parcel Identification No. 19-3-2A to be a separate and distinct economic unit. Said economic unit should be valued unto itself in keeping with generally accepted appraisal practice.

## HIGHEST AND BEST USE "BEFORE THE PARTIAL ACQUISITION"

| | |
|---|---|
| Legally Permissible Uses: | The Property is zoned A-1 District and vested with an approved building permit that allows for a structure to be occupied as the residence of the proprietor with a maximum of 5 guest room sleeping units provided for transient occupants.[45] |
| | Changing or expanding the Property's use to include a food establishment, wedding venue, winery and/or renting the contiguous accessory unit to transient guests would require legislative approvals and is speculative due to the risk involved.[46] |
| Physically Possible Uses: | The existing building improvement is physically possible. |
| Financially Feasible Uses: | The existing transient lodging appears to be financially feasible within the price limits demonstrated by the subject submarket. |
| Maximally Productive Use (Conclusion): | The maximally productive use of the Property as though vacant and improved is continued use as a transient lodging occupied as the residence of the proprietor with a maximum of 5 guest room sleeping units provided for transient occupants. |

The most likely purchaser of the Property is a local buyer seeking a owner-occupied transient lodging. The timing of the highest and best use is immediate.

---

[45] A representative of the owner indicated six guest rooms are rented to transients at the Property but the approved building permit and plan review comments limit such use to five guest rooms. *See* Deposition of William Fenton dated February 5, 2019, page 40, lines 12 through 15.

[46] A representative of the owner also indicated tentative future plans for the Property include a restaurant, tasting room for a nearby winery, wedding venue and renting the contiguous accessory unit to transient guests as a pet-friendly guest room. *See* Deposition of William Fenton dated January 17, 2019, page 33, lines 1 through 20; and page 120, lines 5 through 12.

## HIGHEST AND BEST USE "AFTER THE PARTIAL ACQUISITION"

| | |
|---|---|
| Legally Permissible Uses: | The Property's legally permissible uses are the same as those referenced above. |
| Physically Possible Uses: | The Property's physically possible uses are the same as those referenced above. |
| Financially Feasible Uses: | The Property's financially feasible uses are the same as those referenced above. |
| Maximally Productive Use (Conclusion): | The Property's maximally productive use is the same as that referenced above. |

My highest and best use opinion for the Property is continued use as a transient lodging occupied as the residence of the proprietor with a maximum of 5 guest room sleeping units provided for transient occupants.

## VALUATION PROCESS

The valuation process is a systematic procedure an appraiser follows to provide answers to a client's questions about real property value. It is a model that can be adapted to a wide variety of questions that relate to value. [47]

The appraisal problem at issue required that I apply the valuation process to solve a complex appraisal assignment.

Complex assignments all have certain characteristics that make them atypical in their markets and they must be valued by appraisers with specialized qualifications. Some of these special qualifications can be obtained through reading, research, and attending courses and seminars, but the most meaningful knowledge is acquired by appraising a number of complex properties.[48]

Five factors appear to be significant in defining complexity: location, conformity, physical characteristics, market conditions, and special circumstances.[49]

I have the requisite training, specialized education and experience in providing appraisal services for other condemnation assignments to competently solve the appraisal question at issue.

The valuation process is accomplished through specific steps. The number of steps followed depends on the intended use of the assignment results, the nature of the property, the scope of work deemed appropriate for the assignment, and the availability of data. The model provides a

---

[47] The Appraisal of Real Estate, 14th ed., 35.
[48] Frank E. Harrison, MAI, SRA, Appraising the Tough Ones: Creative Ways to Value Complex Residential Properties, (Chicago: Appraisal Institute, 1996), 3.
[49] Ibid., 4.

28

pattern that can be used in any appraisal assignment to perform market research and data analysis, to apply appraisal techniques, and to integrate the results of these activities into an opinion of defined value. In addition to assisting appraisers in their work, models that apply the valuation process are recognized by the market of appraisal users and facilitate their understanding of appraisal conclusions.[50]

Research begins after the appraisal problem has been identified and the scope of work required to solve the problem has been determined. The analysis of data relevant to the problem starts with an investigation of trends observed at the market level—international, national, regional, or neighborhood. This investigation (i.e., the market analysis) helps the appraiser understand the interrelationships among the principles, forces, and factors that affect real property value in the specific market area. Research also provides raw data from which the appraiser can extract quantitative information and other evidence of market trends. Such trends may include positive or negative percentage changes in property value over a number of years, the population movement into an area, and the number of employment opportunities available and their effect on the purchasing power of potential property users.[51]

Three valuation approaches are typically used to estimate the market value of improved property, namely, the cost, income capitalization and sales comparison approaches to value. All three approaches are applicable to many appraisal problems, but one or more of the approaches may have greater significance in a given assignment.

During the past two decades, the bed and breakfast inn has experienced a tremendous increase in popularity. This product, which is not much more than a spruced-up rooming house, offers relatively low-cost accommodations in a comfortable, residential atmosphere. Many establishments are historic houses with period furnishings, and breakfast is generally included in the price. Bed and breakfast establishments are typically owner-operated. They are basically large homes whose owners take roomers in to help supplement the property's operating expenses. Because the economics or income-generating capability of such small lodging facilities can seldom support absentee ownership, the most appropriate appraisal approach for bed and breakfast properties is usually the sales comparison approach.[52]

Frequently, appraisers opt for the income approach, often in conjunction with direct sales comparison.[53]

Sales comparison is usually the preferable methodology for developing an opinion of land or site value. When there are not enough sales of similar parcels for the application of sales comparison, alternative methods such as market extraction, allocation, and various income capitalization techniques may be used.

---

[50] *Id.*
[51] *Id.*
[52] Stephen Rushmore, MAI, John W. O'Neill, MAI, PhD, and Stephen Rushmore, Jr., MAI, Hotel Market Analysis and Valuation: International Issue and Software Applications, (Chicago: Appraisal Institute, 2012), 142.
[53] Steve Bergsman, "B&B&B: Bed and Breakfast and Beyond," *Valuation* (First Quarter 2013): 19-21

When only part of a landowner's property is taken by a private gas company under the Natural Gas Act, "the owner is not confined to recover for the part taken only, but is entitled to recover also for the damages thereby visited upon the area remaining in his title, possession and use."[54]

Thus, the measure of damages for a partial taking is the "fair market value of the parcel actually taken plus the severance damages"; severance damages are defined as "the difference in market value of the residue before and after taking."[55]

> "[I]t is well settled that in the event of a 'partial taking' - i.e., a case in which the Government has taken one part of a larger tract, leaving the remainder to the landowner - the measure of just compensation is the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking.")[56]

In applying the *before-and-after method* to value a Property, an appraiser estimates the value of a property under two entirely different sets of circumstances – one before a certain event occurs and the other after the event has occurred. The difference between the two values is usually assumed to be attributable to the event. I used this technique to value the permanent easement to be taken on the Property.

A temporary easement is typically valued by capitalizing the rental rate of the land being used during the temporary construction use. Upon completing the construction, the property is returned to its original state. The rental rate for the land is often based on an annual rate of return of the fee simple land value (expressed as a percentage). I used this technique to value the temporary easements to be taken on the Property.

Of the recognized techniques used to value an improved property operated as a transient lodging subject to permanent and temporary easement takings, it is my opinion that elements of the cost, income capitalization and sales comparison approaches are necessary for credible assignment results.

## LAND VALUATION

I estimated the Property's land value "before the taking" by developing the sales comparison approach.

The sales comparison approach is defined as "the process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land,

---

[54] *97.19 Acres of Land, More or Less, in Montgomery, Washington & Alleghany Ctys., Md.*, 582 F.2d at 880 (citation and internal quotation marks omitted).
[55] *Ibid.*, 88.
[56] *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 378 (4th Cir. 1995).

or land being considered as though vacant when an adequate supply of comparable sales is available."[57]

The principle of substitution states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price attracts the greatest demand and widest distribution. This principle assumes rational, prudent market behavior with no undue cost due to delay. According to the principle of substitution, a buyer will not pay more for one property than for another that is equally desirable.[58]

Property values tend to be set by the price of acquiring an equally desirable substitute property. The principle of substitution recognizes that buyers and sellers of real property have options, i.e., other properties are available for similar uses. The substitution of one property for another may be considered in terms of use, structural design, or earnings. The cost of acquisition may be the cost to purchase a similar site and construct a building of equivalent utility, assuming no undue cost due to delay. This is the basis of the cost approach. On the other hand, the cost of acquisition may be the price of acquiring an existing property of equal utility, again assuming no undue cost due to delay. This is the basis of the sales comparison approach.[59]

In order to locate comparable land sales, I conducted a comprehensive search of public records and CAAR-MLS land listings going back five years with a concentrated focus in the Roseland submarket.

I collected, verified and analyzed land sale data with similar highest and best uses in comparison to the Property. A summary of the comparable land sales I considered is presented below.

### COMPARABLE LAND SALE DATA

| ID | Address | Grantor | Grantee | Ac. | Zoning | Instrument | Sale Date | Sale Price | Price/Ac. |
|----|---------|---------|---------|-----|--------|------------|-----------|------------|-----------|
| 1 | 20 Shelton Laurel Trl. Roseland, VA 22967 | Walter R. Potter, et al. | William Fenton, et al. | 17.834 | A-1 | 150000571 | 03/11/15 | $180,000 | $10,093 |
| 2 | S/S Beech Grove Rd. Roseland, VA 22967 | Francis X. Dilorenzo, et al. | William N. Evans, et al. | 4.990 | A-1 | 150000678 | 03/23/15 | $100,000 | $20,040 |
| 3 | N/S Beech Grove Rd. Roseland, VA 22967 | Mary L.B.M. Moore | Elizabeth A. Wachtmeister | 4.620 | A-1 | 150002900 | 10/30/15 | $90,000 | $19,481 |
| 4 | 5 Winery Ln. Roseland, VA 22967 | W. Wayne Blanchard, et al. | Kirstin S. Sandquist | 10.140 | A-1 | 170000770 | 03/31/17 | $135,000 | $13,314 |
| SP | 29 Shelton Laurel Trl. Roseland, VA 22967 | - - - - | - - - - | 2.922 | A-1 | - - - - | 01/31/18 (Effective) | - - - - | - - - - |

Source: CAAR-MLS & Public Records

In my opinion, the above-referenced settled sales were the best available to value the Property's land "before the taking," as of the effective date of appraisal.

---

[57] The Dictionary of Real Estate Appraisal, 6th ed., 207.
[58] The Appraisal of Real Estate, 14th ed., 30.
[59] Id.

31

The Land Appraisal Report containing the valuation of the Property's land "before the taking" is presented in in the Addenda (see **Exhibit No. 2**).

A summary of my opinion of the fair market value "before the taking" of the Property's land is presented below.

| Property Identification | FMV "Before" |
|---|---|
| Subject Property's Land Value (Parcel Identification No. 19-3-2A) | $60,000 |

## IMPROVED PROPERTY VALUATION

I estimated the Property's improved value "before the taking" by developing the cost, income capitalization and sales comparison approaches.

### COST APPROACH

The cost approach is defined as "a set of procedures through which a value indication is derived for the fee simple estate by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive or profit; deducting depreciation from the total cost; and adding the estimated land value. Adjustments may then be made to the indicated value of the fee simple estate in the subject property to reflect the value of the property interest being appraised."[60]

The principle of substitution recognizes that buyers and sellers of real property have options, i.e., other properties are available for similar uses. The substitution of one property for another may be considered in terms of use, structural design, or earnings. The cost of acquisition may be the cost to purchase a similar site and construct a building of equivalent utility, assuming no undue cost due to delay. This is the basis of the cost approach.[61]

In the cost approach, the subject property is treated as a physical entity which, for valuation purposes, is segregated into two components - land and improvements.  Therefore, the value indication per this approach is the summation of the estimated land value and the estimated replacement cost of the improvements less any accrued depreciation.

The cost approach is mistakenly used by some appraisers to value special-purpose properties that have no active market with effective demand. If there is no market for a special-purpose property, the appraiser must develop an opinion based on a use that does have market demand. The cost approach can be used to estimate the market value of special-purpose properties, but if there is no demand for that design, reconfiguration costs must be considered.[62]

---

[60] The Dictionary of Real Estate Appraisal, 6th ed., 54.
[61] The Appraisal of Real Estate, 14th ed., 30.
[62] The Student Handbook to The Appraisal of Real Estate, 14th ed., 309.

32

In applying the cost approach, an appraiser must distinguish between two cost bases-reproduction cost and replacement cost-and use one of the two consistently throughout the analysis. The market and physical condition of the appraised property usually suggest whether an exact replica of the subject property (reproduction cost) or a substitute property of comparable size and use (replacement cost) would be the basis of a more suitable comparison.[63]

*Reproduction cost* is defined as "the estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building."[64]

*Replacement cost* is defined as "the estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout."[65]

The Property's existing building improvement is a unique, one-of-a-kind structure and has many hand-crafted, custom doors and treatments built by the property owner. Thus, the reproduction cost is difficult to estimate as many of the unique features are not commercially available.[66]

Conversely, the replacement cost of a substitute building using modern materials and current standards, design, and layout is easier to estimate and is commonly used throughout the real estate industry.[67]

The use of replacement cost can eliminate the need to measure some, but not all, forms of functional obsolescence such as superadequacies and poor design. Replacement structures usually cost less than identical structures (i.e., reproductions) because they are constructed with materials and techniques that are more modern, more readily available, and less expensive in the current market. Also, correcting deficiencies may result in lower costs. Thus, a replacement cost estimate is usually lower and may provide a better indication of the existing structure's contribution to value. A replacement structure typically does not suffer functional obsolescence resulting from superadequacies. However, if functional problems persist in the hypothetical replacement structure, an amount must be deducted from the replacement cost. Estimating replacement cost generally simplifies the procedure for measuring depreciation in components of superadequate construction.[68]

I utilized a recognized cost service, namely, the CoreLogic Swift Commercial Estimator (formerly known as the Marshall Valuation Service), to develop the direct replacement cost estimate for the Property's existing improvement using the B&B #539 Occupancy Code, Class D, Excellent Quality (4.0) criteria. Indirect costs and an entrepreneurial profit allowance were estimated as a lump-sum percentage of direct costs.

---

[63] The Appraisal of Real Estate, 14th ed., 562.
[64] The Dictionary of Real Estate Appraisal, 6th ed., 198.
[65] *Ibid.*, 197.
[66] *See* Deposition of Paykon Sarmadi dated February 25, 2019, page 33, lines 5 through 16.
[67] For example, the insurable value of the Property's existing building improvement was $2,006,000, as of the effective date of appraisal, and reflects replacement cost (and not reproduction cost) as shown on Defendant 000277.
[68] The Appraisal of Real Estate, 14th ed., 570.

33

Total depreciation is the difference between an improvement's replacement cost and its market value, as of the effective date of appraisal.

Depreciation in an improvement can result from three major causes operating separately or in combination:

- wear and tear from regular use, the impact of the elements, or damage, which is known as physical deterioration and may be curable or incurable.

- a flaw in the structure, materials, or design that diminishes the function, utility, and value of the improvement, which is known as functional obsolescence and again may be curable or incurable.

- a temporary or permanent impairment of the utility or salability of an improvement or property due to negative influences outside the property, which is known as external obsolescence and is incurable.

In my opinion, the Property's existing building improvement evidences physical deterioration and functional and external obsolescence due to the following causes:

- Physical deterioration - The building was constructed in 2012 and is six years old. Thus, it evidences normal wear and tear. I believe its effective age is equal to its actual age.

- Functional obsolescence - The building's development and use is limited to a maximum of five guest room sleeping units provided for transient occupants; however, the building was constructed with six guest room sleeping units and has other rooms that are used infrequently. Therefore, the building has superadequacies.

- External obsolescence - Nelson County has an oversupply of short-term rental units throughout the county with an additional 200 in the Wintergreen Resort alone. Revenue is therefore limited due to supply and demand conditions.

The three principal methods for estimating depreciation are:

1. the market extraction method
2. the economic age-life method
3. the breakdown method

The various methods may be combined to solve specific problems, or each method may be applied separately to test the reasonableness of the estimates derived from other methods.

The Property is income producing and an alternative to the market extraction and economic age-life methods is the capitalization of income lost from all forms of depreciation used in the breakdown method. The income lost is measured by comparing market-derived revenue at equilibrium to actual rent affected by all forms of depreciation present in the Property.

34

| Element | Harvey Replacement Cost Estimate[A] | Owner Reproduction Cost Estimate[B] |
|---|---|---|
| Capital Outlay (Project Cost) | $2,055,965 | $3,657,000 |
| Times Market Investment Return $(R_O)$[C] | 0.10 | 0.10 |
| Equals Market Anticipated Investment Return | $205,597 | $365,700 |
| Less Property's 2017 Net Operating Income[D] | (104,112) | (104,112) |
| Equals Income Loss (All Forms of Depreciation) | ($101,485) | ($261,588) |
| Divided by Market Investment Return $(R_O)$ | 0.10 | 0.10 |
| Equals Total Depreciation | ($1,014,850) | ($2,615,880) |
| Value Indication "Before the Taking" (Rounded) | $1,040,000 | $1,040,000 |

[A]  Includes land, direct replacement costs, indirect costs, and an entrepreneurial profit allowance.
[B]  Includes allocated land and site improvement costs, direct reproduction costs, and indirect costs per
       Defendant 001856-001859.   .
[C]  Reflects concluded $R_O$ for Property based on overall rates of regional B&B sales.
[D]  Includes net operating income and rent payment between related parties reported on Owner's 2017 Federal
       tax return per Defendant 000167.

The cost approach summary for the Property as improved is presented in the Addenda (see **Exhibit No. 7**).

The Property's improved value indication "before the taking" by the cost approach was $1,040,000.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach is defined as "specific appraisal techniques applied to develop a value indication for a property based on its earning capability and calculated by the capitalization of property income."[69]

Anticipation is fundamental to the income capitalization approach. All income capitalization methods, techniques, and procedures forecast anticipated future benefits and estimate their present value. This may involve forecasting the anticipated future income from a property or estimating a capitalization rate that implicitly reflects the anticipated pattern of change in income over time.[70]

In the income capitalization approach, all the necessary income, expense, and rate data is evaluated in light of the market forces of supply and demand.

The typical steps involved in this approach are summarized as follows:

1)  Estimate the potential gross income.

2)  Estimate an allowance for vacancy and collection loss.

3)  Estimate and deduct operating expenses to derive net operating income.

---

[69] The Dictionary of Real Estate Appraisal, 6th ed., 115.
[70] The Appraisal of Real Estate, 14th ed., 440.

4)  Select an applicable capitalization technique and develop the appropriate capitalization rate.

5)  Complete the necessary computations to derive an economic value indication.

The capitalization process involves the conversion of an income projection and reversion into a present value estimate.  The two techniques used to accomplish this process are direct capitalization and yield capitalization.

The Property was placed in service in July 2016 and is in a highly competitive market given the abundant supply of short-term rental units available in the nearby Wintergreen Resort.

I analyzed the Property's income and expenses for 2016 and 2017 as the basis for developing a reconstructed operating statement for the going concern and eliminated nonrealty elements from the valuation.

A reconstructed operating statement represents an opinion of the probable future net operating income of an investment. Certain items included in operating statements prepared for property owners should be omitted in reconstructed operating statements prepared for appraisal purposes. These items include book depreciation, depletion allowances or other special tax considerations, income tax, special corporation costs, additions to capital, and loan payments.[71]

The Property's principal source of revenue comes from renting guest rooms to transient guests. The Property's occupancy rate in 2017 was approximately 38% and the ADR was approximately $300.[72]

As compared to PAII's statistics for B&Bs in the South Atlantic region and Airbnb, Inc.'s published prices for short-term rentals in Nelson County, including the Wintergreen Resort, the Property achieved stabilized occupancy in 2017.

*Stabilized occupancy* is defined as "1. The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand., 2. An expression of the average or typical occupancy that would be expected for a property over a specified projection period or over its economic life."[73]

I used direct capitalization to value the Property. This method converts a single year's income estimate into a value indication. The conversion is accomplished in one step, either by dividing the income estimate by an appropriate income rate or multiplying the income estimate by an appropriate factor.

---

[71] *Ibid.,* 487.
[72] A representative of the owner provided this income data. *See* Deposition of William Fenton dated February 5, 2019, page 38, lines 16 through 21; page 43, lines 11 through 13; and page 45, lines 2 through 4.
[73] The Dictionary of Real Estate Appraisal, 6th ed., 219.

36

The direct capitalization formula is:

$$\frac{NOI}{R_O} = Value$$

In estimating an overall capitalization rate ($R_O$) for the Property, I used generally accepted appraisal techniques including derivation from comparable sales and secondary data regarding investor expectations.

A summary of the overall capitalization rate analyses is presented below.

| Technique | $R_O$ |
|---|---|
| B&B Regional Sales (6) IL, NC, NY, MA, PA & VA | 7.5% (min.) – 10.0% (max.) 8.4% (avg.) |
| Surveyed Lodging Rates | 4.0% (min.) – 17.0% (max.) 9.5% (avg.) |

Sources:  CoStar, PwC Real Estate Investor Survey -1st Quarter 2018 and RealtyRates.com Investor Survey – 1st Quarter 2018

After reviewing the adequacy of the data and the degree of reliability of the recognized techniques used to estimate the $R_O$, I placed most weight on the rates derived from the comparable sales. Based on my analysis, I believe a 10.0% $R_O$ was appropriate for the Property. The selected $R_O$ takes into account the relative risk an investment in the Property would entail due to the property's: (i) location and physical characteristics, (ii) prevailing investment market conditions, and (iii) supply and demand conditions in the market area, especially when one considers the Property must compete with around 200 short-term rentals in the Wintergreen Resort that are more proximate to the resort amenities.

The income approach summary for the Property as improved is presented in the Addenda (**see Exhibit No. 8**).

The Property's improved value indication "before the taking" by the income capitalization approach was $1,040,000.

**SALES COMPARISON APPROACH**

As mentioned, the sales comparison approach is defined as "the process of deriving a value indication for the subject property by comparing sales of similar properties to the property being appraised, identifying appropriate units of comparison, and making adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales is available."[74]

---

[74] The Dictionary of Real Estate Appraisal, 6th ed., 207.

37

The sales comparison approach is applicable to most types of real property interests when there are sufficient recent, reliable transactions to indicate value patterns or trends in the market. For property types that are bought and sold regularly, the sales comparison approach often provides a credible indication of market value. When data is available, sales comparison can be the most straightforward and simple way to explain and support an opinion of market value.[75]

To apply the sales comparison approach, appraisers follow a systematic procedure:

1) Research the competitive market for information on properties that are similar to the subject property and that have recently sold, are listed for sale, or are under contract. Information on agreements of sale, options, listings, and bona fide offers may also be collected. The characteristics of the properties such as property type, date of sale, size, physical condition, location, and land use constraints should be considered. The goal is to find a set of comparable sales or other evidence such as property listings or contracts as similar as possible to the subject property to ensure they reflect the actions of similar buyers. Market analysis and highest and best use analysis set the stage for the selection of appropriate comparable sales.

2) Verify the information by confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations. Verification should elicit additional information about the property such as buyer motivation, economic characteristics (if the property is income-producing), value component allocations, and other significant factors as well as information about the market to ensure that comparisons are credible. Select the most relevant units of comparison used by participants in the market (e.g., price per acre, price per square foot, price per front foot, price per dwelling unit) and develop a comparative analysis for each unit. The appraiser's goal is to define and identify a unit of comparison that explains market behavior.

3) Look for differences between the comparable sale properties and the subject property using all appropriate elements of comparison. Then adjust the price of each sale property, reflecting how it differs, to equate it to the subject property or eliminate that property as a comparable. This step typically involves using the most similar sale properties and then adjusting for any remaining differences. If a transaction does not reflect the actions of a buyer who would also be attracted to the subject property, the appraiser should be concerned about comparability.

4) Reconcile the various value indications produced from the analysis of comparables into a value conclusion. A value opinion can be expressed as a single point estimate, as a range of values, or in terms of a relationship (e.g., more or less than a given amount).[76]

In order to develop the sales comparison approach, I collected regional sales data along the Appalachian/Blue Ridge Mountains corridor due to the paucity of local sales.

---

[75] The Appraisal of Real Estate, 14th ed., 380.
[76] Ibid., 381.

Elements of comparison analyzed included real property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions (time differential), location, and property characteristics.

For purposes of this appraisal, I used qualitative techniques to develop the sales comparison approach to value.

Qualitative techniques are based on the study of the relationships indicated by market data without regard to the exact measurement of their effect on value. Many appraisers use this technique because it reflects the imperfect nature of real estate markets. In applying this technique, an appraiser analyses comparable data to merely determine whether the characteristics of the comparables are inferior, superior, or equal to those of the subject.

Comparable Sale 4 is a listing and has been on the market since 2008. Its original offering price was $1,695,000 and has been reduced -29% to its current offering price of $1,195,000. The gross revenue at Comparable Sale 4 was $319,633, which is equivalent to a gross income multiplier (GIM) of 3.74. The Property's gross revenue of $225,165 is significantly lower than that of Comparable Sale 4 and equates to a value indication of only $842,000 (rounded) using a 3.74 GIM.

The sales comparison approach summary for the Property as improved is presented in the Addenda (see Exhibit No. 9).

The Property's improved value indication "before the taking" by the sales comparison approach was $1,050,000.

## RECONCILIATION

Reconciliation requires appraisal judgment and a careful, logical analysis of the procedures that lead to each value indication. Appropriateness, accuracy, and quantity of evidence are the criteria with which an appraiser forms a meaningful, defensible final opinion of value.[77]

| Value Indication | FMV "Before" |
|---|---|
| Cost Approach | $1,040,000 |
| Income Capitalization Approach | $1,040,000 |
| Sales Comparison Approach | $1,050,000 |

After reviewing the adequacy of data and degree of reliability of the value indications developed by the cost, income capitalization and sales comparison approaches, I believe they produce credible assignment results. In reconciling a final estimate of value, I placed equal weight on each approach.

A summary of my opinion of the Property's fair market value "before the taking" as improved is presented below.

---

[77] The Appraisal of Real Estate, 14th ed., 644.

| Property Identification | FMV "Before" |
|---|---|
| Subject Property (Parcel Identification No. 19-3-2A) | $1,045,000 |

## PERMANENT EASEMENT VALUATION

I developed the *before-and-after method* to value the permanent easement to be taken on the Property by estimating the value of the Property before and after the taking. The difference between the two values is attributable to the value the permanent easement to be taken on the Property.

### VALUATION "BEFORE THE TAKING"

I estimated the Property's fair market value "before the taking" as improved was $1,045,000 and the land value was $60,000 or $20,000/ac.

### VALUATION OF THE PART TAKEN

The partial interest taken on the Property reflects a vertical division of real property where ACP is acquiring various surface and subsurface rights in the form of both permanent and temporary easements and licenses.

The owner of an easement is said to have a *dominant estate*, while the owner of the underlying fee is said to have a *subservient estate*. A dominant estate is sometimes referred to as an *affirmative easement* and a subservient estate as a *negative easement*. The terms are somewhat self-explanatory in that the interest in the land held by the owner of the easement dominates the rights retained by the fee owner. Although the fee owner may retain the right to use the land unencumbered by the easement, this use may not interfere in any manner with the easement owner's use of the property for the purposes specified in the written easement. Thus, a fee owner's interest in the easement area is subservient to the interest of the easement owner.[78]

In analyzing the percentage of fee value attributable to the property rights taken by ACP, I considered the following:

a) Appraisal literature, including but not limited to, treatises by Donald Sherwood, SR/WA, "Easement Valuation," *Right of Way* (May/June 2006): 30-33, and David R. Dominy, MAI, CRE, FRICS, "Pipeline Impact to Property Value and Property Insurability," *The INGAA Foundation, Inc.* (April 2016), and

b) Reported easement acquisitions by various utility companies, such as Colonial Pipeline and Baltimore Gas & Electric Co.

---

[78] Real Estate Valuation in Litigation, 2nd ed., 356.

The Easement Valuation Matrix from Mr. Sherwood's treatise is presented in the Addenda (see **Exhibit No. 10**).

Easements are generally valued on the basis of a percentage of the fee value in accordance with the impact the easement has on the underlying property rights. Various types of easements impose different impacts on the underlying property rights, thus the percentage used will not necessarily be the same for each easement.

In terms of space, three broad classes of easements exist and include subsurface, surface and overhead easements. Some easements may involve two or even all three of these types of space. Subsurface easements may be required for the construction of water and sewer lines, gas pipelines, communication lines, or tunnels. During construction, surface disturbance may occur and some above ground appurtenances may be present, however the bulk of the project remains below the surface and is unseen. Common surface easements may allow for drainage, flowage, railroads and highways. These types of easements severely impact the surface area. Typical overhead easements include electrical transmission lines and avigation easements. Some easements may involve two or even all three of these types of space. For example, overhead transmission lines require surface areas for the placement of the towers and some subsurface areas may be needed for the underground footings required. Thus, while generally classified as one of these three broad classes of easements, most easements involve multi-space occupancy.[79]

The Easement Valuation Matrix is used as a general guide in looking at the effect an easement may have on the total bundle of rights.[80]

The USPAP Scope of Work Rule states, in pertinent part, "the scope of work undertaken in an appraisal or appraisal review must include the research and analyses that are necessary to develop credible assignment results. The scope of work is acceptable when it meets or exceeds:

- the expectation of parties who are regularly intended users for similar assignments; and

- what an appraiser's peer's actions would be in performing the same or a similar assignment.[81]

In order to determine the percentage of the fee value applicable to the partial interest in the Property being taken by ACP, I searched the broader market for property sales encumbered by similar easements and reviewed peer-reviewed appraisal literature on this specialized topic as well as peer actions in similar assignments. I found a paucity of property sales encumbered by similar easements. Thus, I relied on peer-reviewed appraisal literature and peer actions in similar assignments.

The percentage of the fee value taken by my peers in similar assignments ranges between 5% and 95% depending on the severity of the impact of the easement.

---

[79] Donald Sherwood, SR/WA, "Easement Valuation," *Right of Way* (May/June 2006): 30-33.
[80] Id.
[81] Uniform Standards of Professional Appraisal Practice, 2018-2019 ed., 15.

The appraiser must consider the effects of the easement under three specific circumstances. First, the effect of a proposed easement must be considered in making appraisals for easement acquisitions. In this type of assignment, the appraiser must consider the rights being acquired by the condemnor, the rights remaining with the condemnee, and the obligations and responsibilities of each party. Second, the appraiser must consider the effect of existing easements that encumber the property under appraisal. Third, easements appurtenant to a property under appraisal must also be considered. In this case, the larger parcel consists of the fee ownership plus the appurtenant easement attached to it, which are viewed as a single entity.[82]

The rights conveyed by the creation of the ACP permanent easement taken on the Property include permanent use of the subsurface and a permanent major impact on the surface. While the owner may continue to have ground cover on the surface, such vegetation will be limited to grass and small shrubs and ACP can clear the surface as it sees fit. Moreover, no improvement(s) is permitted on the surface.

In my opinion, the severity of the impact of the ACP's permanent easement warrants 90% of the fee value for land area taken.

In valuing the Property's residue "after the taking," I considered the value of the partial taking as well as any resulting damages to the Property's residue by reason of the taking and the value of the special (particular) benefits to the Property's residue that may arise from ACP's future use of the part taken.

Subjective concerns about a perceived hazard held by many property owners do not necessarily equate to objective evidence of diminished property value. While proximity to an UGTL may be objectionable to some segments of the market, there may be other markets in which the locations are considered benign or even desirable because of the additional open space or other perceived amenities.

The appraisal profession has long recognized that proximity to detrimental conditions and sources of possible adverse environmental conditions does not automatically result in an adverse effect on the value of adjacent or nearby properties.[83]

As of this writing, I am aware of some of the local opposition to the ACP Project and have studied many of the articles and press releases from such groups (i.e., Augusta County Alliance, Blue Ridge Environmental Defense League, Friends of Nelson County, Friends of Wintergreen, etc.). I have also reviewed peer-reviewed appraisal literature published by nationally recognized professional appraisal organization such as Appraisal Institute and International Right of Way Association as well as publications from trade organizations such as the Interstate Natural Gas Association of America (INGAA) and EnergySure. I have also studied many of the articles and press releases from the ACP.

---

[82] Real Estate Valuation in Litigation, 2nd ed., 369.
[83] Appraisal Institute, Corridor Valuation: An Overview and New Alternatives, (Chicago: Appraisal Institute, 2019), 211.

My research revealed a wide divergence of opinions, both pro and con, regarding the perceived benefits and detriments of the ACP and its impact on property values.

The impact of a UGTL on property value is ultimately an empirical question that requires the application of one or more of the three traditional approaches to value. I again developed the sales comparison approach utilizing the paired sales analysis method, which uses market data with and without a UGTL to address potential damages. This approach is not always easy to apply because of the difficulty in finding relevant market data, but it is a very strong approach for quantifying value issues in a condemnation assignment.

My paired sales analysis features properties with UGTLs (the "Case Sales") to similar properties that do not have UGTLs (the "Control Sales"). If damages were to result from the imposition of a UGTL on a property, there will likely be a measurable and consistent difference between the two sets of data.

I have researched all of the properties along the ACP's route in Augusta, Buckingham and Nelson Counties and, at present, there is a paucity of arm's-length sales involving ACP-eased properties. Thus, I have also analyzed case studies involving UGTLs in other communities with seasoned transactional histories. Case studies can be a valid means of empirical research.[84]

My paired sales analysis revealed an overall *de minimus* difference (i.e., 0.0% to -3.4%) between the two sets of data and, therefore, I concluded that a UGTL on most properties is a mostly benign condition that is unlikely to diminish the fair market value of the land. The exception to that conclusion is when the UGTL is very proximate to a valuable improvement, which is the case with the Property's transient lodging as it is approximately 200 feet from the ACP. Thus, it becomes somewhat of a misplaced improvement.

In the case studies I analyzed where the UGTLs were very proximate to building improvements, the differences in paired sales analysis revealed a difference between -6.3% and -12.5%.

A summary of my analysis and the individual paired sales analyses I developed are presented in the Addenda (see **Exhibit No. 11**).

My conclusions are further supported by a learned treatise by David R. Dominy, MAI, CRE, FRICS. Mr. Dominy's treatise found:

1) There is no measurable impact on the sales price of properties located along or in proximity to a natural gas pipeline versus properties which are not located along or in proximity to the same pipeline.

2) Neither the size nor the age of a natural gas pipeline affects a property's sale price.

3) There is no impact on demand for properties located along natural gas pipeline easements nor is development in areas with natural gas pipelines hindered.

---

[84] Thomas Jackson PhD, MAI, and Randall Bell, PhD, MAI, "The Analysis of Environmental Case Studies," *The Appraisal Journal* (January 2002): 86-95.

43

4) Natural gas pipelines do not affect the property value of any particular type of residence any more or less than another type of residence.

5) The sales frequency of homes "on" a pipeline is consistent with those "off" a pipeline indicating that the presence of a pipeline does not inhibit sales.

6) Buyers purchasing homes along pipeline easements in each area were able to obtain conventional, Federal Housing Administration (FHA), and Veterans Affairs (VA) loans. This indicates that the presence of a natural gas pipeline had no effect on obtaining a mortgage.

7) Insurance companies and agents interviewed said there was no indication that the presence of a natural gas pipeline would hinder a buyer's ability to acquire property insurance. They also said there was no indication that premiums paid for insurance policies would increase because of the proximity to a natural gas pipeline.

8) Based upon the geographically disparate areas studied, I concluded that it was highly likely that the results and conclusions of this report would apply to other markets across the country in which natural gas pipelines were located. [85] [86]

Therefore, I estimated the value of the permanent easement taken on the Property was $739, rounded to $700. This value was derived by calculating the 90% pro rata fee value of the area within the permanent easement (i.e., 0.04 Ac. x $20,000/Ac. = $800 x 90% = $720, rounded to $700).

## VALUATION "AFTER THE TAKING"

I estimated the Property's land and improved value "after the taking" by again developing the cost, income capitalization and sales comparison approaches.

## LAND VALUATION

I estimated the Property's land value "after the taking" by again developing the sales comparison approach.

I used the same comparable land sales as in the "before" scenario; however, in this instance, an additional -12.5% adjustment was made to the comparables to reflect their superior views after considering the effect of the ACP on the Property's residue.

---

[85] David R. Dominy, MAI, CRE, FRICS, "Pipeline Impact to Property Value and Property Insurability," *The INGAA Foundation, Inc.* (April 2016).

[86] I am aware that the Augusta County Alliance and Friends of Nelson County have advanced criticisms of Mr. Dominy's treatise by Key-Log Economics, LLC, dated May 2016. For the most part, Key-Log Economics' study relies upon contingent valuation methods that are not generally accepted appraisal practice. *See* Albert R. Wilson, "Contingent Valuation: Not and Appropriate Valuation Tool," *The Appraisal Journal* (Winter 2006): 53-60.

The Land Appraisal Report containing the valuation of the Property's land "after the taking" is presented in in the Addenda (**see Exhibit No. 12**).

A summary of my opinion of the fair market value "after the taking" of the Property's land is presented below.

| Property Identification | FMV "After" |
|---|---|
| Subject Property's Land Value (Parcel Identification No. 19-3-2A) | $52,500 |

## COST APPROACH

I developed the cost approach using the same criteria as in the "before" scenario; however, in this instance, an additional 12.5% of depreciation was added to reflect the effects of the ACP on the Property's residue.

The cost approach summary for the Property as improved is presented in the Addenda (**see Exhibit No. 13**).

The Property's improved value indication "after the taking" by the cost approach was $910,000.

## INCOME CAPITALIZATION APPROACH

I estimated the Property's improved value "after the taking" by again developing the income capitalization comparison approach.

I used the same income and expense analysis and direct capitalization rate as in the "before" scenario; however, in this instance, an additional -12.5% adjustment was made after considering the effect of the ACP on the Property's residue.

The income approach summary for the Property as improved is presented in the Addenda (**see Exhibit No. 14**).

The Property's improved value indication "after the taking" by the income approach was $910,000.

## SALES COMPARISON APPROACH

I estimated the Property's improved value "after the taking" by again developing the sales comparison approach.

I used the same comparable improved sales as in the "before" scenario; however, in this instance, an additional -12.5% adjustment was made to the comparables to reflect their superior views after considering the effect of the ACP on the Property's residue.

45

The sales comparison approach summary for the Property as improved is presented in the Addenda (see **Exhibit No. 15**).

The Property's improved value indication "after the taking" by the sales comparison approach was $919,000.

**RECONCILIATION**

| Value Indication | FMV "After" |
|---|---|
| Cost Approach | $910,000 |
| Income Capitalization Approach | $910,000 |
| Sales Comparison Approach | $919,000 |

In reconciling a final estimate of value, I placed equal weight on each approach.

A summary of my opinion of the Property's fair market value "after the taking" as improved is presented below.

| Property Identification | FMV "After" |
|---|---|
| Subject Property (Parcel Identification No. 19-3-2A) | $915,000 |

## TEMPORARY EASEMENT VALUATION

I developed the income capitalization approach to value the temporary easement taken on the Property.

As mentioned, the income capitalization approach is defined as "specific appraisal techniques applied to develop a value indication for a property based on its earning capability and calculated by the capitalization of property income."[87]

The most common measure of damages accepted by the courts is the rental value of the easement area for the period of occupancy by the condemnor.[88]

The rights conveyed by the creation of the temporary easement include temporary use of the subsurface and a temporary major impact on the surface. Once the ACP Project is completed in approximately five (5) years, the temporary easement expires and the property owner has full and complete use and enjoyment of the subsurface, surface and air rights. As such, an improvement(s) will be permitted on the surface after the temporary easement terminates.

---

[87] The Dictionary of Real Estate Appraisal, 6th ed., 115.
[88] Real Estate Valuation in Litigation, 2nd ed., 357.

46

Where a taking is temporary in duration rather than permanent, then the condemning authority "essentially takes a leasehold in the property," and "the value of the taking is what rental the marketplace would have yielded for the property taken."[89]

Thus, I considered what the Property would generate in terms of a short-term rental during the duration of the temporary easement.

In my opinion, the fair market value of the temporary easement is best estimated by calculating a 10% annual return (i.e., rental value) on the 100% pro rata fee value of the affected land for five (5) years discounted.

I based the 10% annual return on my analysis of alternative investment returns for less risky 5-Year Treasury Bonds and Corporate Bonds (Baa) ranging between 2.05% and 4.27% as well as real estate investor surveys published by PwC and RealtyRates.com with average rates of return for net leases and land leases between 6.60% and 7.48%. I added a non-institutional risk premium of 3% to the range and reconciled the data at the upper end of the range at 10%.

I estimated the value of the temporary easement taken on the Property was $272, rounded to $300. This value was derived by calculating a 10% annual return (i.e., rental value) on the 100% pro rata fee value for five (5) years (i.e., 0.03 Ac. x $20,000/Ac. x 100% = $600 x 10% = $60 ÷ 12 = $5 x 52.9907 = $265, rounded to $300).

Temporary damages can result when a condemnor acquires a permanent property right, in fee or through an easement, plus a temporary easement beyond the permanent property right for construction of a proposed public improvement. After construction of the public improvement is completed, the construction easement is extinguished and the unencumbered fee interest in the land reverts back to the owner.[90]

## RECONCILIATION AND FINAL VALUE CONCLUSION

Reconciliation requires appraisal judgment and a careful, logical analysis of the procedures that lead to each value indication. Appropriateness, accuracy, and quantity of evidence are the criteria with which an appraiser forms a meaningful, defensible final opinion of value.[91]

After reviewing the adequacy of data and degree of reliability of the value indications developed by the cost, income capitalization and sales comparison approaches, I believe they produce credible assignment results.

---

[89] *United States v. Banisadr Bldg. Joint Venture*, 65 F.3d 374, 378 (4th Cir. 1995).
[90] Real Estate Valuation in Litigation, 2nd ed., 357.
[91] The Appraisal of Real Estate, 14th ed., 644.

47

A summary of my opinions of the fair market value "before and after the taking" of the Property is presented below.

| Property Identification | FMV "Before" | FMV "After" | Difference |
|---|---|---|---|
| Subject Property (Parcel Identification No. 19-3-2A) | $1,045,000 | $915,000 | $130,000 |
| Plus: Temporary Easement Value | | | 300 |
| Just Compensation | | | $130,300 |

# STATEMENT OF CERTIFICATION

I certify that, to the best of my knowledge and belief:

1.   The statements of fact contained in this report are true and correct.

2.   The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.   I have no present or prospective interest in the property that is the subject of this report and no personal interest or bias with respect to the parties involved.

4.   I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

5.   I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.   My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.   My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.   My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, 2018-2019 edition.

9.   My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10.   I, William C. Harvey, II, CCIM, MAI, have made a personal inspection of the property that is the subject of this report.

11.   William D. O'Donnell and Joseph C. Harvey, associates with William C. Harvey & Associates, Inc., provided me with significant real property appraisal assistance in preparing this report. No one else provided me with significant real property appraisal assistance in preparing this report.

12.   The use of this appraisal report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13.   As of the date of this report, I, William C. Harvey, II, CCIM, MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

49

## STATEMENT OF CERTIFICATION (CONT.)

14. As a result of my inspection and analysis, it is my opinion that the fair market value of the fee simple interest in the permanent partial taking of the Property, *"subject to the definitions, certifications, assumptions and limiting conditions, and scope of work set forth in this report,"* as of January 31, 2018, was $130,000.

15. It is also my opinion that the fair market value of the fee simple interest in the temporary partial taking of the Property, *"subject to the definitions, certifications, assumptions and limiting conditions, and scope of work set forth in this report,"* as of January 31, 2018, was $300.

Certified by,

William C. Harvey & Associates, Inc.

William C. Harvey, II
Digitally signed by William C. Harvey, II
Date: 2019.04.17 14:56:53 -04'00'

_____
William C. Harvey, II, CGM, MAI
President
Virginia Certified General Real
Estate Appraiser No. 4001-000731

_____April 17, 2019_____
Date Signed

*This report has been transmitted electronically to my client and includes my signature in electronic form. I affirm that I maintain sole personal control over the use of the electronic signature appended hereto. Electronically affixing my signature to this report carries the same level of authenticity and responsibility for this report's content, analyses and conclusions as would be appending an original ink signature on a paper copy of this report.*

50

## APPRAISER QUALIFICATIONS - WILLIAM C. HARVEY, II, CCIM, MAI

### PROFESSIONAL EDUCATION:

- Undergraduate:
  - Wesley Junior College; Dover, Delaware (9/71-5/72)
  - University of Maryland; College Park, Maryland (9/72-5/75)
- Appraisal Institute:
  - Course 101, Residential Property Valuation (5/82)
  - Course 1A1, Real Estate Appraisal Principles (3/84)
  - Course 1A2, Basic Valuation Procedures (3/84)
  - Course 8-2, Residential Valuation (10/79)
  - Course 1B-A & B, Capitalization Theory and Techniques, Parts A & B (2/85)
  - Course 2-1, Case Studies in Real Estate Valuation (7/84)
  - Course 2-2, Valuation Analysis and Report Writing (7/84)
  - Course 510, Advanced Income Capitalization (9/95)
  - Course SPP-A & B, Standards of Professional Practice, Parts A & B (5/85, 3/89, 11/92 & 7/01 – Part B Only)
  - Course SPP-C, Standards of Professional Practice, Part C (11/97 & 12/02)
  - Valuation of Conservation Easements Certificate Program (10/07)
  - Appraising Historic Preservation Easements Certificate Program (1/09)
  - General Appraiser Market Analysis and Highest & Best Use (5/18)
- Commercial Investment Real Estate Institute:
  - Course CI 101, Financial Analysis for Commercial Real Estate (3/97)
  - Course CI 201, Market Analysis for Commercial Investment Real Estate (2/98)
  - Course CI 301, Decision Analysis for Commercial Investment Real Estate (6/98)
- National Association of Securities Dealers:
  - Series 7 Exam, NASD/NYSE Registered Representative (4/84)
  - Series 63 Exam, NASD Uniform Securities Agent (4/84)
- Northern Virginia Community College:
  - Principles of Real Estate I (7/75)
  - Principles of Real Estate II (9/75)
- Related Seminars:
  - Appraising Residential Condominiums (6/83)
  - Subdivision Analysis (10/86 & 4/92)
  - Appraisal of Fractional Interests (6/91)
  - Appraising Residential and Commercial Real Estate in a Distressed Market (6/91)
  - Marina Valuation Issues (AI-6/91)
  - Techniques of Residential Inspection (6/91)
  - Discounted Cash Flow Analysis (4/92)
  - Environmental Risk and the Real Estate Appraisal Process (4/94)
  - Faculty Training Workshop-Level II Curriculum (10/94)
  - Regression Analysis: The Appraisal Approach of the Future (4/95)
  - Mid-Year 1995 Real Estate Colloquium (5/95)
  - Automated Valuation Models (10/97)
  - Appraising High-Value and Historic Homes (11/97)
  - Appraisal Instructor Training (4/98)
  - Appraising from Blueprints and Specifications (11/99)

51

- FHA and The Appraisal Process (11/99)
- Internet Search Strategies for Real Estate Appraisers (11/99)
- Valuation of Detrimental Conditions in Real Estate (11/00)
- 2001 USPAP Update for Instructors & Regulators – DC (2/01)
- Eminent Domain and Condemnation (7/01)
- Linear Rights-of-Way: Federal Agency Rent Schedules Reforged (12/01)
- 2002 USPAP Update for Instructors & Regulators - DC (01/02)
- AQB Instructor Certification Program Course (2/03)
- AQB Instructor Recertification Course (4/05)
- Regression Analysis in Appraisal Practice: Concepts and Applications (8/05)
- 7-Hour National USPAP Course (10/05)
- Business Practices and Ethics (11/05)
- Virginia 4-Hour Instruction Course for Local Boards of Equalization (11/05)
- Real Estate Finance, Statistics and Valuation Modeling (10/06)
- Online Experience Training Seminar (8/07)
- Update on Federal & State Legislation on Conservation Easement Tax Benefits (10/07)
- 7-Hour National USPAP Course (12/09)
- Analyzing Distressed Real Estate (12/09)
- Appraisal Curriculum Overview – Residential (2/10)
- Appraisal Curriculum Overview – General (2/10)
- Business Practices and Ethics (2/10)
- AQB Instructor Recertification Course (3/10)
- 7-Hour National USPAP Course (12/11)
- AQB Instructor Recertification Course (12/11)
- What Commercial Clients Would Like Appraisers to Know (2/12)
- An Introduction to Valuing Commercial Green Buildings (2/12)
- Ad Valorem Tax Consultation (12/13)
- Appraisal Applications of Regression Analysis (12/13)
- Appraising and Analyzing Retail Shopping Centers for Mortgage Underwriting (12/13)
- Environmental Issues for Appraisers (12/13)
- 7-Hour National USPAP Course (12/13)
- AQB Instructor Certification Program Course (12/13)
- IRS Valuation Summit (10/14)
- Getting Started with GIS (5/15)
- Getting Started with ArcGIS (5/15)
- AQB Instructor Certification Program Course (9/15)
- 7-Hour National USPAP Course (12/15)
- Forecasting Revenue (12/15)
- Analyzing Operating Expenses (12/15)
- Business Practices and Ethics (10/17)
- USPAP Instructor Recertification Course 2018-2019 (10/17)
- Cool Tools: New Technology for Real Estate Appraisers (11/17)
- Data Verification Methods (11/17)
- 7-Hour National USPAP Course (11/17)

**PROFESSIONAL EXPERIENCE - REAL ESTATE APPRAISAL:**

- William C. Harvey & Associates, Inc., President, 1986-Present.

- Legg Mason Appraisal Group, a division of Legg Mason Realty, Inc., Vice President and Regional Manager, 1983-1986.

- Appraisal Service of America, Inc., a subsidiary of Trustbank Federal Savings, F.S.B., President and Director, 1981-1983.

- Accredited Real Estate Appraisal Service, Inc., Staff Appraiser, 1977-1980.

**PROFESSIONAL EXPERIENCE - REAL ESTATE AUCTION:**

- Chesapeake Auctions, LLC, President, 2006-2012.

**PROFESSIONAL EXPERIENCE - REAL ESTATE BROKERAGE:**

- William C. Harvey & Associates, Inc., President, 2018-Present.

- Harvey Realty Group, LLC, President, 1997-2017.

- Harper and Company, Realtors, Realtor Associate and Assistant Property Manager, 1976-1997.

**PROFESSIONAL MEMBERSHIP:**

- Appraisal Foundation:
  - AQB Certified USPAP Instructor (No. 10669) 2003-Present.
- Appraisal Institute:
  - MAI, Designated Member of the Appraisal Institute (No. 7367), 1986-Present.
  - Member, Ethics and Administration and Review and Counseling Divisions, Region VI; National Standards Panel, 1987-1998.
  - Member, Experience Review Committee, General; Washington D.C. Metropolitan Chapter, 1988-1998.
  - Chair, Experience Review Committee, General; Washington D.C. Metropolitan Chapter, 1990-1992.
  - Director, Washington, D.C. Metropolitan Chapter, 1994-1998 & 2004-2005.
  - Chair, Government Relations Committee; Washington D.C. Metropolitan Chapter, 1995-1996.
  - Regional Representative, Region VI Regional Committee, 1995-1999.
  - Chair, National Experience Review Committee, General; Region VI, 1995-1999.
  - Assistant Regional Member, Ethics and Administration Division, Region VI, 1996-1998.
  - Secretary, Washington, D.C. Metropolitan Chapter, 1997.
  - Member, National Government Relations Committee, Region VI, 1997-2002.
  - Treasurer, Washington, D.C. Metropolitan Chapter, 1998.
  - Member, National Appraisal Journal Review Panel, 1999-2001.

- Screener, National Experience Review Panel, 1999-Present.
  - Member, National Public Affairs Committee, 2001-2002.
  - Vice Chair, National Government Relations Committee, 2001-2002.
  - Chair, Valuation in the Government Sector Shared Interest Group, 2006-2007.
  - Advisor, Candidate for Designation Program, 2013-Present.
- Commercial Investment Real Estate Institute:
  - Certified Commercial Investment Member (CCIM) designation (No.8430), 1998-Present.
- District of Columbia Board of Appraisers:
  - Certified General Real Estate Appraiser (No. GA10390), 1997-Present.
  - District of Columbia Board of Appraisers:
- Fairfax County Board of Equalization of Real Estate Assessments:
  - Appraiser Member, 2005-2013.
- Great Falls Citizens Association, Inc.:
  - Co-Chair, Land Use and Zoning Committee, 2011-2014.
- International Association of Assessing Officers:
  - Associate Member (No. 016486), 1994-Present.
- Maryland Real Estate Appraisers Commission:
  - Certified General Real Estate Appraiser (No. 04-10182), 1992-Present.
- National Association of Realtors:
  - Member, 1976-Present.
- National Association of Securities Dealers:
  - Registered Representative, 1984-1986.
- New York Stock Exchange:
  - Registered Representative, 1984-1986.
- Northern Virginia Association of Realtors:
  - Member, 1976-Present.
- Pennsylvania Board of Certified Real Estate Appraisers:
  - Certified General Real Estate Appraiser (No. GA004344), 2017-Present.
- Town of St. Michaels, Maryland:
  - Chair, Board of Zoning Appeals, 2015-Present.
- U.S. Dept. of Housing and Urban Development:
  - Direct Endorsement Lender Selection Roster of Appraisers-Richmond, VA and Washington, DC, 1994-1999.
- U.S. General Services Administration:
  - Panels 1, 2 and 3 for the Washington, D.C. Metropolitan Area, 1998-2000.
- Virginia Real Estate Appraiser Board:
  - Certified General Real Property Appraiser (No. 4001-000731), 1991-Present.
  - Certified Instructor (No. 4002-000076), 1996-Present.
- Virginia Real Estate Board:
  - Licensed Real Estate Salesperson (No. 0205-056843), 1976-Present.
- West Virginia Real Estate Appraiser Licensing & Certification Board:
  - Certified General Real Estate Appraiser (No. CG618), 2019-Present.

**ACADEMIC AFFILIATIONS AND ACTIVITIES**:

- Appraisal Institute, Level II Faculty - Associate Instructor, Course 510 - *Advanced Income Capitalization*, 1995-1999.

- Northern Virginia Association of Realtors, Associate Instructor, *Environmental Influences and the Valuation Process Seminar*, 1994-1996.

- Northern Virginia Association of Realtors, Associate Instructor, *Environmental Issues, Agency and Fair Housing Seminar*, 1995-1996.

- William C. Harvey & Associates. Inc., Instructor, *Appraisals for Litigation: New Business Opportunities*, 1997-2004.

- William C. Harvey & Associates. Inc., Instructor, *Environmental Influences and the Valuation Process Seminar*, 1997-2004.

- William C. Harvey & Associates. Inc., Instructor, *Virginia State 3-Hour Board Mandated Seminar*, 1997-2004.

**PROFESSIONAL LECTURES**:

- 1994 NVAR Convention and Trade Show, Guest Lecturer, "*Environmental Issues in Appraising*," October 11, 1994.

- 1995 ASTSWMO Brownsfield Workshop, Guest Lecturer, "*Deed Restrictions, Institutional Controls, and Future Land Use Issues*," August 17, 1995.

- 1995 Appraisal Institute Region VI Fall Conference, Guest Lecturer, "*Environmental Influences & the Valuation Process*," October 19, 1995.

- U.S. Court of Federal Claims 12th Judicial Conference, Guest Panelist, "*Experts – Who Needs Them?*" November 16, 1999.

- Eminent Domain, Condemnation & 5th Amendment Takings Conferences, Guest Lecturer, "*Contemporary Appraisal Issues in Eminent Domain Proceedings,*" October 18, 2002.

- 2010 Washington Appraisal Summit hosted by the Appraisal Institute, Guest Lecturer, "*The Valukas Report: Examination of the Chapter 11 Proceedings of Lehman Brothers Holdings, Inc.,*" Washington, DC, July 19, 2010.

- Understanding Real Estate Tax Assessment Appeals: From Assessment, Through Board of Equalization, to Circuit Court Seminar hosted by Virginia CLE, Guest Lecturer, "*Appraiser's Overview*" and "*Appeal to the Board of Equalization/Board of Review,*" Charlottesville and Fairfax, VA, January 19 and 23, 2011.

- CLE Eminent Domain Conference, Guest Lecturer, *"Appraisal Problems and Neglected Issues: Lost Profits, Disputed Highest and Best Uses, and More,"* Irvington, VA, April 25, 2013.

- National Business Institute, Guest Lecturer, *"Calculating Damages and Just Compensation: Appraiser Insights,"* Fairfax, VA, July16, 2014.

- Appraisal Institute's 2014 National Meeting, Guest Lecturer, *"Dissecting the Appraisal Report,"* Austin, TX, August 6, 2014.

**PUBLICATIONS:**

- William C. Harvey, II, CCIM, MAI, *Appraisals for Litigation: New Business Opportunities Seminar Workbook* (Great Falls: William C. Harvey & Associates, Inc., 1997).

- William C. Harvey, II, CCIM, MAI, *Environmental Influences and the Valuation Process Seminar Workbook* (Great Falls: William C. Harvey & Associates, Inc., 1997).

- William C. Harvey, II, CCIM, MAI, "Appraisal Issues Relating to Wireless Telecommunication Facilities," *Telecom Land Management Law Report* (April 1999): 6-9.

- William C. Harvey, II, CCIM, MAI, "Is the Price Right?" *Commercial Investment Real Estate Magazine* (January/February 2004): 36-38.

- William C. Harvey, II, CCIM, MAI, "2012 & Beyond – Board of Equalization vs. Circuit Court," *Virginia Association of Assessing Officers' Network* (Summer 2011): 10. [This publication received the 2011 Zangerle Award from the International Association of Assessing Officers.]

**REPRESENTATIVE CLIENTS:**

Attorneys, banks, builders, corporations, developers, government agencies, insurance companies, private investors, and savings and loans.

**APPRAISAL ASSIGNMENTS:**

Mr. Harvey has forty-two (42) years of commercial and residential real estate appraisal and consulting experience including, but not limited to, appraisals of apartments, condominiums (residential, commercial and industrial), cooperatives, hotels, industrial facilities, vacant land (raw and developed), mansions, motels, nursing homes, office buildings, planned unit developments, retail facilities, right-of-ways, shopping centers (neighborhood strips, community centers and regional malls), single family properties, and special-purpose properties (environmentally-impaired property, fiber optic cables, golf courses, high-tech facilities, etc.). Valuation appraisals as well as evaluation assignments (market studies, feasibility analyses, etc.) have been completed on existing, partially completed, and proposed improvements.

Mr. Harvey has testified as an expert witness on appraisal matters in the following venues: (1) Circuit Court for Albemarle County, Virginia, (2) Circuit Court for the City of Alexandria, Virginia, (3) Circuit Court for Arlington County, Virginia, (4) Circuit Court for Augusta County, Virginia, (5) Circuit Court for Fairfax County, Virginia, (6) Circuit Court for Goochland County, Virginia, (7) Circuit Court for Loudoun County, Virginia, (8) Circuit Court for Montgomery County, Maryland, (9) Circuit Court for Prince George's County, Maryland, (10) Circuit Court for Prince William County, Virginia, (11) Circuit Court for Stafford County, Virginia, (12) Circuit Court for Washington County, Maryland, (13) General District Court for Loudoun County, Virginia, (14) Superior Court of the District of Columbia, (15) U.S. Bankruptcy Court for the District of Maryland, (16) U.S. Bankruptcy Court for the Eastern District of Virginia, (17) U.S. Bankruptcy Court for the District of New Jersey, (18) U.S. Bankruptcy Court for the Southern District of New York, (19) U.S. Court of Federal Claims (court-appointed expert), (20) U.S. District Court for the Eastern District of Virginia, and (21) U.S. House of Representatives, House Committee on Financial Services.

# EXHIBIT 1



3-577A

COMPOSITE PLAT SHOWING
A PORTION OF THE PROPERTY OF

WILLIAM O., JR. & JANET R. SHELTON

ROCKFISH DISTRICT        NELSON COUNTY, VIRGINIA
COMM. #21074  DATE: JULY 26, 2001  FILE #1404-C

97009.CMD  21074.PRO



SAUNDERS' SURVEYS, INC.
329 CRABTREE FALLS HIGHWAY
ROSELAND, VIRGINIA 22967
804-277-8574

GRAPHIC SCALE        1" 100'

0        100        200

# EXHIBIT 2

William C. Harvey & Associates, Inc.

| | Client File #: | | | Appraisal File #: | T000010-B |
|---|---|---|---|---|---|

# Appraisal Report · Land

**AI Reports™**

Form 120.05*

| Appraisal Company: | William C. Harvey & Associates, Inc. | | |
|---|---|---|---|
| Address: | 1146 Walker Rd., Suite H, Great Falls, VA 22066-1838 | | |
| Phone: 703-759-6644 | Fax: 703-759-4112 | Website: www.wchainc.com | |

| Appraiser: | William C Harvey, II, CCIM, MAI | Co-Appraiser: | |
|---|---|---|---|
| AI Membership (if any): ☐ SRA ☒ MAI ☐ SRPA ☐ AI-GRS ☐ AI-RRS | | AI Membership (if any): ☐ SRA ☐ MAI ☐ SRPA ☐ AI-GRS ☐ AI-RRS | |
| AI Affiliation (if any): ☐ Candidate for Designation ☐ Practicing Affiliate | | AI Affiliation (if any): ☐ Candidate for Designation ☐ Practicing Affiliate | |
| Other Professional Affiliation: CCIM | | Other Professional Affiliation: | |
| E-mail: wcha@erizon.net | | E-mail: | |
| Client: McGuireWoods LLP | | Contact: Richard D. Holzheimer, Jr., Esq. | |
| Address: 1750 Tysons Boulevard, Suite 1800, Tysons, VA 22102-4215 | | | |
| Phone: 703-712-5000 | Fax: 703-712-5050 | E-mail: rholzheimer@mcguirewoods.com | |

**SUBJECT PROPERTY IDENTIFICATION**

| Address: | 29 Shelton Laurel Trl | | | | |
|---|---|---|---|---|---|
| City: Roseland | County: Nelson | State: VA | ZIP: 22967 | | |
| Legal Description: | See attached Expert Report for additional information. | | | | |

| Tax Parcel #: | 19-3-2A | | RE Taxes: $4,165 | Tax Year: 2018 |
|---|---|---|---|---|
| Use of the Real Estate As of the Date of Value: | | Transient lodging | | |
| Use of the Real Estate Reflected in the Appraisal: | | Vacant | | |
| Opinion of highest and best use (if required): | | Continued use as a proprietor-occupied transient lodging | | |

**SUBJECT PROPERTY HISTORY**

Owner of Record: Fenton Family Holdings, LLC

Description and analysis of sales within 3 years (minimum) prior to effective date of value:   Research of applicable public records and private data services reveal that there have been no sales of the subject property within the last three years.

Description and analysis of agreements of sale (contracts), listings, and options:   Research of applicable public records and private data services reveal that the subject property was not under contract or option and was not offered for sale within the past three years.

**RECONCILIATIONS AND CONCLUSIONS**

| Indication of Value by Sales Comparison Approach | $ 60,000 |
|---|---|
| Indication of Value by Cost Approach | $ Not Developed |
| Indication of Value by Income Approach | $ Not Developed |

Final Reconciliation of the Methods and Approaches to Value:   The sales comparison approach is the preferred approach to value land and has been relied upon exclusively.

| Opinion of Value as of: | January 31, 2018 | $ 60,000 |
|---|---|---|

Exposure Time: Twelve (12) months

The above opinion is subject to: ☒ Hypothetical Conditions and/or ☒ Extraordinary Assumptions cited on the following page.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved   June 2017

| Client: | McGuireWoods LLP | Client File #: | |
|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | Appraisal File #: | T000010-B |

## ASSIGNMENT PARAMETERS

| Intended User(s): | Atlantic Coast Pipeline, LLC, McGuireWoods LLP and United States District Court for the Western District of Virginia |
|---|---|
| Intended Use: | The intended use of this appraisal is for litigation purposes. |

This report is not intended by the appraiser for any other use or by any other user.

| Type of Value: | Fair Market Value | Effective Date of Value: | January 31, 2018 |
|---|---|---|---|
| Interest Appraised: | ☒ Fee Simple ☐ Leasehold ☐ Other | | |

Hypothetical Conditions: (A hypothetical condition is that which is contrary to what exists, but is asserted by the appraiser for the purpose of analysis. Any hypothetical condition may affect the assignment results.) The Property has been valued before the taking by disregarding the taking and the effects of the public project on value in conformance with the scope of the project rule. If this condition were false, then the value indications in this appraisal might be affected.

Extraordinary Assumptions: (An extraordinary assumption is directly related to a specific assignment and presumes uncertain information to be factual. If found to be false this assumption could alter the appraiser's opinions or conclusions. Any extraordinary assumption may affect the assignment results.) The Property has been valued based on the assumption that the duration of the temporary construction easement is five (5) years. If this assumption were false, then the value indications in this appraisal might be affected.

This is an Appraisal Report in accordance with Standard Rule 2-2(a) of the Uniform Standard of Professional Appraisal Practice (USPAP).

## SCOPE OF WORK

Definition: The scope of work is the type and extent of research and analysis in an assignment. Scope of work includes the extent to which the property is identified, the extent to which tangible property is inspected, the type and extent of data research, and the type and extent of analysis applied to arrive at credible opinions or conclusions. The specific scope of work for this assignment is identified below and throughout this report.

| Scope of Subject Property Inspection/Data Sources Utilized | Approaches to Value Developed |
|---|---|
| **Appraiser**<br>Property Inspection: ☒ Yes ☐ No<br>Date of Inspection: April 13, 2018<br>Describe Scope of Property Inspection, Source of Area Calculations and Data Sources Consulted: The Property's land was inspected on a "walk-through" basis and the improvements were inspected on a "limited interior" and "complete exterior" basis. Data was collected from public assessment and land records. | **Cost Approach:**<br>☐ Is necessary for credible results and is developed in this analysis<br>☒ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |
| | **Sales Comparison Approach:**<br>☒ Is necessary for credible results and is developed in this analysis<br>☐ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |
| **Co-Appraiser**<br>Property Inspection: ☐ Yes ☐ No<br>Date of Inspection:<br>Describe Scope of Property Inspection, Source of Area Calculations and Data Sources Consulted: | **Income Approach:**<br>☐ Is necessary for credible results and is developed in this analysis<br>☒ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |

| Additional Scope of Work Comments: I followed the valuation process to appraise the Property. |
|---|
| See attached Expert Report for additional information. |

| Significant Real Property Appraisal Assistance: ☐ None ☒ Disclose Name(s) and contribution: William D. O'Donnell and Joseph C. |
|---|
| Harvey provided me with significant real property appraisal assistance in preparing this report. |

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                                           June 2017

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-B |

## MARKET AREA ANALYSIS

| Location | Built Up | Growth | Supply & Demand | Value Trend | Typical Marketing Time |
|---|---|---|---|---|---|
| ☐ Urban | ☐ Under 25% | ☐ Rapid | ☐ Shortage | ☐ Increasing | ☐ Under 3 Months |
| ☐ Suburban | ☒ 25-75% | ☒ Stable | ☒ In Balance | ☒ Stable | ☐ 3-6 Months |
| ☒ Rural | ☐ Over 75% | ☐ Slow | ☐ Over Supply | ☐ Decreasing | ☒ Over 6 Months |

| Neighborhood Single Family Profile | | | Neighborhood Land Use | | Neighborhood Name: | Wintergreen |
|---|---|---|---|---|---|---|
| Price | | Age | | | | |
| 100,000 | Low | New | 1 Family | 50% Commercial | 5% | PUD ☐ Condo ☐ HOA: $ N/A/ |
| 2,000,000 | High | 42 | Condo | 10% Vacant | 30% | Amenities: Recreational |
| 175,000 | Predominant | 39 | Multifamily | 5% | % | |

Market area description and characteristics:    The Property is situated on the eastern slopes of the Blue Ridge Mountains, just east of the Blue Ridge Parkway and south of Beech Grove Road, across from the Wintergreen Resort.

Wintergreen Resort is a four-season mountain resort that opened in 1975. Amenities include seasonal skiing and snowboarding, golf, spa, tennis and trails.

See attached Expert Report for additional information.

## SITE ANALYSIS

| Dimensions: | See exhibit in the attached Expert Report. | Area: | 2.922 Acres |
|---|---|---|---|
| View: | Mountains and woods | Shape: | Irregular |
| Drainage: | Adequate | Utility: | None |

| Site Similarity/Conformity To Neighborhood | | Zoning/Deed Restriction | |
|---|---|---|---|
| Size: | View: | Zoning:  Agricultural A-1 District | Covenants, Condition & Restrictions |
| ☐ Smaller than Typical | ☒ Favorable | | ☐ Yes ☒ No ☐ Unknown |
| ☒ Typical | ☐ Typical | ☒ Legal ☐ No zoning | Documents Reviewed |
| ☐ Larger than Typical | ☐ Less than Favorable | ☐ Legal, non-conforming | ☐ Yes ☐ No |
| | | ☐ Illegal | Ground Rent $ N/A/ |

| Utilities | | | Off Site Improvements | | |
|---|---|---|---|---|---|
| Electric | ☒ Public | ☐ Other | Street | ☐ Public | ☒ Private |
| Gas | ☐ Public | ☐ Other | Alley | ☐ Public | ☐ Private |
| Water | ☐ Public | ☒ Other  Well | Sidewalk | ☐ Public | ☐ Private |
| Sewer | ☐ Public | ☒ Other  Septic | Street Lights | ☐ Public | ☐ Private |

Site description and characteristics:    The Property is located in a FEMA-Designated Zone X per FIRM Map #51125C0115B dated 6/18/2010.

See attached Expert Report for additional information.

## HIGHEST AND BEST USE ANALYSIS

☒ Present Use    ☐ Proposed Use    ☐ Other

Summary of highest and best use analysis:    The continued use of the Property as a proprietor-occupied transient lodging is the highest and best use.

See attached Expert Report for additional information.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                                                                         June 2017

Form AI1205 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-B |

## SITE VALUATION

### Site Valuation Methodology

☒ **Sales Comparison Approach:** A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, then applying appropriate units of comparison and making adjustments to the sale prices of the comparables based on the elements of comparison. The sales comparison approach may be used to value improved property, vacant land, or land being considered as though vacant; it is the most common and preferred method of land valuation when an adequate supply of comparable sales are available.

☐ **Market Extraction:** A method of estimating land value in which the depreciated cost of the improvements on the improved property is estimated and deducted from the total sale price to arrive at an estimated sale price for the land; most effective when the improvements contribute little to the total sale price of the property.

☐ **Alternative Method: (Describe methodology and rationale)**

### Site Valuation

| ITEM | SUBJECT | COMPARISON 1 | | COMPARISON 2 | | COMPARISON 3 | |
|---|---|---|---|---|---|---|---|
| Address 29 Shelton Laurel Trl | | 20 Shelton Laurel Trl | | S/S Beech Grove Rd | | N/S Beech Grove Rd | |
| Roseland, VA 22967 | | Roseland, VA 22967 | | Roseland, VA 22967 | | Roseland, VA 22967 | |
| Proximity to Subject | | Adjacent | | Approx 2.08 miles SE | | Approx 2.07 miles SE | |
| Data Source/ Verification | | Public Records/PIN 19-3-2B Instrmnt #150000571 | | Public Records/PIN 31-A-39A Instrmnt #150000678 | | Public Records/PIN 31-A-51C Instrmnt #150002900 | |
| Sales Price | $ N/A | $ 180,000 | | $ 100,000 | | $ 90,000 | |
| Price / Acre | $ | $ 10,093 | | $ 20,040 | | $ 19,481 | |
| Sale Date | 01/31/2018 | 03/11/2015/Inf | +900 | 03/23/2015/Inf | +1,800 | 10/30/2015/Inf | +1,300 |
| Location | Rural | Rural/Similar | | Rural/Similar | | Rural/Similar | |
| Site Size | 2.922 Acres | 17.834 Ac/Inf | +4,000 | 4.99 Ac/Similar | | 4.62 Ac/Similar | |
| Site View | Mtns&Wds | Mtns&Wds/Sim | | Mtns&Wds/Sim | | Mtns&Wds/Sim | |
| Site Improvements | None (Assumed) | None/Similar | | None/Similar | | None/Similar | |
| Access | Private Street | Private St/Sim | | Public St/Sup | -1,000 | Public St/Sup | -1,000 |
| Status | Vacant (Assumd) | Vacant/Similar | | Vacant/Similar | | Vacant/Similar | |
| Topography | Rolling | Rolling/Similar | | Rolling/Similar | | Rolling/Similar | |
| Utilities (Available) | Elc,Well&Spc | ElcWell&Spc/Sim | | ElcWell&Spc/Sim | | ElcWell&Spc/Sim | |
| Zoning | Agricultural A-1 | Agricultural A-1 | | Agricultural A-1 | | Agricultural A-1 | |
| Net Adjustment | | ☒ + ☐ – | $ 4,900 | ☒ + ☐ – | $ 800 | ☒ + ☐ – | $ 300 |
| (Adj,s, N.A. & I.V. are in $ / Acre) | | Net Adj. 48.5 % | ($ 4900.00 /Acre) | Net Adj. 4% | ($ 800.00 /Acre) | Net Adj. 1.5% | ($ 300.00 /Acre) |
| Indicated Value | | Gross Adj. 48.5 % | $ 14,993 | Gross Adj. 14% | $ 20,840 | Gross Adj. 11.8% | $ 19,781 |
| Prior Transfer History | Per public records, there are no sales in the last 3 years | Per public records, there are no sales in the last 3 years | | Per public records, there are no sales in the last year | | Per public records, there are no sales in the last year | |

**Site Valuation Comments:** The comparables are settled sales from the subject market area. The most significant adjustments were due to differences in land area.

**Site Valuation Reconciliation:** Comparable Nos. 2 and 3 required the least gross and net adjustments and were given the most weight in the final reconciliation of value. I estimated the Property's land value was $20,000 per acre or $60,000 rounded (2.922 Ac. x $20,000/Ac. = $58,440, rounded to $60,000).

| Opinion of Site Value | | $ 60,000 |
|---|---|---|

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved June 2017

Form AI1205 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## ADDITIONAL COMPARABLE SITES

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-B |

### SITE VALUATION

| ITEM | SUBJECT | COMPARISON 4 | | COMPARISON 5 | | COMPARISON 6 | |
|---|---|---|---|---|---|---|---|
| Address | 29 Shelton Laurel Trl | 5 Winery Ln | | | | | |
| | Roseland, VA 22967 | Roseland, VA 22967 | | | | | |
| Proximity to Subject | | 2.82 miles SE | | | | | |
| Data Source/ | | Public Records/PIN 20-6-5 | | | | | |
| Verification | | Instrmnt #170000770 | | | | | |
| Sales Price | $           N/A | $ | 135,000 | $ | | $ | |
| Price / Acre | $ | $ | 13,314 | $ | | $ | |
| Sale Date | 01/31/2018 | 03/31/2017/Inf | +300 | | | | |
| Location | Rural | Rural/Similar | | | | | |
| Site Size | 2.922 Acres | 10.14 Ac/Inferior | +3,300 | | | | |
| Site View | Mtns&Wds | Mtns&Wds/Sim | | | | | |
| Site Improvements | None (Assumed) | None/Similar | | | | | |
| Access | Private Street | Private St/Similar | | | | | |
| Status | Vacant (Assumd) | Vacant/Similar | | | | | |
| Topography | Rolling | Rolling/Similar | | | | | |
| Utilities (Available) | Elc,Well&Spc | ElcWell&Spc/Sim | | | | | |
| Zoning | Agricultural A-1 | Agricultural A-1 | | | | | |
| Net Adjustment | | ☒ +   ☐ – | $       3,600 | ☐ +  ☐ – | $ | ☐ +  ☐ – | $ |
| (Adj.s, N.A. & I.V. are in $ / Acre) | | Net Adj.          27% | ($ 3600.00 /Acre) | Net Adj.          % | | Net Adj.          % | |
| Indicated Value | | Gross Adj.        27% | $      16,914 | Gross Adj.        % | $ | Gross Adj.        % | $ |
| Prior Transfer | Per public records, there are | Per public records, there are | | | | | |
| History | no sales in the last 3 years | no sales in the last year | | | | | |

Comments:

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                                                          June 2017

| Client: | McGuireWoods LLP | Client File #: | |
|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | Appraisal File #: | T000010-B |

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

- This report is prepared using forms developed and copyrighted by the Appraisal Institute. However, the content, analyses, and opinions set forth in this report are the sole product of the appraiser. The Appraisal Institute is not liable for any of the content, analyses, or opinions set forth herein.

- No responsibility is assumed for matters legal in character or nature. No opinion is rendered as to title, which is assumed to be good and marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, having responsible ownership and competent management.

- I have examined the property described herein exclusively for the purposes of identification and description of the real property. The objective of my data collection is to develop an opinion of the highest and best use of the subject property and make meaningful comparisons in the valuation of the property. The appraiser's observations and reporting of the subject improvements are for the appraisal process and valuation purposes only and should not be considered as a warranty of any component of the property. This appraisal assumes (unless otherwise specifically stated) that the subject is structurally sound and all components are in working condition.

- I will not be required to give testimony or appear in court because of having made an appraisal of the property in question, unless specific arrangements to do so have been made in advance, or as otherwise required by law.

- I have noted in this appraisal report any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, I have no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and have assumed that there are no such conditions and make no guarantees or warranties, express or implied. I will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because I am not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources that I believe to be true and correct.

- I will not disclose the contents of this appraisal report except as provided for in the Standards and Ethical Rules under which this appraisal was developed and reported and/or applicable federal, state or local laws.

- The Client is the party or parties who engage an appraiser (by employment contract) in a specific assignment. A party receiving a copy of this report from the client does not, as a consequence, become a party to the appraiser-client relationship. Any person who receives a copy of this appraisal report as a consequence of disclosure requirements that apply to an appraiser's client, does not become an intended user of this report unless the client specifically identified them at the time of the assignment. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

- If this valuation conclusion is subject to satisfactory completion, repairs, or alterations, it is assumed that the improvements will be completed competently and without significant deviation.

## VALUE DEFINITION

☐ Market Value Definition (below)          ☒ Alternate Value Definition (attached)

MARKET VALUE is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.     Source: The Dictionary of Real Estate Appraisal, 6th ed., Appraisal Institute

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-900.05 Certification, Assumptions and Limiting Conditions© Appraisal Institute 2017, All Rights Reserved                                                                                              June 2017

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-B |

## APPRAISER CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analysis, opinions, and conclusions are limited only by the report assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions.

- I have no present (unless specified below) or prospective interest in the property that is the subject of this report, and I have no (unless specified below) personal interest with respect to the parties involved.

- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon the developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- Individuals who have provided significant real property appraisal assistance are named below. The specific tasks performed by those named are outlined in the Scope of Work section of this report.

☐ None   ☒ Name(s)   William D. O'Donnell and Joseph C. Harvey

As previously identified in the Scope of Work section of this report, the signer(s) of this report certify to the inspection of the property that is the subject of this report as follows:

Property Inspected by Appraiser         ☒ Yes   ☐ No

Property Inspected by Co-Appraiser      ☐ Yes   ☐ No

- Services provided, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment:   ☒ None   ☐ Specify services provided:

## ADDITIONAL CERTIFICATION FOR APPRAISAL INSTITUTE MEMBERS, CANDIDATES AND PRACTICING AFFILIATES

Appraisal Institute Designated Member, Candidate for Designation, or Practicing Affiliate Certify:

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

| - I am a Designated Member of the Appraisal Institute. As of the date of this report, I have completed the continuing education program of the Appraisal Institute. | ▪ |
|---|---|

## APPRAISERS SIGNATURES

| APPRAISER: | CO-APPRAISER: |
|---|---|
| Signature | Signature |
| Name   William C Harvey, II, CCIM, MAI | Name |
| Report Date   April 17, 2019 | Report Date |
| Trainee ☐   Licensed ☐   Certified Residential ☐   Certified General ☒ | Trainee ☐   Licensed ☐   Certified Residential ☐   Certified General ☐ |
| License #   4001-000731          State VA | License #          State |
| Expiration Date   12/31/2019 | Expiration Date |

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-900.05 Certification, Assumptions and Limiting Conditions© Appraisal Institute 2017, All Rights Reserved                                    June 2017

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | | |



**Subject Front**

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | Mtns&Wds |
| Site | 2.922 Acres |
| Quality | |
| Age | |



**Subject Rear**



**Subject Street**

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Subject Lobby

| Sales Price | N/A |
|---|---|
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | Mtns&Wds |
| Site | 2.922 Acres |
| Quality | |
| Age | |



### Subject Kitchen



### Subject Dining Room

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | | |



### Subject Exercise Room

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | Mtns&Wds |
| Site | 2.922 Acres |
| Quality | |
| Age | |



### Subject Typical Bedroom



### Subject Typical Bathroom

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



**Subject Store**

29 Shelton Laurel Trl
Sales Price          N/A
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location             Rural
View                 Mtns&Wds
Site                 2.922 Acres
Quality
Age



**Subject Courtyard**



**Subject Patio**

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Subject Picnic Area

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | Mtns&Wds |
| Site | 2.922 Acres |
| Quality | |
| Age | |

**Aerial Photo**

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



## Comparable Photo Page

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower | Fenton Family Holdings, LLC | | | | | | |
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Comparable 1

20 Shelton Laurel Trl
| | |
|---|---|
| Prox. to Subject | Adjacent |
| Sale Price | 180,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sim |
| Site | 17.834 Ac/Inf |
| Quality | |
| Age | |
| Note | Image is after boundary adj. |



### Comparable 2

S/S Beech Grove Rd
| | |
|---|---|
| Prox. to Subject | Approx 2.08 miles SE |
| Sale Price | 100,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sim |
| Site | 4.99 Ac/Similar |
| Quality | |
| Age | |



### Comparable 3

N/S Beech Grove Rd
| | |
|---|---|
| Prox. to Subject | Approx 2.07 miles SE |
| Sale Price | 90,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sim |
| Site | 4.62 Ac/Similar |
| Quality | |
| Age | |

## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Comparable 4

| | |
|---|---|
| 5 Winery Ln | |
| Prox. to Subject | 2.82 miles SE |
| Sale Price | 135,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sim |
| Site | 10.14 Ac/Inferior |
| Quality | |
| Age | |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

## Comparable Sales Map

| Borrower | Fenton Family Holdings, LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | |



# EXHIBIT 3

| NELSON COUNTY INSPECTIONS | BUILDING PERMIT | PERMIT NUMBER: | 0000097 - 2011 |
|---|---|---|---|
| LOVINGTON      VA 22949 0558 | | USBC: | 2006 |
| LIEN AGENT: | | APPLICATION DATE: | 3/22/2011 |
| | | ISSUANCE DATE: | 12/27/2011 |
| | | RENEWAL DATE: | |
| | | DATE: | 4/16/2019 |

| OWNER NAME/ADDRESS | SITE ADDRESS | CONTRACTOR NAME/ADDRESS |
|---|---|---|
| Fenton, Will  (B&B) | | OWNER |
| 39  Shelton Laurel Trail | 29      Shelton Laurel Trail | |
| Roseland, VA 22967 | | |
| PHONE:  325-9230 | | PHONE: 000 000 0000 |

RE ACCOUNT#:                    DESCRIPTION OF CONSTRUCTION LOCATION
TAX MAP NO.: 19  3  2 D            LOT:          BLOCK:        SECTION:          BLDG NO.:

SET-BACKS:                        HEALTH PERMIT NO.:              DISTRICT: ROCKFISH DISTRICT
  FRONT:       BACK:             FLOODPLAIN:                    SUB-DIVISION:
  RIGHT:       LEFT:             AREA:                          ZONE:  AGRICULTURE DISTRICT
  CNTR :       FRTGS:            RIGHT-OF-WAY:                  S/E CUP NO.:       SITE PLAN:

  DIRECTIONS TO SITE:   Property is located on Shelton Laurel Trail just past
                        the entrance to Wintergreen on Beech Grove Road

USE GROUP: R-5, 1-2 Family (IRC)    USE CODE:  Single Family Dwelling      SQ FEET:
CNST.TYPE: TYPE 5B                  NATURE/WRK:  Building New Structure for Bed & Breakfast

### BUILDING PERMIT

| BLDG. SIZE | | BASEMENT | YES | CRAWLSPACE | | CMENT SLAB | |
|---|---|---|---|---|---|---|---|
| TRUSS ROOF | | # BEDROOMS | EIGHT (8) | # STORIES | TWO | GARAGE | NO |
| CARPORT | NO | TYPE FRAME | WOOD | # BATHS | ELEVEN (11) | # CHIMNEYS | YES |
| TYPE HEAT | HEAT PUMP | SPRINKLERS | | WOODSTOVE | | FIREPLACE | YES (3) |
| EXT.FINISH | STUCCO | OCCUP.LOAD | | | | | |
| DESC. WORK | NEW BED & BREAKFAST | DESC. WORK | | DESC. WORK | | | |
| REMARKS | | GAS APPLI. | | | | | |

JOB VALUE:    300,000.00

PERMIT FEE:    1,500.00
VA State Levy :    30.00

TOTAL    FEES:    1,530.00

```
|--------------------------------------------------------|
|                    N O T I C E                         |
|   THIS PERMIT BECOMES NULL AND VOID IF THE WORK OR CONSTRUCTION |
|   AUTHORIZED IS NOT COMMENCED WITHIN 6 MONTHS, OR IS SUSPENDED OR |
|   ABANDONED FOR A PERIOD OF 6 MONTHS. ** THIS PERMIT SHALL BE A |
|   LICENSE TO PROCEED WITH THE WORK IN ACCORDANCE WITH THE |
|   APPLICATION AND PLANS FOR WHICH THE PERMIT IS ISSUED.  THIS |
|   PERMIT SHALL NOT BE CONSTRUED AS AUTHORITY TO OMIT OR AMEND ANY |
|   OTHER PROVISIONS OF THE UNIFORM STATEWIDE BUILDING CODE.  ALL |
|   WORK IS SUBJECT TO THE REQUIRED FIELD INSPECTIONS FOR FINAL |
|   APPROVAL AND ISSUANCE OF A CERTIFICATE OF USE AND OCCUPANCY. |
|--------------------------------------------------------|
```

REQUIRED SIGNATURES

APPLICATION TAKEN BY------DATE

OWNER/AGENT------------DATE        BUILDING OFFICIAL        (CHECK)   CHK#_____   (CASH)

PRINT NAME



USBC Edition  2006
Use Group  R-5

## *NELSON COUNTY*
## BUILDING PLAN REVIEW

(MAINTAIN A COPY OF THIS FORM WITH BUILDING PLANS ON JOB SITE)

#97-2011
Applicant: William Fenton
Project: Single Family Dwelling
Location: Shelton Laurel Trail

Review Date:  6-7-2011
Reviewer:  Thompson

**APPROVED  X   NOT APPROVED ___ DATE 6-7-2011**

PAGE #  COMMENT #  COMMENT

| PAGE # | COMMENT # | COMMENT |
|---|---|---|
| 1 | 1 | Proprietor occupied bed and breakfast and other transient boarding facilities not more than three stories above grade plane in height, that are also occupied as the residence of the proprietor, with a maximum of 5 guest room sleeping units provided for the transient occupants are permitted in this USE group R-5, designed and built under the Virginia Residential Code - (VCC) section 310.1 exception # 2. |
| 4 | 2 | Timber Frame construction plans for the roof ceiling system must be designed, detailed, and sealed by an Virginia licensed professional. |
| 4 | 3 | Structural systems using engineered wood products.  Provide manufacture's plan and design details on site during framing inspection. |
| 4 | 4 | An electrode encased by at least 2" of concrete, located within and near the bottom of a concrete foundation or footing that is in direct contact with the earth must be used as a service grounding electrode system. VRC 3508.1 |
| 4 | 5 | Insulating concrete form (ICF) foundation walls shall be designed and constructed in accordance with the provisions of this section or the provisions of ACI 318. VRC 404.4. |
| 2 | 6 | Tempered glazing required adjacent to tub.  (Section R308.4) |
| 2 | 7 | The dryer exhaust duct shall be rigid metal ducts, having smooth interior surfaces with joints running in the direction of air flow. Exhaust ducts shall not be connected with sheet metal screws or fastening means which extend into the duct. The duct shall be .016-inch-thick 28 gage. IRC M1502.5 |
| 1,2,3 | 8 | All new buildings, additions and conversions shall be braced in accordance with this section. Where a building, or portion thereof, does not comply with one or more of the bracing requirements in this section, those portions shall be designed and constructed in accordance with the International Building Code. VRC R602.10 Wall Bracing. |
| 1 | 9 | Roof coverings shall be applied in accordance with the applicable provisions of this section and the manufacturer's installation instructions. VRC 905.1. |
| 1 | 10 | Attic and rafter spaces require ventilation.  The total net free ventilating area must be at least 1/150 of ventilated space (1/300 if at least 50% but not more than 80% is located in upper portion at least 3 feet above eave).  Minimum 1 inch space shall be |

*Plan approval is conditional based on comments listed and does not constitute approval to violate any provision of the Virginia Uniform Statewide Building Code, Nelson County Zoning Ordinance or any other applicable federal, state or local regulation.  All work is subject to field inspection for approvals.

**Page 1 of 2**

|  |  |  |
|---|---|---|
|  |  | provided between insulation and roof sheathing. (Section 806) |
| 2,3,4 | 11 | All habitable rooms shall have an aggregate glazing area of not less than 8 percent of the floor area of such rooms. Natural ventilation shall be through windows, doors, louvers or other approved openings to the outdoor air. The minimum openable area to the outdoors shall be 4 percent of the floor area being ventilated. Exceptions # 1-3 are permissive. VRC R 303.1 |
| 3,4 | 12 | All glazing in doors and in fixed or operable panels adjacent to doors where the nearest vertical edge is within a 24" arc of the door in a closed position whose bottom edge is less than 60" above the floor or walking surface must be safety glazing which has passed the requirements of CPSC 16-CFR Part 1201. (Section R308.4) |
| 3,2 | 13 | Accessible bathrooms require 5 ft turning radius inside the unit. |
| 2,3,4 | 14 | Bathrooms, water closet compartments and similar rooms require windows of not less than 3 square feet (1/2 of which screened and openable) or mechanical system capable of providing at least 1 air change every 12 minutes and terminated directly to the outside. (Section 303.3) |
| 5 | 15 | The deck ledger connection to a band joist must be made in accordance with VRC table R 502.2.2.1 (Section VRC R502.2.2.1) |
| GENERAL | 1 | Provide smoke detectors on each level, in the vicinity of each bedroom (within 10 feet of doorway) and in each bedroom. Additional detector(s) may be necessary if cathedral or vaulted ceilings are present in order to meet the provisions of NFPA 72 (1996) for household fire warning equipment. Primary power from building electrical system with battery back-up and interconnection. (Section R313) |
|  | 2 | Each bedroom required to have exterior door or emergency escape and rescue window having minimum required dimensions and opening size. (Section R310.1) |
|  | 3 | Handrails required for all stairs of four or more risers and must be continuous through the full length of the stairs. Graspability must meet requirements for either Type I or Type II. Handrails must be returned to the wall or terminated in newel posts or safety terminals. At least 1.5 inches shall be provided between the wall and handrail. (Section R311) |
|  | 4 | Floors, stairs and other walking surfaces in excess of 30 inches above adjacent levels need to be protected by guardrails designed to resist a minimum concentrated load of 200 PSF. Minimum height is 36 inches and openings must prohibit passage of a 4 inch sphere except that openings for guards on the sides of stair treads shall not allow passage of a 4 3/8" sphere. (Section R312.2) |
|  | 5 | Arc-fault interrupters required for all circuits supplying 125v single-phase 15 and 20 amp outlets installed in bedrooms. (Section E3802.9) |
|  | 6 | Fasteners, connectors and flashing in contact with pressure-preservatively treated wood must be suitable for the type of chemical treatment used. |
|  | 7 | Ice barrier required and must extend from the eave's edge to a point at least 24" inside the exterior wall line. It shall consist of at least 2 layers of underlayment cemented together or a self-adhering polymer modified bitumen sheet. (Section R905.4.3.1) |
|  | 8 | The grade away from foundation walls must fall a minimum of 6 inches within the first 10 feet. (Section R401.3) |

*Plan approval is conditional based on comments listed and does not constitute approval to violate any provision of the Virginia Uniform Statewide Building Code, Nelson County Zoning Ordinance or any other applicable federal, state or local regulation. All work is subject to field inspection for approvals.

# EXHIBIT 4













# EXHIBIT 5

# FENTON FAMILY HOLDINGS, LLC PROPERTY

## PARCEL IDENTIFICATION NUMBER 19-3-2A

### EXISTING IMPROVEMENTS SUMMARY

| ID | Element | PIN | Year Built | Stories | Exterior | Condition | GBA Sq. Ft. |
|----|---------|-----|-----------|---------|----------|-----------|-------------|
| A | Residential Use Group R-5 Structure | 19-3-2A | 2012 | 2.0+ Bsmt. | Frame | Good | 10,004 |
| B | Site Improvements: Driveway, Fencing, Septic System & Well, Etc. | 19-3-2A | 2012 | N/A | N/A | Good | N/A |

Sources: Nelson County Commissioner of Revenue, Nelson County Department of Inspections, Defendant 000001-000006, Defendant's Counsel's E-mail dated 04/26/18, and Physical Inspection

# EXHIBIT 6



# EXHIBIT 7

# FENTON FAMILY HOLDINGS, LLC PROPERTY

## PARCEL IDENTIFICATION NUMBER 19-3-2A

### COST APPROACH SUMMARY "BEFORE THE TAKING"

| | SQ. FT.-GBA | $/SQ. FT. | TOTAL |
|---|---|---|---|
| **ESTIMATED DIRECT CONSTRUCTION COST:** | | | |
| TRANSIENT LODGING STRUCTURE (A) | 10,004  x | $145.91 | $1,459,731 |
| SUBTOTAL | | | $1,459,731 |
| | | | |
| **ESTIMATED INDIRECT COST:** | | | |
| C/L INTEREST | $15,675 | | |
| ADMIN./MISC. | 52,250 | | |
| R. E. TAXES | 648 | | |
| SUBTOTAL | | | 68,573 |
| | | | |
| ENTREPRENEURIAL PROFIT ALLOWANCE @ 20% | | | 317,661 |
| | | | |
| TOTAL REPLACEMENT COST - NEW | | | $1,845,965 |
| | | | |
| **DEPRECIATION:** | | | |
| LESS ALL FORMS | ($1,014,850) | | |
| SUBTOTAL | | | ($1,014,850) |
| | | | |
| REPLACEMENT COST - DEPRECIATED | | | $831,115 |
| PLUS COST OF SITE IMPROVEMENTS (B) | | | 150,000 |
| PLUS ESTIMATED LAND VALUE | | | 60,000 |
| TOTAL ESTIMATED COST (FEE SIMPLE) | | | $1,041,115 |
| PROPERTY RIGHTS ADJUSTMENT | | | 0 |
| VALUE INDICATION "BEFORE THE TAKING" | | | $1,041,115 |
| ROUNDED: | | | $1,040,000 |

Source: Swift Commercial Estimator

Prepared by William C. Harvey & Associates, Inc.

# EXHIBIT 8

# FENTON FAMILY HOLDINGS, LLC PROPERTY

## PROPERTY IDENTIFICATION NUMBER 19-3-2A

## INCOME APPROACH SUMMARY "BEFORE THE TAKING"

| Revenues | Total | % of Revenue |
|---|---|---|
| Gross Revenue | $225,165 | 99.8% |
| Other Income | 511 | 0.2% |
| **Total Revenue** | **$225,676** | **100.0%** |
| **Expenses** | | |
| *Fixed*: | | |
| Insurance | $4,625 | 2.0% |
| Real Estate Taxes | 4,165 | 1.8% |
| Subtotal Fixed Expenses | $8,790 | 3.9% |
| *Variable*: | | |
| Advertising | $5,581 | 2.5% |
| Cost of Goods Sold | 21,711 | 9.6% |
| Legal & Accounting | 3,631 | 1.6% |
| Administrative & Office | 8,402 | 3.7% |
| Payroll | 10,881 | 4.8% |
| Repairs & Maintenance | 8,238 | 3.7% |
| Telephone & Internet | 6,997 | 3.1% |
| Travel & Entertainment | 4,065 | 1.8% |
| Utilities | 11,492 | 5.1% |
| Other Expenses | 10,534 | 4.7% |
| Subtotal Variable Expenses | $91,532 | 40.6% |
| **Total Expenses** | **(100,322)** | **-44.5%** |
| **Going Concern Net Operating Income** | **$125,354** | **55.5%** |
| Less Return for Nonrealty Assets | (21,242) | |
| **Real Estate Net Operating Income** | **$104,112** | |
| Overall Capitalization Rate ($R_O$) | 10.0% | |
| Value Indication | $1,041,123 | |
| **Final Value Indication (Rd.)** | **$1,040,000** | |

Sources: Defendant 000049, 000092, 000158, 000159, 000167, 000176 & 000177

Prepared by William C. Harvey & Associates, Inc.

# EXHIBIT 9

**FENTON FAMILY HOLDINGS, LLC**

**PARCEL IDENTIFICATION NUMBER 19-3-2A**

**SALES COMPARISON APPROACH SUMMARY "BEFORE THE TAKING"**

| ELEMENT | SUBJECT | IMPROVED SALE 1 | IMPROVED SALE 2 | IMPROVED SALE 3 | IMPROVED SALE 4 |
|---|---|---|---|---|---|
| Name | Fenton Inn | Victoria & Albert Inn | 3 Bs Inn | Fuller House | The Mark Addy Inn |
| Address | 29 Shelton Laurel Tri. | 224 Oak Hill St. | 5793 Gerton Hwy. | 220 W. Boscawen St. | 56 Rodes Farm Dr. |
| | Roseland, VA 22967 | Abingdon, VA 24210 | Gerton, NC 28735 | Winchester, VA 22601 | Nellysford, VA 22958 |
| Parcel Identification No. | 19-3-2A | 12-1-41-AB | 05-01163 | 172-01-C-2 | 22-A-39 |
| Date of Sale (Deed Date) | January 31, 2018 | November 12, 2015 | July 13, 2016 | November 15, 2016 | Listing |
| Instrument No. | - - - | 5239 | 1671/57 | 2748 | N/A |
| Grantor | - - - | Ramos-Cano, Inc. | Peaceful Quest Retreats, LLC | Debra Johnson | Rafael L. Tui, et al. |
| Grantee | - - - | Paul Armstrong, et al. | Glen Gilmore, II | Fuller House, LLC | N/A |
| Sale Price | - - - | $375,000 | $438,000 | $800,000 | $1,195,000 |
| Price per GBA Sq. Ft. | - - - | $88 | $84 | $123 | $182 |
| Price per Keyed Room | - - - | $62,500 | $109,500 | $133,333 | $119,500 |
| Transactional Characteristics: | | | | | |
| - Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| - Financing Terms | Cash Sale (Assumed) | Cash Sale | Cash Sale | Cash Sale | Cash Sale |
| - Conditions of Sale | Arm's-Length & | Arm's-Length & | Arm's-Length & | Arm's-Length & | Arm's-Length & |
| | Normal Motivation | Normal Motivation | Normal Motivation | Normal Motivation | Normal Motivation |
| - Expenditures After Sale | None | None | None | None | None |
| Property Characteristics: | | | | | |
| - Location | Rural | Rural | Rural | Suburban | Rural |
| - Building Size (GBA) | 10,004 | 4,245 | 5,235 | 6,530 | 6,560 |
| - Condition | Good | Average | Average | Average | Average |
| - Land Area (Ac.) | 2.922 | 0.57 | 5.20 | 0.21 | 4.42 |
| - Keyed Rooms | 6 | 6 | 4 | 6 | 10 |
| - Zoning/Use | A-1/Transient Lodging | OH/B&B | R3/B&B | B1/B&B | SE-1/B&B w/Restaurant |
| ADJUSTMENTS | | IMPROVED SALE 1 | IMPROVED SALE 2 | IMPROVED SALE 3 | IMPROVED SALE 4 |
| Transactional Adjustments: | | | | | |
| - Price per GBA Sq. Ft. | | $88 | $84 | $123 | $182 |
| - Property Rights Adjustment | | Similar | Similar | Similar | Similar |
| - Financing Adjustment | | Similar | Similar | Similar | Similar |
| - Conditions of Sale Adjustment | | Similar | Similar | Similar | Similar |
| - Market Conditions Adjustment | | Slightly Inferior | Slightly Inferior | Slightly Inferior | Similar |
| Property Adjustments: | | | | | |
| - Location | | Similar | Similar | Very Superior | Similar |
| - Physical Characteristics | | Inferior | Inferior | Inferior | Inferior |
| - Use | | Similar | Similar | Similar | Superior |
| Price per GBA Sq. Ft. | | $88 | $84 | $123 | $182 |
| For Reconciliation Purposes: | | | | | |
| Overall Comparison | | Inferior | Inferior | Superior | Superior |

|  | RANKING ANALYSIS | |
|---|---|---|
|  | UNIT PRICE | COMPARISON |
| IMPROVED SALE 4 | $182 | Superior |
| IMPROVED SALE 3 | $123 | Superior |
| SUBJECT | - - - | - - - |
| IMPROVED SALE 1 | $88 | Inferior |
| IMPROVED SALE 2 | $84 | Inferior |

RECONCILIATION:

| | |
|---|---|
| Subject Property GBA Sq. Ft. | 10,004 |
| Value per GBA Sq. Ft. | $105 |
| Value Indication "Before" (Rd.) | $1,050,000 |

Source: CAAR-MLS, CoStar & InnShopper.com

Prepared by William C. Harvey & Associates, Inc.

### Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



**Comparable 1**

224 Oak Hill St NE
Prox. to Subject      184.42 miles SW
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Comparable 2**

5793 Gerton Hwy
Prox. to Subject      224.63 miles SW
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



**Comparable 3**

220 W Boscawen St
Prox. to Subject      96.71 miles NE
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Comparable 4

56 Rodes Farm Dr
Prox. to Subject    6.63 miles E
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

### Comparable 5

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

### Comparable 6

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

### Comparable Sales Map

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



# EXHIBIT 10

## EASEMENT VALUATION MATRIX

| Percentage of Fee | Comments | Potential Types of Easements |
|---|---|---|
| 90% - 100% | ▪ Severe impact on surface use<br>▪ Conveyance of future uses | ▪ Overhead electric<br>▪ Flowage easements<br>▪ Railroad ROW<br>▪ Irrigation canals<br>▪ Access roads |
| 75% - 89% | ▪ Major impact on surface use<br>▪ Conveyance of future uses | ▪ Pipelines<br>▪ Drainage easements<br>▪ Flowage easements |
| 51% - 74% | ▪ Some impact on surface use<br>▪ Conveyance of ingress/egress rights | ▪ Pipelines<br>▪ Scenic easements |
| 50% | ▪ Balanced use by both owner and easement holder | ▪ Water or sewer lines<br>▪ Cable line<br>▪ Telecommunications |
| 26% - 49% | ▪ Location along a property line, location across non-useable land area | ▪ Water or sewer line<br>▪ Cable line |
| 11% - 25% | ▪ Subsurface or air rights that have minimal effect on use and utility location with a setback | ▪ Air rights<br>▪ Water or sewer line |
| 0% - 10% | ▪ Nominal effect on use and utility | ▪ Small subsurface easement |

Source: Easement Valuation

# EXHIBIT 11

## PAIRED SALES ANALYSES OF CASE AND CONTROL PROPERTIES
## INVOLVING UNDERGROUND GAS TRANSMISSION LINES

**Columbia Gas Transmission, LLC's Line MA & MB Study (Baltimore Co., MD) - Conducted August 2016:**

| Pairing | Case Sale | Control Sale | Difference ($) | Difference (%) |
|---|---|---|---|---|
| 1 | 2308 Kings Arms Dr. (Line MB) | 2304 Kings Arms Dr. (No UGTL) | ($37,100) | -6.66% |
| 2 | 2308 Kings Arms Dr. (Line MB) | 3150 Charles St. (No UGTL) | $5,350 | 1.04% |
| 3 | 2308 Kings Arms Dr. (Line MB) | 3000 Lyndebrooke Ct. (No UGTL) | $26,100 | 5.28% |
| 4 | 2308 Kings Arms Dr. (Line MB) | 2702 Pemberton Ridge (No UGTL) | ($23,300) | -4.29% |
| 5 | 7 Joel Ct. (Line MA&MB) | 1 Forwood Ct. (No UGTL) | $12,050 | 1.39% |
| 6 | 7 Joel Ct. (Line MA&MB) | 5 Forwood Ct. (No UGTL) | ($27,200) | -3.05% |
| 7 | 7 Joel Ct. (Line MA&MB) | 5 Deep Run Ct. (No UGTL) | ($46,450) | -5.10% |
| 8 | 7 Joel Ct. (Line MA&MB) | 7 Deep Run Ct. (No UGTL) | $36,750 | 4.44% |
| 9 | 23 Dellwood Ct. (Line MA) | 1A Dellwood Ct. (No UGTL) | $24,400 | 3.90% |
| 10 | 23 Dellwood Ct. (Line MA) | 9 Jonathans Ct. (No UGTL) | ($12,700) | -1.92% |
| 11 | 23 Dellwood Ct. (Line MA) | 13205 Falls Rd. (No UGTL) | ($700) | -0.11% |
| 12 | 3207 Hunting Tweed Dr. (Line MA) | 12 Huntersworth Ct. (No UGTL) | $5,500 | 0.57% |
| **Mean (Avg.)** | | | **($3,108)** | **-0.38%** |
| **Median** | | | **$2,325** | **0.23%** |
| **Say (Rd.)** | | | **$0** | **0.00%** |

**Columbia Gas Transmission, LLC's Line WBX Study (Fairfax Co., VA) - Conducted July 2017:**

| Pairing | Case Sale | Control Sale | Difference ($) | Difference (%) |
|---|---|---|---|---|
| 1 | 10618 Shadow Ln (Line WBX) | 10625 Timberidge Rd (No UGTL) | ($27,867) | -3.1% |
| 2 | 11020 Briarlynn Ct (Line WBX) | 8209 Copperglow Trl (No UGTL) | ($28,750) | -2.8% |
| 3 | 12118 Beaver Creek Rd (Line WBX) | 11905 Cub Ct (No UGTL) | ($33,100) | -4.7% |
| 4 | 9035 Swift Creek Rd (Line WBX) | 8707 Cathedral Forest Dr (No UGTL) | ($54,250) | -6.8% |
| 5 | 12200 Cliffwood Ct (Line WBX) | 12387 Henderson Rd (No UGTL) | ($93,800) | -12.5% |
| 6 | 7047 Balmoral Forest Rd (Line WBX) | 7408 Clifton Quarry Dr (No UGTL) | ($13,650) | -1.4% |
| 7 | 6289 Fairfax National Way (Line WBX) | 6728 Cedar Spring Rd (No UGTL) | $22,100 | 2.5% |
| 8 | 13319 Ivakota Farm Rd (Line WBX) | 7074 Balmoral Forest Rd (No UGTL) | ($88,350) | -8.3% |
| 9 | 8720 Ox Rd (Line WBX) | 10634 Timberidge Rd (No UGTL) | ($51,800) | -6.8% |
| 10 | 7427 Maple Branch Rd (Line WBX) | 6822 Glencove Dr (No UGTL) | $91,700 | 16.0% |
| 11 | 10516 Dominion Valley Dr (Line WBX) | 10800 Mountain Dulcimer Ct (No UGTL) | $116,500 | 14.4% |
| **Mean (Avg.)** | | | **($14,661)** | **-1.2%** |
| **Median** | | | **($28,750)** | **-3.1%** |
| **Say (Rd.)** | | | **($29,000)** | **-2.0%** |

**Atlantic Coast Pipeline, LLC's Line ACP Study (Augusta, Buckingham & Nelson Co., VA) - Conducted January 2018:**

| Pairing | Case Sale | Control Sale | Difference ($) | Difference (%) |
|---|---|---|---|---|
| 1 | 1718 Howardsville Tpke (Line ACP) | 10625 Timberidge Rd (No UGTL) | ($3,313) | -1.9% |
| 2 | 4127 Woodland Church Rd (Line ACP) | 1536 River Ridge Rd. (No UGTL) | ($15,000) | -4.8% |
| **Mean (Avg.)** | | | **($9,157)** | **-3.4%** |
| **Median** | | | **($9,157)** | **-3.4%** |
| **Say (Rd.)** | | | **($14,200)** | **-3.4%** |

Prepared by William C. Harvey & Associates, Inc.

# EXHIBIT 12

William C. Harvey & Associates, Inc.

| | Client File #: | | | Appraisal File #: | T000010-A |
|---|---|---|---|---|---|
| **AI Reports™**<br>Form 120.05* | | **Appraisal Report · Land** | | | |
| | Appraisal Company: | William C. Harvey & Associates, Inc. | | | |
| | Address: | 1146 Walker Rd., Suite H, Great Falls, VA 22066-1838 | | | |
| | Phone: 703-759-6644 | Fax: 703-759-4112 | Website: www.wchainc.com | | |

| Appraiser: | William C Harvey, II, CCIM, MAI | | Co-Appraiser: | |
|---|---|---|---|---|
| AI Membership (if any): | ☐ SRA  ☒ MAI  ☐ SRPA  ☐ AI-GRS  ☐ AI-RRS | | AI Membership (if any): | ☐ SRA  ☐ MAI  ☐ SRPA  ☐ AI-GRS  ☐ AI-RRS |
| AI Affiliation (if any): | ☐ Candidate for Designation  ☐ Practicing Affiliate | | AI Affiliation (if any): | ☐ Candidate for Designation  ☐ Practicing Affiliate |
| Other Professional Affiliation: | CCIM | | Other Professional Affiliation: | |
| E-mail: | wcha@erizon.net | | E-mail: | |
| Client: | McGuireWoods LLP | | Contact: | Richard D. Holzheimer, Jr., Esq. |
| Address: | 1750 Tysons Boulevard, Suite 1800, Tysons, VA 22102-4215 | | | |
| Phone: 703-712-5000 | Fax: 703-712-5050 | E-mail: | rholzheimer@mcguirewoods.com | |

**SUBJECT PROPERTY IDENTIFICATION**

| Address: | 29 Shelton Laurel Trl | | | | | |
|---|---|---|---|---|---|---|
| City: | Roseland | County: | Nelson | State: | VA | ZIP: 22967 |
| Legal Description: | See attached Expert Report for additional information. | | | | | |

| Tax Parcel #: | 19-3-2A | | RE Taxes: | $4,165 | Tax Year: | 2018 |
|---|---|---|---|---|---|---|
| Use of the Real Estate As of the Date of Value: | | Transient lodging | | | | |
| Use of the Real Estate Reflected in the Appraisal: | | Vacant | | | | |
| Opinion of highest and best use (if required): | | Continued use as a proprietor-occupied transient lodging | | | | |

**SUBJECT PROPERTY HISTORY**

Owner of Record:   Fenton Family Holdings, LLC

Description and analysis of sales within 3 years (minimum) prior to effective date of value:   Research of applicable public records and private data services reveal that there have been no sales of the subject property within the last three years.

Description and analysis of agreements of sale (contracts), listings, and options:   Research of applicable public records and private data services reveal that the subject property was not under contract or option and was not offered for sale within the past three years.

**RECONCILIATIONS AND CONCLUSIONS**

| Indication of Value by Sales Comparison Approach | $ | 52,500 |
|---|---|---|
| Indication of Value by Cost Approach | $ | Not Developed |
| Indication of Value by Income Approach | $ | Not Developed |

Final Reconciliation of the Methods and Approaches to Value:   The sales comparison approach is the preferred approach to value land and has been relied upon exclusively.

| Opinion of Value as of: | January 31, 2018 | $ | 52,500 |
|---|---|---|---|

| Exposure Time: | Twelve (12) months |
|---|---|

The above opinion is subject to:   ☐ Hypothetical Conditions   and/or   ☐ Extraordinary Assumptions   cited on the following page.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                                    June 2017

Form AI1205 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-A |

## ASSIGNMENT PARAMETERS

| Intended User(s): | Atlantic Coast Pipeline, LLC, McGuireWoods LLP and United States District Court for the Western District of Virginia |
|---|---|
| Intended Use: | The intended use of this appraisal is for litigation purposes. |

This report is not intended by the appraiser for any other use or by any other user.

| Type of Value: | Fair Market Value | Effective Date of Value: | January 31, 2018 |
|---|---|---|---|
| Interest Appraised: | ☒ Fee Simple   ☐ Leasehold   ☐ Other | | |

Hypothetical Conditions: (A hypothetical condition is that which is contrary to what exists, but is asserted by the appraiser for the purpose of analysis. Any hypothetical condition may affect the assignment results.)   None

Extraordinary Assumptions: (An extraordinary assumption is directly related to a specific assignment and presumes uncertain information to be factual. If found to be false this assumption could alter the appraiser's opinions or conclusions. Any extraordinary assumption may affect the assignment results.)   None

This is an Appraisal Report in accordance with Standard Rule 2-2(a) of the Uniform Standard of Professional Appraisal Practice (USPAP).

## SCOPE OF WORK

Definition: The scope of work is the type and extent of research and analysis in an assignment. Scope of work includes the extent to which the property is identified, the extent to which tangible property is inspected, the type and extent of data research, and the type and extent of analysis applied to arrive at credible opinions or conclusions. The specific scope of work for this assignment is identified below and throughout this report.

| Scope of Subject Property Inspection/Data Sources Utilized | Approaches to Value Developed |
|---|---|
| **Appraiser**<br>Property Inspection:  ☒ Yes  ☐ No<br>Date of Inspection:   April 13, 2018<br>Describe Scope of Property Inspection, Source of Area Calculations and Data Sources Consulted:   The Property's land was inspected on a "walk-through" basis and the improvements were inspected on a "limited interior" and "complete exterior" basis. Data was collected from public assessment and land records. | **Cost Approach:**<br>☐ Is necessary for credible results and is developed in this analysis<br>☒ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |
| | **Sales Comparison Approach:**<br>☒ Is necessary for credible results and is developed in this analysis<br>☐ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |
| **Co-Appraiser**<br>Property Inspection:   ☐ Yes  ☐ No<br>Date of Inspection:<br>Describe Scope of Property Inspection, Source of Area Calculations and Data Sources Consulted: | **Income Approach:**<br>☐ Is necessary for credible results and is developed in this analysis<br>☒ Is not necessary for credible results; not developed in this analysis<br>☐ Is not necessary for credible results but is developed in this analysis |

Additional Scope of Work Comments:   I followed the valuation process to appraise the Property.

See attached Expert Report for additional information.

Significant Real Property Appraisal Assistance:   ☐ None  ☒ Disclose Name(s) and contribution:   William D. O'Donnell and Joseph C. Harvey provided me with significant real property appraisal assistance in preparing this report.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                June 2017

| Client: | McGuireWoods LLP | Client File #: | |
|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | Appraisal File #: | T000010-A |

## MARKET AREA ANALYSIS

**Location**
- ☐ Urban
- ☐ Suburban
- ☒ Rural

**Built Up**
- ☐ Under 25%
- ☒ 25-75%
- ☐ Over 75%

**Growth**
- ☐ Rapid
- ☒ Stable
- ☐ Slow

**Supply & Demand**
- ☐ Shortage
- ☒ In Balance
- ☐ Over Supply

**Value Trend**
- ☐ Increasing
- ☒ Stable
- ☐ Decreasing

**Typical Marketing Time**
- ☐ Under 3 Months
- ☐ 3-6 Months
- ☒ Over 6 Months

### Neighborhood Single Family Profile

| | Price | | Age |
|---|---|---|---|
| | 100,000 | Low | New |
| | 2,000,000 | High | 42 |
| | 175,000 | Predominant | 39 |

### Neighborhood Land Use

| | | | |
|---|---|---|---|
| 1 Family | 50% | Commercial | 5% |
| Condo | 10% | Vacant | 30% |
| Multifamily | 5% | | % |

**Neighborhood Name:** Wintergreen

PUD ☐  Condo ☐  HOA: $  N/A/
Amenities: Recreational

Market area description and characteristics:   The Property is situated on the eastern slopes of the Blue Ridge Mountains, just east of the Blue Ridge Parkway and south of Beech Grove Road, across from the Wintergreen Resort.

Wintergreen Resort is a four-season mountain resort that opened in 1975. Amenities include seasonal skiing and snowboarding, golf, spa, tennis and trails.

See attached Expert Report for additional information.

## SITE ANALYSIS

| Dimensions: | See exhibit in the attached Expert Report. | Area: | 2.922 Acres |
|---|---|---|---|
| View: | Mountains and woods | Shape: | Irregular |
| Drainage: | Adequate | Utility: | None |

**Site Similarity/Conformity To Neighborhood**

**Zoning/Deed Restriction**

**Size:**
- ☐ Smaller than Typical
- ☒ Typical
- ☐ Larger than Typical

**View:**
- ☒ Favorable
- ☐ Typical
- ☐ Less than Favorable

Zoning: Agricultural A-1 District

- ☒ Legal   ☐ No zoning
- ☐ Legal, non-conforming
- ☐ Illegal

**Covenants, Condition & Restrictions**
☐ Yes  ☒ No  ☐ Unknown

**Documents Reviewed**
☐ Yes  ☐ No

Ground Rent  $  N/A/

**Utilities**

| Electric | ☒ Public | ☐ Other | |
|---|---|---|---|
| Gas | ☐ Public | ☐ Other | |
| Water | ☐ Public | ☒ Other | Well |
| Sewer | ☐ Public | ☒ Other | Septic |

**Off Site Improvements**

| Street | ☐ Public | ☒ Private | |
|---|---|---|---|
| Alley | ☐ Public | ☐ Private | |
| Sidewalk | ☐ Public | ☐ Private | |
| Street Lights | ☐ Public | ☐ Private | |

Site description and characteristics:   The Property has an underground gas transmission line (UGTL) along its northeastern boundary.

The Property is located in a FEMA-Designated Zone X per FIRM Map #51125C0115B dated 6/18/2010.

See attached Expert Report for additional information.

## HIGHEST AND BEST USE ANALYSIS

☒ Present Use   ☐ Proposed Use   ☐ Other

Summary of highest and best use analysis:   The continued use of the Property as a proprietor-occupied transient lodging is the highest and best use.

See attached Expert Report for additional information.

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved
June 2017

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-A |

## SITE VALUATION

### Site Valuation Methodology

☒ **Sales Comparison Approach:** A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, then applying appropriate units of comparison and making adjustments to the sale prices of the comparables based on the elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant; it is the most common and preferred method of land valuation when an adequate supply of comparable sales are available.

☐ **Market Extraction:** A method of estimating land value in which the depreciated cost of the improvements on the improved property is estimated and deducted from the total sale price to arrive at an estimated sale price for the land; most effective when the improvements contribute little to the total sale price of the property.

☐ **Alternative Method:** (Describe methodology and rationale)

### Site Valuation

| ITEM | SUBJECT | COMPARISON 1 | | COMPARISON 2 | | COMPARISON 3 | |
|---|---|---|---|---|---|---|---|
| Address | 29 Shelton Laurel Trl | 20 Shelton Laurel Trl | | S/S Beech Grove Rd | | N/S Beech Grove Rd | |
| | Roseland, VA 22967 | Roseland, VA 22967 | | Roseland, VA 22967 | | Roseland, VA 22967 | |
| Proximity to Subject | | Adjacent | | Approx 2.08 miles SE | | Approx 2.07 miles SE | |
| Data Source/ | | Public Records/PIN 19-3-2B | | Public Records/PIN 31-A-39A | | Public Records/PIN 31-A-51C | |
| Verification | | Instrmnt #150000571 | | Instrmnt #150000678 | | Instrmnt #150002900 | |
| Sales Price | $          N/A | $ | 180,000 | $ | 100,000 | $ | 90,000 |
| Price /  Acre | $ | $ | 10,093 | $ | 20,040 | $ | 19,481 |
| Sale Date | 01/31/2018 | 03/11/2015/Inf | +900 | 03/23/2015/Inf | +1,800 | 10/30/2015/Inf | +1,300 |
| Location | Rural | Rural/Similar | | Rural/Similar | | Rural/Similar | |
| Site Size | 2.922 Acres | 17.834 Ac/Inf | +4,000 | 4.99 Ac/Similar | | 4.62 Ac/Similar | |
| Site View | Mtns Wds&UGTL | Mtns&Wds/Sup | -1,900 | Mtns&Wds/Sup | -2,600 | Mtns&Wds/Sup | -2,500 |
| Site Improvements | None (Assumed) | None/Similar | | None/Similar | | None/Similar | |
| Access | Private Street | Private St/Sim | | Public St/Sup | -1,000 | Public St/Sup | -1,000 |
| Status | Vacant (Assumd) | Vacant/Similar | | Vacant/Similar | | Vacant/Similar | |
| Topography | Rolling | Rolling/Similar | | Rolling/Similar | | Rolling/Similar | |
| Utilities (Available) | Elc,Well&Spc | ElcWell&Spc/Sim | | ElcWell&Spc/Sim | | ElcWell&Spc/Sim | |
| Zoning | Agricultural A-1 | Agricultural A-1 | | Agricultural A-1 | | Agricultural A-1 | |
| Net Adjustment | | ☒ + ☐ - | $          3,000 | ☐ + ☒ - | $      -1,800 | ☐ + ☒ - | $      -2,200 |
| (Adj.s, N.A. & I.V. are in $ / Acre) | | Net Adj.    29.7 % | ($ 3000.00 /Acre) | Net Adj.        9 % | ($ -1800.00 /Acre) | Net Adj.      11.3% | ($ -2200.00 /Acre) |
| Indicated Value | | Gross Adj. 67.4 % $   13,093 | | Gross Adj. 26.9% $   18,240 | | Gross Adj. 24.6% $   17,281 | |
| Prior Transfer | Per public records, there are | Per public records, there are | | Per public records, there are | | Per public records, there are | |
| History | no sales in the last 3 years | no sales in the last 3 years | | no sales in the last year | | no sales in the last year | |

**Site Valuation Comments:**    The comparables are settled sales from the subject market area. The most significant adjustments were due to differences in land area.

**Site Valuation Reconciliation:**    Comparable Nos. 2 and 3 required the least gross and net adjustments and were given the most weight in the final reconciliation of value. I estimated the Property's land value was $17,970 per acre or $52,500 rounded (2.922 Ac. x $17,970/Ac. = $52,508, rounded to $52,500).

| Opinion of Site Value | $    52,500 |
|---|---|

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                                                                                                          June 2017

## ADDITIONAL COMPARABLE SITES

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-A |

### SITE VALUATION

| ITEM | SUBJECT | COMPARISON 4 | | COMPARISON 5 | | COMPARISON 6 | |
|---|---|---|---|---|---|---|---|
| Address | 29 Shelton Laurel Trl | 5 Winery Ln | | | | | |
| | Roseland, VA 22967 | Roseland, VA 22967 | | | | | |
| Proximity to Subject | | 2.82 miles SE | | | | | |
| Data Source/ | | Public Records/PIN 20-6-5 | | | | | |
| Verification | | Instrmnt #170000770 | | | | | |
| Sales Price | $ N/A | $ | 135,000 | $ | | | $ |
| Price / Acre | $ | $ | 13,314 | $ | | | $ |
| Sale Date | 01/31/2018 | 03/31/2017/Inf | +300 | | | | |
| Location | Rural | Rural/Similar | | | | | |
| Site Size | 2.922 Acres | 10.14 Ac/Inferior | +3,300 | | | | |
| Site View | MtnsWds&UGTL | Mtns&Wds/Sup | -2,100 | | | | |
| Site Improvements | None (Assumed) | None/Similar | | | | | |
| Access | Private Street | Private St/Similar | | | | | |
| Status | Vacant (Assumd) | Vacant/Similar | | | | | |
| Topography | Rolling | Rolling/Similar | | | | | |
| Utilities (Available) | Elc,Well&Spc | ElcWell&Spc/Slm | | | | | |
| Zoning | Agricultural A-1 | Agricultural A-1 | | | | | |
| Net Adjustment | | ☒ + ☐ – | $ 1,500 | ☐ + ☐ – | $ | ☐ + ☐ -- | $ |
| (Adj.s, N.A. & I.V. are in $ / Acre) | | Net Adj. 11.3% | ($ 1500.00 /Acre) | Net Adj. % | | Net Adj. % | |
| Indicated Value | | Gross Adj. 42.8% | $ 14,814 | Gross Adj. % | $ | Gross Adj. % | $ |
| Prior Transfer | Per public records, there are | Per public records, there are | | | | | |
| History | no sales in the last 3 years | no sales in the last year | | | | | |

Comments:

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-120.05 Appraisal Report - Land© Appraisal Institute 2017, All Rights Reserved                                    June 2017

| Client: | McGuireWoods LLP | Client File #: | |
|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | Appraisal File #: | T000010-A |

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal is subject to the following assumptions and limiting conditions:

- This report is prepared using forms developed and copyrighted by the Appraisal Institute. However, the content, analyses, and opinions set forth in this report are the sole product of the appraiser. The Appraisal Institute is not liable for any of the content, analyses, or opinions set forth herein.

- No responsibility is assumed for matters legal in character or nature. No opinion is rendered as to title, which is assumed to be good and marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, having responsible ownership and competent management.

- I have examined the property described herein exclusively for the purposes of identification and description of the real property. The objective of my data collection is to develop an opinion of the highest and best use of the subject property and make meaningful comparisons in the valuation of the property. The appraiser's observations and reporting of the subject improvements are for the appraisal process and valuation purposes only and should not be considered as a warranty of any component of the property. This appraisal assumes (unless otherwise specifically stated) that the subject is structurally sound and all components are in working condition.

- I will not be required to give testimony or appear in court because of having made an appraisal of the property in question, unless specific arrangements to do so have been made in advance, or as otherwise required by law.

- I have noted in this appraisal report any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, I have no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and have assumed that there are no such conditions and make no guarantees or warranties, express or implied. I will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because I am not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources that I believe to be true and correct.

- I will not disclose the contents of this appraisal report except as provided for in the Standards and Ethical Rules under which this appraisal was developed and reported and/or applicable federal, state or local laws.

- The Client is the party or parties who engage an appraiser (by employment contract) in a specific assignment. A party receiving a copy of this report from the client does not, as a consequence, become a party to the appraiser-client relationship. Any person who receives a copy of this appraisal report as a consequence of disclosure requirements that apply to an appraiser's client, does not become an intended user of this report unless the client specifically identified them at the time of the assignment. The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

- If this valuation conclusion is subject to satisfactory completion, repairs, or alterations, it is assumed that the improvements will be completed competently and without significant deviation.

## VALUE DEFINITION

☐ Market Value Definition (below)        ☒ Alternate Value Definition (attached)

MARKET VALUE is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and acting in what they consider their own best interests;

3. a reasonable time is allowed for exposure in the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.                    Source: The Dictionary of Real Estate Appraisal, 6th ed., Appraisal Institute

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-900.05 Certification, Assumptions and Limiting Conditions© Appraisal Institute 2017, All Rights Reserved                                          June 2017

Form AI9005 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

| Client: | McGuireWoods LLP | | Client File #: | |
|---|---|---|---|---|
| Subject Property: | 29 Shelton Laurel Trl, Roseland, VA 22967 | | Appraisal File #: | T000010-A |

## APPRAISER CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.
- The reported analysis, opinions, and conclusions are limited only by the report assumptions and limiting conditions, and are my personal, unbiased professional analysis, opinions, and conclusions.
- I have no present (unless specified below) or prospective interest in the property that is the subject of this report, and I have no (unless specified below) personal interest with respect to the parties involved.
- I have no bias with respect to any property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon the developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
- Individuals who have provided significant real property appraisal assistance are named below. The specific tasks performed by those named are outlined in the Scope of Work section of this report.

☐ None   ☒ Name(s)   William D. O'Donnell and Joseph C. Harvey

As previously identified in the Scope of Work section of this report, the signer(s) of this report certify to the inspection of the property that is the subject of this report as follows:

Property Inspected by Appraiser   ☒ Yes   ☐ No

Property Inspected by Co-Appraiser   ☐ Yes   ☐ No

- Services provided, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment:   ☒ None   ☐ Specify services provided:

## ADDITIONAL CERTIFICATION FOR APPRAISAL INSTITUTE MEMBERS, CANDIDATES AND PRACTICING AFFILIATES

Appraisal Institute Designated Member, Candidate for Designation, or Practicing Affiliate Certify:

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.
- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

| ▪ I am a Designated Member of the Appraisal Institute. As of the date of this report, I have completed the continuing education program of the Appraisal Institute. | ▪ |
|---|---|

## APPRAISERS SIGNATURES

| APPRAISER: | CO-APPRAISER: |
|---|---|
| Signature | Signature |
| Name   William C Harvey, II, CCIM, MAI | Name |
| Report Date   April 17, 2019 | Report Date |
| Trainee ☐   Licensed ☐   Certified Residential ☐   Certified General ☒ | Trainee ☐   Licensed ☐   Certified Residential ☐   Certified General ☐ |
| License #   4001-000731   State VA | License #   State |
| Expiration Date   12/31/2019 | Expiration Date |

*NOTICE: The Appraisal Institute publishes this form for use by appraisers where the appraiser deems use of the form appropriate. Depending on the assignment, the appraiser may need to provide additional data, analysis and work product not called for in this form. The Appraisal Institute makes no representations, warranties or guarantees as to, and assumes no responsibility for, the data, analysis or work product, or third party certifications, verifications, data specifications, scores, indexes, or valuation tools, used or provided by the individual appraiser(s) or others in the specific contents of the AI Reports®. AI Reports® AI-900.05 Certification, Assumptions and Limiting Conditions© Appraisal Institute 2017, All Rights Reserved                                                                     June 2017

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22867 |
| Lender/Client | McGuireWoods LLP | | | | | | |



**Subject Front**

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | MtnsWds&UGTL |
| Site | 2.922 Acres |
| Quality | |
| Age | |



**Subject Rear**



**Subject Street**

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | | |



### Subject Lobby

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | MtnsWde&UGTL |
| Site | 2.922 Acres |
| Quality | |
| Age | |



### Subject Kitchen



### Subject Dining Room

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Subject Exercise Room

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | MtnsWds&UGTL |
| Site | 2.922 Acres |
| Quality | |
| Age | |



### Subject Typical Bedroom



### Subject Typical Bathroom

### Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | |



**Subject Store**

29 Shelton Laurel Trl
Sales Price        N/A
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location           Rural
View               MtnsWds&UGTL
Site               2.922 Acres
Quality
Age



**Subject Courtyard**



**Subject Patio**

## Subject Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22987 |
| Lender/Client | McGuireWoods LLP | | | | | | | |



### Subject Picnic Area

| | |
|---|---|
| Sales Price | N/A |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural |
| View | MtnsWds&UGTL |
| Site | 2.922 Acres |
| Quality | |
| Age | |



### ACP Pipeline Route View

**Aerial Photo**

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | |



### Comparable 1

20 Shelton Laurel Trl
| Prox. to Subject | Adjacent |
|---|---|
| Sale Price | 180,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sup |
| Site | 17.834 Ac/Inf |
| Quality | |
| Age | |
| Note | Image is after boundary adj. |



### Comparable 2

S/S Beech Grove Rd
| Prox. to Subject | Approx 2.08 miles SE |
|---|---|
| Sale Price | 100,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wde/Sup |
| Site | 4.99 Ac/Similar |
| Quality | |
| Age | |



### Comparable 3

N/S Beech Grove Rd
| Prox. to Subject | Approx 2.07 miles SE |
|---|---|
| Sale Price | 90,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wde/Sup |
| Site | 4.62 Ac/Similar |
| Quality | |
| Age | |

## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code 22967 |
| Lender/Client | McGuireWoods LLP | | | | | |



### Comparable 4

| | |
|---|---|
| 5 Winery Ln | |
| Prox. to Subject | 2.82 miles SE |
| Sale Price | 135,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Rural/Similar |
| View | Mtns&Wds/Sup |
| Site | 10.14 Ac/Inferior |
| Quality | |
| Age | |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

## Comparable Sales Map

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



# EXHIBIT 13

# FENTON FAMILY HOLDINGS, LLC PROPERTY

## PARCEL IDENTIFICATION NUMBER 19-3-2A

### COST APPROACH SUMMARY "AFTER THE TAKING"

| | SQ. FT.-GBA | $/SQ. FT. | TOTAL |
|---|---|---|---|
| **ESTIMATED DIRECT CONSTRUCTION COST:** | | | |
| TRANSIENT LODGING STRUCTURE (A) | 10,004  x | $145.91 | $1,459,731 |
| SUBTOTAL | | | $1,459,731 |
| | | | |
| **ESTIMATED INDIRECT COST:** | | | |
| C/L INTEREST | $15,675 | | |
| ADMIN./MISC. | 52,250 | | |
| R. E. TAXES | 567 | | |
| SUBTOTAL | | | 68,492 |
| | | | |
| ENTREPRENEURIAL PROFIT ALLOWANCE @ 20% | | | 316,145 |
| | | | |
| TOTAL REPLACEMENT COST - NEW | | | $1,844,368 |
| | | | |
| **DEPRECIATION:** | | | |
| LESS ALL FORMS | ($1,137,350) | | |
| SUBTOTAL | | | ($1,137,350) |
| | | | |
| REPLACEMENT COST - DEPRECIATED | | | $707,018 |
| PLUS COST OF SITE IMPROVEMENTS (B) | | | 150,000 |
| PLUS ESTIMATED LAND VALUE | | | 52,500 |
| TOTAL ESTIMATED COST (FEE SIMPLE) | | | $909,518 |
| PROPERTY RIGHTS ADJUSTMENT | | | 0 |
| VALUE INDICATION "AFTER THE TAKING" | | | $909,518 |
| ROUNDED: | | | $910,000 |

Source: Swift Commercial Estimator

Prepared by William C. Harvey & Associates, Inc.

# EXHIBIT 14

# FENTON FAMILY HOLDINGS, LLC PROPERTY

## PROPERTY IDENTIFICATION NUMBER 19-3-2A

## INCOME APPROACH SUMMARY "AFTER THE TAKING"

| Revenues | Total | % of Revenue |
|---|---|---|
| Gross Revenue | $225,165 | 99.8% |
| Other Income | 511 | 0.2% |
| **Total Revenue** | **$225,676** | **100.0%** |
| **Expenses** | | |
| *Fixed*: | | |
| Insurance | $4,625 | 2.0% |
| Real Estate Taxes | 4,165 | 1.8% |
| Subtotal Fixed Expenses | $8,790 | 3.9% |
| *Variable*: | | |
| Advertising | $5,581 | 2.5% |
| Cost of Goods Sold | 21,711 | 9.6% |
| Legal & Accounting | 3,631 | 1.6% |
| Administrative & Office | 8,402 | 3.7% |
| Payroll | 10,881 | 4.8% |
| Repairs & Maintenance | 8,238 | 3.7% |
| Telephone & Internet | 6,997 | 3.1% |
| Travel & Entertainment | 4,065 | 1.8% |
| Utilities | 11,492 | 5.1% |
| Other Expenses | 10,534 | 4.7% |
| Subtotal Variable Expenses | $91,532 | 40.6% |
| **Total Expenses** | **(100,322)** | **-44.5%** |
| **Going Concern Net Operating Income** | **$125,354** | **55.5%** |
| Less Return for Nonrealty Assets | (21,242) | |
| **Real Estate Net Operating Income** | **$104,112** | |
| Overall Capitalization Rate (R$_O$) | 10.0% | |
| Value Indication | $1,041,123 | |
| **Final Value Indication "Before" (Rd.)** | **$1,040,000** | |
| Less 12.5% due to ACP | ($130,000) | |
| **Final Value Indication "After" (Rd.)** | **$910,000** | |

Sources: Defendant 000049, 000092, 000158, 000159, 000167, 000176 & 000177

Prepared by William C. Harvey & Associates, Inc.

# EXHIBIT 15

**FENTON FAMILY HOLDINGS, LLC**

PARCEL IDENTIFICATION NUMBER 19-3-2A

SALES COMPARISON APPROACH SUMMARY "AFTER THE TAKING"

| ELEMENT | SUBJECT | IMPROVED SALE 1 | IMPROVED SALE 2 | IMPROVED SALE 3 | IMPROVED SALE 4 |
|---|---|---|---|---|---|
| Name | Fenton Inn | Victoria & Albert Inn | 3 Ba Inn | Fuller House | The Mark Addy Inn |
| Address | 29 Shelton Laurel Trl. | 224 Oak Hill St. | 5793 Gerton Hwy. | 220 W. Boscawen St. | 56 Rodes Farm Dr. |
| | Roseland, VA 22967 | Abingdon, VA 24210 | Gerton, NC 28735 | Winchester, VA 22601 | Nellysford, VA 22958 |
| Parcel Identification No. | 19-3-2A | 12-1-41-AB | 05-01163 | 172-01-C-2 | 22-A-39 |
| Date of Sale (Deed Date) | January 31, 2018 | November 12, 2015 | July 13, 2016 | November 15, 2016 | Listing |
| Instrument No. | - - - | 5239 | 1671/57 | 2748 | N/A |
| Grantor | - - - | Ramos-Cano, Inc. | Peaceful Quest Retreats, LLC | Debra Johnson | Rafael L. Tal, et al. |
| Grantee | - - - | Paul Armstrong, et al. | Glen Gilmore, II | Fuller House, LLC | N/A |
| Sale Price | - - - | $375,000 | $438,000 | $800,000 | $1,195,000 |
| Price per GBA Sq. Ft. | - - - | $88 | $84 | $123 | $182 |
| Price per Keyed Room | - - - | $62,500 | $109,500 | $133,333 | $119,500 |
| Transactional Characteristics: | | | | | |
| - Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| - Financing Terms | Cash Sale (Assumed) | Cash Sale | Cash Sale | Cash Sale | Cash Sale |
| - Conditions of Sale | Arm's-Length & | Arm's-Length & | Arm's-Length & | Arm's-Length & | Arm's-Length & |
| | Normal Motivation | Normal Motivation | Normal Motivation | Normal Motivation | Normal Motivation |
| - Expenditures After Sale | None | None | None | None | None |
| Property Characteristics: | | | | | |
| - Location | Rural | Rural | Rural | Suburban | Rural |
| - Building Size (GBA) | 10,004 | 4,245 | 5,235 | 6,530 | 6,560 |
| - Condition | Good | Average | Average | Average | Average |
| - Land Area (Ac.) | 2.922 | 0.57 | 5.20 | 0.21 | 4.42 |
| - Keyed Rooms | 6 | 6 | 4 | 6 | 10 |
| - Zoning/Use | A-1/Transient Lodging | QH/B&B | R3/B&B | BI/B&B | SE-1/B&B w/Restaurant |
| ADJUSTMENTS | | IMPROVED SALE 1 | IMPROVED SALE 2 | IMPROVED SALE 3 | IMPROVED SALE 4 |
| Transactional Adjustments: | | | | | |
| - Price per GBA Sq. Ft. | | $88 | $84 | $123 | $182 |
| - Property Rights Adjustment | | Similar | Similar | Similar | Similar |
| - Financing Adjustment | | Similar | Similar | Similar | Similar |
| - Conditions of Sale Adjustment | | Similar | Similar | Similar | Similar |
| - Market Conditions Adjustment | | Slightly Inferior | Slightly Inferior | Slightly Inferior | Similar |
| Property Adjustments: | | | | | |
| - Location | | Similar | Similar | Very Superior | Similar |
| - Physical Characteristics | | Inferior | Inferior | Inferior | Inferior |
| - Use | | Similar | Similar | Similar | Superior |
| Price per GBA Sq. Ft. | | $88 | $84 | $123 | $182 |
| For Reconciliation Purposes: | | | | | |
| Overall Comparison | | Inferior | Inferior | Superior | Superior |

RANKING ANALYSIS

| COMPARABLE | UNIT PRICE | COMPARISON |
|---|---|---|
| IMPROVED SALE 4 | $182 | Superior |
| IMPROVED SALE 3 | $123 | Superior |
| SUBJECT | | - - - |
| IMPROVED SALE 1 | $88 | Inferior |
| IMPROVED SALE 2 | $84 | Inferior |

RECONCILIATION:

| | |
|---|---|
| Subject Property GBA Sq. Ft. | 10,004 |
| Value per GBA Sq. Ft. | $105 |
| Value Indication "Before" (Rd.) | $1,050,000 |
| Less 12.5% due to ACP | ($131,250) |
| Final Value Indication "After" (Rd.) | $919,000 |

Source: CAAR-MLS, CoStar & InnShopper.com

Prepared by William C. Harvey & Associates, Inc.

## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | | |
| City | Roseland | County | Nelson | | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | | |



### Comparable 1

224 Oak Hill St NE
Prox. to Subject    164.42 miles SW
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



### Comparable 2

5793 Gerton Hwy
Prox. to Subject    224.63 miles SW
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age



### Comparable 3

220 W Boscawen St
Prox. to Subject    98.71 miles NE
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

\

## Comparable Photo Page

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |



### Comparable 4

58 Rodes Farm Dr
Prox. to Subject          6.63 miles E
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

### Comparable 5

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

### Comparable 6

Prox. to Subject
Sale Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

## Comparable Sales Map

| Borrower | Fenton Family Holdings, LLC | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 29 Shelton Laurel Trl | | | | | | |
| City | Roseland | County | Nelson | State | VA | Zip Code | 22967 |
| Lender/Client | McGuireWoods LLP | | | | | | |

