# EXHIBIT B

# In the Matter of:

*ATLANTIC COAST PIPELINE*

*vs*

*FENTON FAMILY HOLDINGS*

---

*William Harvey*

*April 26, 2019*

---



## COURT REPORTING

208 E. Plume Street, Suite 214
Norfolk, Virginia 23510
*tel:* 757 627 6554 *fax:* 757 625 7077
*email:* info@zahncourtreporting.com



IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION


ATLANTIC COAST PIPELINE, LLC,   )

       Plaintiff,        )

  vs.                     ) Case No.

FENTON FAMILY HOLDINGS, LLC,  ) 3:18-CV-00006

et al.,                   )

       Defendants.      )

         *     *     *     *     *

**ORIGINAL**


       The deposition of WILLIAM HARVEY, II, was

taken on Friday, April 26, 2019, commencing at 9:06

a.m., at the offices of McGuire Woods, LLP, 1750

Tysons Boulevard, Suite 1800, Tysons Corner, Virginia,

before Deborah Wehr, RPR, Notary Registration No.

292810, Notary Public.


       *     *     *     *     *



```
 1               A P P E A R A N C E S

 2

 3

 4    ON BEHALF OF THE PLAINTIFF:

 5            KEITH J. MINSON, ESQUIRE

 6            McGuire Woods

 7            1750 Tysons Boulevard

 8            Suite 1800

 9            Tysons Corner, Virginia   22102

10            (703) 712-5363

11            kminson@mcguirewoods.com

12

13

14    ON BEHALF OF THE DEFENDANTS:

15            BRIAN G. KUNZE, ESQUIRE

16            Waldo & Lyle, P.C.

17            301 West Freemason Street

18            Norfolk, Virginia   23510

19            (757) 622-5812

20            bgk@waldoandlyle.com

21

22

23

24

25
```



```
 1                        I N D E X

 2            DEPOSITION OF WILLIAM HARVEY, II

 3                 FRIDAY, APRIL 26, 2019

 4

 5    EXAMINATION BY:                    PAGE

 6    Mr. Kunze                             4

 7

 8

 9    EXHIBIT        DESCRIPTION              PAGE

10    No. 1          9/14/18 report    33

11    No. 2          4/17/19 supplement 33

12    No. 3          12/17/18 rebuttal       73

13    No. 4          4/17/18 rebuttal        73

14    No. 5          Calculator method       134

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                   -    -    -    -

 3   Whereupon --

 4                   WILLIAM C. HARVEY, II,

 5   a witness, called for examination, having been first

 6   duly sworn, was examined and testified as follows:

 7                        EXAMINATION

 8   BY MR. KUNZE:

 9       Q.    Would you please state your name and address

10   for the record.

11       A.    William Charles Harvey, II.  My home address

12   or work?

13       Q.    Work address is fine.

14       A.    1146 Walker Road, Unit H, Great Falls,

15   Virginia, 22066.

16       Q.    And bear with me today, I'm getting over a

17   cold, so I'll be coughing a lot.

18       A.    No problem.

19       Q.    Mr. Harvey, I know we've met before, but for

20   the record, my name is Brian Kunze with Waldo & Lyle.

21   I'm counsel for the defendant in this matter, which is

22   Fenton Family Holdings, LLC.

23            I know you have been deposed before, but just

24   a few ground rules before we get going.  I'm going to

25   ask you a series of questions to learn more about your
```



1   opinion and prepare for trial to try to avoid any

2   surprises or anything like that.  I would ask that

3   when I ask a question, you wait for me to finish

4   before you answer.  The idea today is to make a clean

5   record that can be understood by everybody when we

6   read it again in a few weeks.

7          I ask if you answer yes or no to my

8   questions, don't say um-hum or huh-uh because they

9   look the same on the transcript.  And don't shake your

10  head, because the court reporter can't take that down

11  either.

12         If you need to take a break, let me know.

13  That's fine.  I just ask that if I have a question

14  pending that you answer that before we do take a

15  break.  Is that okay?

16      A.    Yes.

17      Q.    Is there any reason today that you would be

18  unable to answer my questions?

19      A.    None that I know of.

20      Q.    Could you give me a little background on your

21  education, please.

22      A.    It's in the report on my CV starting with

23  junior college at Wesley.

24      Q.    Did you get any degree at Wesley?

25      A.    No, no degree.  Moved on to Maryland.  No



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    degree.  I have about 4,000 hours in specialized real

2    estate education, culminating in the award of private

3    designations and licenses.

4       Q.    What licenses are those?

5       A.    I'm licensed as a general real estate

6    appraiser in Maryland, D.C., Virginia, West Virginia,

7    North Carolina, and I'm licensed as a salesperson in

8    Virginia.

9       Q.    Is that a broker's license?

10      A.    My wife is the broker of record.  I'm the

11   sales guy.

12      Q.    So what is a salesperson license, then?

13      A.    It's a different license under the

14   Commonwealth's structure of licensing.

15      Q.    What does that allow you to do?

16      A.    Everything other than act as a principal

17   broker.

18      Q.    So are you regularly involved in real estate

19   transactions, then?

20      A.    I'm not sure what you mean by regularly.  It

21   is part of my activity.  I do more appraisal than

22   anything, but one of my designations, CCIM, was earned

23   through documented transactions of income-producing

24   property.  I mean, I have sold retail centers, office

25   buildings, industrial buildings and land, but it's not



1    what I do day in and day out.

2        Q.    What you do day in and day out is appraising

3    properties?

4        A.    Primarily, yes.

5        Q.    What other activities are there other than

6    appraising and involved in real estate transactions?

7        A.    Previously we had an auction company.  So we

8    cried -- we held auctions.  Sometimes I consult.  That

9    has pretty much changed, by definition, since 2014.

10   It now is under the same umbrella as appraisal, but

11   before it was a different standard.

12       Q.    Explain that further, please.  What type of

13   consulting did you do?

14       A.    Mostly real estate-related consulting.  And

15   as you know, licensed practitioners in Virginia follow

16   professional standards, one of which would be the

17   Uniform Standards of Professional Appraisal Practice.

18   So prior to 2014, of the ten standards, one dealt with

19   consulting, three dealt with appraisal, and the other

20   six dealt with personal property and businesses.  But

21   in 2014, they retired the consulting and folded it

22   into appraisal.  So that's why I said since that time,

23   I would no longer distinguish between appraisal and

24   consulting.  It's one and the same.

25       Q.    But consulting is still governed by USPAP,



1    the standards of professional appraisal practice?

2        A.    It's really not.   They retired the standard

3    on consulting and said if you are providing consulting

4    that has to do with value, that's an appraisal, and if

5    you are not providing valuation, it's not a service

6    that's regulated by USPAP.

7        Q.    I'm going to jump a little ahead.   We are

8    going to talk about this more later, but since you

9    brought that up, what about rebuttal review reports,

10   is that governed by USPAP?

11       A.    Well, appraisal review is.

12       Q.    Even if you are not giving a value opinion?

13       A.    Appraisal review is covered if you are

14   opining on the work of another party.   And if you were

15   to opine as to a different value or a concurrence

16   opinion, that would go outside of appraisal review,

17   and that would be an appraisal opinion itself.

18       Q.    Which standard is --

19       A.    One and two is appraisal of real property.

20   One is development.   Two is reporting.   Three is

21   appraisal review.   Development four is appraisal

22   review reporting.

23       Q.    You mentioned the CCIM designation.   What

24   does that stand for?

25       A.    Well, it's CCIM Institute is a division of



1    the National Association of Realtors.  They award --

2    it's basically commercial and industrial by

3    application as opposed to realtors who do residential

4    would be under a different designation such as GRI.

5        Q.    What is GRI?

6        A.    It's a residential designation equivalent to

7    the CCIM.  But the CCIM is recognized as having

8    transactional experience in complex income-producing

9    properties.

10       Q.    Any other designations?

11       A.    AQB certified USPAP instructor.  That

12   designation comes from the Appraisal Foundation.

13       Q.    What does AQB stand for?

14       A.    That is the Appraisal Qualifications Board,

15   who is one of the two boards making up the brain trust

16   for the Appraisal Foundation that directs activity.

17       Q.    You also said you have the MAI designation?

18       A.    I am an MAI, yes.

19       Q.    When did you receive that designation?

20       A.    May of 1986.

21       Q.    Any other designations?

22       A.    None that relate to today's activity.

23       Q.    Okay.

24       A.    I mean I'm an NCAA official, if you want me

25   to go through that.



1      Q.      I would probably be more interested in

2   talking about that.

3      A.      It is a designation, but it is not one that I

4   think is germane to today.  I have other designations,

5   but those are the ones that relate to my activity by

6   which I was involved with the Fenton matter.

7      Q.      How long have you been a licensed appraiser

8   in Virginia?

9      A.      Licensing came in to being in 2000.  It was

10  suspended by then-Governor Wilder for two years.  And

11  I have been licensed since the law went back into

12  effect in 2002.

13     Q.      You were licensed before that as well?

14     A.      Yeah.  And it was funny that there is an AG

15  opinion which nobody can seem to find anymore that

16  said if you weren't licensed, you don't have to be

17  licensed, but if you were licensed, even though we've

18  suspended the license law, you have act under your

19  license.  I thought that was a little...

20     Q.      You have been licensed since licensure came

21  into effect in 1994?

22     A.      Well, I was licensed originally.  I was a

23  charter licensee.  And then like I said, it was

24  suspended for two years.  So it's a nebulous question

25  as to when did it go into effect.  Technically 2002,



1    but I was licensed in 2000.

2        Q.    Did you bring any of your files for this case

3    today with you?

4        A.    No.  Your notice just asked me to appear.

5        Q.    Did you bring any documents with you today?

6        A.    I brought nothing with me other than

7    eyeglasses.

8        Q.    Who is your client in this case?

9        A.    My client is McGuire Woods.

10       Q.    And when did they engage you?

11       A.    April 2017.

12       Q.    Who at McGuire Woods engaged you?

13       A.    John Wilburn.

14       Q.    How many appraisals have you done for the ACP

15   project?

16       A.    Eighty-one.

17       Q.    Were you engaged on all of those by McGuire

18   Woods?

19       A.    Yes.

20       Q.    How many different properties have you

21   appraised for the ACP project?

22       A.    Could you restate your question?  I don't

23   totally understand it.  When you say different

24   properties, 81 different assignments, all different

25   properties.  But if you are referring to type of



1   property, there would be some similarities, land

2   versus improved and residential versus agriculture.

3        Q.    Let me clarify my question.  You have had 81

4   assignments or properties that you have appraised.

5   Did you appraise any of those properties multiple

6   times?

7             MR. MINSON:  Object to form.

8             THE WITNESS:  No.

9   BY MR. KUNZE:

10       Q.    Have you ever done --

11       A.    You know what, let me correct that.  There is

12  one pending that I believe will be a second appraisal

13  of the same property.  And that would be Steve Clark's

14  client, the Van Fossens.  Ralston and Van Fossen.  The

15  reason I say that is because they recently filed an

16  inverse claim.

17       Q.    So you will be performing a second appraisal

18  for the inverse claim?

19       A.    I already have.

20            MR. MINSON:  I'm going to object to form for

21  that question.

22            THE WITNESS:  I have been tasked with

23  providing a new valuation, which is technically a new

24  assignment, based upon the claim put forth in the

25  Ralston/Van Fossen complaint on inverse condemnation.



1   BY MR. KUNZE:

2       Q.     Okay.  So if you have a new valuation, is

3   that considered a new appraisal assignment?

4       A.     Well, yeah.  I don't totally understand your

5   question, but --

6              MR. MINSON:  I'm just going to renew my

7   objection for everything that doesn't have to do --

8   for all appraisals that are non-germane to this

9   matter.

10             THE WITNESS:  Any time somebody asks you,

11  even if it's the same property for a different date --

12  effective date or a different definition of value,

13  that would be a new assignment.  Here it's the same

14  property but a different date.  And the context of the

15  assignment is different.

16  BY MR. KUNZE:

17      Q.     Okay.  Let's go back to this case.  You have

18  performed an original appraisal; is that correct?

19      A.     Correct.

20      Q.     And then you performed a supplemental report,

21  did you not?

22      A.     It's a supplemental report, but it's the same

23  appraisal.  Same effective date, same definition of

24  value.  The supplement is only --

25      Q.     Did you come up with the same amount of just



1    compensation for each report?

2        A.    No, there was a revision in the opinion.

3        Q.    So would that be two separate assignments?

4        A.    No.   It's the same assignment.   It's a

5    revision of the original assignment through the

6    supplemental materials.

7        Q.    Have you ever done any work for Dominion

8    before?

9        A.    Yes.

10       Q.    When was that?

11       A.    I still do work for Dominion.

12       Q.    When did you first start doing work for

13   Dominion?

14       A.    I would say earlier in my career, 40-some

15   years ago.

16       Q.    How many utility projects have you done

17   appraisal work for Dominion before?

18       A.    I don't have an exact census over the last

19   40 years.

20       Q.    Would you say more than 10?

21       A.    I would say more than 100.

22       Q.    More than 100 separate projects?

23       A.    Yeah.   And I have done -- just so my answer

24   is complete, I have done more than 100 where Dominion

25   is the opposing party, assignments where Dominion is



1    the opposing party.

2       Q.    I want to make sure I'm clear here.  When you

3    say more than 100, that's more than 100 appraisal

4    assignments?

5       A.    Correct.

6       Q.    I want to ask you about specific utility

7    projects.  How many utility projects have you done

8    work for, for Dominion, appraisal work for Dominion?

9       A.    Well, I believe all hundred were

10   utility-related infrastructure projects, either

11   acquisition of right-of-way or --

12      Q.    Approximately -- so we have in this case the

13   Atlantic Coast Pipeline Project.  You understand that?

14   How many utility line projects similar to the ACP

15   project have you done appraisal work for Dominion

16   before?

17      A.    Well, I would say all 100 or so are

18   utility-related corridor-type assignments of either

19   electricity or gas.

20      Q.    How many different corridors have you

21   appraised on?

22      A.    I would say at least 30.  In other words,

23   sometimes there's multiple parcels associated with

24   those assignments, but each was a different utility

25   vested through SEC.



1    Q.    And then you said you have done more than 100

2    different appraisal assignments for landowners against

3    Dominion?

4    A.    At least 100.  And I currently represent

5    landowners who are opposed to Dominion.

6    Q.    On which projects?

7    A.    I have been in the Poland Road high-voltage

8    transmission line.

9    Q.    Is that Poleman?

10   A.    Poland, P-O-L-A-N-D.  I testified in front of

11   the SEC on behalf of Loudoun County, and they were my

12   client and some of the other consortiums that were in

13   that one.  And those assignments are ongoing.

14   Q.    For the more than 100 appraisal assignments

15   you have done for landowners against Dominion, were

16   all of those eminent domain appraisal assignments?

17   A.    I would say the super majority is.  I won't

18   say 100 percent because I just don't have that degree

19   of memory as to what the nuances were with each

20   assignment.  Every once in a while there's something

21   strange that comes around.  Most would be eminent

22   domain.

23   Q.    But in Poland Road were you representing the

24   county?  That is not an eminent domain matter?

25   A.    It was an eminent domain.  That was a vesting



1    of the PoE application filed with the SEC.  So before

2    the eminent domain can occur, the SEC has to bless the

3    project so it can go forward.  And the SEC did bless

4    that project.  Now that it's going forward, there were

5    eminent domain cases related to those original clients

6    that I am currently servicing.

7         Q.    If you can remember, what other utility

8    corridors did you do work for -- appraisal work for

9    Dominion on?

10        A.    I would say most have been electrical

11   related.

12        Q.    Do you remember the particular ones?

13        A.    Well, I mean, I would go back to one of the

14   earlier ones was in Old Town, Alexandria, and that was

15   the burying of an electronic substation along South

16   Union Street.  Dominion Lands was a subsidiary where

17   they did wholly-owned investments, development,

18   basically.  So that was a different type of one.  It

19   wasn't eminent domain.  It was permission to change

20   the scope of the aboveground to below grade

21   infrastructure and so forth.

22             I have done numerous electrical transmission

23   corridors, high-voltage, from 230 kilovolts to

24   740 kilovolts throughout most areas of Virginia;

25   right-of-way ground beds, you know, not necessarily



1    electrical or gas, but related to the necessity for

2    that infrastructure; valve stems, PIG launchers.  You

3    know, the things that go with corridors I have

4    generally had some involvement with.

5        Q.    Have you worked --

6        A.    I should say, PIG launcher is pipe-in-ground.

7    Some people think why are you throwing pigs in the

8    air.

9        Q.    Yes, the first time I heard that term, it

10   took me a little while.

11       A.    Some people find it offensive.  So I clarify

12   so the record is complete we are not throwing farm

13   animals in the air.

14       Q.    Have you worked on or done appraisal work for

15   other natural gas pipeline projects?

16       A.    Yes.

17       Q.    Which ones were those?

18       A.    That's a difficult question for me, because I

19   can only tell you the ones that I was named in

20   litigation.  A client that by contract says my

21   activity is confidential, that remains so until I'm

22   designated.  So the ones that I can disclose by name

23   would be TransCanada, Washington Gas Light, Columbia

24   Gas, Columbia Gas NiSource.  And there's more, but I

25   can't -- those are ongoing projects, and I haven't



1    been named, and they are confidential identities.

2        Q.    What was the last one?  Columbia Gas?

3        A.    Columbia Gas NiSource is different from

4    Columbia Gas.  As you may know, they split off their

5    assets.

6        Q.    And these are ones that you are currently

7    working on?

8        A.    They are all ones I did within the last --

9    either currently working on or have worked on in the

10   last 12 to 24 months.

11       Q.    What about in the past, how many natural gas

12   pipeline projects have you worked on that you have

13   completed?

14       A.    I couldn't give you a number, but it would be

15   more than a couple dozen.  And when you say worked on,

16   I mean, if you go by extension, I mean --

17       Q.    Done appraisal --

18       A.    Anything related to an infrastructure

19   corridor with natural gas, I mean, that would include

20   an assignment that I did in Oklahoma where I

21   represented an Indian tribe.  So I mean, not

22   everything is eminent domain that deals with a gas

23   corridor.

24       Q.    Sure.  With regard to the four you listed,

25   TransCanada, Washington Gas, Columbia Gas and Columbia



1  NiSource, which ones of those, if any, have you done

2  eminent domain appraising for?

3     A.     All four were eminent domain-related

4  assignments.

5     Q.     Were you doing work on behalf of the utility

6  companies?

7     A.     For those four named parties, yes.  For the

8  other named parties, it was equally distributed

9  between landowners who were opposed to pipeline

10 operators and developers as well as other pipeline

11 operators and developers who were my clients.

12    Q.     How many eminent domain appraisals did you do

13 in the TransCanada natural gas pipeline or are doing?

14    A.     I think the number is either 16 or 18.

15    Q.     What about Washington Gas?

16    A.     I can't remember because there were different

17 lines, line MB, line MA, WBX.

18    Q.     More than 50?

19    A.     Less than 50, but probably more than two

20 dozen.

21    Q.     What about Columbia Gas?

22    A.     Pretty much the same answer.  Those were in

23 the state of Maryland involving different lines at

24 different times.

25    Q.     Where was TransCanada?



1      A.     In northwest Maryland into Kaiser, West

2   Virginia.

3      Q.     Are you licensed in West Virginia?

4      A.     I am.

5      Q.     And the Washington Gas pipeline?

6      A.     Washington Gas has been active in both

7   Virginia and Maryland and D.C., and I have had

8   assignments in all those jurisdictions.

9      Q.     And the Columbia NiSource, is that in

10  Maryland too?

11     A.     No, that was in Prince William County.

12     Q.     Approximately how many eminent domain

13  appraisals did you do for the Columbia NiSource?

14     A.     Just a handful.

15     Q.     How many appraisals in general does your

16  company do a year?

17     A.     It's a highly variable number.  Depends upon

18  market conditions.  Keep in mind, I have a residential

19  and commercial division.  So there's a greater number

20  of assignments completed on the residential side.  A

21  couple hundred a year on average.

22     Q.     Just on the residential?

23     A.     Just on the residential side.  On the

24  commercial side, given that they take longer and they

25  are a little bit more complex, there's a lesser amount



1    of production.  That, again, depending upon the nature

2    of the assignment, it could be as few as 50.  It could

3    be more than 100.  As I mentioned, the Quapaw Indian

4    reservation assignment, that took me almost a year,

5    just myself.

6        Q.    How many employees do you have working for

7    you?

8        A.    One employee, but I have independent

9    contractors.

10       Q.    Who is your employee?

11       A.    Me.

12       Q.    And how many independent contractors do you

13   use?

14       A.    That's a variable number.  It would go no

15   less than 10 at any given time.  And it's been to a

16   height of 36.  And the 36 number incorporated at a

17   time when I had independent contractors who were doing

18   brokerage, appraisal and auctioneering.

19       Q.    And these independent contractors are

20   licensed appraisers?

21       A.    As I said, the three activities that I

22   mentioned, they would be licensed in the appropriate

23   discipline.

24       Q.    How many independent contractors do you use

25   for appraising?



1      A.      Generally between 10 and 15.

2      Q.      Do you have any independent contractors

3  working for you right now?

4      A.      Yes.

5      Q.      How many?

6      A.      Twelve.

7      Q.      Are they assisting you with your eminent

8  domain appraisals for the ACP project?

9      A.      Two are on my team for ACP.

10     Q.      Who are they?

11     A.      William O'Donnell and Joseph Harvey.

12     Q.      Is Joseph Harvey any relation?

13     A.      He is one of my sons.

14     Q.      William O'Donnell?

15     A.      And Joseph Harvey.

16     Q.      Is Mr. O'Donnell a licensed appraiser in

17  Virginia?

18     A.      He is.  Maryland and Virginia.

19     Q.      Does he have MAI designation?

20     A.      No, non-designated.

21     Q.      What about Joseph Harvey?

22     A.      Licensed appraisal trainee in Virginia.

23     Q.      Any designations?

24     A.      No.  As a trainee, he's relatively new to the

25  industry.



1       Q.      How long has he been appraising property?

2       A.      It's going on his second year.

3       Q.      Explain to me what a licensed appraisal

4    trainee is.

5       A.      Under the Commonwealth of Virginia, licenses

6    can be appraiser, and of that, it's two categories,

7    residential and certified or commercial, which is a

8    form of certification.  And then the more recent

9    licensing category is appraisal trainee.  So that is

10   somebody who has taken the minimum educational

11   requirements, including USPAP, and is trying to earn

12   credits and experience so they can then apply for a

13   full license.  I wouldn't say full license.  A higher

14   level of licensure.

15      Q.      Is there any limitations on the types of

16   properties a licensed appraiser trainee can assist on?

17      A.      No, because they are under the supervisory

18   role of whoever is their supervisor.  So that

19   supervisory role would be the limitation on the type

20   of assignments being appraised to begin with.  In

21   other words, a licensed residential appraiser has to

22   do transactional values under a million and no more

23   than two to four residential units.  A certified

24   residential appraiser can do more.  A certified

25   general can do all types of property.  So in Joe's



1   case, Joseph, my son, because I'm a certified general,

2   he can assist on any type of property.

3       Q.    What kind of assistance did Mr. O'Donnell

4   provide?

5       A.    Well, he provides field work with me.    He

6   holds the other end of the tape a lot of times.    He

7   does verifications in the form of telephone

8   interviews, interviews with government employees,

9   collection of documents and analysis of documents.

10      Q.    Did he do all of those things in this case?

11      A.    Yeah.   Well, both Mr. O'Donnell and Joseph

12  Harvey did those activities in this case, along with

13  myself.

14      Q.    I want to make sure I'm clear.

15  Mr. O'Donnell, you said, did field work with you?

16      A.    Yes.   In other words he was, when I

17  inspected -- when you set up the inspection with

18  Mrs. Fenton, he accompanied me.

19      Q.    He did verifications?

20      A.    Yes.   In other words, he has collected and

21  verified transactional data through the analysis of

22  public records and through conducting telephone

23  interviews of parties to the transactions.

24      Q.    What things specific to your appraisal in

25  this case did he verify?



1     A.    Well, the land report that appears in

2  Exhibits 2A and 8A -- I say 2A, Exhibit 2 and 8 of the

3  expert report, those were land appraisals that

4  Mr. O'Donnell confirmed the data on.

5     Q.    You say confirmed the data?

6     A.    Verified is a better term.  It's more

7  appropriate under USPAP.

8     Q.    Like a comparable sales letter included, did

9  he verify those?

10     A.    Yes.

11     Q.    Did you do any work to verify those?

12     A.    Yes.

13     Q.    What did you do?

14     A.    I reviewed everything he did.

15     Q.    But you didn't actually verify or confirm

16  those sales?

17     A.    I did spot calls and checks.  I have talked

18  to realtors in Nelson County relating to the

19  transactions that were used.  I have talked to the

20  same government employees that both Mr. O'Donnell and

21  Joseph Harvey -- I'll say Joseph Harvey so the record

22  doesn't get confused.

23     Q.    I appreciate that.  Thank you.  Anything else

24  that Mr. O'Donnell verified other than the data in

25  Exhibits 2 and 8 to your report?



1      A.    That's what I tasked him with.  The other

2   data would have been collected and verified by myself.

3      Q.    All the other data in your appraisal report?

4      A.    Most of it.  Joseph Harvey assisted, as did

5   Mr. O'Donnell.

6      Q.    What did Mr. Harvey -- did he attend the site

7   visit with you?

8      A.    No, he did not.

9      Q.    Joseph Harvey for the record.

10      A.    No, he did not.  He did the original

11   screening of information, collecting, contacting the

12   zoning director, asking for certain information,

13   certain documents and so forth.  He handed that off

14   and then, you know, it was taken to a greater degree

15   of scrutiny and analysis and verification by

16   Mr. O'Donnell and myself.

17      Q.    Did Joseph Harvey do any verifications?

18      A.    He normally pulls the deeds through the

19   remote access site, but that's the extent.  I mean,

20   once he provides the deeds, he doesn't necessarily

21   analyze those deeds.  He just checks the recordation

22   date, consideration lists on the deed and then hands

23   the document off with notes.

24      Q.    Did Joseph Harvey provide any analysis

25   assistance for your report?

1      A.     No analysis, but he did assist in data

2    collection and as I said, the limited verification

3    that I mentioned.

4      Q.     Other than the deeds, what other data did he

5    assist in collecting?

6      A.     MLS data, Multiple Listing Service data

7    through my membership in the Charlottesville Area

8    Realtors Association.  So he would go on to CAR MLS,

9    pull CRS data.  It's a type of data that is provided

10   as a service, the listings themselves, tax and

11   assessment information, zoning, that kind of thing.

12     Q.     Did Joseph Harvey assist you in drafting the

13   report at all?

14     A.     No.

15     Q.     What about Mr. O'Donnell?

16     A.     As I said, Exhibits 2 and 8, he assisted in

17   the drafting of parts of those.  As far as the

18   narrative, that's entirely my work.

19     Q.     And you are referring to the narrative in the

20   remainder of the report?

21     A.     Yeah.  So the nomenclature is clear

22   throughout today, a form style report is what I'm

23   referring to as Exhibits 2 and 8.  It's a form, a

24   preprinted form with certain fields.

25     Q.     So did Mr. O'Donnell --



1      A.     He assisted on the form style reports.

2      Q.     Did he fill out those fields?

3      A.     In part.  And then the narrative, which is

4  the non-form style reporting in both expert reports

5  and rebuttal report, all of that is my work as far as

6  the narrative that was drafted.

7      Q.     With regard to Exhibits 2 and 8, which is the

8  land value appraisal reports, correct?

9      A.     Before and after, yes, respectively.

10     Q.     Did Mr. O'Donnell research the comparable

11 sales that are used in those exhibits?

12     A.     He would have researched some.  Given my

13 activity in Nelson County and the surrounding

14 jurisdictions, you know, we are not reinventing the

15 wheel every time.  If data had been verified and used

16 in a prior assignment, it could get carried over.  So

17 he wouldn't have done that.  But the introduction of

18 any new data, he would be primarily the first party to

19 verify and analyze that data.  And there would be a

20 combination in Fenton's work.

21     Q.     Did he select the comparable sales to use in

22 those two exhibits?

23     A.     No.  The final determination of data

24 presented in exhibits is mine.

25     Q.     Did he bring these comparable sales to you to


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1   review?

2       A.    He may have brought some.  I was already

3   aware of others because of my activity in the area.

4   As you know, I did the Wintergreen assignment and

5   other assignments in the vicinity.  So that's -- it's

6   impossible for me to tell you which ones I brought

7   forward, which ones he may have introduced.  It's a

8   collaborative effort, and it's part of the library of

9   data we use.

10      Q.    Do you recall if Mr. O'Donnell introduced any

11  other comparable sales that were not used in

12  Exhibits 2 and 8?

13      A.    Generally there's a collection of data that

14  we look at, and as we go through which ones are the

15  best arbiters of value, i.e., which ones have the most

16  similar characteristics to the property at issue,

17  there would be a discarding of the ones that were

18  deemed to be not similar.  So that's typical.

19      Q.    Did Mr. O'Donnell select the sales that were

20  used in Exhibit 2 and 8 as the most similar?

21      A.    As I said, it was a collaborative effort.  I

22  would have put forth the majority because of my

23  activity in the area.  He would have then

24  supplemented, you know, with any updating of that data

25  from prior assignments.



1        Q.     Did Mr. O'Donnell provide any assistance in

2    any other part of the report other than Exhibits 2 and

3    8?

4        A.     Proofreading.

5        Q.     Anything else?

6        A.     No.

7        Q.     And I want to be clear here too because --

8    well, let's just go ahead and mark these as exhibits.

9               (Harvey Deposition Exhibit Numbers 1 and 2

10   were marked for identification.)

11   BY MR. KUNZE:

12       Q.     Do you recognize these documents?

13       A.     Yes.

14       Q.     And what is Exhibit 1?

15       A.     Exhibit 1 is the original expert report that

16   I generated in the Fenton matter.

17       Q.     What is the date of the report?

18       A.     September 14, 2008.

19       Q.     And do you recognize Exhibit 2?

20       A.     Yes.  This is a supplemental report that I

21   generated, supplemental expert report that I generated

22   in the Fenton matter.

23       Q.     What is the date of that report?

24       A.     April 17, 2019.

25       Q.     When you are referring to Exhibits 2 and 8



1   that Mr. O'Donnell provided assistance on, are those

2   Exhibits 2 and 8 in the Exhibit 1 or Exhibit 2 or

3   both?

4       A.   Exhibit 2.

5       Q.   With regard to Exhibit 1, did Mr. O'Donnell

6   provide any assistance in that?

7       A.   Yes.  Exhibit 2 in Exhibit 1 is the same as

8   Exhibit 2 in Depo Exhibit 2.

9           MR. KUNZE:  Maybe we should change those to

10  Exhibit A and B.  Is that possible?

11          THE WITNESS:  Whatever you want.

12          MR. KUNZE:  Let's do that so it's a little

13  less confusing.

14          THE WITNESS:  I use the same convention, A

15  and B, later on.  So you won't get away from it.

16          MR. KUNZE:  Let's not do that, then.

17          THE WITNESS:  I think I can speak clearly

18  throughout the day.

19          BY MR. KUNZE:

20      Q.   Mr. Harvey, let's do this.  For the record,

21  and if you are agreeable to this, let's call Exhibit 1

22  your initial report.  Is that okay if I refer to your

23  initial report as your first report?

24      A.   I use the term "original" and "supplemental."

25      Q.   Okay, original.  We'll refer to Exhibit 1 as



1   your original report and Exhibit 2 as your

2   supplemental report.

3       A.    Sure.

4       Q.    In your original report, Exhibits 2 and 8 are

5   the form appraisals for land value before and after

6   that Mr. O'Donnell provided the assistance we have

7   been talking about?

8       A.    No.

9       Q.    Please explain.

10      A.    Exhibit 2 in Exhibit 1 to the depo is the

11  land appraisal report that I was discussing previously

12  in your line of questioning.  That coincides with

13  Exhibit 2 in Depo 2, which is the supplemental report.

14          Exhibit 8 in Exhibit 2 to the deposition is a

15  refinement of the report before and after.  In other

16  words, it was summarized in the original exhibit.  It

17  was more definitive in the supplemental exhibit.

18      Q.    When you say refinement, what does that mean?

19      A.    The value was presented in the original

20  report without the form.  It was just discussed what

21  the adjustments were.  I went ahead and provided the

22  actual form with the adjustments, and that's what

23  Exhibit 8 is in Depo Exhibit Number 2.  Again, I

24  apologize, 2 and 8 in my prior answers should be 2 and

25  12.


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    Q.    So previously when we were speaking about 8,

2   it should be 12?

3    A.    Correct, on all the answers.

4    Q.    When you completed your original report, did

5   you do an after value form report?

6    A.    Yes.

7    Q.    That was not included in your original

8   report?

9    A.    No, it was part of the file and it was

10  summarized in my expert report under Rule 26.

11   Q.    When you say file, what is that?

12   A.    Appraisal memorandum is a file that supports

13  the opinions expressed in an oral report such as the

14  Rule 26 requirements of this court.

15   Q.    Are you required to keep a file?

16   A.    Yes.

17   Q.    By whom?

18   A.    Multiple parties.  As a licensed practitioner

19  in Virginia, the Virginia Administrative Code requires

20  that I comply with USPAP.  And the recordkeeping

21  provision of USPAP requires that I have an appraisal

22  file in existence prior to expressing an opinion of

23  value.  As an MAI designee, I also have to provide an

24  appraisal report any time I contemporaneously provide

25  an appraisal opinion.



1    Q.    Is that commonly referred to as a work file?

2    A.    Yes.

3    Q.    Did you complete a work file for your

4  original report?

5    A.    Yes.

6    Q.    Did you create a second file, a separate file

7  for your supplemental report?

8    A.    No.  It's part of -- the first file was

9  expanded.

10   Q.    If you would look at Exhibit 12 in your

11 supplemental report, this is the form report that was

12 completed by Mr. O'Donnell?

13   A.    By both of us.

14   Q.    So Mr. O'Donnell signed it?

15   A.    No.  He is referenced in the report in

16 accordance with the professional standards.

17   Q.    If you could turn to the signature page of

18 Exhibit 12, is that your signature?

19   A.    That is my signature.

20   Q.    When was that report dated?

21   A.    April 17, 2019.

22   Q.    Is there a similar report in your work file

23 for the analysis you did in your original report?

24   A.    Could you rephrase?  I don't understand your

25 question.



1    Q.    What is the date of the original report?

2    A.    September 14, 2018.

3    Q.    Did you complete one of these form land

4  appraisal reports for that report?

5    A.    Yes.

6    Q.    And that report is in your work file?

7    A.    Correct.

8    Q.    Do you know what the date on that would be?

9    A.    It's the same date --

10         MR. MINSON:  I'm going object to the extent

11  that it's draft reports, that you are referring to his

12  draft reports.

13         THE WITNESS:  September 14th.

14  BY MR. KUNZE:

15    Q.    Is that a draft?  Would that be a draft

16  report in your file?

17    A.    When a signature is applied, it's no longer a

18  draft.

19    Q.    Is there any difference between the analysis

20  and the report in your file from your original report

21  and the analysis in this Exhibit 12 to your supplement

22  report?

23    A.    Nothing substantial.

24    Q.    What insubstantial differences are there?

25    A.    Well, there's a different date.  The values



1  are the same.

2      Q.    Are they the same adjustments that were made

3  to the sales?

4      A.    I would have to review them.  I believe so.

5      Q.    Were they the same sales that were considered

6  in both?

7      A.    Yes.

8      Q.    Were any other sales considered in the report

9  in your file for your original --

10     A.    Just the same answer as previously, that part

11  of the valuation process would be collection of data,

12  then the filtering of that data for comparability.

13     Q.    Does your work file contain documents that

14  you reviewed in completing your appraisal report?

15     A.    Can you repeat that, please.

16     Q.    Does your work file contain documents that

17  you reviewed in completing your reports?

18     A.    Yes.

19     Q.    Documents that aren't contained within or

20  attached to your reports here, Exhibits 1 and 2 for

21  the deposition?

22     A.    Yes.

23     Q.    Are any documents in your work file that are

24  not referenced in Exhibits 1 and 2 to the deposition?

25     A.    Well, I believe the reference in the scope of



1   work would incorporate everything in the work file.

2       Q.    What reference in the scope of work are you

3   referring to?

4       A.    In Exhibit 2, if you could turn to page 10,

5   number 10, there are 21 numbered paragraphs.  Each one

6   of those deals with different potential topics and by

7   extension documents.  So by reference, in one of these

8   21 paragraphs, that's what the appraisal work file

9   would represent.  But each specific document, it

10  wouldn't necessarily be listed.

11      Q.    So there are documents in your work file that

12  are not listed in numbers 1 through 21 in the scope of

13  work?

14      A.    No, that's not what I said.  I said that the

15  21 paragraphs reference the type of documentation that

16  is in my appraisal work file.  But the appraisal work

17  file exceeds probably 5,000 pages.  So not every

18  document is identified other than by the type of

19  documentation that I was addressing in those 21

20  paragraphs.

21      Q.    Let's look at, while we are here, at page 10,

22  number 6.

23      A.    Yes.

24      Q.    Halfway down there's a list of things that

25  you collected data from; is that correct?



39

1    A.    Correct.

2    Q.    I see that you included innshopper.com?

3    A.    Yes.

4    Q.    What information did you or data did you

5    collect from innshopper.com?

6    A.    Those are B&Bs offered in the marketplace

7    throughout the country.

8    Q.    Why is that website, innshopper.com, included

9    in your supplemental report and not in your original

10   report?

11   A.    Because an extension of the information I

12   received in what I'll call the delayed discovery that

13   occurred throughout this case led me to have

14   conversations with the PAII president, and that

15   discussion yielded that innshopper would be the best

16   source of information to corroborate what my interview

17   yielded.

18   Q.    What information in what you call delayed

19   discovery, what information led you to contact this

20   person?

21   A.    Well, the testimony by Mr. Fenton as to the

22   nature of the two LLCs, operating and holding, the

23   performance of the structure on parcel 2A, transient

24   lodging, B&B, it's called different things by

25   different people, and then the information that you



1  conveyed through counsel with regard to the

2  improvements, that that combination of data was not as

3  forthcoming as what I originally had hoped for.

4           And in cooperating with the parties, I

5  basically said, okay, let's see what comes forward.

6  And as that information came forward specifically in

7  Mr. Fenton's three different deposition transcripts,

8  that led me to then have a discussion with the PAII

9  president primarily related to the operations of the

10 inn.

11    Q.    What information regarding the improvements,

12 what information was that you just referenced?

13    A.    Well, you may recall there was a -- we set up

14 an inspection.  The inspection, which scope of the

15 inspection was conveyed, I believe, to you.  I thought

16 it was also conveyed to the Fentons.  Apparently there

17 was some disagreement as to what your side agreed to.

18 And as to avoid then another motion for right of entry

19 or some type of further litigation, it was my

20 understanding that you were going to cooperate by

21 providing additional facts on those portions of the

22 property where access was denied to me and my

23 associate.  And you did that.  You provided an e-mail

24 with, I think, three sentences as to what was in the

25 lower portion.  You attached a floor plan.



1          But as those floor plans then were provided

2    in different form and fashion throughout the discovery

3    process, there was a lot more information than was

4    originally conveyed through you to McGuire Woods that

5    I came to understand the full improvements that were

6    present on the property.

7          Q.    Was that information not made available to

8    you until after your site inspection?

9          A.    That's correct.  And when you say site

10   inspection, I would classify it as a limited site

11   inspection.

12         Q.    What things would you have -- what things

13   were you not allowed to see during your site

14   inspection?

15         A.    Mrs. Fenton said I could only go where guests

16   were.  I wasn't allowed -- for instance, I was allowed

17   in the dining room.  I wasn't allowed in the kitchen.

18   I wasn't allowed in the lower basement level where the

19   manager apartment was, where the storage rooms were.

20   I wasn't allowed off the property, 2A, wasn't allowed

21   to go on either parcel 2B or 2C.

22         She provided no input whatsoever on anything

23   such as -- you know, there was a stark difference

24   between the scope of my inspection and the interaction

25   with the owner versus the scope of Mr. Ray and



1   Mr. Sarmadi and Mr. Pitt's inspection and interaction

2   with the owner.  So I mean, that's part of the

3   process.  And you tried to mollify those distinctions,

4   and that's what led to the expansion of the reports.

5       Q.    What was your assignment with regard to your

6   original appraisal report?

7       A.    The assignment all along has been value the

8   property as of the effective date of appraisal, the

9   date of the complaint under the federal rule, which is

10  before and after using the defined value of fair

11  market value.

12      Q.    And what was your assignment with regard to

13  the supplemental report?

14      A.    No different.  Same assignment.  The only

15  difference between the two is the additional

16  information received through discovery prompted

17  expansion of some of the data and analysis.

18      Q.    So the additional information we've talked

19  about so far was the additional info regarding the

20  improvements.  What other additional information did

21  you receive to do your supplemental report?

22      A.    Operational -- operations.  If you recall,

23  some of the line of questioning that Mr. Fenton

24  testified under was his average daily rate, his annual

25  occupancy rates in 2016, 2017, 2018, those parts of



1   the facilities that he rented, those parts that he

2   didn't rent, those parts which he occupied, and you

3   know, that type of information.

4       Q.   Did you ask for that information before doing

5   your original report?

6       A.   Yes.

7       Q.   And you were told that information was not

8   available?

9       A.   I reviewed correspondence between counsel

10   where my list was conveyed to you.  And you responded

11   in part that you thought tax returns, for instance,

12   were going to be forthcoming and that QuickBooks

13   reports would be forthcoming.  And there was a

14   subsequent QuickBooks report, but it was a

15   consolidated report.  It wasn't broken down.  So what

16   came back after my initial request was a partial

17   response to my original request.

18       Q.   Did you not receive the tax return documents

19   until after your original report?

20       A.   Well, the tax returns, I think, have come out

21   in different stages.  So there was an initial tax

22   return, and then I believe there was some discussion

23   amongst the counsel as to what was going to be

24   presented.  And then I guess the magistrate judge got

25   involved.  I got more documents later than I got



1    initially, and it was part of the process that

2    unfolded in between those dates.

3       Q.    Could you go to page number 1 in your updated

4    report, Exhibit 2 to the deposition.

5       A.    Yes.

6       Q.    At the bottom is listed cases in which you

7    have testified within the last four years.

8       A.    Yes.

9       Q.    And the list is the same as for the original

10   report except I believe number 1 has been added since

11   that date?

12      A.    Right.

13      Q.    Is that correct?

14      A.    Yes.

15      Q.    I know it's only been a short time since your

16   supplemental report was completed, but have you been

17   deposed or testified in any other matters since

18   publishing this report?

19      A.    No.

20      Q.    Number 1 on --

21      A.    Other than today.

22      Q.    I imagine you'll be updating your list again.

23      A.    Yes.

24      Q.    Number 1 is Atlantic Coast Pipeline, LLC

25   versus SMJB Realty, LLC.



1    A.    Yes.

2    Q.    You had your deposition taken in that case?

3    A.    Correct.

4    Q.    You have not given any trial testimony?

5    A.    The case is settled.

6    Q.    Where was that property located?

7    A.    Suffolk.

8    Q.    And you were engaged by McGuire Woods in that

9    case; is that correct?

10   A.    Yes.

11   Q.    Who was the counsel for the landowner in that

12   case?

13   A.    Chip -- or Chuck Lollar.

14   Q.    In your appraisal for that case, did you find

15   any damages to the residue as a result of the

16   easements acquired?

17   A.    Not beyond --

18         MR. MINSON:  I'll object to that.  That's

19   confidential settlement information and the case has

20   been closed.

21         MR. KUNZE:  I'm not asking him what the

22   settlement was for.  I'm asking him about his opinion

23   in that case.

24         MR. MINSON:  I'll object to relevance then.

25         THE WITNESS:  I didn't find any damages



1    beyond the value of the take.

2    BY MR. KUNZE:

3        Q.    Do you recall if you did a larger parcel

4    analysis in that appraisal?

5        A.    I did.

6        Q.    Did you conclude that there were multiple

7    parcels that make up a larger parcel?

8        A.    Yes.

9        Q.    Were all the parcels contiguous in that case?

10        A.    Yes.

11        Q.    Were they all being used for the same use in

12    that case?

13        A.    Yes.

14        Q.    What use were the parcels being put to?

15        A.    It was an inspection of land holding with

16    agricultural interim use, and it was anticipated to be

17    a packaged rezoning.

18            MR. MINSON:   I'm just going to renew my

19    objection for your line of questioning for all the

20    details in the case.

21    BY MR. KUNZE:

22        Q.    At the time of the take in that case, were

23    all of the properties being put to the same use?

24        A.    There had been some interim residential which

25    they were no longer renting.   They were dilapidated



1    structures.  So the property was basically vacant with

2    the exception of those negative building improvements.

3        Q.    Could you explain your highest and best use

4    in that case for all the parcels?

5        A.    It was continued use as agricultural until

6    such time as infrastructure and demand would warrant

7    the rezoning.

8        Q.    And all the parcels were being used as

9    agricultural parcels?

10       A.    Yeah.  Some were timbered.  Others were

11   cleared, but all under the category of its zoning

12   which was agriculture.  And it was a rural residential

13   district of the comprehensive plan.  You couldn't do

14   anything else with it.

15       Q.    With regard to the rest of the list of cases

16   in which you have been deposed or testified at trial

17   in the last four years, which ones were eminent domain

18   matters?

19       A.    2, 3, 7, 10, 11, 12, 13 was a breach of

20   trust, but I think it was more inverse condemnation.

21   So I'm going to qualify that and include it as 13.

22   15, 17, 20, 21.  That's the list.

23       Q.    Number 2 is 1417 Belmont Community

24   Development, LLC v. District of Columbia?

25       A.    Yes.


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    Q.    Who engaged you on that?

2    A.    Counsel for 1417 Belmont Community

3  Development, LLC.

4    Q.    Who was that counsel?

5    A.    Amy Miller.

6    Q.    So you provided appraisal services for the

7  landowner in that eminent domain matter?

8    A.    Correct.

9    Q.    The next, number 3, District of Columbia v.

10 SW Landholder, LLC, who engaged you in that matter?

11   A.    The principal at SW Landholder, LLC.

12   Q.    So you performed appraisal services for the

13 landowner in that matter?

14   A.    That's correct.

15   Q.    Who was the attorney for the landowner?

16   A.    Went through a couple.  Principal David Fuss

17 with Wilkes Artis.

18   Q.    The next eminent domain matter is number 7,

19 Commissioner of Highways versus HPT TA Properties

20 Trust, et al.

21   A.    Correct.

22   Q.    Who engaged you in that matter?

23   A.    Counsel for HPT TA Properties Trust.

24   Q.    Who was that counsel?

25   A.    John Wilburn with McGuire Woods.



1      Q.    You did appraisal services for the landowner

2   in that eminent domain matter?

3      A.    Yes.

4      Q.    Let's go back up to number 2 real quick where

5   you were representing the landowner, 1417 Belmont

6   Community Development, LLC.  Was that a full or

7   partial take?

8      A.      Interesting question.  Hard to answer.  I'll

9   just give you a little background.  You tell me what

10  category you think it falls in.  There was a shell

11  building on that site that was planned for renovation

12  and rehabilitation expansion.  Prior to the

13  renovation/expansion but after the plans were

14  approved, the district government demolished the

15  property.  So while the property owner remained the

16  holder of title to the then-vacant land, because he

17  was no longer vested with the grandfathering

18  provision, he lost his vested right to the expansion.

19  So probably more of a partial, but valuation-wise, you

20  know, the allegation is total waste of -- total take.

21      Q.    So I understand, did you determine then that

22  the residue property had no value?

23      A.    No, I put value on the residue.  The claim

24  was it was worthless and no longer financially

25  feasible.  So I put it more of a partial take, but it



1    was a full take of the vesting and improvements.  It's

2    a very unique case.  It goes way back, too.

3        Q.    With regard to number 3, District of

4    Columbia --

5        A.    That is the now Audi Field soccer stadium.

6    And that was the site of the stadium.  And Akridge is

7    the principal.

8        Q.    I remember reading about that case.  I

9    actually represent Superior Concrete across the

10   street.  With regard to SW Landholder, LLC, was that a

11   full or partial take?

12       A.    Full take.

13       Q.    With regard to Commissioner of Highways v.

14   HPT TA Properties Trust, et al., was that a full or

15   partial take?

16       A.    Full.

17       Q.    Let's go back to number 3 real quick, the

18   District of Columbia, I see you testified at trial

19   there?

20       A.    That's correct.

21       Q.    Do you know, did it go to verdict?

22       A.    Yeah.

23       Q.    What was the jury's verdict, do you know?

24       A.    34 million.

25             MR. MINSON:  Object.



1   BY MR. KUNZE:

2       Q.    What was your opinion -- I'm sorry.

3             MR. MINSON:  Object to the form.  It's fine.

4   BY MR. KUNZE:

5       Q.    What was your opinion of just compensation in

6   that?

7       A.    Just under 36 million.  Opposing appraiser

8   was at 10 million.

9       Q.    Who was the opposing appraiser?

10      A.    David Lenhoff.

11      Q.    Number 10 is National Railroad Passenger

12  Corp. v. CASCO Second Street, LLC.  Who were you

13  engaged by in that matter?

14      A.    Counsel for CASCO.

15      Q.    Are they the landowner in an eminent domain

16  matter?

17      A.    Air rights holder.

18      Q.    Who was counsel for the landowner in that

19  case?

20      A.    I can't remember his first name.  Siegel.  He

21  was a principal at CASCO as well.  Eric Siegel maybe.

22      Q.    So was that a condemnation of CASCO's --

23      A.    Union Station expansion, condemned CASCO's

24  air rights.

25      Q.    As part of your just compensation opinion,

1   did you find that there were damages to the residue in

2   that case?

3       A.    Well, there was no residue because of air

4   rights.  They took all the air rights.  It was a total

5   take of air rights.

6       Q.    I see.  Another party owned the land and

7   property beneath?

8       A.    That's correct.

9       Q.    Waverly View Investors, LLC v. United States.

10  Who were you engaged by in that case?

11      A.    Counsel for Waverly View.

12      Q.    Was that a full or partial take?

13      A.    Well, it was a Fifth Amendment claim for

14  environmental contamination.  So partial.

15      Q.    I see you had trial testimony?

16      A.    Yes.

17      Q.    Was it a jury trial?

18      A.    No.  It's Court of Federal Claims.

19      Q.    I see that, yes.  Did the judge award just

20  compensation in that?

21      A.    She did.

22      Q.    What was the amount of just compensation, if

23  you recall?

24      A.    Not enough.  It's on appeal.

25      Q.    Do you remember what her ruling was?



1    A.    Yeah --

2         MR. MINSON:  I'll object to form, just

3    continuing.

4         THE WITNESS:  Her ruling was that the

5    property that I appraised was contaminated on the date

6    of appraisal in a way she felt differently than what I

7    had described under MDE's no further action letter.

8    It was a very complicated matter, which is why it's

9    under appeal.  And that's all I can tell you.

10   BY MR. KUNZE:

11   Q.    Commissioner of Highways v. Woodbridge Ford

12   Property, who were you engaged by?

13   A.    Woodbridge Ford, counsel for Woodbridge Ford.

14   Q.    Was that a road project case?

15   A.    Yes, Route 1 expansion.

16   Q.    Who was counsel for Woodbridge Ford?

17   A.    Coughlin at --

18   Q.    Walsh Colucci?

19   A.    Walsh Colucci, thank you.  You all look alike

20   to me.  Sound alike, look alike.  All part of the same

21   bar.

22   Q.    Was that a full or partial take?

23   A.    It was a full take, I believe.

24   Q.    You mentioned that Grace Goodeagle, et al, v.

25   United States is inverse condemnation claim?



```
 1        A.      Multiple-tiered claim.   My client was the
 2   tribe.   It's a 500,000-acre reservation, Oklahoma,
 3   breach of trust, but also Fifth Amendment taking
 4   claims.   It's known as Tar Creek.   Supper fun site.
 5        Q.      And Commissioner of Highways v. North Cherok,
 6   LLC?
 7        A.      Yes.
 8        Q.      And who did you -- who were you engaged by in
 9   that case?
10        A.      North Cherok.
11        Q.      Who was the attorney?
12        A.      Paul Terpak at Blankingship & Keith.
13        Q.      Is that a full or partial take?
14        A.      It was a full take.
15        Q.      Commissioner of Highways v. Terry Shreve, who
16   engaged you in that matter?
17        A.      Paul Terpak, counsel for landowner.
18        Q.      Was that a full or partial take?
19        A.      Full take.
20        Q.      City of Chesapeake v. Clear Sky Car Wash, who
21   were you engaged by on that?
22        A.      Counsel for Clear Sky Car Wash.
23        Q.      Was that a full or partial take?
24        A.      Full take.
25        Q.      That one did not go to trial?
```



1      A.    Did not.

2      Q.    And did you -- did your appraisal assignment

3    include valuing the car wash on the property?

4      A.    Yes.

5      Q.    Then finally, Commissioner of Highways v.

6    Elkins 418 Garrisonville, LLC, who engaged you on that

7    matter?

8      A.    The intervenor.

9      Q.    Was that a tenant?

10     A.    I'm trying to remember the facts.  Convoluted

11   case.  I take it back.  It was Elkins 418

12   Garrisonville was the owner, and that was my client.

13   The intervenor was the tenant.

14     Q.    Who was counsel for the owner, if you recall?

15     A.    I can't remember the name or the firm.

16     Q.    Do you remember if it was a full or partial

17   take?

18     A.    Partial.

19     Q.    Do you recall if your just compensation

20   included any damage to the remainder in that case?

21     A.    I don't think so.  I think -- well, nothing

22   beyond the value of the take.

23     Q.    So would I be correct in saying that in the

24   last four years you have not been deposed, other than

25   your most recent ACP matter, ACP versus SMJB, other



1    than that matter, in the last four years you have not

2    been deposed or testified in any cases in which you

3    were engaged by a condemning authority in an eminent

4    domain case?

5        A.    Not deposed, correct.

6        Q.    Other than Atlantic Coast Pipeline, LLC, what

7    condemning authorities have you been engaged to

8    perform appraisal services for in eminent domain

9    matters in the last five years?

10       A.    Let me direct you to page 57.  So in the past

11   five years I have represented the Board of Supervisors

12   of Fairfax County.

13       Q.    Where does it say Board of Supervisors?

14       A.    It doesn't.  I'm using this list to refresh

15   my memory.  Board of Supervisors of Loudoun County.

16   The previous testimony I provided on Dominion.

17       Q.    The SMJB case?

18       A.    Well, other Dominion cases, VEPCO doing

19   business as VEPCO.

20       Q.    I understand.

21       A.    All the Washington Gas and Columbia Gas and

22   Columbia Gas NiSource, none of those went beyond the

23   exchange of appraisals.  In other words, I wasn't

24   deposed because the cases were all resolved.  But

25   there have been numerous cases in the last five years,



1    I just wasn't deposed, all where my representation was

2    with the condemning authority.

3        Q.    Any others?

4        A.    Well, those are the ones that come to mind.

5        Q.    Have you done any work for VDOT in the last

6    five years?

7        A.    Yes, along Silver Line phases 1 and 2.

8        Q.    The Silver Line, did you say?

9        A.    Metro.

10       Q.    I just couldn't tell if you said silver or --

11       A.    Silver Line.  And for the last 25 years I

12   have represented MWAA, Metropolitan Washington

13   Airports Authority.  So I have done lots of

14   condemnation work at all of its locations, Reagan

15   National, the Dulles Toll Road and Dulles

16   International.  Every fiber optic, every gateway,

17   every retail, every hangar I have done in the last

18   25 years.

19       Q.    Any other condemning authorities you can

20   recall?

21       A.    Government entities, private companies, those

22   are the ones that come to mind.  I would have to go

23   back through my list of assignments.  I just can't

24   recall them off the top of my head.  The

25   representative sample I gave you, I think, is the type



1    of industries that I have been involved with.

2         Q.    Do you know an appraiser named Rick Olsen?

3         A.    Yes.

4         Q.    Does he work for you?

5         A.    He does.

6         Q.    As an employee?

7         A.    Independent contractor.

8         Q.    How many appraisals does Mr. Olsen do for you

9    in a year?

10        A.    Again, it would depend upon the nature of the

11   assignment.

12        Q.    Does Mr. Olsen work for his own company or is

13   he employed by another agency?

14        A.    He is a sole proprietor under his independent

15   contractor agreement.

16        Q.    Does he have an LLC or --

17        A.    Sole proprietor.

18        Q.    I'm sorry, you did say that.  Has he

19   testified in matters in which he's worked as an

20   independent contractor for you?

21        A.    Yes, he has.  I think you were his last case.

22        Q.    That was Josh's case.  I was just there.

23        A.    Stealer Josh.

24        Q.    When he is testifying or working as an

25   independent contractor for you, is he under the



1    umbrella of William C. Harvey & Associates, Inc.?

2       A.    Yes.   Well, you say umbrella.   He's covered

3    by my E&O policy.   He's covered by my general

4    liability policy.   When he's on my site, he's subject

5    to his agreement with me as to who owns the data, the

6    equipment that he uses.   But when he's working for

7    others, he's free to do whatever he wants.

8       Q.    He's not an employee of William C. Harvey &

9    Associates?

10      A.    There's only one employee, and that's me.   I

11   have been audited several times.   The IRS -- in fact,

12   the IRS is also my client.   But I don't do

13   condemnation for them.

14            (A recess was taken.)

15   BY MR. KUNZE:

16      Q.    Mr. Harvey, did you prepare at all for your

17   deposition today?

18      A.    I did.

19      Q.    What did you do to prepare?

20      A.    I went back and reread Exhibits 1 and 2 of

21   the deposition today, as well as the supplemental and

22   the original expert rebuttal report, had a

23   conversation with counsel, went through some of the

24   documentation in the file.

25      Q.    How many hours did you spend preparing,



1    approximately?

2        A.    In the activity I just described, I would say

3    it was a little under three.

4        Q.    What is your hourly rate?

5        A.    525 per hour.  While you are on that, what is

6    the arrangement today?

7        Q.    Send us a bill.

8        A.    I will.  I appreciate you coming up here too.

9        Q.    I don't think my client is going to afford

10   you to come all the way down, and I don't charge by

11   the hour.

12       A.    There you go.

13       Q.    Do you charge by the hour in completing your

14   appraisal reports?

15       A.    Excuse me.  I have hearing aids.  My phone is

16   going off.  I didn't hear any of that.

17       Q.    In completing your appraisal report, did you

18   charge by the hour to do that?

19       A.    All my services are hourly only.

20       Q.    For all 81 appraisals you have completed for

21   the Atlantic Coast Pipeline Project have been charged

22   hourly?

23       A.    Yes.

24       Q.    Approximately how much have you billed on the

25   Atlantic Coast Pipeline?



1       A.     I can't tell you the total billings.   I

2   focused more on Fenton's billings for purposes of

3   today.

4       Q.     Can you estimate how much you have billed

5   total on the Atlantic Coast Pipeline Project?

6       A.     From April 2017 through today?

7       Q.     Sure.

8              MR. MINSON:   Just for the record, I'll object

9   to that question.

10             THE WITNESS:   Probably in excess of 250,000.

11  BY MR. KUNZE:

12      Q.     And what about for the Fenton Inn matter?

13      A.     Well, for the original expert report, it was

14  11,000.  For the supplemental, for the rebuttal and

15  supplemental reports, it was 21,000.  So it's a total

16  of about 30,000 through today.

17             I should clarify too.  You said how much did

18  I bill.  And when you say "you," I'm assuming you mean

19  my corporate umbrella.  My hourly rate is 525.

20  Mr. O'Donnell is billed at 325.  Mr. Joseph Harvey is

21  billed at $100.  The figures I have given you have

22  incorporated all billings at all hourly rates.

23      Q.     I appreciate that.  Thank you.  Can you

24  explain to me again, I know we briefly talked about it

25  before, but what was your appraisal assignment in this



1   case?

2       A.    To value the partial taking of the property

3   on the effective date of appraisal, which is the date

4   the complaint was filed in the U.S. District Court,

5   under the federal rule, which is the before and after

6   rule, using the standard of value fair market value.

7       Q.    How many assignments did you have in this

8   case?

9           MR. MINSON:   I'm going to object to that.

10  Attorney-client privilege.

11  MR. KUNZE:   I'm not asking him -- I'm asking him how

12          many appraisal assignments did he have in

13          this case.

14          MR. MINSON:   You are asking him what we've

15  instructed him to do.

16          MR. KUNZE:   No, I'm asking him a number of

17  appraisal assignments did he have in this case.

18          MR. MINSON:   You can answer that.

19          THE WITNESS:   Yeah, I can.   And when you say

20  "this case," the Fenton Family Holdings, LLC matter?

21  BY MR. KUNZE:

22      Q.    Yes, Atlantic Coast Pipeline, LLC versus --

23      A.    I think technically it's been two

24  assignments, the first of which was an appraisal, the

25  second of which was an appraisal review.   And that



1    coincides with expert report, expert rebuttal report.

2        Q.    And so you've done an expert -- an original

3    expert report which was Exhibit 1 to this deposition

4    and a supplemental report which is Exhibit 2.  And in

5    your opinion, those are one assignment; is that

6    correct?

7        A.    That's correct.

8        Q.    Is that a single assignment under USPAP?

9        A.    Yes.

10       Q.    And then the rebuttal report, the original

11   rebuttal report and supplemental rebuttal report you

12   did is a separate assignment?

13       A.    Correct, second and separate, constituting

14   one additional assignment.

15       Q.    And again, it's only one assignment under the

16   guidelines of USPAP?

17       A.    Correct.

18       Q.    Are your original report, Exhibit 1, and your

19   supplemental report, Exhibit 2, are they considered

20   separate appraisals under USPAP?

21       A.    No.

22       Q.    But you do have two different opinions of

23   just compensation?

24       A.    I have a revision in my opinion, yes.  It

25   went up.



1    Q.    So is the opinion in Exhibit 1, your original

2  appraisal report, is that no longer your opinion?

3    A.    It is no longer my opinion.

4    Q.    Will you be testifying to that opinion at

5  court?

6    A.    Which opinion?  When you say "that opinion,"

7  I'm not sure.

8    Q.    Exhibit 1, I'm sorry.  The opinions contained

9  in Exhibit 1, your original report, will you be

10  testifying to those?

11    A.    It would not be my intent to.  Obviously, if

12  I'm asked a question, I will answer it honestly and

13  under oath.  I will tell the truth, but it's no longer

14  my opinion.  It's not my holding.

15    Q.    Exhibit 2 is called a supplemental opinion,

16  though?

17    A.    Correct.

18    Q.    Is that supplementing your opinions in

19  Exhibit 1 or replacing your opinions in Exhibit 1?

20    A.    It's more the former.  It's a supplemental.

21  As the rule has been explained to me, there's a duty

22  to supplement when additional information becomes

23  available and it has an impact on the expert's

24  opinion.  So that's why it's labeled supplemental, in

25  the spirit of the rule.  And it is an extension of my



1   original opinion but modified based upon supplemental

2   materials, documents and analysis performed.

3       Q.    I'm asking because when we go to trial in

4   June, I want to make sure that I'm not surprised and I

5   understand what your testimony or expected testimony

6   will be.

7       A.    Sure.

8       Q.    And so let me ask you, then, are there any

9   opinions in Exhibit 1 that are not contained in

10  Exhibit 2 that you would be testifying to at trial?

11      A.    I don't believe so.

12      Q.    I think you testified before, but correct me

13  if I'm wrong, that you just expanded the work file.

14  It's the same work file that you had for both

15  Exhibits 1 and 2 that was expanded as you supplemented

16  your opinion?

17      A.    That's correct.

18      Q.    Does USPAP allow for supplemental reports?

19      A.    USPAP is silent on the term "supplemental"

20  reports.  USPAP clearly recognized, though, that for

21  litigation purposes under jurisdictional exception

22  rule that USPAP is superseded by whatever the

23  appropriate rules are.  Here we are in Federal

24  District Court, Rule 26, what the requirements are for

25  me as an expert providing oral reports, I have to



1   supplement when my opinion is modified based upon

2   information that was discovered during the course of

3   litigation.   Now, I don't have a bar card.   That's my

4   lay interpretation of Rule 26.   I'm not offering legal

5   opinions.

6        Q.    Fair enough.   Is that jurisdictional

7   exception set forth in your report?

8        A.    Well, no, because the jurisdictional

9   exception that I invoked was in connection with USPAP.

10  But I was saying there's no need for me to invoke a

11  jurisdictional exception for a supplemental report

12  because supplemental reports are not addressed in

13  USPAP.   I was answering your question the way you

14  posed it.

15       Q.    Is your appraisal assignment complete at this

16  time?

17       A.    Barring any other information, which I

18  believe discovery is over and everybody has taken a

19  position and there is not going to be any further

20  information forthcoming, then my assignment would be

21  complete, in my mind.

22       Q.    Both assignments with regard to the report

23  regarding just compensation and the rebuttal?

24       A.    Yes.

25       Q.    Report assignment?



1    A.    Right.

2    Q.    Are there any opinions other than those that

3  are contained in Exhibit 2, which is your supplemental

4  report, that you intend to give at trial?

5    A.    You could always ask me a question or anybody

6  could ask me a question that's not addressed there,

7  but it wouldn't be my intent.   That's the sum and

8  substance of what I think I have to offer in this

9  litigation.

10    Q.    As we sit here today, do you have any other

11  opinions regarding the just compensation owed in this

12  matter that are not set forth in this exhibit?

13    A.    I do not.

14    Q.    Are there any facts that you relied upon,

15  that you are aware of today, that you relied upon in

16  formulating your report, your supplemental report,

17  that are not set forth in your -- in Exhibit 2?

18    A.    No.

19          (Harvey Deposition Exhibit Numbers 3 and 4

20  were marked for identification.)

21  BY MR. KUNZE:

22    Q.    Will you take a look at what's been marked as

23  Exhibit 3, please.

24    A.    I have.

25    Q.    Do you recognize that document?



1    A.    Mostly.

2    Q.    Mostly?  Is there portions of it that you do

3  not recognize?

4    A.    Page 34.  There's no stamp.  Now, that can

5  occur if somebody printed this document using a PDF

6  engine and didn't say document and markup.

7    Q.    Okay.  What is missing from page 34?

8    A.    Go to page 36 on Exhibit 4.

9    Q.    I'm on page numbered 36, but it is -- I have

10  that.

11    A.    On Exhibit 4?  This is Exhibit 4 and that's

12  page 36.

13    Q.    I'm sorry.

14    A.    That's okay.  It's confusing.

15    Q.    I pulled out the wrong one.

16    A.    If you turn to page 36, what you are going to

17  see is what's missing is my digital stamp.  Again,

18  that can occur, depending upon who printed the

19  document, as to what attributes they used with the

20  print engine.

21    Q.    Okay.

22    A.    But it looks to be complete.  But without the

23  stamp, I have to qualify my answer.  I didn't print

24  this document.  It's your document.  I don't know how

25  it was generated.



1     Q.     Do you have any reason to believe that

2    Exhibit 3 is not a complete and accurate copy of your

3    expert rebuttal report dated December 17, 2018?

4     A.     Other than the caveat that it lacks the

5    digital stamp, I would have to literally go through it

6    and do a word count.  I have software that would do

7    that.  I can't do that physically.  But it appears to

8    be the sum and substance of the original.  But the

9    purpose of that stamp is, again, USPAP compliance when

10   disseminating electronic media.  And the italicized

11   paragraph explains it on page 34 and 36 respectively.

12    Q.     Do you recognize the document that's been

13   handed to you and marked Exhibit 4?

14    A.     Yes.

15    Q.     What is that document?

16    A.     This is the supplemental expert rebuttal

17   report.

18    Q.     Does Exhibit 4, your supplemental expert

19   report, is that meant to replace the opinions that you

20   included in Exhibit 3, your original rebuttal report?

21    A.     Yes.

22    Q.     Similar to before, are there any opinions

23   that are in Exhibit 3 that are not in Exhibit 4?

24    A.     No.

25    Q.     As you sit here today, do you intend to



1    testify regarding the contents of Exhibit 3?

2        A.     I would not intend to unless I'm asked a

3    peripheral question.  But I don't believe Exhibit 3 to

4    today's deposition is operative.  It's not reflective

5    of my opinions that I would offer at trial.  While

6    some of the opinions are the same, they have been

7    supplemented along the same lines as the original and

8    supplemental expert report.

9        Q.     Any opinions that are contained in Exhibit 3

10   that you intend to testify about are also contained in

11   Exhibit 4; is that correct?

12       A.     That's correct.

13       Q.     Why did you do a supplemental?

14       A.     For the same reason is that the pace of

15   discovery responses and the dissemination of

16   information that I had originally requested occurred

17   after the effective date of Exhibit Number 3.

18   Therefore, there was a need under the rules to

19   supplement, and that's what Exhibit Number 4

20   represents.

21       Q.     We talked about before the information that

22   you received after completing your original appraisal

23   report that you used to supplement that report, which

24   was Exhibits 1 and 2.  Is there any other information

25   that you received that we didn't talk about before



1   that you utilized in your supplemental rebuttal

2   report?

3       A.    We talked about the testimony of Mr. Fenton

4   with regard to Exhibits 1 and 2 to today's deposition.

5   But there would be additional testimony from Fenton's

6   experts, other experts.  I'm not sure if Mr. Fenton is

7   designated as an expert or not, but I'll say other

8   experts in case he is, that they were incorporated,

9   which wasn't part of your original question.

10      Q.    So in addition to the information gleaned

11  from Mr. Fenton's deposition, you also relied upon the

12  depositions of the other experts engaged by the

13  defendant in completing your supplemental expert

14  report; is that correct?

15      A.    That's correct.

16      Q.    Other than those depositions and the

17  information you received from Mr. Fenton's deposition,

18  is there any other information you relied upon that

19  you did not have when you created your original

20  rebuttal report that you did to complete your second

21  or supplement?

22      A.    The way you phrased your question, you said

23  from Mr. Fenton's testimony.  But you also provided

24  discovery.  So if you incorporate discovery into that

25  answer, no, other than that discovery prompted



1   additional queries with government officials to

2   understand, you know, to put it in its proper context

3   and to analyze it.  So the follow-up based upon the

4   supplemental discovery received caused supplemental

5   questions to government.  And I did receive under a

6   FOIA and other inquiries documents, all of which is

7   reflected in Number 4 to today's deposition.  Exhibit

8   Number 4.

9        Q.    What documents did you receive pursuant to

10  your FOIA request?

11       A.    The permits for parcel 2A and 2C, the plan

12  review comments to parcel 2A and 2C, the plans for

13  what's called the cottage which is actually classified

14  as an inlaw suite by the county for parcel 2C.

15       Q.    How does the county define an inlaw suite?

16       A.    I have got the definition in there.

17       Q.    Which exhibit are you looking at?

18       A.    Well, right now I'm looking at 4, but I'm not

19  sure where I should best send you to see those

20  definitions.  I think if we go back to Number 2,

21  Exhibit Number 2 to today, you'll find that more

22  instructive.  And if you want to take a minute to --

23  yeah, if you could turn to page 13 in Exhibit Number 2

24  to today's deposition, starting at the subcategory

25  Zoning, you'll see a first bullet point is



1    definitions.  So accessory use of structure is what

2    the inlaw suite, according to the zoning director,

3    classifies as.  It's a subordinate use or building

4    customarily incidental to and located on the same lot

5    occupied by the main use or building.

6            And then if you go to number 9 on page 14,

7    you'll see that that's -- one is the structure.  The

8    other is the use.  It's a subordinate use customarily

9    incidental to and located on the same lot occupied by

10   the main use.  In that regard, the main use was number

11   4 and 5, single-family detached residence which is

12   located on parcel 2C.  And it's designed for family

13   occupancy.  In this case, the inlaw suite is an

14   extension of a blood relative of that family.

15       Q.    So I'm clear, you have defined that cottage

16   we are talking about as the structure that is under

17   construction on the property?

18       A.    I don't know that it's under construction

19   because under the documents provided, the last

20   inspection was done in 2015.  The permit is now

21   expired.  Six months without inspected activity

22   violates the term of the permit.  I would classify it

23   as partially constructed but not under construction.

24       Q.    We can call it partially constructed.

25       A.    Sure, I agree with that.  I'm just listening



1    carefully to the way you frame your question.

2       Q.     A partially constructed structure on the

3    property --

4       A.     When you say the property, definitive as to

5    the property -- the properties owned by Fenton Family

6    Holdings are three distinct parcels.  So I prefer

7    instead of using the generic term "property," because

8    I don't understand your question, if we could just

9    elaborate parcels 2A, 2B, 2C.  And I'll help you with

10   what's on those three.

11      Q.     Okay.  What parcel, to your understanding, is

12   the partially constructed structure on?

13      A.     That's on parcel 2C.

14      Q.     What parcel is the operating bed and

15   breakfast on?

16      A.     2A.

17      Q.     What do you consider the use or the potential

18   use of the partially constructed structure on parcel

19   2C to be?

20      A.     The potential use is an inlaw suite for the

21   single-family residence on parcel 2C.

22      Q.     In your understanding, is that what the owner

23   intends the use of the structure to be?

24      A.     Well, based upon the testimony of Mr. Fenton,

25   he said that he planned on using it as a pet-friendly


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    extension of the structure on parcel 2A.  That's not a

2    legally permissible use on the effective date of

3    appraisal.  It's really not even reasonably possible

4    because it's a legislative act required for him to do

5    that.

6        Q.    Why is it not legally possible or

7    permissible?

8        A.    Because the permit that was issued for the

9    construction of that building was tied to its

10   designated use.  Its designated use is an auxiliary --

11   accessory structure and use to the existing

12   single-family dwelling.  Not to the transient lodging

13   on parcel 2A.  If he wants to modify or append that

14   use, he has to go through the necessary steps under

15   the zoning code.

16       Q.    And this information is contained in the

17   permits that you received or obtained via FOIA

18   request?

19       A.    It was information that I obtained as well as

20   interviews that I conducted, yes.

21       Q.    Are those permit documents contained anywhere

22   in your report, Exhibit 2?

23       A.    Yes.  Oh, in Exhibit 2?  They are in

24   Exhibit 2 and 4 respectively.  If you look at -- I'm

25   sorry.  We are on --



1    Q.    We are on Deposition Exhibit 2.

2    A.    So they are in 2 and 4.  And if you go to

3  Exhibit 3 of Deposition Exhibit Number 2, you'll see

4  it says Subject Property Building Permit Plan Review

5  Comments.

6    Q.    Yes.

7    A.    Okay.  And if you go to Exhibit Number 4 of

8  today's deposition, it would be Exhibits 2 and 3.  So

9  the combination of those three exhibits are in the two

10  reports.

11    Q.    Okay.  Back to where we started this line of

12  questioning, you had talked about additional

13  information you received that you relied upon in your

14  supplemental rebuttal report, which is Exhibit 4 to

15  the deposition.  And you had listed the additional

16  information received in discovery, Mr. Fenton's

17  depositions, the depositions of the other experts --

18  deposition transcripts of the other experts engaged by

19  the defendant, the documents obtained pursuant to your

20  FOIA request and then subsequent phone calls motivated

21  by those documents you received?

22    A.    That's correct.

23    Q.    Is there any other information, additional

24  information that you relied upon in creating your

25  supplemental rebuttal report that you did not have



1  available when you did your original rebuttal report?

2      A.    I don't believe so.

3      Q.    Did you create any drafts of your reports

4  before you finalized them?

5      A.    I do create a singular draft.  In other

6  words, when I'm done, it's in a draft form.

7      Q.    Did Mr. O'Donnell or Mr. Harvey create any

8  drafts?

9      A.    No.  I was the author of the reports that

10 have been discussed today, the narrative of the

11 report.

12     Q.    When you created your singular draft, did you

13 share it with ACP or its lawyers before finalizing?

14          MR. MINSON:  Object to form.

15          THE WITNESS:  I shared it with my associates,

16 and I shared it with ACP.

17 BY MR. KUNZE:

18     Q.    With your associates?

19     A.    And ACP's counsel.

20     Q.    By associates, you mean Mr. O'Donnell and

21 Mr. Harvey?

22     A.    That's correct.

23     Q.    What was the purpose in sharing your draft

24 with ACP's counsel?

25          MR. MINSON:  Object to form for that



1    question.

2           THE WITNESS:  So typos or anything of such a

3    nature that needed to be corrected could be

4    identified.

5    BY MR. KUNZE:

6       Q.    Was there any change in your analysis?

7       A.    No.

8       Q.    Or your conclusions?

9       A.    No.  There were typos.

10      Q.    Is there anything in any of these reports,

11   Exhibits 1 through 4, that you would like to change as

12   we sit here today?

13      A.    No.  I believe 2 and 4 are the final

14   iteration, version of what I would offer at trial in

15   the way of opinions and that those opinions are

16   complete and well founded.

17      Q.    Were you asked to create the supplemental

18   reports?

19           MR. MINSON:  Objection.

20           THE WITNESS:  I had a discussion as to what

21   the legal interpretation of the rule requirements were

22   when I received the supplemental discovery and said,

23   you know, this is changing my opinions, and what do I

24   need to do.  At that point --

25           MR. MINSON:  I'm going to object to this as



1  being between us.  That's out of bounds.

2      MR. KUNZE:  I'm not asking for the substance.

3  I asked if he was asked to.  I don't need to know the

4  substance.

5      THE WITNESS:  I asked the interpretation of

6  what the rule required.  Based upon that answer --

7      MR. MINSON:  You don't have to tell him what

8  you discussed with us.

9  BY MR. KUNZE:

10     Q.    When you completed your initial appraisal and

11  rebuttal report, did you believe that the information

12  you had available to you was insufficient?

13     A.    Yeah, I had indicated such, and I was

14  informed that discovery was continuing and that if

15  need be, a supplemental report would be generated and

16  that, you know, the parties were trying to work out

17  the process.

18     Q.    Did you indicate anywhere in your reports

19  that you felt that you did not have enough information

20  to adequately complete your opinions?

21     A.    No.  The scope of work in the original

22  reports speaks for itself.  The document speaks for

23  itself.  And the discussions that I had with counsel

24  were my firm understanding that in the event

25  additional data was forthcoming in discovery that



1    changed my opinion, that I would modify my report.

2          MR. KUNZE:  I'm sorry, is there --

3          MR. MINSON:  I'm sorry.  I said try not --

4    you don't have to discuss things that you talked about

5    that aren't factually related between counsel and

6    yourself.

7    BY MR. KUNZE:

8    Q.    Can we look at the extraordinary assumptions

9    in Exhibit 2, please, on page 6.

10   A.    Okay.

11   Q.    Are there any other extraordinary assumptions

12   that aren't listed here that you made?

13   A.    For the purposes of the appraisal review, no.

14   Q.    I'm talking about Exhibit 2, which is your --

15   A.    I'm sorry.  I was looking at 4.

16   Q.    No problem.

17   A.    No.

18   Q.    You added -- there's two extraordinary

19   exceptions there; is that correct?

20   A.    That's correct.

21   Q.    The second one was not included in your first

22   appraisal report?

23   A.    That's correct.

24   Q.    Why did you add that?

25   A.    Because of the subsequent discovery documents



1  that I reviewed, testimony that I reviewed, interviews

2  that I conducted, I felt that the original report

3  would be misleading without this extraordinary

4  assumption.   In other words, this extraordinary

5  assumption qualifies certificate of use and occupancy

6  availability for the structure on parcel 2A.   I can

7  give you some context and maybe explain.

8      Q.      Please do.

9      A.      The zoning director, Tim Padalino, at Nelson

10  County, he left and went to Albemarle County, who is

11  my client.   The building officer, David Thompson, at

12  Nelson County, he passed away.   So both of those

13  officials were kind of key and were who I originally

14  contacted when I first started the Fenton property

15  assignment.   They both exited.

16          The replacements are Sandy Shackelford and

17  Chuck Miller, respectively, to those two positions.

18  They were really not that familiar with -- since they

19  were new to the jobs.   So in the context of developing

20  the original reports based upon the original floor

21  plan that I got from Mr. Fenton, which tied to the

22  plan, what Mr. Fenton didn't provide was the plan --

23  the building permit and the plan permit comments which

24  qualified the structure.   Mr. Thompson passed away.

25  He wasn't available.   So it wasn't until those



1   replacement parties came online that I was able to

2   conduct these interviews.

3           As to right now as we sit here today and as

4   of the effective date of appraisal, the transient

5   lodging on parcel 2A, otherwise known as the Fenton

6   Inn, does not have a certificate of use and occupancy.

7   It doesn't have a temporary or a permanent CO.

8           So it was my intent to then say is it

9   reasonably probable that they could get it under the

10  original planned construction?  That's the purpose of

11  this extraordinary assumption.

12  Q.     So your conclusion is that it would be

13  reasonably probable?

14  A.     As I qualified it in both the assumption and

15  in the report, it is my opinion that it's reasonably

16  probable that they will get a certificate of use and

17  occupancy for what was permitted under 97-211.

18  Q.     Let's look at the hypothetical conditions.

19  A.     In the same report?

20  Q.     Yes, on page 7.  Are there any other

21  hypothetical conditions that are not listed here?

22  A.     No, that's the only hypothetical.

23  Q.     Can we look at the hypothetical conditions in

24  your initial report, Exhibit 1 of the deposition, for

25  the record, on page 7.



1      A.    Okay.

2      Q.    You had an additional hypothetical condition

3   in there, did you not?

4      A.    That's a typo.  As I said, that came from

5   Wintergreen's transcript.  And when I copied it

6   over --

7      Q.    I just wanted to make sure there was no

8   substance to that.  So thank you.

9      A.    No substance.  Shouldn't have been there.

10     Q.    And the exclusion of that does not impact

11  your opinions in any way?

12     A.    It bolsters my opinion because it shouldn't

13  have been there in the first place.

14     Q.    Why shouldn't it have been there?

15     A.    Because there's no common area.  It's not

16  under any type of planned development utilization.

17     Q.    Is that the same reason you omitted it from

18  your jurisdictional exceptions, as well too, in

19  Exhibit 4?

20     A.    That's correct.

21     Q.    Number 10 on page 8, which is number 10 in

22  your general assumptions and limiting conditions,

23  says, It is assumed that the utilization of the land

24  and improvements is confined within the boundaries or

25  property lines of the property described and that



1 there is no encroachment or trespass unless noted in

2 the report.  Can you explain that to me?

3   A. Sure.  I'm going to use the cottage as an

4 example.  On the day of inspection, the permit affixed

5 to the tree in front of the cottage identified it as

6 being on parcel A.  It's actually physically located

7 on parcel 2C.  So that assumption would be when I was

8 there originally I thought the cottage was on the same

9 parcel as the inn and was an auxiliary use to the inn.

10   Q. How did you determine that the cottage is

11 actually on parcel 2C?

12   A. Through a combination of the subsequent

13 discovery documents, the testimony, interviews, FOIA

14 and so forth that I analyzed.

15   Q. Would it change your opinion if the cottage

16 straddled the boundary line between the two parcels?

17   A. Under a hypothetical, it's possible.  But

18 definitively, your client has testified that it

19 doesn't straddle.  And the government officials have

20 testified it doesn't straddle.  In my professional

21 opinion there is no straddling of the improvement.

22 But it's a hypothetical.  Sure, you could ask me that

23 and I would have to answer it, and I would have to do

24 analysis for that.

25   Q. On numbered page 9 of Exhibit 4 -- Exhibit 2,



1    I'm sorry, page 9.

2        A.    Yes, sir.

3        Q.    Under the effective date of appraisal

4    section, the second paragraph says, A retrospective

5    appraisal is complicated by the fact that the

6    appraiser already knows what occurred in the market

7    after the effective date of the appraisal.

8              Are you referring to market data or impacts

9    of the project?  What do you know that has occurred

10   after?

11       A.    Everything.  In other words, it's a lookback.

12   And after the fact there are possible developments in

13   reality that one would have to divorce themselves from

14   to stand in the same shoes as a hypothetical buyer and

15   seller on the effective date who wouldn't have that

16   same knowledge after the fact.

17       Q.    So you have knowledge of the market data

18   which includes the impact of the easements on the

19   property?

20       A.    That's not really market data.  Market data

21   would be a transaction or some observable event

22   associated with that.  What you are referring to would

23   be an opinion.

24       Q.    Okay.  On page 11 of Exhibit 4 --

25       A.    Two?



1    Q.    Same exhibit, 2.

2    A.    Okay, page 11.

3    Q.    Number 9 discusses that you completed a

4  survey of the subject market.  What is the subject

5  market, in your mind?

6    A.    What I defined on the prior page.  If you

7  look at paragraph 6, last full sentence, Nelson County

8  as a whole with a concentration on Roseland,

9  Nellysford and Wintergreen submarkets.

10    Q.    So is the market of the subject property the

11  boundaries of Nelson County?

12    A.    Well, my research was focused primarily on

13  Nelson County as a whole and then those submarkets.

14  But I would say it extends to regional competition

15  along the Blue Ridge Mountains.

16    Q.    What kind of survey did you do that you talk

17  about in that paragraph?

18    A.    Well, survey is a collection of information

19  which notes land uses and the number of those uses

20  that are active in the marketplace and what the

21  parallel demand would be for those same criteria.

22    Q.    So you did a larger parcel analysis in both

23  Exhibit 1 and Exhibit 2?

24    A.    Yes.

25    Q.    I noted that they are located in different



1    sections of the report, and the report was generally

2    reformatted?

3        A.    That's correct.

4        Q.    Why did you reformat the report?

5        A.    In the process of having done a lot of

6    reports, if you present a larger parcel first, which I

7    did in the original report, it leads to more questions

8    than answers.  I felt that putting it back in the

9    highest and best use section, the reader was more

10   informed by the time they got to that point and it was

11   more readily understood, and that was the intended

12   refinement.

13       Q.    On page 18 of Exhibit 2, about halfway down

14   that paragraph is discussing your conversations with

15   Thomas Eick?

16       A.    Yes.

17       Q.    Did you speak with him before you did your

18   original report?

19       A.    Yes.

20       Q.    Can you show me in Exhibit 1 where your

21   discussions with him were included?

22       A.    I didn't put it in there.  It wasn't

23   relevant.  It didn't yield anything.

24       Q.    Why is it relevant in your supplemental

25   report?



1    A.    Because of, again, the supplemental materials

2    that were discovered and presented by Fenton, along

3    with the testimony, such as doing weddings, having a

4    commercial kitchen, having a winery tasting room.

5    Those representations made by Mr. Fenton were

6    materially different than what my understanding was

7    based upon the limits of the inspection and the

8    documents that I had available at the time of the

9    original report.

10    Q.    Two paragraphs down is your description of a

11    conversation with Sandy Shackelford?

12    A.    Yes.

13    Q.    Why did you add this -- did you have that

14    conversation before?

15    A.    Ms. Shackelford had -- we had had multiple

16    discussions with her based upon the original report,

17    but again, same criteria.  There was supplemental

18    materials that were provided that led to further

19    examination of the zoning issues with Ms. Shackelford,

20    and it rendered different conclusions based upon that

21    subsequent inquiry that were prompted by the

22    additional discovery materials and testimony.

23    Q.    So in this paragraph you talk about a change

24    in the property's use to a bed and breakfast class A

25    would require that the owner first apply for a change



1    in the certificate of use and occupancy.

2        A.    Let me correct that.  You have to go back to

3    the preceding paragraphs.  First they have to get a

4    CO.  Then they would have to amend that CO by

5    requesting a change in use.  So I wouldn't take the

6    four corners of that paragraph unto itself.  You have

7    to take it as presented in a logical presentation of

8    the report format.

9             So starting with Charles Miller's synopsis on

10   the bottom of page 17, then it follows as to what

11   Ms. Shackelford indicated would occur.  And that goes

12   back to the extraordinary assumption you asked me

13   about.  I assumed it was reasonably probable they

14   would get a CO for the transient lodging of five guest

15   rooms.  Then if they want to change that to anything

16   else, they have to follow the protocols set forth by

17   Ms. Shackelford and Mr. Miller and Mr. Eick, depending

18   upon those uses that they may contemplate.

19       Q.    So the bed and breakfast class A facility,

20   the change to that, so I understand it, so that they

21   could have six rooms?

22       A.    Six, yes.

23       Q.    So in your opinion, they would need to get a

24   conditional use permit initially for the five-room bed

25   and breakfast, which is a class B?



1    A.    No.   The original permit, 97-211, was issued

2    under the VCC code, Virginia Commercial Code for

3    residential construction of a single-family

4    residential nature for the use as a transient lodging.

5    The restriction was no more than five transient

6    overnight guests and no more than, I think, 14 meals

7    being served, breakfasts.

8          Now, subsequent to that original plan in

9    '97 -- I mean, in 2011, the Virginia legislature

10   changed the amount of meals.   You can now provide

11   meals to your transient guests so long as you reside

12   on the property as the proprietor at any time of the

13   day.   But they are still limited to no more than the

14   12 or 14 guests that were put forth in the original

15   permit.

16   Q.    Why would the property 2A, the inn, why would

17   they apply for a change to a bed and breakfast class

18   A?

19   A.    One, so they could rent six versus five rooms

20   legally.   Now, Mr. Fenton testified that he rents six

21   rooms now.   You know, I'm not trying to prompt an

22   enforcement action based upon my due diligence, so I

23   was very delicate with the questions I was asking

24   these officials.   But basically you can't operate the

25   facility, no matter how many rooms you rent under any



1    scenario, until you first get either a temporary or

2    permanent CO, which as of today -- this is that

3    retrospective thing -- on the effective date of

4    appraisal they didn't have either.

5            So they first need to get that under what was

6    originally permitted.  Once that's in place, they

7    could apply for a change in that use and occupancy to

8    go to a class A or to get a commercial kitchen or to

9    do something else.

10   Q.     In your mind, in your opinion, is it

11   reasonably probable after getting the initial CO that

12   they would be able to apply and receive a change to

13   become a class A?

14   A.     I can't comment -- I can't render an opinion

15   because that's a legislative act.  In other words,

16   it's reasonably probable.  It's just an administrative

17   function, and you can talk to the administrator or go

18   what through they would do.

19           And let me give you the hypothetical.  In

20   discussing with Mr. Miller, he said, look, they did do

21   a final inspection, but it's been so long, we have to

22   do a new final inspection.  If they go onsite and they

23   don't find improvements beyond what was originally

24   permitted, they would probably issue the CO.  If they

25   go onsite and find improvements that were beyond the

1   scope of what was permitted and hasn't been inspected,

2   that's a whole different problem.  That would first

3   lead to enforcement and potentially opening walls to

4   inspect wiring and plumbing and so forth.

5           And so you got to go through that process

6   first.  Once they go through that process and

7   potential enforcement action, then they could go

8   through the legislative act.  If they want to go to a

9   class A, because it's a change in use, Ms. Shackelford

10  said they have to go back to Mr. Miller first and it

11  has to be inspected under that criteria.  And upon

12  Mr. Miller's opinion which Mr. Thompson, the

13  now-deceased Mr. Thompson, previously explained when

14  they applied for the commercial kitchen, that that was

15  a legislative act that required a special-use permit,

16  public hearings, filing of a site plan.  And that's

17  where a reasonable probability, because it's a

18  legislative act, you can't opine to that.  It's

19  something that you don't control as a legislative act.

20  It's a legislator.  It's not something that I can find

21  reasonably probable.  It hasn't been applied for yet.

22       Q.    I just want to make sure I'm clear on what

23  your opinion is.  Do you not have an opinion as to

24  whether it would be reasonably probable or not or are

25  you testifying that it is not reasonably probable?


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1      A.      I'm testifying based upon what I have put

2   forth in the report that it's reasonably probable

3   they'll get a CO for what was originally permitted.

4   And that is the five legally rentable guest rooms and

5   the maximum of 14 overnight guests.

6           As far as any change in use, it's speculative

7   and conjecture because of the legislative act.  I

8   can't opine on such speculative criteria.

9      Q.      Let's start with the hypothetical condition

10  that they go back and get the certificate of occupancy

11  for the originally permitted use.  Based on that

12  hypothetical, do you have an opinion as to whether it

13  would be reasonably probable or not that they would be

14  able to change that CO to be a class A bed and

15  breakfast facility?

16          MR. MINSON:  I'm going to object to form for

17  the question.

18          THE WITNESS:  I believe it is such a

19  speculative undertaking so far in the future that it's

20  not something one can render a degree of reasonable

21  probability attached to.

22          I will qualify my answer that should they

23  apply for that change in use and they follow what's

24  set forth in the comprehensive plan in the Nelson

25  County zoning ordinance, as amended through



1    November 2017, and they make proper application, the

2    inspections are undertaken and don't yield additional

3    improvements that were beyond that, I think it's

4    reasonably probable that they could get ultimately a

5    class A, but only after the legislative approvals,

6    public hearing, legislative approvals.

7            Now, that hearing process could yield

8    opposition.  And that's why I say it's speculative --

9    your question is speculative in its nature.  But I'm

10   trying to give you the best answer I could.

11   BY MR. KUNZE:

12   Q.    I just want to understand what your opinions

13   are.  I'm not asking you to speculate, and if your

14   opinion is that it's speculative, then that's fine.

15   Is your opinion the same as far as your conversations

16   with Mr. Eick regarding the food establishment?

17   A.    Well, that yielded a further explanation that

18   they clearly would need to do capital expenditures and

19   retrofit the facility for a commercial kitchen

20   license.  And so I don't think that's reasonably

21   probable without the hypothetical that such capital

22   expenditures and further improvement of facilities

23   that would be necessary are undertaken first before

24   applying for a change in use to allow a commercial

25   kitchen or a wine tasting room or anything of that



1    nature, all of which require special-use permit,

2    public hearings and a new CO.

3        Q.    Towards the bottom of page 18 of Exhibit 2,

4    the very last paragraph you say, The existing building

5    improvement is specially designed as a Bavarian-style

6    village and has many unique, handcrafted features.

7    For purposes of this appraisal, I consider the

8    existing building improvement to be a special-purpose

9    property.

10        Is that a new conclusion you generated in

11    Exhibit 2, your supplemental report?

12        A.    It's a new statement.  When I generated the

13    original report, I went back to a seminar that I had

14    taken offered by the Appraisal Institute.

15    Special-purpose properties is the nature of the thing.

16    And in that workbook, there's a compendium that lists

17    special-purpose properties recognized by the Appraisal

18    Institute.  Motel, hotel, inns, B&B are not listed.

19        But subsequent to that, there are learned

20    treatises published by Appraisal Institute and staff

21    and others that do classify it.  I think the original

22    category that I was most comfortable with was special

23    design.  That's a term of art.  It's not an accepted

24    definition.  I think special-purpose does fit this

25    property.



1    Q.    So I want to make sure I'm clear.  After

2    you -- you had looked -- you had looked at an original

3    treatise, and bed and breakfast was not listed as a

4    special-purpose property?

5    A.    Correct.

6    Q.    You subsequently did additional research and

7    found treaties that did call bed and breakfasts

8    special-purpose properties?

9    A.    Special-purpose and special-design.

10   Originally I was under the concept that it was

11   special-design.  Not necessarily special-purpose.

12   Keep in mind that the classification that the permit

13   was applied for was single-family residential.  So you

14   know, most don't consider a single-family residence as

15   a special-purpose property.

16        What this was, was a single-family

17   residential property with special design features.

18   Now, because that is not -- again, it's a term of art.

19   In the final analysis, I think, of all of the

20   adjectives that fit, special-purpose is more

21   appropriate.

22   Q.    Those additional treatises you researched

23   after you completed your additional --

24   A.    Well, it was additional information.

25   Remember, I wasn't permitted to see most of the



1    property even though we had a preexisting agreement

2    that that's what I was going to be permitted to do.

3    So for the categories of special-purpose and

4    special-design, that information was forthcoming after

5    my inspection, after the fact through the information

6    that was provided to Fenton's experts and through

7    which they listed in their expert reports and for

8    which they have testified now under oath in their

9    depositions.  So that's all that cumulative

10   information and subsequent analysis I did that I

11   formed my opinion under.

12       Q.    What aspects of this property make it a

13   special-purpose property?

14       A.    The kind of handcrafted elements that --

15   there were a few, I would call them computer cuts.

16   You can get these programs where a silhouette of a

17   tree can be inlaid on a piece of plywood and it all

18   could be lacquered and so forth.  When I first went

19   through the property, that's what I assumed it was.

20   The supplemental discovery and so forth yielded that

21   it was more specialized construction than that that I

22   first physically observed.  And I wasn't even allowed

23   to look at what the basement walls were made out of.

24       Q.    Do you know what the basement walls are made

25   out of now?



1    A.    I do from the understanding of all the

2  supplemental discovery, yes.

3    Q.    Do the basement walls make it a

4  special-purpose property?

5    A.    The materials.

6    Q.    What materials are those?

7    A.    The concrete that was inlaid and the -- all I

8  saw was the stucco exterior, which I assumed was

9  framed underneath.  If I had known it was concrete,

10  that would have affected my opinion.  I subsequently

11  learned it was concrete from the subsequent discovery.

12  The original plans provided were floor plans.  Not

13  construction bid plans.

14    Q.    Are you aware that's because Mr. Fenton

15  constructed it himself and did not bid the project?

16    A.    You still have to get your plans approved and

17  so forth.  So throughout the process of development,

18  subsequent plans have to be submitted and approved and

19  field changes are made.  And those are normally made

20  with alterations to those plans.  None of that was

21  provided to me.

22    Q.    Other than the concrete in the basement and

23  the hand carvings that you mentioned before, what

24  other aspects of the property, in your mind, make it a

25  special-purpose property?



1     A.     Those are primarily the characteristics that

2   special-design yielded to special-purpose.   Now,

3   special-purpose is that it should be used for the

4   purpose for which it was originally designed.   That

5   property could be modified, but would it be

6   financially feasible to do so in the way it's

7   contoured with the two wings and the joining of the

8   two wings over the underground passageway?   Again, I

9   wasn't allowed into any of that.

10          Now, I subsequently saw how they were

11   improved, and I would say that lent itself to

12   special-purpose.   The proprietor's living unit in the

13   basement, you know, I wasn't even allowed down there.

14   There was nothing on the floor plan that said that,

15   the original floor plan I got.   It was all through the

16   subsequent materials, testimony and so forth that that

17   came out.

18     Q.     Have you seen any pictures or anything with

19   regard to the proprietor's apartment?

20     A.     I saw what was the expanded floor plans with

21   notations in the Sarmadi expert report.   And then the

22   testimony of Pitt, Sarmadi and Fenton all elaborate on

23   what's physically in the areas that I was denied

24   access to.

25     Q.     Just so I'm clear, nothing else other than



1    the concrete in the basement and the handcrafted

2    features support your opinion regarding the

3    special-purpose property?

4        A.    I think those are elements of

5    special-purpose, but I'm not limiting my answer to

6    those, because if we want to go back and look at all

7    the discovery materials, I'll go through them with you

8    and point out every attribute that I didn't see

9    because of the denial of access that I subsequently

10   learned based upon my receipt and analysis of the

11   supplemental discovery.  But those are the things that

12   jump out at me.

13       Q.    I'm asking, as you sit here today, you have

14   described in your report, your updated supplemental

15   report, a special-purpose property which is not an

16   opinion that you opined to in your original report,

17   correct?

18       A.    Special-design was the limit.

19       Q.    Where in your --

20       A.    I would have to do a word search.  I can't

21   tell you.

22       Q.    As we sit here today, it's your testimony

23   that special-design, your conclusion that the

24   special-design property is included in Exhibit 1?

25       A.    As we sit here today, it was my opinion that



1   the property was more special-design when I generated

2   Exhibit 1.   Refinement of that opinion was through the

3   subsequent discovery materials that I have analyzed.

4   And I've formulated my final opinion that it goes

5   beyond special-design to special-purpose.   I think

6   it's a more appropriate description.

7       Q.   As we sit here today, you don't know if your

8   conclusion or opinion that it's a special-design

9   property is included in Exhibit 1?

10      A.   I don't know if it's in 1 or 3.   I would

11   think it's somewhere in one of those two reports.

12      Q.   When you completed Exhibit 2, you had access

13   to all the supplemental discovery in this matter; is

14   that correct?

15      A.   Yes.

16      Q.   My question to you, is there anything else

17   when you completed Exhibit 2, other than the

18   handcrafted features and the concrete in the basement

19   that you considered contributed to the special-purpose

20   property opinion?

21      A.   Well, the recognition in the marketplace.   As

22   I said, there were treatises that I footnoted in

23   Exhibits 2 and 4 to this deposition that discuss B&Bs

24   as special-purpose.   But those learned treatises don't

25   say unequivocally all appraisers consider it.   It says

1   some appraisers consider these to be special-purpose.

2   I think that it fits.

3       Q.    Go to page 20 in Exhibit 2, please.  Is this

4   a description of the rights granted to ACP in both the

5   permanent and temporary easements on this page?

6       A.    And the rights retained by the owner.

7       Q.    And the rights retained by the owner.  Where

8   did you obtain this information?

9       A.    The complaint.

10      Q.    That's the complaint filed in the Federal

11  Court in this matter?

12      A.    ECF number 1.

13      Q.    At the top of page 20 you say, For purposes

14  of this appraisal, I have assumed that the rights

15  granted to ACP in connection with the permanent

16  easement include the right to, and then you list

17  several rights.  Why did you assume what those rights

18  are?

19      A.    Well, I haven't -- I'm not able to grant ACP

20  anything.  I make assumptions until such time as the

21  Court were to say, yes, those are the rights that the

22  Court recognizes.  I can only make reasonable

23  assumptions based upon what I read in the complaint.

24      Q.    And so the complaint filed in this matter,

25  the rights listed in Numbers 1, 2 and 3 under the

1  permanent easement, those are the rights that are

2  listed in the complaint?

3     A.    No, that's my paraphrase of my interpretation

4  of what's in the complaint.

5     Q.    And in your interpretation of the rights

6  listed in the complaint, it includes the permanent

7  right to do these things listed in 1, 2 and 3?

8     A.    That's correct.

9     Q.    And then further under your interpretation of

10 the rights listed and being acquired in the complaint,

11 ACP is acquiring the temporary right to do the things

12 listed as 1, 2, 3 and 4 in that second paragraph?

13    A.    That's correct.

14    Q.    And the same thing for the rights retained by

15 the owner?

16    A.    Right.   Now, my experience has been that a

17 lot of times in these matters, supplemental terms and

18 conditions are being discussed throughout the process.

19 So why I'm assuming, it's a secondary reason if I'm

20 assuming that, I'm not privy to those discussions.

21    Q.    Certainly, but if we go to trial in this

22 matter, it will be to condemn the rights contained in

23 the complaint?

24    A.    And that's what my opinion is tied to.

25 Unless you tell me to assume something else in your



1   line of questioning at trial, this is what I'm going

2   to say.

3       Q.    Let's talk about the permanent easements.

4   Under your understanding, these are perpetual rights

5   that ACP is acquiring?

6       A.    Yes.

7       Q.    Any time in the future they will be able to

8   come back and exercise any of the rights contained in

9   the complaint?

10      A.    Yeah, including the right to abandon.

11      Q.    What is your understanding of what will be

12  occurring on the Fenton Inn property as far as the

13  construction of the ACP pipeline?

14      A.    Well, there would be clearing.  The pipe

15  itself would be placed on the center line of the

16  permanent easement, and the temporary easement would

17  be used for purposes of equipment positioning, staging

18  of materials and forth.

19      Q.    Let's go to your highest and best use

20  analysis on page 21 of Exhibit 2.  And on page 22 you

21  have a market analysis.

22      A.    Yes.

23      Q.    Is this a feasibility study?

24      A.    No.  It's a market analysis.

25      Q.    What is a market analysis?



1    A.    It's basically an analysis of supply and

2    demand conditions in an identified delineated market

3    based upon the identified property use.

4    Q.    Did you do a feasibility study in this case

5    in your highest and best use analysis?

6    A.    I don't know what you mean -- I don't

7    understand your question.  When you say feasibility

8    study, could you define what you mean.

9    Q.    Did you analyze the feasibility of various

10   uses in your highest and best use analysis?

11   A.    Well, I went through the hierarchal tests,

12   and one of those renders an opinion of financial

13   feasibility.  That I did.

14   Q.    Where is that?

15   A.    If you go to page 27, under the subheading

16   Highest and Best Use Analysis Before the Partial

17   Acquisition, and the third topic down is Financially

18   Feasible Uses, that's the opinion.

19   Q.    What analysis did you perform to determine

20   that this use was financially feasible?

21   A.    Well, I developed the accepted approaches to

22   value improved property.  And I would point you to

23   page 35.  The grid on the top is the determination of

24   what was and what wasn't financially feasible under

25   the price limits determined by the market.

1    Q.    So this grid here in 35, which you have

2    included in your cost approach valuation, also should

3    be considered in your highest and best use analysis

4    for financial feasibility?

5    A.    Financial feasibility addresses all

6    applicable approaches to value, all data collected and

7    all analysis.  It's an opinion that's rendered as part

8    of highest and best use.  But the valuation process

9    incorporates all of the analysis the appraiser

10   undertakes.

11   Q.    I understand.  I'm trying to understand, when

12   reading your report on page 27, when you make the

13   statement that the existing transient lodging appears

14   to be financially feasible.

15   A.    Based upon the data I collected, the

16   approaches to value that I developed and the

17   conclusions rendered, I believe it's financially

18   feasible under the price limits determined by the

19   market.  Those price limits relate to both income and

20   sales prices and product type.  So it's cumulative.

21   It's not -- you don't do a separate feasibility

22   analysis.  It's part and parcel of the entirety of the

23   process undertaken, which is classified as the

24   valuation process.  There's a chart in Exhibit 4, if

25   you want to go through that.



1      Q.     I'm sorry.  On Exhibit 4 to the report?

2      A.     To the depo.  So if you go to the first

3  exhibit, Exhibit 1, valuation process is on the right

4  side.  So before you render an opinion of financial

5  feasibility, you have gone through the first three

6  steps, including data collection analysis.

7      Q.     Okay.

8      A.     I'm just saying, a feasibility analysis is

9  embedded as part of the entire valuation process.

10     Q.     I see.  Thank you.  Continuing in your

11 highest and best use analysis in Exhibit 2 on page 23,

12 under the market description there, you say the

13 property's market area is Nelson County as a whole and

14 the property's competitive area is along the Blue

15 Ridge Mountains.

16     A.     Correct.

17     Q.     Is it your opinion that the competitive area

18 extends along the entire Blue Ridge Mountain chain?

19     A.     It depends upon what context you are saying.

20 As far as -- appraisers can't create facts.  They can

21 only collect facts that the market creates.  B&B is

22 not a prolific use.  So to find sales, for instance,

23 of improved B&Bs, generally accepted appraisal

24 practice holds two criteria: Either go back in time or

25 you extend geographically.  That extension of

1   geographic area for search purposes has to be the

2   competitive market.  And what's the draw in this

3   competitive market, the mountain vista, orientation to

4   resort communities along the Blue Ridge and what all

5   of those amenities entail.  So I do consider the Blue

6   Ridge Mountain Range to be the competitive area.  But

7   the most competition is rendered closest in proximity

8   to the subject in Roseland, Nellysford and

9   Wintergreen.

10       Q.    So if there is a paucity of geographically

11   close located sales, appraisal methodology is to

12   expand the area within which you search for sales; is

13   that correct?

14       A.    Twofold.  Go back in time or expand the

15   search.

16       Q.    Did you do both in this case?

17       A.    I did.

18       Q.    How far back did you go?

19       A.    2008.

20       Q.    How far did you expand your range, geographic

21   range?

22       A.    Eastern seaboard, eastern Atlantic seaboard.

23       Q.    Is there a point in which the amount of time

24   you have to go back or the geographic boundaries are

25   expanded where it becomes unreliable?



1    A.    It's always a consideration.  I mean, in a

2  perfect world, you would have three properties across

3  the street on the same date of appraisal.  The world

4  is not perfect.  As I said, the real estate market is

5  the most imperfect market.  It's not like the stock

6  market where you have thousands of bid and asks on any

7  particular security issue at any second of the day.

8  It's one of the inherent issues appraisers deal with.

9  And that's what my training and experience has

10  provided me, the ability to deal with it.

11    Q.    On page 24, please, under Capture, I'm just

12  curious, you say public statistics suggest that

13  there's demand for the property's use based on market

14  activity, but the oversupply of short-term rentals

15  will limit revenue.  Which statistics are those?

16    A.    Those were provided by the Commissioner of

17  Revenue in Nelson County.

18    Q.    Are they listed in an exhibit?

19    A.    No.  They are summarized on page 23, last

20  paragraph.

21    Q.    So those are the statistics that you are

22  referring to in that paragraph?

23    A.    Primarily, because they are right in the

24  immediate submarket.  So you have five subject units,

25  and the immediate competition is 200 units across the



1   street.  But the amenities associated with

2   Wintergreen, those 200 units are much closer to the

3   ski slope, to the golf course, to the restaurants, to

4   the chair lift.

5       Q.    Go to page 25, the larger parcel analysis.

6       A.    Yes.

7       Q.    Under the definition of larger parcel, will

8   you read that to yourself and let me know when you are

9   ready.

10      A.    Okay.

11      Q.    Thank you.

12      A.    I have.

13      Q.    Okay.  It talks about an integrated highest

14  and best use that parcels or tracts of land have the

15  same or integrated highest and best use.  What is an

16  integrated highest and best use?

17      A.    Integrated highest and best use is not a

18  choice of the owner but how the market would recognize

19  what the properties would yield if offered for sale.

20  Would they all be sold as a package unit to be used in

21  connection with one another or would they be sold

22  separately or some combination thereof.

23      Q.    So you would agree in this case that --

24  strike that, please.

25             Under the larger parcel analysis, is it



1    correct to say that there are three elements, unity of

2    ownership, contiguity and use?

3         A.    Yes.

4         Q.    You would agree that with regard to the three

5    parcels, 2A, 2B, 2C, that they meet those first two

6    prongs, unity of ownership and contiguity?

7         A.    Yes.

8         Q.    Explain to me why, in your opinion, the unity

9    of use prong is not satisfied.

10        A.    As I said, in the most simplistic way

11   possible, if you just consider -- this is value in

12   exchange.  This is the premise of the appraisal.  Not

13   value in use.  Different premise.  Value in use can be

14   the same or different than the value in exchange.  But

15   here it's a hypothetical buyer and seller on the

16   effective date of appraisal and what would somebody

17   pay for the three parcels.  They would base that on

18   the anticipation of what those parcels would yield.

19             Now, the inn isn't enhanced by the vacant

20   land or the single-family house with the inlaw suite.

21   Mr. Fenton testified they aren't rented.  They aren't

22   anticipated to be rented other than the possibility of

23   the future cottage.  That would require a legislative

24   act to change that from the inlaw suite to a transient

25   guest room.  So if you put the three properties on the



1    market, you are not going to get any more revenue from

2    the inn associated with those other two parcels.

3              Those other two parcels consist of a

4    single-family house and then vacant land.  Now, the

5    vacant land is owner-improved.  It's part of the Glen

6    Meadows subdivision.  It has retained rights to be

7    developed with a single-family house.  So its highest

8    and best use would be to improve it with a

9    single-family structure.  Therefore, it has nothing to

10   do integrated with the inn.

11             The single-family house and the accessory

12   unit are going to be acquired for the amenity of

13   homeownership by the most probable buyer.  And again,

14   if you sold it with the inn, it's not going to enhance

15   the inn's revenue.  It can't be rented.  It's not

16   legally permissible to rent the house as part of the

17   inn.  It's not legally permissible to serve any party

18   in the house in the dining room at the inn.  It

19   doesn't do anything as an integrated use.

20             So the choice in the marketplace is not

21   determined by the owner, what's convenient for them,

22   but what the hypothetical buyer or seller would

23   recognize highest and best use of each of the three

24   parcels and do they need to be offered as a package to

25   enhance one or more of them.  And my answer is no,



1   they would be sold independent of one another based

2   upon three different uses: A, the existing structure,

3   that's the inn; B, vacant land should be improved

4   under its current applicable allotment of a structure

5   in the Glen Meadows subdivision; and then 2C as a

6   single-family house with the inlaw suite for a future

7   amenity of ownership.

8       Q.   Is it your opinion that parcels 2A, 2B and 2C

9   are not being used together for the operation of the

10   inn?

11       A.   Value in use, I mean, as an owner's choice,

12   my recollection is Mr. Fenton testified that they are

13   not using the house in any way, shape or form with the

14   inn, that sometime in the future he would like to add

15   a pet-friendly cottage, which isn't part of the inn's

16   parcel.  It's on the house that I have already

17   testified to that, what it would require.

18       So yeah, I mean, other than some of the

19   construction staging of the structure, the transient

20   lodging structure was done at the sawmill and some of

21   the woods were collected, no, they are not integrated

22   in any way, shape or form.  And the choice of the

23   owner to use them collectively is de minimus at best.

24       Q.   What do you mean by de minimus?

25       A.   Just what I testified to.  They previously



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1   used it as a staging area for the sawmill.  They are

2   not renting it.  Whether they rent it in the future, a

3   portion of it, the cottage, if it's legally

4   permissible, that's a speculative use that's going to

5   require a CO, a change in that CO.  First they have to

6   get the CO as the inlaw suite as an accessory unit to

7   the house.  Then they have to go apply for a change.

8   But remember, accessory use has to be on the same lot.

9   So that would require a boundary line adjustment

10   potentially.  There are lots of factors that would

11   have to go into using the cottage as part of the inn

12   as it's physically and legally existing in the

13   marketplace on the effective date of appraisal.

14       Q.    What about other accessory uses with regard

15   to the existing inn?  What if the guests used the

16   other parcels for weddings or recreation or things

17   like that?  Would that change your opinion as to unity

18   of use?

19       A.    No.  Again, that's a choice of the operator.

20   It's not what the market would recognize on the

21   highest and best use.

22            Mr. Fenton testified they didn't do hardly

23   any weddings in 2017.  And I think in the history of

24   the property it has only done three.  But those

25   weddings, he can't serve food to wedding guests.  When



1    is the last time you went to a wedding and didn't eat?

2           I'm just saying the practical applications

3    here are what the market recognizes and the difference

4    between like the Mark Addy Inn.  Well, it's in a SE-1

5    zoning.  Not an A-1 zoning.  It's vested with a

6    commercial kitchen.  It can fully operate for

7    weddings.  But its revenue is much greater than the

8    Fenton Inn's revenue.

9           And that's really the cap here.  They are not

10   going to get any more money if somebody wants to walk

11   off 2A and walk onto 2B or C.  Are you going to charge

12   them for that tour?  No.  You charge them for

13   overnight occupancy.  Ninety percent of the revenue,

14   according to Mr. Fenton, comes from transient guests.

15   Ten percent comes from other activities.

16       Q.    So whether or not the owner actually chooses

17   to use the property together is irrelevant in the

18   larger parcel analysis?

19       A.    It's not controlling.  I wouldn't say it's

20   irrelevant because it can coincide with what the

21   market would recognize.  But not necessarily just

22   because the owner chooses to do something does the

23   market stamp that as the approved and only integration

24   plan available.  The market will seek to recognize the

25   highest value under the long term.  You don't get that

1   by keeping the land 2B vacant and 2C as an inlaw

2   suite.

3       Q.     On page 29 of Exhibit 2, this is your

4   continued discussion of the valuation process.  The

5   fourth paragraph down starts with, During the past two

6   decades, the bed and breakfast inn has experienced a

7   tremendous increase in popularity.  This product,

8   which is not much more than a spruced-up rooming

9   house, offers relatively low cost accommodations and a

10  comfortable residential atmosphere.  Is that your

11  opinion that the Fenton Inn is not much more than a

12  spruced-up rooming house?

13      A.     Yeah.  The Fenton Inn is a transient lodging

14  by legally permissible use presently.  It's not even a

15  bed and breakfast as classified by Nelson County

16  zoning.

17      Q.     So that -- you would classify it as a

18  spruced-up rooming house, correct?

19      A.     Yeah.  If you look at the information, the

20  discussion between Mr. Padalino and Mr. Thompson when

21  they were discussing what Fenton Inn can and cannot be

22  used for in an e-mail thread, they specifically

23  referred that the original five-room definition came

24  from boarding house.

25            Now, just so the record is clear, the



1    beginning of this paragraph, which is a footnote from

2    a generally accepted text, is during the past two

3    decades.  But more recently with the advent of Airbnb

4    and temporary short-term lodgings, things have

5    changed.  So I wouldn't take it out of context.  In

6    other words, the entirety of the information provided

7    has to be considered.

8        Q.    Okay.  Let's go to the land valuation,

9    please.  I think we already talked about this earlier

10   when we discussed Mr. O'Donnell.  He created the land

11   valuation report in the exhibits, correct?

12       A.    No.  I testified it was a collaborative

13   effort.  He presented some of the information.  I

14   presented some of the information.  At the end of the

15   day, it's my report.  But we collaborated.

16       Q.    Are there any other comparable land sales

17   that you relied upon in forming your opinion?

18       A.    Not that I relied upon.  There were land

19   sales that were considered and then not utilized due

20   to issues of comparability and other factors.

21       Q.    And those are contained in your work file?

22       A.    To the degree they would be relevant, some

23   reference would be in the work file.  Whether the

24   full -- the work file is already 5,000 pages or more.

25   So I don't retain trash in the work file.  I do retain



1    some relevant documents.

2        Q.    Let's talk about your cost approach, next

3    page on 32.   The last paragraph on that page, 32, will

4    you read that and let me know when you have had a

5    chance to review it.

6        A.    I have.

7        Q.    That paragraph was not in your original

8    report, was it?

9        A.    No, it wasn't.

10       Q.    Can you show me where in Exhibit 1 it was?

11       A.    I said, no, it wasn't.

12       Q.    I'm sorry, I thought you said it was.   Why

13   did you add that paragraph here?

14       A.    Again, as an extension of the additional

15   documents and analysis I received, and primarily

16   understanding Mr. Fenton's orientation when he

17   provided his opinion of value.   That's why I said I'm

18   not sure if he's an expert.   He's certainly an owner,

19   and my understanding is owners can testify as to

20   valuation.   But he's presenting that as a value

21   opinion.   So to try to orient intended uses of this

22   report is to -- for a special-purpose property, one

23   that's used for transient lodging, one that's in this

24   type of resort market, you know, rural resort market,

25   what is the proper application of the accepted



1   approaches of value and what are the constraints and

2   limitations on that.  And that's why I added it.

3        Q.    You also added a pretty detailed write-up on

4   the page after that.  Is that the same reason?

5        A.    Yes, because I think clearly some of the

6   parties in this litigation rely upon reproduction

7   costs.  I'm relying on replacement costs.  So I wanted

8   to make sure those definitions were provided to make

9   it easy for a jury, a Court to better understand the

10  differences, key differences in those determinations

11  and how they affect value.

12       Q.    Explain to me the difference in your mind

13  here, in your words, the difference between

14  reproduction and replacement.

15       A.    Well, cutting to the chase, an exact

16  reproduction would be the original materials,

17  specifications of the existing structure.  A

18  replacement would be the same functional utility but

19  using modern materials or replacement materials that

20  had the substitute capabilities.

21       Q.    And is one more appropriate than the other?

22       A.    Depends upon its context.

23       Q.    In this case, is one more appropriate than

24  the other?

25       A.    In my opinion, I think replacement cost is



1    more appropriate than reproduction cost.  If you go

2    back and see footnote 66, this is Sarmadi was

3    attempting to provide an opinion of reproduction

4    costs.  And on those reference pages of his

5    deposition, he said how difficult it was to render the

6    opinion of reproduction because the materials don't

7    exist in the marketplace.  Well, if they don't exist

8    and you are speculating and so forth, you really

9    should default to what does exist.  What does exist

10   are replacement materials as recognized by generally

11   accepted appraisal practice.  So I think it's more

12   appropriate to use replacement.  You can use either as

13   long as you use it properly.

14        Q.    Okay.  And did you do a replacement cost

15   analysis?

16        A.    I did.

17        Q.    How did you do that?

18        A.    I did a unit of cost methodology where I used

19   an accepted cost manual, a computerized application of

20   CoreLogic's SwiftEstimator.  I used the B&B occupancy

21   code class D, which is the highest classification of

22   B&B construction.  But it's a replacement structure.

23   It's not the same specifications that exist out there

24   that were built in 2011.

25        Q.    And the quality descriptions and the class



1   descriptions that you relied upon, are they set out

2   anywhere in your report?

3       A.    Bottom of page 33.

4       Q.    What does class D mean?  Is there a breakdown

5   of what is included in the various classes?

6       A.    Yeah.  I mean, the class D is concrete,

7   fireproof frame construction.

8       Q.    And what about excellent quality?

9       A.    It's the highest quality you get.  In other

10  words, it's new.  The cost approach, the starting

11  point of the cost approach is what is the cost new.

12  So if you take something other than an excellent

13  quality or you incorporate depreciation, you are not

14  getting that cost new.  So I used the highest -- based

15  upon subsequent discovery, the descriptions, I

16  elevated my class, elevated my quality, used the same

17  occupancy code.

18      Q.    So that's from CoreLogic Swift Commercial

19  Estimator?

20      A.    That's correct.

21      Q.    And that was formerly Marshall?

22      A.    Yes.

23           (Harvey Deposition Exhibit Number 5 was

24  marked for identification.)

25  BY MR. KUNZE:



1      Q.     So in your report you reference B&B number

2   539.   Is this on page 1 of exhibit -- what has now

3   been marked as Exhibit 5, is that the same

4   information, Bed and Breakfast Inns, number 539?

5      A.     No, because if you look on the top right

6   corner, this is as of August 2018.

7      Q.     Okay.  And when --

8      A.     This is post valuation.  My valuation date is

9   as of the respective date of appraisal of

10   January 31st.

11      Q.     Okay.  Let me ask you here, this has class C

12   and class D on it.

13      A.     Right.  And I used class D.

14      Q.     Is class D --

15      A.     Excellent.

16      Q.     What is the difference between class C and

17   class D?

18      A.     The type of construction.

19      Q.     You believe that class D is the appropriate

20   type of construction in this case?

21      A.     I do for replacement purposes.

22      Q.     Let's go to, I think you said your cost

23   approach summary is Exhibit 7 to Exhibit 2.

24      A.     Sure.

25      Q.     Here you are using $145.91?



1      A.     Correct.

2      Q.     And that's based on class D excellent at the

3  time of the taking?

4      A.     With the TLM.

5      Q.     What is TLM?

6      A.     Time/location multiplier.  In other words,

7  what's shown on Exhibit 5 is a hedonic pricing model

8  based upon the middle of the United States.  It's

9  modified based upon the actual ZIP code of the subject

10 property.  So what's missing on 5 is the TLM that's

11 incorporated into the computer application I used.

12     Q.     And what is the TLM in this case?

13     A.     I couldn't tell you what it is off the top of

14 my head.  It's on the documents.  It's in the work

15 file.

16     Q.     Is it anywhere in your report?

17     A.     No.

18     Q.     What is the base price per square foot before

19 factoring the TLM that you used in this?

20     A.     I would have to look.  The output is a

21 function of my input and the computer's hedonic

22 pricing model as modified.  I don't know what those

23 are.  All I'm concerned with is what the output

24 yielded.

25     Q.     Let's look at the cost approach summary from



1    your initial report.

2        A.    Sure.

3        Q.    Which I think is Exhibit 5 to Exhibit

4    Number 1 of the deposition.

5        A.    Okay.

6        Q.    Your initial price per square foot in your

7    original report, Exhibit 1, is $77.91.

8        A.    And the improvement is smaller.

9        Q.    And the improvement is smaller.

10       A.    Right.  And that's based upon the limited

11   observations I was able to make based upon the

12   limitations put on the inspection, coupled with the

13   lack of the discovery documents that I understood were

14   forthcoming.

15       Q.    Why is there such a disparate difference

16   between the price per square foot in your updated

17   supplemental report and the price per square foot in

18   your initial report?

19       A.    Based upon the assumptions that I utilized,

20   all I saw was stucco and frame.  When I looked at the

21   cottage, that had some exposed walls, so I assumed

22   there was, for instance, no concrete-reinforced

23   columns and so forth.  They weren't visibly apparent.

24   So in other words, I embraced the further descriptions

25   of the materials that were provided in discovery in



1   the supplemental report that weren't present in the

2   original report as well as the size.

3       Q.    What class and quantity did you use for your

4   initial report?

5       A.    Well, the quantity was 94 --

6       Q.    I'm sorry, I meant quality.

7       A.    Quality was average.

8       Q.    And class?

9       A.    Class would have still been D.

10      Q.    So based on the information you received

11  after your initial inspection and after your initial

12  report, you believe now that the quality of the Fenton

13  Inn improvements is excellent?

14      A.    Correct.

15      Q.    So back to Exhibit 7 to Deposition Exhibit 2,

16  which is your cost approach summary before the taking,

17  you started out with some base price per square foot

18  based on being a class D, excellent quality, correct?

19      A.    Correct.

20      Q.    And then adjusted downward for the TLM,

21  correct?

22      A.    I don't recall whether the TLM was more than

23  one or less than one.  I adjusted for the TLM.

24      Q.    Thank you.  Were there any other adjustments

25  to the price per square foot other than the TLM that



1  you made to the base price?

2      A.     Not for the unit value of direct replacement

3  costs, no.

4      Q.     Did you make any adjustments for any of the

5  special hand-carved --

6      A.     No, that's replacement.  That's the

7  difference between replacement and reproduction.  I'm

8  not replacing the exact same materials.  I'm just

9  replacing with a high-quality replacement on the same

10  utilization category.

11      Q.     Does Marshall Evaluation or the software that

12  you used, does it allow for adjustments based on

13  certain attributes such as those?

14      A.     It would allow for additions, but you have to

15  have a basis for those additions.  And going back to

16  the footnote of Mr. Sarmadi, as a licensed architect,

17  he said he couldn't find those materials in the

18  marketplace.  So I don't think there's a reasonable

19  basis to make those additions without speculating.

20      Q.     Does the base price per square foot you used

21  or the price per square foot you used in your cost

22  approach, does it account for the items that you

23  determined made the property special-purpose?

24      A.     Yes.

25      Q.     How?



1    A.      Because the design hasn't changed.  The

2  square footage, It's the same footprint, same

3  functional utility.  It's just built with different

4  materials.

5    Q.      Under your cost approach summary, Exhibit 7

6  to Deposition Exhibit 2, you list values for the CL

7  interest, what is that?

8    A.      Construction loan.

9    Q.      And where did you get this number from, the

10  15,675?

11    A.      That's based upon the retail value as

12  determined by the income and sales comparison

13  approach, 75 percent loan-to-value times the

14  prevailing market rate of 2 over Prime.  Prime as of

15  December 31, 2018 -- January 31, 2018.

16    Q.      And then the admin miscellaneous?

17    A.      That's allowance based upon 5 percent.

18    Q.      Five percent of what?

19    A.      Of direct and indirect, other indirects.

20    Q.      Of other indirects?

21    A.      In other words, 52,250 divided by .05 would

22  give you the base number that I incorporated.  I would

23  have to do the calculation.  I don't have my

24  calculator with me, but it's 5 percent.

25    Q.      Five percent of a number that --

1      A.    I believe's 5 percent of the directs.

2      Q.    Where are the directs listed?

3      A.    Above that, a million-459.

4      Q.    So 52,250 should be 5 percent of 1,459,731?

5      A.    Approximately.  I would have to go back and

6  look at the cell.

7      Q.    And then RE taxes?

8      A.    That's the interim real estate taxes on the

9  land.  Remember, your starting point is vacant land.

10  You are building the improvements.  So you would carry

11  the land during the construction period.

12      Q.    So are these the actual taxes on the land?

13      A.    It's the estimate of value times the millage

14  rate.

15      Q.    So I want to make sure I'm clear on how we

16  got to these numbers because we are going to be in

17  court.  You took your appraised value of the land?

18      A.    My appraised value of the land.

19      Q.    And then applied?

20      A.    The millage rate in effect.

21      Q.    On the date of take?

22      A.    Right, because Nelson County is not on an

23  annual reassessment basis.  So if I had used the

24  actual taxes, I would have been understating it.

25      Q.    And then how did you determine the



1    20 percent --

2       A.    That's an allowance.   It's an opinion.

3       Q.    Did you do any market research or --

4       A.    Yeah.   I mean, the threshold hurdle rate for

5    this type of enterprise is a lot of times it would be

6    done for the amenity of ownership, meaning to create

7    the property.   There wouldn't be an entrepreneurial

8    profit other than the profit derived from operation.

9    In this case, I think given its uniqueness, given the

10   paucity of activity, you have to have a higher hurdle

11   rate.   And at the 20 percent, that's an allowance.

12   Now, what's charged off against that allowance is all

13   important to accrued depreciation.   I'm sure we are

14   going do get into that.

15      Q.    That's next there.   Let's talk about

16   depreciation, then.   How did you come up with that

17   $1,014,850.

18      A.    If you go back to -- let me direct you to

19   page 35.   So in this grid on the top -- and I tried to

20   portray, you know, how my replacement cost estimate

21   compared to the owner's reproduction cost estimate.

22   You can use either one, the 2,055,965 or the

23   3,657,000, which is Mr. Fenton's schedule without the

24   cottage.

25      Q.    I want to clarify.   When you are talking



1    about the owner reproduction, that's the figure

2    submitted by Mr. Fenton and not the cost estimate by

3    Mr. Sarmadi, correct?

4        A.    I address that in 4, Exhibit 4.  I'm sure

5    we'll get into that.

6        Q.    For the record, I just want to make sure --

7        A.    This is the spreadsheet most recently

8    submitted by Mr. Fenton at the time of his last

9    deposition.

10       Q.    Thank you.

11       A.    So the context is replacement or

12   reproduction.  It doesn't matter which one you use.

13   What does matter is what is the inn.  It's an

14   income-producing property.  The principal of

15   anticipation is why investors buy income-producing

16   property.  They are going to exchange you cash today

17   for the anticipated future benefits, which are the

18   cash flow and the reversion at the time they terminate

19   their subsequent investment.

20            So the criteria that one looks at for accrued

21   depreciation of all forms is what is the market rate

22   of return versus the actual rate of return.  The

23   difference between that capitalized is accrued

24   depreciation from all forms, physical, functional and

25   external, which is you are going to get the same

1    answer whatever cost you use, replacement or

2    reproduction, if you properly analyze accrued

3    depreciation.  And when you asked me about

4    feasibility, the market-anticipated investment return,

5    that would be known as feasibility or equilibrium

6    rent, third line down.

7          The actual operating income, well, that's

8    what the property produced based upon its stabilized

9    occupancy in 2017 and the stabilized occupancy I

10   established previously in the report based upon its

11   comparison in a peer group along the southern United

12   States peer group as well and based upon the testimony

13   of Mr. Fenton when he said originally they were at

14   below 39 percent.  Then they were operating at

15   39 percent.  He hopes to go to 50 percent down the

16   road.

17          So the difference between those is the income

18   loss from all forms of depreciation, which is the

19   fifth line down.  So you capitalize that at the 10

20   percent overall rate, and that's your accrued

21   depreciation.  You can see that on the right column,

22   because you are using a higher cost basis, the accrued

23   depreciation is greater.

24          So whatever cost you plug in there, it's not

25   going to matter on the bottom line because the



1    investor anticipation is they are going to capitalize

2    the income loss, and it doesn't justify paying more

3    than X dollars and meeting the hurdle rate in the

4    market.   And hurdle rate in the market is established

5    by the sales criteria.

6         Q.    Okay.

7         A.    Does that explain the accrued depreciation?

8         Q.    Yes.   Let's talk about the individual types

9    of depreciation, the different forms, which I think

10   you explain on page 34.   Physical deterioration,

11   that's pretty straightforward.   My question would be,

12   what is your opinion or if you have one on the

13   effective life of this property, this building?

14        A.    Well, modernization extends effective life.

15   So over the holding period -- it's an iterative timed

16   answer to a multifaceted question.   What is the

17   typical investor period or what could be the longest

18   investor period, those are different criteria.   Most

19   investors would hold seven to ten years.   Clearly the

20   life of this facility would extend beyond that holding

21   period, but the entire life, physical and economic

22   life without modernization, would cap out at 50 to

23   60 years.   But with modernization, I mean, there's

24   B&Bs from the 1800s, but that's because their life has

25   been extended through modernization and renovation.



1    Q.    And then functional obsolescence?

2    A.    Functional obsolescence is -- I think all

3   forms are present in the property, which is why I used

4   the accrued depreciation.  Here you have got a legally

5   permissible use that limits you to five transient

6   uses -- five transient guest rooms, yet six transient

7   guest rooms exist, plus the seventh Wilhelm House.

8   It's superadequate.  You can't legally rent those

9   units.  Why would you build them?  That's a form of

10  functional obsolescence that's incurable.  It's not

11  financially feasible to knock down the Wilhelm House

12  and to incorporate two rooms into one to be legally

13  compliant.  I think the room that's missing from the

14  published rates is the Poplar Room.

15          And then external obsolescence is just that,

16  offsite.  The supply and demand that has recently

17  emanated from short-term B&B applications,

18  specifically those concentrated in Wintergreen, they

19  represent significant oversupply conditions.

20          So all three of those factors have to be

21  considered.  Now, to do it individually goes really

22  beyond the scope of what a typical commercial

23  appraisal would involve.  But that's where the

24  anticipated income compared to actual income is

25  recognized as a catchall.



1    Q.    So explain to me, then, how based on those

2    three factors that we just discussed, how did you get

3    the numbers in each of those two columns for the total

4    depreciation?

5    A.    Well, the numbers in the two columns are a

6    computation.  It's straightforward.  It compares the

7    cost basis times the rate of return demanded by the

8    market, which is what the overall capitalization rate

9    yielded from the other sales.  And you don't use

10   building and land capitalization because this is the

11   entire cost plus land.  So you use the overall rate.

12        So the overall rate times the costs provides

13   what the anticipated investment return should be.  The

14   shortfall is, if there is a shortfall, what is the

15   actual comparison to the stabilized occupancy.  So

16   here we have the 2007 actual operating in the signed

17   tax returns, and I added back in the rent, okay.  I

18   didn't deduct the rent.  I added it back to give the

19   104,112 includes that rent payment which I don't

20   believe existed, okay.  I think we clarified that.

21   The difference between those two is the shortfall.

22   And it represents all forms of depreciation.

23        So then to come up with a total

24   depreciation -- you want to take a break?

25             MR. KUNZE:  Yeah we can take two minutes.



1            (A recess was taken.)

2    BY MR. KUNZE:

3        Q.    Were you done with your answer?

4        A.    Yes.

5        Q.    And so just so I'm clear and I understand,

6    back to the chart at the top of page 35 in Exhibit 2,

7    the total depreciation number is that income shortfall

8    capitalized at 10 percent; is that correct?

9        A.    Yes.

10       Q.    Quickly back at Exhibit 7, which is your cost

11   approach summary, you include $150,000 for site

12   improvements.

13       A.    Yes.   I allocated Mr. Fenton's line item for

14   that times the acreage.

15       Q.    Let's talk your income approach for a moment.

16   On page 36 you talk about how you analyzed the

17   property's income.   Is that based on the tax returns

18   that you reviewed?

19       A.    And the Quicken statements and the posted

20   rates -- the rates I paid Fenton and the posted rates

21   that Fenton's website had on it from time to time.

22       Q.    Did you include in your analysis the income

23   from any other beds and breakfast?

24       A.    For the subject?   You mean --

25       Q.    I mean, you created your income analysis



1    based off of the information for the Fenton Inn,

2    correct?

3        A.    For the actual property, yes.

4        Q.    Did you look at the income for any other

5    similar properties?

6        A.    Sure, yeah.  I qualified it.  Nobody was

7    willing to share their tax returns, okay, but they

8    were willing to share, and in fact, if you go on

9    innshopper you'll that the gross revenues for most of

10   the offerings were presented.  So you are able to

11   match up gross to gross, and you can use that as a

12   gross income multiplier as a test.  And then the

13   published rates, to qualify the rates, all of the

14   other B&Bs have similar websites with reservation

15   engines.

16       Q.    What other B&Bs did you look at as far as

17   their rates?

18       A.    Turn to page 24.  So those seven all have

19   published rates, all within Nelson County.

20       Q.    And do you know what the rates for these are?

21       A.    I mean, it's in my file.  I will say that the

22   Fenton -- Mr. Fenton testified as to a 300 ADR,

23   average daily rate.  I didn't find any of them that

24   approached that ADR.  So I think the Fentons are

25   getting the top of the market, but that's a function



1   of occupancy as well.

2       Q.    What do you mean by that?

3       A.    If you charge more than the competition, your

4   capture rate is less of the whole.  I have rented lots

5   of rooms in that submarket.  I have rented condos,

6   townhouses and single-families up in Wintergreen.  I

7   paid more for a single bedroom in Fenton than I did

8   for a single-family house in Wintergreen.  So you can

9   charge more, but you'll garner less of the capture of

10  the available target market.

11      Q.    Did you analyze the occupancy rates for these

12  eight beds and breakfasts here?

13      A.    Yeah, to the degree they were willing to

14  disclose it.  And for instance, the most recent one

15  that I verified, Mark Addy, was 43 percent.

16      Q.    Is that significantly higher than the

17  Fenton's occupancy rate?

18      A.    It was slightly higher, but they also have a

19  restaurant.  So their gross revenue -- they

20  incorporated that gross revenue into their ADR

21  calculation.

22      Q.    What was the occupancy rate for the Orchard

23  Home?

24      A.    I just remember the most recent one I

25  confirmed.



1    Q.    But you did look at the occupancy rates for

2  these?

3    A.    All of the proprietors were interviewed.   To

4  the degree they -- if you recall from Mr. Fenton's

5  three depositions, he wasn't even sure of the

6  occupancy rates the first time you asked that

7  question.  So a lot of times it's not something they

8  have at their fingertips, and you have to then qualify

9  the answer: Is it more than 50 percent; is it less

10 than 50 percent and so forth.

11         The bottom line was that the verifications of

12 the information that the proprietors were willing to

13 share correlated closely with the south Atlantic for

14 the PAII report.  And basically 39 to 43 percent,

15 that's stabilized occupancy for these types of rural

16 remote B&Bs.

17         So I think Fenton Inn is at stabilized

18 occupancy as of 2017 based on the rate and the

19 occupancy and the testimony of Mr. Fenton, the tax

20 returns and the Quicken trial balances that I

21 reviewed -- QuickBooks.  Not Quicken.  Sorry.

22    Q.    Did you personally conduct interviews with

23 proprietors of each of these eight?

24    A.    A combination.  I may have called some.  Joe

25 Harvey called some.  Bill O'Donnell wasn't involved



1    with that process.

2         Q.    Do you take notes of your conversations?

3         A.    Yes.

4         Q.    Those are in your file?

5         A.    Yes, as part of the appraisal file.

6         Q.    Do you recall which ones you personally

7    verified?

8         A.    The only one I remember is the most recent

9    one is Mark Addy.  I think it was me on the farmhouse

10   in Harmony Hill.  I think it was Joe on the other

11   ones.  I just don't recall.

12        Q.    What other information, other than ADR and

13   occupancy rates, did you discuss with these people?

14        A.    Necessity for a proprietor to live onsite

15   versus in some other offsite facility.  They all said

16   uniformly that as a function of Nelson County, if you

17   were going to offer any type of food service, you got

18   to be onsite, you got to live onsite.  So that was

19   part of the discussion.

20              The nature of the draw to the community,

21   Wintergreen was recognized as a resort amenity and the

22   associated golf courses and the skiing.  The fact that

23   it's seasonal, the distances between the other

24   metropolitan areas by which they drew traffic.  And

25   then the competition that's offered in the Blue Ridge.


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    General discussions, just trying to get a better

2    handle on things.

3        Q.    On page 37 of your income approach, you have

4    a table there that you used to obtain capitalization

5    rates; is that correct?

6        A.    That's correct.

7        Q.    You mentioned in the top line six B&B

8    regional sales in various states.  What sales were

9    those?

10       A.    The six that I gleaned from CoStar in the

11   states listed.

12       Q.    And do you know what particular bed and

13   breakfast those sales included?

14       A.    I know what they are.  Do I remember the

15   names?  No.  But all that data is in the work file.

16       Q.    And I'm assuming information regarding the

17   date of sale and --

18       A.    Dates.

19       Q.    Sale price?

20       A.    Descriptions, supporting materials, yes.

21       Q.    And it's not listed in your report that we

22   could look at today that you could refresh your

23   memory?

24       A.    It's summarized.  But, no, the details of the

25   5,000 pages of my notes are not appended to my report.



1      Q.     And then I guess the same thing with the

2   surveyed lodging rates, are they different than the

3   six sales you looked at?

4      A.     Yes.   They come from two different surveys,

5   PricewaterhouseCoopers and RealtyRates.com.

6      Q.     Do you recall the rates today by chance?

7      A.     Today?

8      Q.     Yes.

9      A.     Well, today wouldn't be relevant.

10     Q.     As we sit here today, do you recall those

11  rates is my question?

12     A.     The range is what's summarized.   The minimum

13  and the maximum and the average was computed from the

14  survey respondents.

15     Q.     Let's talk about your sales comparison

16  approach.   These are the improved sales?

17     A.     Yes.

18     Q.     It appears that you added a fourth

19  comparable.

20     A.     I did.

21     Q.     Why did you add that?

22     A.     For the same reasons that I have added other

23  things.   It is part of the context of what I learned

24  with the subsequent material testimony that I

25  reviewed.   In this case I thought it was instructive

1    because it was very close by competition.  And if you

2    look at the characteristics of that property, the Mark

3    Addy Inn, it's been on the market for eight years.

4    Started at a million-six.  It's now been reduced close

5    to 30 percent.  It's on at a million-195.  Has an

6    operating restaurant which is legally permissible

7    under the SE-1 category.  It produces more gross

8    revenue than the Fenton Inn.

9           Now, in comparison listings, this is a

10   listing.  It's not a sale.  But it generally sets

11   appraisal criteria.  You consider completed sales,

12   incomplete sales.  You put maybe less emphasis on the

13   incomplete transaction because it's just that,

14   incomplete.  But it sits at the top of the market.

15   Most listings are negotiated to a price below the

16   listing.

17          So here, to put it in context, how does a

18   property listed at this not sell at a million-195

19   that's producing more revenue than the Fenton Inn?  I

20   think it goes to support not only the conclusion that

21   I rendered from the completed sales, but the

22   application of the other approaches to value.

23          Here you can use a GIM which is just the list

24   price divided by the revenue.  So if you apply the GIM

25   from Mark Addy under the current list price, a



1    million-195, you don't even get to $1 million on

2    Fenton.   Yet I appraised it for more than $1 million.

3    It just helps to put everything in context.   You know,

4    can you get to a $3.3 million value on the inn parcel?

5    I don't see any way possible.

6        Q.    What information that you received after

7    completing your initial report, what information did

8    you receive that prompted you to add sale 4?

9        A.    Well, sale 4 is important because it has a

10   restaurant.   If you recall, Mr. Fenton testified that

11   he applied for a restaurant, but when HB-155 was

12   adopted, he withdrew it.   Under a FOIA request, the

13   applications provide by Mrs. Fenton for that was

14   provided.   The response from Tom Eick that I verified

15   in my interview with Tom Eick was, hey, the

16   application has to be accompanied by a special-use

17   permit, site plan, requires a legislative act and will

18   be subject to hearings.   It just reenforced everything

19   along the way that I have previously testified as to

20   what prompted a lot of the supplemental material.

21        But I thought the restaurant was a

22   distinguishing characteristic because here, again,

23   it's the difference between the subject zoning, its

24   A-1, its limitations under the building permit 97-211,

25   the fact that the kitchen can only be used for



1    transient guest meals and not outside of that, the

2    four corners of those guests.  Here it demonstrates

3    that what the benefit of a commercial kitchen would be

4    in concert with a B&B that would allow, for instance,

5    a capture rate of a greater number of weddings and so

6    forth, all of which was the subject of Mr. Fenton's

7    deposition testimony and some of the materials he

8    provided.

9        Q.     I would like to go to Exhibit 9, which I

10   think is the further -- your adjustment grid.

11       A.     This is before and after.

12       Q.     This is before.  I believe Exhibit 9 is

13   before, correct?

14       A.     Yeah.

15       Q.     Did either Mr. O'Donnell or Mr. Harvey assist

16   you with the improved sales analysis?

17       A.     Well, assisted in the form of data collection

18   but not analysis.

19       Q.     So initially in your first report you

20   included improved sales 1, 2 and 3 that are on this

21   chart, correct?

22       A.     In the original report, 1, 2 and 3.

23       Q.     Then for the supplemental you added improved

24   sale 4, which is not actually a sale?

25       A.     It's a listing.



1    Q.    And sale 1 is located in Abingdon, Virginia?

2    A.    Correct.

3    Q.    You believe that's in the same market area as

4    the Fenton Inn?

5    A.    Yeah.  If you go three pages back from the

6    grid, you see the map.  I testified that I believe the

7    competitive area was along the Blue Ridge.  And that

8    what yellow contour is, it's the Blue Ridge Mountains.

9    You can see that all of these are located either

10   north, east, south or west of the mountains.  That's

11   why it's part of the competitive market.

12   Q.    Okay.  And so that's why you made no

13   adjustment to sale 1 for location; is that correct?

14   A.    That's correct.  I believe that it would be a

15   speculative adjustment.  The unit price paid is the --

16   is part of the qualitative analysis process.  It's not

17   quantum, meaning you render -- you are familiar with

18   it.  You're grouping it into two subcategories of

19   superior and inferior.

20   Q.    For improved sale 1, you found the

21   adjustments that you made were similar for property

22   rights, correct?

23   A.    Um-hum.

24   Q.    Similar for financing, similar for conditions

25   of sale, and slightly inferior for market conditions.



1    Why were those market conditions slightly inferior?

2        A.    Well, 2015.   It happened -- you have

3    inflation in the marketplace and you are closer to the

4    2008 great recession and the influences of that.   So

5    those market conditions were inferior.

6        Q.    Location you say similar as well.   Is that

7    simply because of its proximity to the Blue Ridge

8    Mountains?

9        A.    It's a B&B in a resort community oriented in

10   the Blue Ridge, yes.   Now, contrast that to improved

11   sale 3 which is in a less rural area of Winchester.

12   That's where I did say that locational attribute was

13   clearly superior.   It's not only oriented to the

14   mountains, but it's got a population center very

15   proximate to it that the other sales didn't, nor that

16   the subject has.

17       Q.    And Winchester is that that population

18   center?

19       A.    Yes.

20       Q.    Back to sale 1, though, the physical

21   characteristics you have an inferior adjustment

22   quantitative -- qualitative adjustment?

23       A.    Right.   It's half the size.

24       Q.    Any other physical characteristics that you

25   considered and adjusted for?


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    A.    Yeah, in the discussion it was an older

2   improvement.  It wasn't as new.  So the physical

3   characteristics take into account size, condition.

4    Q.    And the use as a B&B?

5    A.    Yes.

6    Q.    Is it still being used as a B&B?

7    A.    Well, it was on the day of the sale.  Whether

8   it was converted subsequent, I don't know.

9    Q.    Improved sale 2, The 3Bs Inn, the only

10   difference you noted between improved sale 2 and the

11   subject is the slight -- I'm sorry, there's two

12   differences.

13    A.    Just like sale 1.  It's a mirror of sale 1,

14   which is why it's part of that subgroup.

15    Q.    And the physical characteristics, explain to

16   me why it's inferior.

17    A.    Half the size.  It's just like sale 1.  Half

18   the size, the building improvement, lesser number of

19   keyed rooms, older.

20    Q.    Any other factors?

21    A.    Those are the primary factors.

22    Q.    And then improved sale 3, we talked about the

23   location?

24    A.    Right, suburban versus rural.

25    Q.    And then physical characteristics, what went



1   into that inferior?

2      A.    It's smaller.

3      Q.    Anything else?

4      A.    Older and smaller.

5      Q.    Then the improved sale 4, which is a listing,

6   the same reasons for the inferior physical

7   characteristics?

8      A.    Correct.

9      Q.    Older and smaller?

10     A.    But the zoning with the restaurant, legally

11  permissible restaurant, that was the superior.

12     Q.    That's the use?

13     A.    Zoning use, yes.

14     Q.    And so it's your opinion that after your

15  research, that these are the four most comparable

16  properties to the subject property?

17     A.    Best analogs, yes.   There could be other

18  comparables but they didn't transact.

19     Q.    But number 4 didn't transact, did it?

20     A.    It doesn't transact, but I would direct your

21  attention to page 38, numbered paragraph 1.   If you

22  want to take a minute and read the paragraph,

23  primarily look at the last two full sentences.   The

24  goal is to find a set of comparable sales or other

25  evidence such as property listings or contracts that



1    are similar.  So I mean, generally accepted appraisal

2    accepts not only transactions that are completed, but

3    incomplete transactions can still serve as some

4    arbiter of value.

5        Q.    So based on -- back to Exhibit 9 to

6    Deposition Exhibit 2, based on the adjustments that

7    you made, you found that overall, sales 1 and 2 are

8    inferior to the Fenton Inn; is that correct?

9        A.    Yes.

10       Q.    And 3 and 4 are superior?

11       A.    Correct.

12       Q.    And so per square foot, someone would pay

13   greater than $88 per square foot but less than a $123

14   per square foot?

15       A.    Correct.

16       Q.    Because they would value sales 3 and 4 more

17   than the Fenton Inn; is that correct?

18       A.    Correct.

19       Q.    Did you confirm these sales?

20       A.    Yeah.

21       Q.    Who did you confirm them with?

22       A.    By deed, by published reports and by the

23   principals that we were able to reach from those same

24   reports, be it either the broker or the grantee or the

25   grantor.  It was always going to be somebody



1   different.

2       Q.    Who did you confirm --

3       A.    It's in the file.

4       Q.    For all of those?

5       A.    Yes.   The process is the same.   Deed,

6   published report, assessment data, you know, as more

7   than two sources of publication and then trying to get

8   verification from a party.

9       Q.    Other than the adjustments here on your chart

10  in Exhibit 7, you didn't make any other adjustments to

11  the sales?

12      A.    Not on 9, but on the after chart, yes.

13      Q.    Let's go to page 44 and talk about your

14  valuation after the taking.

15      A.    Okay.

16      Q.    Under Land Valuation, the last paragraph

17  there you mention you used the same comparable land

18  sales as in the before, however, in this instance you

19  -- an additional -12.5 percent adjustment was made to

20  the comparables to reflect their superior views after

21  considering the effect of the ACP on the property's

22  residue.

23      A.    Correct.

24      Q.    What do you mean by superior views?

25      A.    The market reaction to the property in the



1  after scenario with an underground transmission line

2  onsite, the market reaction takes it in account that

3  that view amenity or disamenity relates to no more

4  than a 12-1/2 percent discount.

5      Q.    So I just want to make sure I understand what

6  you mean by view.  So by being able to see a pipeline

7  from the guest rooms warrants a 12-1/2 percent

8  reduction?

9      A.    You can't see the pipeline.  You can see the

10  corridor.

11      Q.    I'm sorry, see the easement.

12      A.    I just want to make sure we're on the same

13  page.

14      Q.    I appreciate the clarification.  To see the

15  easement, would you agree with that?

16      A.    Yes, markers.

17      Q.    The ability to see the easement and the

18  associated -- whatever you can see from the rooms

19  warrants a 12-1/2 percent reduction?

20      A.    Correct.  And just again, so the record is

21  clear, it's a market reaction as measured with

22  transactional data.  I classify it as view.  But I

23  wouldn't necessarily say the market reaction is what

24  the market reaction is.  It can be due to any factor

25  that influenced the buyer or the seller and having the



1  meeting of the minds.  I think it best falls under the

2  singular category of view.

3      Q.     On Exhibit 1 on your initial report, on your

4  valuation on page 30 you write that you estimated the

5  property's fair market value after the taking as

6  improved by deducting approximately 12-1/2 percent

7  damages caused by the permanent taking.  Why did you

8  change that from caused by the permanent taking to

9  just the superior views?

10     A.     Well, because the application -- this was

11  more of a summary.

12     Q.     Which one was?

13     A.     The statement you just read was more of a

14  summary based upon --

15     Q.     The statement from Exhibit 1?

16     A.     Based upon the after valuation analysis of

17  the income sales and cost approaches, which are in the

18  file but weren't presented as an appendix to the

19  report.

20            In the supplemental report, because I

21  provided in greater detail the before and after

22  analysis of the three accepted approaches to value,

23  it's more proper to classify that in the approach as

24  to how the 12-1/2 percent is used.  In other words, 12

25  -1/2 percent in the income approach is further accrued

1    depreciation.   12-1/2 percent in the cost approach is

2    accrued depreciation.   12-1/2 percent in the sales

3    comparison approach is market reaction.   It's not

4    across the board the same element, but the summary

5    statement took that into account.   The numbers are the

6    same.   It was just a summary description versus the

7    more articulate descriptions of the approaches that

8    were developed.

9        Q.    Okay.   So the statement from Exhibit 1 in

10   your initial report was a summary from all three

11   approaches to value?

12       A.    Yes.   12-1/2 percent was applied to all three

13   approaches, same as in the latter report.

14       Q.    With regard to your supplemental report, you

15   recognize that the market would make a 12-1/2 percent

16   adjustment based on the impact to the views?

17       A.    I think, as I tried to qualify the answer,

18   it's a market reaction.   Now, what is that market

19   reaction tied to?   What is obvious to a buyer, seller

20   and before and after is the changed condition that you

21   see the view.   If you couldn't view it, you wouldn't

22   know it was there.

23       Q.    Well, you would know that there's an

24   underground pipeline there if you were purchasing it,

25   wouldn't you?



1      A.     If you couldn't view it, would it be obvious

2   to anybody?

3      Q.     Well, I certainly know when I purchased my

4   home if there's any utility easements on it and what

5   they are.  My question is, are there any other --

6      A.     I'm an active salesperson of commercial and

7   residential properties, and I can tell you that if

8   most people don't see it, most house location plots

9   are prepared without benefit of a title report.

10  That's the benefit of the view.  You see it.  You can

11  then associate with it and deem what the market

12  reaction is.  It triggers the market reaction.  But

13  it's not solely limited to view.  It's properly

14  categorized, in my opinion, as to a change in view,

15  but the market reaction is what it is.

16     Q.     What other factors would prompt the market

17  reaction other than seeing --

18     A.     It's the interaction between buyers and

19  sellers as to like properties with and without

20  underground transmission lines, what is the difference

21  as measured in the marketplace.

22     Q.     Would a potential buyer look to the rights as

23  being acquired within the easement as part of its

24  market reaction?

25     A.     If that potential buyer was sophisticated


ZAHN
COURT REPORTING
www.zahncourtreporting.com

1   enough to understand that statement and what due

2   diligence would be required, sure.

3       Q.    In your initial report you said that the

4   12-1/2 percent reduction was caused by the permanent

5   taking.  Generally speaking, in appraisal methodology,

6   is there ever an instance where there's a damage or

7   decrease in value as a result of a temporary taking?

8       A.    It would depend upon the specific facts

9   associated with that hypothetical.  But a temporary is

10  assumed to be finite.  And depending upon if there

11  were no change conditions in the property, in other

12  words, restoration occurs, then the temporary would

13  not have a material impact.

14      Q.    Let me pose a hypothetical, then.  If a

15  willing buyer was going to purchase a property and

16  knew that there would be a temporary easement on their

17  property for five years, would a potential buyer

18  potentially pay less at the time of sale due to that

19  five-year encumbrance?

20          MR. MINSON:  I'm just going to object to form

21  for that question.  I don't think it's --

22          THE WITNESS:  That's what my computation of

23  the temporary easement reflects, the adjustment that

24  an informed buyer would make.

25  BY MR. KUNZE:

1    Q.    Doesn't your temporary construction easement

2   calculation reflect the value of the land that's

3   encumbered?

4    A.    Yes, by the temporary easement.

5    Q.    Would a potential buyer pay less for the

6   residue of the property, the entire property as a

7   result of being encumbered by the temporary easement

8   for five years?

9    A.    You mean if it's absent a permanent easement?

10   Because then you are double accounting.  If I have

11   already accounted for an impairment for the permanent

12   easement that supersedes and survives the temporary

13   easement, that's the same impact.  But if you want to

14   make them cumulative, that would be a double

15   accounting of that impact.

16    Q.    Couldn't there be different impacts from a

17   permanent and a temporary easement?

18    A.    Well, the permanent is long-lasting, and it's

19   the market reaction that is reflected.  Now, the

20   temporary and the permanent are joined at the hip.

21   But if there were no permanent and there was only a

22   temporary, I wouldn't necessarily find the 12-1/2

23   percent diminution to the residue.

24    Q.    I'm speaking in the hypothetical.  If there

25   was just a temporary, is there an instance where that



1    temporary could cause a decrease in value to the

2    remainder?

3              MR. MINSON:   I'm going to renew my objection

4    for all the hypotheticals.

5              THE WITNESS:   In reality, not hypothetically,

6    I can't recall in my 41 years ever being asked to

7    analyze that, an easement that was temporary and not

8    permanent.   I don't have a basis to answer your

9    question.

10   BY MR. KUNZE:

11      Q.    Thank you.   On page 45, your after values for

12   the cost and income capitalization approaches, under

13   the cost approach you do -- a 12-1/2 percent

14   depreciation was added to reflect the effects of the

15   ACP on the property's residue.   What effects are

16   those?

17      A.    Market reaction.

18      Q.    What is the market reacting to?

19      A.    A property with or without a like-kind

20   easement encumbrance.

21      Q.    There aren't any significant impacts or

22   aspects of that that you are accounting for?

23      A.    Well, subsumed in the transaction.   Some

24   people that I have interviewed have said they actually

25   like the view because it opens up their view of the



1  mountains.  Now, I don't think most people attribute a

2  benefit to an easement.  But some do.  Everybody has a

3  subjective reaction that could be different.  What I'm

4  not looking at is the subjective but trying to look at

5  the cumulative in an objective fashion as to what is

6  the range of impacts.  And in an abundance of caution

7  here, I went to the worst-case scenario of that range

8  in how I treated this property, which is the 12-1/2

9  percent.  That's the most market reaction I have found

10  in like-kind pairings using underground transmission

11  lines as case as compared to like-kind control sales.

12  And it's market reaction.

13      Q.    So tell me if you agree with me, with this

14  statement, then.  I want to make sure I understand.

15  It's your opinion that the market would react

16  negatively to an amount of 12-1/2 percent reduction

17  due to the ACP easement that's on the property?

18      A.    I would say it slightly differently.

19      Q.    If you disagree, please tell me how so.

20      A.    How I would qualify what you just said would

21  be market reactions vary to these scenarios, but it

22  would be no worse based upon measured transactional

23  data at 12-1/2 percent.  It could be zero, but it

24  would be -12-1/2 percent.  In this particular instance

25  in this application, in fairness, I went to the



1    -12-1/2 percent, the maximum measured in the

2    marketplace.

3        Q.    You just mentioned worst-case scenario.   So I

4    want to ask about your valuation of the easement --

5    permanent easement itself.   You ascribed 90 percent

6    reduction in value.   What is that based on?

7        A.    Review of peers as to what they have done in

8    like-kind similar situations which is one of the tests

9    in USPAP's scope of work rule.   Published treatises

10   and my interviews with other condemning authorities as

11   to when they reach consensual deals what they pay.

12       Q.    Would you agree that in eminent domain

13   appraising when valuing easements, you value as though

14   the easement is being exercised to the fullest extent

15   possible?

16       A.    The potential.   This easement has the right

17   to be abandoned.   That would not be the fullest extent

18   possible, but it is still a reserved right.   But the

19   12-1/2 percent doesn't assume it's abandoned.   It

20   assumes that it's utilized to the fullest extent

21   possible.

22       Q.    So you assume that they are exercising all

23   the rights that have been acquired, correct?

24       A.    Correct.

25           (A recess was taken.)



1  BY MR. KUNZE:

2      Q.    Mr. Harvey, I just want to go over, there are

3  several exhibits to your supplemental report that were

4  not included in your initial report.  So I just wanted

5  to discuss why you decided to include those now.  And

6  so on Exhibit 2, you now have included the subject

7  property building permit and plan review comments.  I

8  think we've discussed that at length, but --

9      A.    Just so the record is clear too, even Exhibit

10 1, the property plat, is different between the

11 original -- if you recall Mr. Fenton's testimony, he

12 didn't like looking at GIS data.  So fine.  Even

13 though it's representative of the shape and size of

14 the subject property, I included the actual survey in

15 supplemental report, again, based upon some of the

16 documents that were subsequently produced in

17 discovery.  So it's not just the additions of a non --

18 of a new exhibit.  It's a change in some of the

19 exhibits.

20     Q.    So you substituted the subject property plat

21 in Exhibit 2 for the tax map which you had in your

22 initial report; is that correct?

23     A.    The initial report was a GIS of the -- I

24 wouldn't call it the tax map because that would be a

25 third type of exhibit.



1    Q.    I'm only saying that because your additional

2    report lists Exhibit 1, subject property tax map?

3    A.    Understood but it was a GIS representation of

4    the tax map.  Not the tax map itself.

5    Q.    Regardless, you substituted what was

6    Exhibit 1 in your initial report for the subject

7    property plats in your updated report?

8    A.    Correct.  In fairness to Mr. Fenton's

9    objection to dealing with the GIS, fine.  Let's deal

10   with the actual plat because the actual plat was

11   instructive, again, when you look at the permit for

12   the cottage.  Now, the permit that the Fenton's signed

13   and applied for, they identified it as on parcel 2A.

14   He testified it's on parcel 2B -- I'm sorry, 2C.  And

15   the actual plats confirm that.  So I think it's

16   helpful to consider both and why there's differences.

17   Q.    Then you added the building permit and plan

18   review comments.  Is that because you had the

19   additional conversations after reviewing Mr. Fenton's

20   testimony?

21   A.    Well, I believe, no.  It's because when you

22   provided in your response to Mr. He, that's H-E, about

23   the inspection screw up and materials you were going

24   to provide, you provided the floor plans.  But those

25   floor plans were stamped as part of the same permit.



1    You didn't provide the permit.

2        Q.     Right.

3        A.     So I think there was a lack of response on

4    that element.  And that's when I went and did further

5    discussions, investigations and so forth.  So that

6    combination of 3 and 4 is meant to supplement the

7    inadequacy of the original discovery, in my opinion.

8        Q.     Do you know if the Fentons, Mr. and Mrs.

9    Fenton, had a copy of the permits in their possession?

10       A.     Well, they were issued to them.  Whether they

11   still had it, I don't know.  They certainly had the

12   capability of getting it.

13       Q.     Similar to how you did, correct?

14       A.     Yeah.  But I mean, they clearly would have

15   also had the plans for the cottage, which they never

16   produced.

17       Q.     Okay.

18       A.     But they were asked to.  But then again, they

19   were asked to produce, you know, what was relevant to

20   the property.  And I think he qualified all his

21   answers in his deposition if he deemed it to be

22   relevant.  Well, he didn't deem the cottage plans to

23   be relevant, apparently, because he didn't produce

24   them.

25       Q.     Have you seen cottage plans since then?



1    A.    Yeah, I got them and I included them, and

2  they are in Exhibit 4 to this deposition.  You are

3  looking at Exhibit 2.

4    Q.    I'm sorry.

5    A.    Exhibit 4.

6    Q.    Your rebuttal report?

7    A.    Correct.  I'm just trying to qualify so that

8  you have a full understanding of what changed and why.

9    Q.    Thank you.

10    A.    Everything else is the same until you get to

11  12, 13, 14, 15.  And that was just, as I previously

12  testified, they already preexisted.  In this case I

13  just produced them so that there would be clarity as

14  to how the before and after was treated.  Previously I

15  did it in the summary statement.  This time I included

16  the actual work product.

17    Q.    Well, for example, Exhibit 12 has your

18  signature dated April 17, 2019.  How did it preexist?

19    A.    Because if you look back, Exhibit 2 has two

20  different signature dates.  The date you sign it is

21  the date you put on the report.

22    Q.    So Exhibit 12 existed --

23    A.    12, 13, 14, 15 existed at the time of the

24  original Exhibit 1 report to this deposition being

25  generated in the work file.



1      Q.     It was just not signed in the work file?

2      A.     It was signed.  I already testified it was

3   signed in the work file, but I didn't produce it as

4   part of the summary report.

5      Q.     What date was it signed in the initial

6   report?

7      A.     Same as Exhibit 2 in the original report

8   which would be the date of the report.  In other

9   words, the original report was dated September 14,

10   2018.  All the associated form reports have that same

11   signature date.  The supplemental report is dated

12   April 17, 2019.  All of the form reports have that

13   same supplemental date.

14      Q.     So I just want to make sure I'm clear and

15   understand.

16      A.     I'm trying to clarify it for you so you

17   understand.

18      Q.     So Exhibit 2 and your supplemental report,

19   Exhibits 2, 12, 13, 14 and 15, are all signed and

20   dated April 17, 2019, correct?

21      A.     Yes.  All of them are signed, all of the form

22   reports --

23      Q.     I understand.

24      A.     -- are signed on the same date as the

25   narrative report.



1    Q.    I just want to clarify.  So for your initial

2  report where you said that you had these forms but did

3  not produce them, would they be signed and dated

4  September 14, 2018?

5    A.    Right.  There's two sets of forms.

6    Q.    I just want to make sure I'm clear.  And I

7  think I asked you before, but just to be clear, the

8  versions from your September 14, 2018 reports that

9  were not produced, there's no different adjustments or

10 analysis --

11   A.    Other than date?

12   Q.    -- other than date?

13   A.    With the exception of the changes that we

14 went over in the cost approach.

15              MR. KUNZE:  That's all the questions I have.

16              MR. MINSON:  I don't have any questions.

17              THE WITNESS:  And I would like to read and

18 sign, please, whatever arrangements have to be made.

19 Are you getting expedited delivery?

20              THE REPORTER:  You're asking all my questions

21 for me.  Who wants what, when?

22              MR. KUNZE:  Can I -- Wednesday?  Thursday?

23 Is there a difference in price between them?

24              THE REPORTER:  Yes.  I don't know what it is,

25 but I can have them quote you the difference between



1    Wednesday and Thursday.

2            Did you want the same or different?

3            MR. MINSON:  Same, yeah.

4            (Reading and signature not waived.)

5            (Whereupon, the proceedings at 1:08 p.m.,

6    were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1   COMMONWEALTH OF VIRGINIA, to wit:

2        I, Deborah Wehr, before whom the foregoing

3   deposition was taken, do hereby certify that the

4   within-named witness personally appeared before me

5   at the time and place herein set out, and after

6   having been duly sworn by me, according to law, was

7   examined by counsel.

8        I further certify that the examination was

9   recorded stenographically by me and this transcript

10  is a true record of the proceedings.

11       I further certify that I am not of counsel

12  to any party, nor an employee of counsel, nor

13  related to any party, nor in any way interested in

14  the outcome of this action.

15       As witness my hand and notarial seal this

16  __26__ day of __April_____, 2019.

17

18

19

20                         Deborah Wehr

21                         Notary Public

22  MY COMMISSION EXPIRES:   9/30/20

1                CERTIFICATE OF DEPONENT

2        I hereby certify that I have read and examined

3   the foregoing transcript, and the same is a true and

4   accurate record of the testimony given by me.

5        Any additions or corrections that I feel are

6   necessary, I will attach on a separate sheet of paper

7   to the original transcript.

8

9                    _____

10                   WILLIAM HARVEY, II

11       I hereby certify that the individual

12  representing himself/herself to be the above-named

13  individual, appeared before me this

14  _____ day of _____, 2019, and

15  executed the above certificate in my presence.

16

17  _____

18  NOTARY PUBLIC IN AND FOR

19  _____

20  MY COMMISSION EXPIRES:

21  _____

22

23

24

25



```
 1   WITNESS:  WILLIAM HARVEY, II

 2   DATE:  FRIDAY, APRIL 26, 2019

 3   CASE:   ATLANTIC COAST PIPELINE v. FENTON FAMILY

 4   HOLDINGS, LLC, et al.

 5

 6   Please note any errors and the corrections thereof on

 7   this errata sheet.  Do not write on the transcript.

 8   The Rules require a reason for any change or

 9   correction.  It may be general, such as "To correct

10   stenographic error," or "To clarify the record," or

11   "To conform with the facts."

12   PAGE LINE CORRECTION      REASON FOR CHANGE

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**$**

**$1**  143:1,2

**$1,014,850**  129:17

**$100**  61:21

**$123**  149:13

**$145.91**  122:25

**$150,000**  135:11

**$3.3**  143:4

**$77.91**  124:7

**$88**  149:13

**-1/2**  152:25

**-12-1/2**  158:24 159:1

**-12.5**  150:19

**0**

**05**  127:21

**1**

**1**  31:9,14,15 32:2,5,7,
21,25 33:10 37:20,24
38:12 44:3,10,20,24
53:15 57:7 59:20
63:3,18 64:1,8,9,19
65:9,15 70:24 71:4
78:11 82:24 86:23
87:20 100:24 101:2,
9,10 102:12,25
103:7,12 107:3
118:10 122:2 124:4,7
144:20,22 145:1,13,
20 146:20 147:13,17
148:21 149:7 152:3,
15 153:9 160:10
161:2,6 163:24

**1,459,731**  128:4

**10**  14:20 22:15 23:1
38:4,5,21 47:19 51:8,
11 83:21 131:19
135:8

**100**  14:21,22,24
15:3,17 16:1,4,14,18
22:3

**104,112**  134:19

**11**  47:19 85:24 86:2

**11,000**  61:14

**1146**  4:14

**12**  19:10 33:25 34:2
35:10,18 36:21 47:19
90:14 152:24 163:11,
17,22,23 164:19

**12-1/2**  151:4,7,19
152:6,24 153:1,2,12,
15 155:4 156:22
157:13 158:8,16,23
159:19

**13**  47:19,21 72:23
163:11,23 164:19

**14**  31:18 36:2 73:6
90:6,14 93:5 163:11,
23 164:9,19 165:4,8

**1417**  47:23 48:2 49:5

**14th**  36:13

**15**  23:1 47:22 163:11,
23 164:19

**15,675**  127:10

**16**  20:14

**17**  31:24 35:21 47:22
69:3 89:10 163:18
164:12,20

**18**  20:14 87:13 95:3

**1800s**  132:24

**1986**  9:20

**1994**  10:21

**1:08**  166:5

**2**

**2**  26:2,25 28:16,23
29:7 30:12,20 31:2,9,
19,25 32:2,4,7,8
33:1,4,10,13,14,23,
24 37:20,24 38:4
44:4 47:19,23 49:4
57:7 59:20 63:4,19

64:15 65:10,15 67:3,
17 70:24 71:4 72:20,
21,23 75:22,23,24
76:1,2,3,8 78:13
80:9,14 84:25 86:1,
23 87:13 95:3,11
101:12,17,23 102:3,
25 103:7,12 104:20
107:11 116:3 122:23
125:15 127:6,14
135:6 144:20,22
147:9,10 149:6,7
160:6,21 163:3,19
164:7,18,19

**2,055,965**  129:22

**20**  47:22 102:3,13
129:1,11

**200**  109:25 110:2

**2000**  10:9 11:1

**2002**  10:12,25

**2007**  134:16

**2008**  31:18 108:19
146:4

**2011**  90:9 120:24

**2014**  7:9,18,21

**2015**  73:20 146:2

**2016**  42:25

**2017**  11:11 42:25
61:6 94:1 114:23
131:9 138:18

**2018**  36:2 42:25 69:3
122:6 127:15 164:10
165:4,8

**2019**  31:24 35:21
163:18 164:12,20

**21**  38:5,8,12,15,19
47:22 104:20

**21,000**  61:15

**22**  104:20

**22066**  4:15

**23**  107:11 109:19

**230**  17:23

**24**  19:10 109:11
136:18

**25**  57:11,18 110:5

**250,000**  61:10

**26**  34:10,14 65:24
66:4

**27**  105:15 106:12

**29**  116:3

**2A**  26:2 39:23 41:20
72:11,12 74:9,16
75:1,13 81:6 82:5
90:16 111:5 113:8
115:11 161:13

**2B**  41:21 74:9 111:5
113:8 115:11 116:1
161:14

**2C**  41:21 72:11,12,14
73:12 74:9,13,19,21
84:7,11 111:5 113:5,
8 116:1 161:14

**3**

**3**  47:19 48:9 50:3,17
67:19,23 69:2,20,23
70:1,3,9,17 76:3,8
101:10 102:25 103:7,
12 144:20,22 146:11
147:22 149:10,16
162:6

**3,657,000**  129:23

**30**  15:22 142:5 152:4

**30,000**  61:16

**300**  136:22

**31**  127:15

**31st**  122:10

**32**  118:3

**325**  61:20

**33**  121:3

**34**  50:24 68:4,7 69:11
132:10

**35**  105:23 106:1
129:19 135:6

**36**  22:16 51:7 68:8,9,
12,16 69:11 135:16

**37**  140:3



**38** 148:21

**39** 131:14,15 138:14

**3bs** 147:9

**4**

**4** 67:19 68:8,11
69:13,18,23 70:11,19
72:7,8,18 73:11
75:24 76:2,7,14
78:11,13 80:15 83:19
84:25 85:24 101:23
103:12 106:24 107:1
130:4 143:8,9 144:24
148:5,19 149:10,16
162:6 163:2,5

**4,000** 6:1

**40** 14:19

**40-some** 14:14

**41** 157:6

**418** 55:6,11

**43** 137:15 138:14

**44** 150:13

**45** 157:11

**5**

**5** 73:11 121:23 122:3
123:7,10 124:3
127:17,24 128:1,4

**5,000** 38:17 117:24
140:25

**50** 20:18,19 22:2
131:15 132:22 138:9,
10

**500,000-acre** 54:2

**52,250** 127:21 128:4

**525** 60:5 61:19

**539** 122:2,4

**57** 56:10

**6**

**6** 38:22 80:9 86:7

**60** 132:23

**66** 120:2

**7**

**7** 47:19 48:18 82:20,
25 122:23 125:15
127:5 135:10 150:10

**740** 17:24

**75** 127:13

**8**

**8** 26:2,25 28:16,23
29:7 30:12,20 31:3,
25 32:2 33:4,14,23,
24 34:1 83:21

**81** 11:24 12:3 60:20

**8A** 26:2

**9**

**9** 73:6 84:25 85:1
86:3 144:9,12 149:5
150:12

**90** 159:5

**94** 125:5

**97** 90:9

**97-211** 82:17 90:1
143:24

**A**

**A-1** 115:5 143:24

**abandon** 104:10

**abandoned** 159:17,
19

**ability** 109:10 151:17

**Abingdon** 145:1

**aboveground** 17:20

**absent** 156:9

**abundance** 158:6

**accepted** 95:23

105:21 107:23 117:2
118:25 120:11,19
149:1 152:22

**accepts** 149:2

**access** 27:19 40:22
99:24 100:9 101:12

**accessory** 73:1
75:11 112:11 114:6,
8,14

**accommodations**
116:9

**accompanied** 25:18
143:16

**accordance** 35:16

**account** 126:22
147:3 151:2 153:5

**accounted** 156:11

**accounting** 156:10,
15 157:22

**accrued** 129:13
130:20,23 131:2,20,
22 132:7 133:4
152:25 153:2

**accurate** 69:2

**ACP** 11:14,21 15:14
23:8,9 55:25 77:13,
16 102:4,15,19
103:11 104:5,13
150:21 157:15
158:17

**ACP's** 77:19,24

**ACP's** 77:19,24

**acquired** 45:16
103:10 112:12
154:23 159:23

**acquiring** 103:11
104:5

**acquisition** 15:11
105:17

**acreage** 135:14

**act** 6:16 10:18 75:4
91:15 92:8,15,18,19
93:7 111:24 143:17

**action** 53:7 90:22
92:7

**active** 21:6 86:20
154:6

**activities** 7:5 22:21
25:12 115:15

**activity** 6:21 9:16,22
10:5 18:21 29:13
30:3,23 60:2 73:21
109:14 129:10

**actual** 33:22 123:9
128:12,24 130:22
131:7 133:24 134:15,
16 136:3 160:14
161:10,15 163:16

**add** 80:24 88:13
113:14 118:13
141:21 143:8

**added** 44:10 80:18
119:2,3 134:17,18
141:18,22 144:23
157:14 161:17

**addition** 71:10

**additional** 40:21
42:15,18,19,20 63:14
64:22 71:5 72:1
76:12,15,23 79:25
83:2 88:22 94:2 96:6,
22,23,24 118:14
150:19 161:1,19

**additions** 126:14,
15,19 160:17

**address** 4:9,11,13
130:4

**addressed** 66:12
67:6

**addresses** 106:5

**addressing** 38:19

**Addy** 115:4 137:15
139:9 142:3,25

**adequately** 79:20

**adjectives** 96:20

**adjusted** 125:20,23
146:25

**adjustment** 114:9
144:10 145:13,15
146:21,22 150:19
153:16 155:23



William Harvey - April 26, 2019                     172

adjustments 33:21, 22 37:2 125:24 126:4,12 145:21 149:6 150:9,10 165:9

admin 127:16

administrative 34:19 91:16

administrator 91:17

adopted 143:12

ADR 136:22,24 137:20 139:12

advent 117:3

affect 119:11

affected 98:10

affixed 84:4

afford 60:9

AG 10:14

agency 58:13

agree 73:25 110:23 111:4 151:15 158:13 159:12

agreeable 32:21

agreed 40:17

agreement 58:15 59:5 97:1

agricultural 46:16 47:5,9

agriculture 12:2 47:12

ahead 8:7 31:8 33:21

aids 60:15

air 18:8,13 51:17,24 52:3,4,5

Airbnb 117:3

Airports 57:13

Akridge 50:6

Albemarle 81:10

Alexandria 17:14

alike 53:19,20

allegation 49:20

allocated 135:13

allotment 113:4

allowance 127:17 129:2,11,12

allowed 41:13,16, 17,18,20 97:22 99:9, 13

alterations 98:20

amend 89:4

amended 93:25

Amendment 52:13 54:3

amenities 108:5 110:1

amenity 112:12 113:7 129:6 139:21 151:3

amount 13:25 21:25 52:22 90:10 108:23 158:16

Amy 48:5

analogs 148:17

analysis 25:9,21 27:15,24 28:1 35:23 36:19,21 42:17 46:4 65:2 78:6 84:24 86:22 96:19 97:10 100:10 104:20,21,24, 25 105:1,5,10,16,19 106:3,7,9,22 107:6,8, 11 110:5,25 115:18 118:15 120:15 135:22,25 144:16,18 145:16 152:16,22 165:10

analyze 27:21 29:19 72:3 105:9 131:2 137:11 157:7

analyzed 84:14 101:3 135:16

animals 18:13

annual 42:24 128:23

answering 66:13

answers 33:24 34:3 87:8 162:21

anticipated 46:16 111:22 130:17 133:24 134:13

anticipation 111:18 130:15 132:1

anymore 10:15

apartment 41:19 99:19

apologize 33:24

apparent 124:23

apparently 40:16 162:23

appeal 52:24 53:9

appears 26:1 69:7 106:13 141:18

append 75:13

appended 140:25

appendix 152:18

applicable 106:6 113:4

application 9:3 17:1 94:1 118:25 120:19 123:11 142:22 143:16 152:10 158:25

applications 115:2 133:17 143:13

applied 36:17 92:14, 21 96:13 128:19 143:11 153:12 161:13

apply 24:12 88:25 90:17 91:7,12 93:23 114:7 142:24

applying 94:24

appraisal 6:21 7:10, 17,19,22,23 8:1,4,11, 13,16,17,19,21 9:12, 14,16 12:12,17 13:3, 18,23 14:17 15:3,8, 15 16:2,14,16 17:8 18:14 19:17 22:18 23:22 24:3,9 25:24 27:3 29:8 33:11 34:12,21,24,25 36:4 37:14 38:8,16 42:6,8

45:14 46:4 48:6,12 49:1 53:6 55:2 56:8 60:14,17 61:25 62:3, 12,17,24,25 64:2 66:15 70:22 75:3 79:10 80:13,22 82:4 85:3,5,7 91:4 95:7, 14,17,20 102:14 107:23 108:11 109:3 111:12,16 114:13 120:11 122:9 133:23 139:5 142:11 149:1 155:5

appraisals 11:14 13:8 20:12 21:13,15 23:8 26:3 33:5 56:23 58:8 60:20 63:20

appraise 12:5

appraised 11:21 12:4 15:21 24:20 53:5 128:17,18 143:2

appraiser 6:6 10:7 23:16 24:6,16,21,24 51:7,9 58:2 85:6 106:9

appraisers 22:20 101:25 102:1 107:20 109:8

appraising 7:2,6 20:2 22:25 24:1 159:13

approach 106:2 118:2 121:10,11 122:23 123:25 125:16 126:22 127:5, 13 135:11,15 140:3 141:16 152:23,25 153:1,3 157:13 165:14

approached 136:24

approaches 105:21 106:6,16 119:1 142:22 152:17,22 153:7,11,13 157:12

approvals 94:5,6

approved 49:14 98:16,18 115:23

approximately 15:12 21:12 60:1,24



128:5 152:6

**April** 11:11 31:24 35:21 61:6 163:18 164:12,20

**AQB** 9:11,13

**arbiter** 149:4

**arbiters** 30:15

**architect** 126:16

**area** 28:7 30:3,23 83:15 107:13,14,17 108:1,6,12 114:1 145:3,7 146:11

**areas** 17:24 99:23 139:24

**arrangement** 60:6

**arrangements** 165:18

**art** 95:23 96:18

**articulate** 153:7

**Artis** 48:17

**ascribed** 159:5

**asks** 13:10 109:6

**aspects** 97:12 98:24 157:22

**assessment** 28:11 150:6

**assets** 19:5

**assignment** 12:24 13:3,13,15 14:4,5 16:20 19:20 22:2,4 29:16 30:4 42:5,7,12, 14 55:2 58:11 61:25 63:5,8,12,14,15 66:15,20,25 81:15

**assignments** 11:24 12:4 14:3,25 15:4,18, 24 16:2,13,14,16 20:4 21:8,20 24:20 30:5,25 57:23 62:7, 12,17,24 66:22

**assist** 24:16 25:2 28:1,5,12 144:15

**assistance** 25:3 27:25 31:1 32:1,6

33:6

**assisted** 27:4 28:16 29:1 144:17

**assisting** 23:7

**associate** 40:23 154:11

**associates** 59:1,9 77:15,18,20

**Association** 9:1 28:8

**assume** 102:17 103:25 159:19,22

**assumed** 83:23 89:13 97:19 98:8 102:14 124:21 155:10

**assumes** 159:20

**assuming** 61:18 103:19,20 140:16

**assumption** 81:4,5 82:11,14 84:7 89:12

**assumptions** 80:8, 11 83:22 102:20,23 124:19

**Atlantic** 15:13 44:24 56:6 60:21,25 61:5 62:22 108:22 138:13

**atmosphere** 116:10

**attached** 37:20 40:25 93:21

**attempting** 120:3

**attend** 27:6

**attention** 148:21

**attorney** 48:15 54:11

**Attorney-client** 62:10

**attribute** 100:8 146:12 158:1

**attributes** 68:19 126:13

**auction** 7:7

**auctioneering**

22:18

**auctions** 7:8

**Audi** 50:5

**audited** 59:11

**August** 122:6

**author** 77:9

**authorities** 56:7 57:19 159:10

**authority** 56:3 57:2, 13

**auxiliary** 75:10 84:9

**availability** 81:6

**average** 21:21 42:24 125:7 136:23 141:13

**avoid** 5:1 40:18

**award** 6:2 9:1 52:19

**aware** 30:3 67:15 98:14

**B**

**B&b** 39:24 95:18 107:21 120:20,22 122:1 133:17 140:7 144:4 146:9 147:4,6

**B&bs** 39:6 101:23 107:23 132:24 136:14,16 138:16

**back** 10:11 13:17 17:13 43:16 49:4 50:2,17 55:11 57:23 59:20 72:20 76:11 87:8 89:2,12 92:10 93:10 95:13 100:6 104:8 107:24 108:14, 18,24 120:2 125:15 126:15 128:5 129:18 134:17,18 135:6,10 145:5 146:20 149:5 163:19

**background** 5:20 49:9

**balances** 138:20

**bar** 53:21 66:3

**Barring** 66:17

**base** 111:17 123:18 125:17 126:1,20 127:22

**based** 12:24 65:1 66:1 72:3 74:24 79:6 81:20 88:7,16,20 90:22 93:1,11 100:10 102:23 105:3 106:15 109:13 113:1 121:14 123:2,8,9 124:10,11, 19 125:10,18 126:12 127:11,17 131:8,10, 12 134:1 135:17 136:1 138:18 149:5,6 152:14,16 153:16 158:22 159:6 160:15

**basement** 41:18 97:23,24 98:3,22 99:13 100:1 101:18

**basically** 9:2 17:18 40:5 47:1 90:24 105:1 138:14

**basis** 126:15,19 128:23 131:22 134:7 157:8

**Bavarian-style** 95:5

**bear** 4:16

**bed** 74:14 88:24 89:19,24 90:17 93:14 96:3,7 116:6,15 122:4 140:12

**bedroom** 137:7

**beds** 17:25 135:23 137:12

**begin** 24:20

**beginning** 117:1

**behalf** 16:11 20:5

**believe's** 128:1

**Belmont** 47:23 48:2 49:5

**beneath** 52:7

**benefit** 144:3 154:9, 10 158:2

**benefits** 130:17



**bid** 98:13,15 109:6

**bill** 60:7 61:18 138:25

**billed** 60:24 61:4,20, 21

**billings** 61:1,2,22

**bit** 21:25

**Blankinship** 54:12

**bless** 17:2,3

**blood** 73:14

**Blue** 86:15 107:14, 18 108:4,5 139:25 145:7,8 146:7,10

**board** 9:14 56:11,13, 15 153:4

**boarding** 116:24

**boards** 9:15

**bolsters** 83:12

**bottom** 44:6 89:10 95:3 121:3 131:25 138:11

**boundaries** 83:24 86:11 108:24

**boundary** 84:16 114:9

**bounds** 79:1

**brain** 9:15

**breach** 47:19 54:3

**break** 5:12,15 134:24

**breakdown** 121:4

**breakfast** 74:15 88:24 89:19,25 90:17 93:15 96:3 116:6,15 122:4 135:23 140:13

**breakfasts** 90:7 96:7 137:12

**Brian** 4:20

**briefly** 61:24

**bring** 11:2,5 29:25

**broken** 43:15

**broker** 6:10,17 149:24

**broker's** 6:9

**brokerage** 22:18

**brought** 8:9 11:6 30:2,6

**build** 133:9

**building** 47:2 49:11 73:3,5 75:9 76:4 81:11,23 95:4,8 128:10 132:13 134:10 143:24 147:18 160:7 161:17

**buildings** 6:25

**built** 120:24 127:3

**bullet** 72:25

**burying** 17:15

**business** 56:19

**businesses** 7:20

**buy** 130:15

**buyer** 85:14 111:15 112:13,22 151:25 153:19 154:22,25 155:15,17,24 156:5

**buyers** 154:18

**C**

**calculation** 127:23 137:21 156:2

**calculator** 127:24

**call** 32:21 39:12,18 73:24 96:7 97:15 160:24

**called** 4:5 39:24 64:15 72:13 138:24, 25

**calls** 26:17 76:20

**cap** 115:9 132:22

**capabilities** 119:20

**capability** 162:12

**capital** 94:18,21

**capitalization** 134:8,10 140:4 157:12

**capitalize** 131:19 132:1

**capitalized** 130:23 135:8

**capture** 109:11 137:4,9 144:5

**car** 28:8 54:20,22 55:3

**card** 66:3

**career** 14:14

**carefully** 74:1

**Carolina** 6:7

**carried** 29:16

**carry** 128:10

**carvings** 98:23

**CASCO** 51:12,14,21

**CASCO's** 51:22,23

**case** 11:2,8 13:17 15:12 25:1,10,12,25 39:13 45:2,5,9,12,14, 19,23 46:9,12,20,22 47:4 50:2,8 51:19 52:2,10 53:14 54:9 55:11,20 56:4,17 58:21,22 62:1,8,13, 17,20 71:8 73:13 105:4 108:16 110:23 119:23 122:20 123:12 129:9 141:25 158:11 163:12

**cases** 17:5 44:6 47:15 56:2,18,24,25

**cash** 130:16,18

**catchall** 133:25

**categories** 24:6 97:3

**categorized** 154:14

**category** 24:9 47:11 49:10 95:22 126:10 142:7 152:2

**caused** 72:4 152:7,8

155:4

**caution** 158:6

**caveat** 69:4

**CCIM** 6:22 8:23,25 9:7

**cell** 128:6

**census** 14:18

**center** 104:15 146:14,18

**centers** 6:24

**certificate** 81:5 82:6,16 89:1 93:10

**certification** 24:8

**certified** 9:11 24:7, 23,24 25:1

**chain** 107:18

**chair** 110:4

**chance** 118:5 141:6

**change** 17:19 32:9 78:6,11 84:15 88:23, 25 89:5,15,20 90:17 91:7,12 92:9 93:6,14, 23 94:24 111:24 114:5,7,17 152:8 154:14 155:11 160:18

**changed** 7:9 80:1 90:10 117:5 127:1 153:20 163:8

**changing** 78:23

**characteristic** 143:22

**characteristics** 30:16 99:1 142:2 146:21,24 147:3,15, 25 148:7

**charge** 60:10,13,18 115:11,12 137:3,9

**charged** 60:21 129:12

**Charles** 4:11 89:9

**Charlottesville** 28:7

**chart** 106:24 135:6



144:21 150:9,12

**charter** 10:23

**chase** 119:15

**checks** 26:17 27:21

**Cherok** 54:5,10

**Chesapeake** 54:20

**Chip** 45:13

**choice** 110:18 112:20 113:11,22 114:19

**chooses** 115:16,22

**Chuck** 45:13 81:17

**City** 54:20

**CL** 127:6

**claim** 12:16,18,24 49:23 52:13 53:25 54:1

**claims** 52:18 54:4

**clarification** 151:14

**clarified** 134:20

**clarify** 12:3 18:11 61:17 129:25 164:16 165:1

**clarity** 163:13

**Clark's** 12:13

**class** 88:24 89:19,25 90:17 91:8,13 92:9 93:14 94:5 120:21,25 121:4,6,16 122:11, 12,13,14,16,17,19 123:2 125:3,8,9,18

**classes** 121:5

**classification** 96:12 120:21

**classified** 72:13 106:23 116:15

**classifies** 73:3

**classify** 41:10 73:22 95:21 116:17 151:22 152:23

**clean** 5:4

**clear** 15:2 25:14 28:21 31:7 54:20,22 73:15 92:22 96:1 99:25 116:25 128:15 135:5 151:21 160:9 164:14 165:6,7

**cleared** 47:11

**clearing** 104:14

**client** 11:8,9 12:14 16:12 18:20 54:1 55:12 59:12 60:9 81:11 84:18

**clients** 17:5 20:11

**close** 108:11 142:1,4

**closed** 45:20

**closely** 138:13

**closer** 110:2 146:3

**closest** 108:7

**Coast** 15:13 44:24 56:6 60:21,25 61:5 62:22

**code** 34:19 75:15 90:2 120:21 121:17 123:9

**coincide** 115:20

**coincides** 33:12 63:1

**cold** 4:17

**collaborated** 117:15

**collaborative** 30:8, 21 117:12

**collect** 39:5 107:21

**collected** 25:20 27:2 38:25 106:6,15 113:21

**collecting** 27:11 28:5

**collection** 25:9 28:2 30:13 37:11 86:18 107:6 144:17

**collectively** 113:23

**college** 5:23

**Colucci** 53:18,19

**Columbia** 18:23,24 19:2,3,4,25 20:21 21:9,13 47:24 48:9 50:4,18 56:21,22

**column** 131:21

**columns** 124:23 134:3,5

**combination** 29:20 40:2 76:9 84:12 110:22 138:24 162:6

**comfortable** 95:22 116:10

**comment** 91:14

**comments** 72:12 76:5 81:23 160:7 161:18

**commercial** 9:2 21:19,24 24:7 88:4 90:2 91:8 92:14 94:19,24 115:6 121:18 133:22 144:3 154:6

**Commissioner** 48:19 50:13 53:11 54:5,15 55:5 109:16

**common** 83:15

**commonly** 35:1

**Commonwealth** 24:5

**Commonwealth's** 6:14

**communities** 108:4

**community** 47:23 48:2 49:6 139:20 146:9

**companies** 20:6 57:21

**company** 7:7 21:16 58:12

**comparability** 37:12 117:20

**comparable** 26:8 29:10,21,25 30:11 117:16 141:19

148:15,24 150:17

**comparables** 148:18 150:20

**compared** 129:21 133:24 158:11

**compares** 134:6

**comparison** 127:12 131:11 134:15 141:15 142:9 153:3

**compendium** 95:16

**compensation** 14:1 51:5,25 52:20,22 55:19 63:23 66:23 67:11

**competition** 86:14 108:7 109:25 137:3 139:25 142:1

**competitive** 107:14, 17 108:2,3,6 145:7, 11

**complaint** 12:25 42:9 62:4 102:9,10, 23,24 103:2,4,6,10, 23 104:9

**complete** 14:24 18:12 35:3 36:3 66:15,21 68:22 69:2 71:20 78:16 79:20

**completed** 19:13 21:20 34:4 35:12 44:16 60:20 79:10 86:3 96:23 101:12,17 142:11,21 149:2

**completing** 37:14, 17 60:13,17 70:22 71:13 143:7

**complex** 9:8 21:25

**compliance** 69:9

**compliant** 133:13

**complicated** 53:8 85:5

**comply** 34:20

**comprehensive** 47:13 93:24

**computation** 134:6



ZAHN
COURT REPORTING
www.zahncourtreporting.com

155:22

computed 141:13

computer 97:15
123:11

computer's 123:21

computerized
120:19

concentrated
133:18

concentration 86:8

concept 96:10

concerned 123:23

concert 144:4

conclude 46:6

concluded 166:6

conclusion 82:12
95:10 100:23 101:8
142:20

conclusions 78:8
88:20 106:17

concrete 50:9 98:7,
9,11,22 100:1 101:18
121:6

concrete-
reinforced 124:22

concurrence 8:15

condemn 103:22

condemnation
12:25 47:20 51:22
53:25 57:14 59:13

condemned 51:23

condemning 56:3,7
57:2,19 159:10

condition 83:2 93:9
147:3 153:20

conditional 89:24

conditions 21:18
82:18,21,23 83:22
103:18 105:2 133:19
145:24,25 146:1,5
155:11

condos 137:5

conduct 82:2 138:22

conducted 75:20
81:2

conducting 25:22

confidential 18:21
19:1 45:19

confined 83:24

confirm 26:15
149:19,21 150:2
161:15

confirmed 26:4,5
137:25

confused 26:22

confusing 32:13
68:14

conjecture 93:7

connection 66:9
102:15 110:21

consensual 159:11

consideration
27:22 109:1

considered 13:3
37:5,8 63:19 101:19
106:3 117:7,19
133:21 146:25

consist 112:3

consolidated 43:15

consortiums 16:12

constituting 63:13

constraints 119:1

constructed 73:23,
24 74:2,12,18 98:15

construction 73:17,
18,23 75:9 82:10
90:3 97:21 98:13
104:13 113:19
120:22 121:7 122:18,
20 127:8 128:11
156:1

consult 7:8

consulting 7:13,14,
19,21,24,25 8:3

contact 39:19

contacted 81:14

contacting 27:11

contained 37:19
64:8 65:9 67:3 70:9,
10 75:16,21 103:22
104:8 117:21

contaminated 53:5

contamination
52:14

contemplate 89:18

contemporaneousl
y 34:24

contents 70:1

context 13:14 72:2
81:7,19 107:19 117:5
119:22 130:11
141:23 142:17 143:3

contiguity 111:2,6

contiguous 46:9

continued 47:5
116:4

continuing 53:3
79:14 107:10

contour 145:8

contoured 99:7

contract 18:20

contractor 58:7,15,
20,25

contractors 22:9,
12,17,19,24 23:2

contracts 148:25

contrast 146:10

contributed 101:19

control 92:19 158:11

controlling 115:19

convenient 112:21

convention 32:14

conversation 59:23
88:11,14

conversations
39:14 87:14 94:15
139:2 161:19

converted 147:8

conveyed 40:1,15,
16 41:4 43:10

Convoluted 55:10

cooperate 40:20

cooperating 40:4

copied 83:5

copy 69:2 162:9

Corelogic 121:18

Corelogic's 120:20

corner 122:6

corners 89:6 144:2

Corp 51:12

corporate 61:19

correct 12:11 13:18,
19 15:5 29:8 34:3
36:7 38:25 39:1 41:9
44:13 45:3,9 48:8,14,
21 50:20 52:8 55:23
56:5 63:6,7,13,17
64:17 65:12,17
70:11,12 71:14,15
76:22 77:22 80:19,
20,23 83:20 87:3
89:2 96:5 100:17
101:14 103:8,13
107:16 108:13 111:1
116:18 117:11
121:20 123:1 125:14,
18,19,21 130:3 135:8
136:2 140:5,6
144:13,21 145:2,13,
14,22 148:8 149:8,
11,15,17,18 150:23
152:20 159:23,24
160:22 161:8 162:13
163:7 164:20

corrected 78:3

correlated 138:13

correspondence
43:9

corridor 19:19,23
151:10

corridor-type 15:18

corridors 15:20



17:8,23 18:3

corroborate 39:16

cost 106:2 116:9
118:2 119:25 120:1,
14,18,19 121:10,11,
14 122:22 123:25
125:16 126:21 127:5
129:20,21 130:2
131:1,22,24 134:7,11
135:10 152:17 153:1
157:12,13 165:14

Costar 140:10

costs 119:7 120:4
126:3 134:12

cottage 72:13 73:15
84:3,5,8,10,15
111:23 113:15 114:3,
11 124:21 129:24
161:12 162:15,22,25

coughing 4:17

Coughlin 53:17

counsel 4:21 40:1
43:9,23 45:11 48:2,4,
23,24 51:14,18 52:11
53:13,16 54:17,22
55:14 59:23 77:19,24
79:23 80:5

count 69:6

country 39:7

county 16:11,24
21:11 26:18 29:13
56:12,15 72:14,15
81:10,12 86:7,11,13
93:25 107:13 109:17
116:15 128:22
136:19 139:16

couple 19:15 21:21
48:16

coupled 124:12

courses 139:22

court 5:10 34:14
52:18 62:4 64:5
65:24 102:11,21,22
119:9 128:17

covered 8:13 59:2,3

create 35:6 77:3,5,7

78:17 107:20 129:6

created 71:19 77:12
117:10 135:25

creates 107:21

creating 76:24

credits 24:12

Creek 54:4

cried 7:8

criteria 86:21 88:17
92:11 93:8 107:24
130:20 132:5,18
142:11

CRS 28:9

culminating 6:2

cumulative 97:9
106:20 156:14 158:5

curious 109:12

current 113:4
142:25

customarily 73:4,8

cuts 97:15

cutting 119:15

CV 5:22

**D**

D.C. 6:6 21:7

daily 42:24 136:23

damage 55:20 155:6

damages 45:15,25
52:1 152:7

data 25:21 26:4,5,24
27:2,3 28:1,4,6,9
29:15,18,19,23 30:9,
13,24 37:11,12 38:25
39:4 40:2 42:17 59:5
79:25 85:8,17,20
106:6,15 107:6
140:15 144:17 150:6
151:22 158:23
160:12

date 13:11,12,14,23
27:22 31:17,23 36:1,
8,9,25 42:8,9 44:11

53:5 62:3 70:17 75:2
82:4 85:3,7,15 91:3
109:3 111:16 114:13
122:8,9 128:21
140:17 163:20,21
164:5,8,11,13,24
165:11,12

dated 35:20 69:3
163:18 164:9,11,20
165:3

dates 44:2 140:18
163:20

David 48:16 51:10
81:11

day 7:1,2 32:18 84:4
90:13 109:7 117:15
147:7

de 113:23,24

deal 109:8,10 161:9

dealing 161:9

deals 19:22 38:6
159:11

dealt 7:18,19,20

decades 116:6
117:3

December 69:3
127:15

decided 160:5

decrease 155:7
157:1

deduct 134:18

deducting 152:6

deed 27:22 149:22
150:5

deeds 27:18,20,21
28:4

deem 154:11 162:22

deemed 30:18
162:21

default 120:9

defendant 4:21
71:13 76:19

define 72:15 105:8

defined 42:10 73:15
86:6

definition 7:9 13:12,
23 72:16 95:24 110:7
116:23

definitions 72:20
73:1 119:8

definitive 33:17 74:4

definitively 84:18

degree 5:24,25 6:1
16:18 27:14 93:20
117:22 137:13 138:4

delayed 39:12,18

delicate 90:23

delineated 105:2

delivery 165:19

demand 47:6 86:21
105:2 109:13 133:16

demanded 134:7

demolished 49:14

demonstrates
144:2

denial 100:9

denied 40:22 99:23

depend 58:10 155:8

depending 22:1
68:18 89:17 155:10

depends 21:17
107:19 119:22

depo 32:8 33:10,13,
23 107:2

deposed 4:23 44:17
47:16 55:24 56:2,5,
24 57:1

deposition 31:9
33:14 37:21,24 40:7
44:4 45:2 59:17,21
63:3 67:19 70:4 71:4,
11,17 72:7,24 76:1,3,
8,15,18 82:24 101:23
120:5 121:23 124:4
125:15 127:6 130:9
144:7 149:6 162:21
163:2,24



William Harvey - April 26, 2019                                                                 178

**depositions** 71:12, 16 76:17 97:9 138:5

**depreciation** 121:13 129:13,16 130:21,24 131:3,18, 21,23 132:7,9 133:4 134:4,22,24 135:7 153:1,2 157:14

**derived** 129:8

**description** 88:10 101:6 102:4 107:12 153:6

**descriptions** 120:25 121:1,15 124:24 140:20 153:7

**design** 95:23 96:17 127:1

**designated** 18:22 71:7 75:10

**designation** 8:23 9:4,6,12,17,19 10:3 23:19

**designations** 6:3, 22 9:10,21 10:4 23:23

**designed** 73:12 95:5 99:4

**designee** 34:23

**detached** 73:11

**detail** 152:21

**detailed** 119:3

**details** 46:20 140:24

**deterioration** 132:10

**determination** 29:23 105:23

**determinations** 119:10

**determine** 49:21 84:10 105:19 128:25

**determined** 105:25 106:18 112:21 126:23 127:12

**developed** 105:21 106:16 112:7 153:8

**developers** 20:10, 11

**developing** 81:19

**development** 8:20, 21 17:17 47:24 48:3 49:6 83:16 98:17

**developments** 85:12

**difference** 36:19 41:23 42:15 115:3 119:12,13 122:16 124:15 126:7 130:23 131:17 134:21 143:23 147:10 154:20 165:23,25

**differences** 36:24 119:10 147:12 161:16

**differently** 53:6 158:18

**difficult** 18:18 120:5

**digital** 68:17 69:5

**dilapidated** 46:25

**diligence** 90:22 155:2

**diminution** 156:23

**dining** 41:17 112:18

**direct** 56:10 126:2 127:19 129:18 148:20

**director** 27:12 73:2 81:9

**directs** 9:16 128:1,2

**disagree** 158:19

**disagreement** 40:17

**disamenity** 151:3

**discarding** 30:17

**discipline** 22:23

**disclose** 18:22 137:14

**discount** 151:4

**discovered** 66:2

88:2

**discovery** 39:12,19 41:2 42:16 66:18 70:15 71:24,25 72:4 76:16 78:22 79:14,25 80:25 84:13 88:22 97:20 98:2,11 100:7, 11 101:3,13 121:15 124:13,25 160:17 162:7

**discuss** 80:4 101:23 139:13 160:5

**discussed** 33:20 77:10 79:8 103:18 117:10 134:2 160:8

**discusses** 86:3

**discussing** 33:11 87:14 91:20 116:21

**discussion** 39:15 40:8 43:22 78:20 116:4,20 139:19 147:1

**discussions** 79:23 87:21 88:16 103:20 140:1 162:5

**disparate** 124:15

**disseminating** 69:10

**dissemination** 70:15

**distances** 139:23

**distinct** 74:6

**distinctions** 42:3

**distinguish** 7:23

**distinguishing** 143:22

**distributed** 20:8

**district** 47:13,24 48:9 49:14 50:3,18 62:4 65:24

**divided** 127:21 142:24

**division** 8:25 21:19

**divorce** 85:13

**document** 27:23 38:9,18 67:25 68:5,6, 19,24 69:12,15 79:22

**documentation** 38:15,19 59:24

**documented** 6:23

**documents** 11:5 25:9 27:13 31:12 37:13,16,19,23 38:7, 11 43:18,25 65:2 72:6,9 73:19 75:21 76:19,21 80:25 84:13 88:8 118:1,15 123:14 124:13 160:16

**dollars** 132:3

**domain** 16:16,22,24, 25 17:2,5,19 19:22 20:2,12 21:12 23:8 47:17 48:7,18 49:2 51:15 56:4,8 159:12

**domain-related** 20:3

**Dominion** 14:7,11, 13,17,24,25 15:8,15 16:3,5,15 17:9,16 56:16,18

**double** 156:10,14

**downward** 125:20

**dozen** 19:15 20:20

**draft** 36:11,12,15,18 77:5,6,12,23

**drafted** 29:6

**drafting** 28:12,17

**drafts** 77:3,8

**draw** 108:2 139:20

**drew** 139:24

**due** 90:22 117:19 151:24 155:1,18 158:17

**Dulles** 57:15

**duly** 4:6

**duty** 64:21

**dwelling** 75:12


ZAHN
COURT REPORTING
www.zahncourtreporting.com

**E**

**E&o** 59:3

**e-mail** 40:23 116:22

**earlier** 14:14 17:14 117:9

**earn** 24:11

**earned** 6:22

**easement** 102:16 103:1 104:16 151:11, 15,17 154:23 155:16, 23 156:1,4,7,9,12,13, 17 157:7,20 158:2,17 159:4,5,14,16

**easements** 45:16 85:18 102:5 104:3 154:4 159:13

**east** 145:10

**eastern** 108:22

**easy** 119:9

**eat** 115:1

**ECF** 102:12

**economic** 132:21

**education** 5:21 6:2

**educational** 24:10

**effect** 10:12,21,25 128:20 150:21

**effective** 13:12,23 42:8 62:3 70:17 75:2 82:4 85:3,7,15 91:3 111:16 114:13 132:13,14

**effects** 157:14,15

**effort** 30:8,21 117:13

**Eick** 87:15 89:17 94:16 143:14,15

**Eighty-one** 11:16

**elaborate** 74:9 99:22

**electrical** 17:10,22 18:1

**electricity** 15:19

**electronic** 17:15 69:10

**element** 153:4 162:4

**elements** 97:14 100:4 111:1

**elevated** 121:16

**Elkins** 55:6,11

**emanated** 133:17

**embedded** 107:9

**embraced** 124:24

**eminent** 16:16,21, 24,25 17:2,5,19 19:22 20:2,3,12 21:12 23:7 47:17 48:7,18 49:2 51:15 56:3,8 159:12

**emphasis** 142:12

**employed** 58:13

**employee** 22:8,10 58:6 59:8,10

**employees** 22:6 25:8 26:20

**encroachment** 84:1

**encumbered** 156:3, 7

**encumbrance** 155:19 157:20

**end** 25:6 117:14

**enforcement** 90:22 92:3,7

**engage** 11:10

**engaged** 11:12,17 45:8 48:1,10,22 51:13 52:10 53:12 54:8,16,21 55:6 56:3, 7 71:12 76:18

**engine** 68:6,20

**engines** 136:15

**enhance** 112:14,25

**enhanced** 111:19

**entail** 108:5

**enterprise** 129:5

**entire** 107:9,18 132:21 134:11 156:6

**entirety** 106:22 117:6

**entities** 57:21

**entrepreneurial** 129:7

**entry** 40:18

**environmental** 52:14

**equally** 20:8

**equilibrium** 131:5

**equipment** 59:6 104:17

**equivalent** 9:6

**Eric** 51:21

**established** 131:10 132:4

**establishment** 94:16

**estate** 6:2,5,18 7:6 109:4 128:8

**estate-related** 7:14

**estimate** 61:4 128:13 129:20,21 130:2

**estimated** 152:4

**Estimator** 121:19

**et al** 48:20 50:14 53:24

**Evaluation** 126:11

**event** 79:24 85:21

**evidence** 148:25

**exact** 14:18 119:15 126:8

**examination** 4:5,7 88:19

**examined** 4:6

**exceeds** 38:17

**excellent** 121:8,12 122:15 123:2 125:13, 18

**exception** 47:2 65:21 66:7,9,11 165:13

**exceptions** 80:19 83:18

**excess** 61:10

**exchange** 56:23 111:12,14 130:16

**exclusion** 83:10

**Excuse** 60:15

**exercise** 104:8

**exercised** 159:14

**exercising** 159:22

**exhibit** 26:2 30:20 31:9,14,15,19 32:2,4, 5,7,8,10,21,25 33:1, 10,13,14,16,17,23 35:10,18 36:21 38:4 44:4 63:3,4,18,19 64:1,8,9,15,19 65:9, 10 67:3,12,17,19,23 68:8,11 69:2,13,18, 20,23 70:1,3,9,11,17, 19 72:7,17,21,23 75:22,23,24 76:1,3,7, 14 80:9,14 82:24 83:19 84:25 85:24 86:1,23 87:13,20 95:3,11 100:24 101:2,9,12,17 102:3 104:20 106:24 107:1, 3,11 109:18 116:3 118:10 121:23 122:2, 3,23 123:7 124:3,7 125:15 127:5,6 130:4 135:6,10 144:9,12 149:5,6 150:10 152:3,15 153:9 160:6,9,18,21,25 161:2,6 163:2,3,5,17, 19,22,24 164:7,18

**exhibits** 26:2,25 28:16,23 29:7,11,22, 24 30:12 31:2,8,25 32:2 33:4 37:20,24 59:20 65:15 70:24 71:4 76:8,9 78:11 101:23 117:11 160:3, 19 164:19


ZAHN
COURT REPORTING
www.zahncourtreporting.com

exist 120:7,9,23
133:7

existed 134:20
163:22,23

existence 34:22

existing 75:11 95:4,
8 106:13 113:2
114:12,15 119:17

exited 81:15

expand 108:12,14,
20

expanded 35:9
65:13,15 99:20
108:25

expansion 42:4,17
49:12,18 51:23 53:15

expected 65:5

expedited 165:19

expenditures
94:18,22

experience 9:8
24:12 103:16 109:9

experienced 116:6

expert 26:3 29:4
31:15,21 34:10 59:22
61:13 63:1,2,3 65:25
69:3,16,18 70:8 71:7,
13 97:7 99:21 118:18

expert's 64:23

experts 71:6,8,12
76:17,18 97:6

expired 73:21

explain 7:12 24:3
33:9 47:3 61:24 81:7
84:2 111:8 119:12
132:7,10 134:1
147:15

explained 64:21
92:13

explains 69:11

explanation 94:17

exposed 124:21

expressed 34:13

expressing 34:22

extend 107:25
132:20

extended 132:25

extends 86:14
107:18 132:14

extension 19:16
38:7 39:11 64:25
73:14 75:1 107:25
118:14

extent 27:19 36:10
159:14,17,20

exterior 98:8

external 130:25
133:15

extraordinary 80:8,
11,18 81:3,4 82:11
89:12

eyeglasses 11:7

———————

**F**

facilities 43:1 94:22

facility 89:19 90:25
93:15 94:19 132:20
139:15

fact 59:11 85:5,12,16
97:5 136:8 139:22
143:25

factor 151:24

factoring 123:19

factors 114:10
117:20 133:20 134:2
147:20,21 154:16

facts 40:21 55:10
67:14 107:20,21
155:8

factually 80:5

fair 42:10 62:6 66:6
152:5

Fairfax 56:12

fairness 158:25
161:8

falls 4:14 49:10

152:1

familiar 81:18
145:17

family 4:22 62:20
73:12,14 74:5

farm 18:12

farmhouse 139:9

fashion 41:2 158:5

feasibility 104:23
105:4,7,9,13 106:4,5,
21 107:5,8 131:4,5

feasible 49:25 99:6
105:18,20,24 106:14,
18 133:11

features 95:6 96:17
100:2 101:18

federal 42:9 52:18
62:5 65:23 102:10

felt 53:6 79:19 81:2
87:8

Fenton 4:22 10:6
25:18 31:16,22 39:21
41:15 42:23 61:12
62:20 71:3,6 74:5,24
81:14,21,22 82:5
88:2,5 90:20 98:14
99:22 104:12 111:21
113:12 114:22 115:8,
14 116:11,13,21
125:12 130:2,8
131:13 135:20 136:1,
22 137:7 138:17,19
142:8,19 143:2,10,13
145:4 149:8,17 162:9

Fenton's 29:20 40:7
61:2 71:5,11,17,23
76:16 97:6 118:16
129:23 135:13,21
137:17 138:4 144:6
160:11 161:8,12,19

Fentons 40:16
136:24 162:8

fiber 57:16

field 25:5,15 50:5
98:19

fields 28:24 29:2

figure 130:1

figures 61:21

file 34:9,11,12,15,22
35:1,3,6,8,22 36:6,
16,20 37:9,13,16,23
38:1,8,11,16,17
59:24 65:13,14
117:21,23,24,25
123:15 136:21 139:4,
5 140:15 150:3
152:18 163:25 164:1,
3

filed 12:15 17:1 62:4
102:10,24

files 11:2

filing 92:16

fill 29:2

filtering 37:12

final 29:23 78:13
91:21,22 96:19 101:4

finalized 77:4

finalizing 77:13

finally 55:5

financial 105:12
106:4,5 107:4

financially 49:24
99:6 105:17,20,24
106:14,17 133:11

financing 145:24

find 10:15 18:11
45:14,25 52:1 72:21
91:23,25 92:20
107:22 126:17
136:23 148:24
156:22

fine 4:13 5:13 51:3
94:14 160:12 161:9

fingertips 138:8

finish 5:3

finite 155:10

fireproof 121:7

firm 55:15 79:24

fit 95:24 96:20



**fits** 102:2

**five-room** 89:24 116:23

**five-year** 155:19

**floor** 40:25 41:1 81:20 98:12 99:14, 15,20 161:24,25

**flow** 130:18

**focused** 61:2 86:12

**FOIA** 72:6,10 75:17 76:20 84:13 143:12

**folded** 7:21

**follow** 7:15 89:16 93:23

**follow-up** 72:3

**food** 94:16 114:25 139:17

**foot** 123:18 124:6,16, 17 125:17,25 126:20, 21 149:12,13,14

**footage** 127:2

**footnote** 117:1 120:2 126:16

**footnoted** 101:22

**footprint** 127:2

**Ford** 53:11,13,16

**form** 12:7,20 24:8 25:7 28:22,23,24 29:1 33:5,20,22 34:5 35:11 36:3 41:2 51:3 53:2 77:6,14,25 93:16 113:13,22 133:9 144:17 155:20 164:10,12,21

**format** 89:8

**formed** 97:11

**forming** 117:17

**forms** 130:21,24 131:18 132:9 133:3 134:22 165:2,5

**formulated** 101:4

**formulating** 67:16

**forthcoming** 40:3 43:12,13 66:20 79:25 97:4 124:14

**forward** 17:3,4 30:7 40:5,6

**Fossen** 12:14,25

**Fossens** 12:14

**found** 96:7 145:20 149:7 158:9

**Foundation** 9:12,16

**founded** 78:16

**fourth** 116:5 141:18

**frame** 74:1 121:7 124:20

**framed** 98:9

**free** 59:7

**front** 16:10 84:5

**full** 24:13 41:5 49:6 50:1,11,12,14,16 52:12 53:22,23 54:13,14,18,19,23,24 55:16 86:7 117:24 148:23 163:8

**fullest** 159:14,17,20

**fully** 115:6

**fun** 54:4

**function** 91:17 123:21 136:25 139:16

**functional** 119:18 127:3 130:24 133:1, 2,10

**funny** 10:14

**Fuss** 48:16

**future** 93:19 104:7 111:23 113:6,14 114:2 130:17

**G**

**garner** 137:9

**Garrisonville** 55:6, 12

**gas** 15:19 18:1,15, 23,24 19:2,3,4,11,19, 22,25 20:13,15,21 21:5,6 56:21,22

**gateway** 57:16

**gave** 57:25

**general** 6:5 21:15 24:25 25:1 59:3 83:22 140:1

**generally** 18:4 23:1 30:13 87:1 107:23 117:2 120:10 142:10 149:1 155:5

**generated** 31:16,21 68:25 79:15 95:10,12 101:1 163:25

**generic** 74:7

**geographic** 108:1, 20,24

**geographically** 107:25 108:10

**germane** 10:4

**GIM** 142:23,24

**GIS** 160:12,23 161:3, 9

**give** 5:20 19:14 49:9 67:4 81:7 91:19 94:10 127:22 134:18

**giving** 8:12

**gleaned** 71:10 140:10

**Glen** 112:5 113:5

**goal** 148:24

**golf** 110:3 139:22

**Goodeagle** 53:24

**governed** 7:25 8:10

**government** 25:8 26:20 49:14 57:21 72:1,5 84:19

**Grace** 53:24

**grade** 17:20

**grandfathering** 49:17

**grant** 102:19

**granted** 102:4,15

**grantee** 149:24

**grantor** 149:25

**great** 4:14 146:4

**greater** 21:19 27:14 115:7 131:23 144:5 149:13 152:21

**GRI** 9:4,5

**grid** 105:23 106:1 129:19 144:10 145:6

**gross** 136:9,11,12 137:19,20 142:7

**ground** 4:24 17:25

**group** 131:11,12

**grouping** 145:18

**guess** 43:24 141:1

**guest** 89:14 93:4 111:25 133:6,7 144:1 151:7

**guests** 41:15 90:6, 11,14 93:5 114:15,25 115:14 144:2

**guidelines** 63:16

**guy** 6:11

**H**

**H-E** 161:22

**half** 146:23 147:17

**halfway** 38:24 87:13

**hand** 98:23

**hand-carved** 126:5

**handcrafted** 95:6 97:14 100:1 101:18

**handed** 27:13 69:13

**handful** 21:14

**handle** 140:2

**hands** 27:22

**hangar** 57:17



happened 146:2

Hard 49:8

Harmony 139:10

harvey 4:4,11,19 23:11,12,15,21 25:12 26:21 27:4,6,9,17,24 28:12 31:9 32:20 59:1,8,16 61:20 67:19 77:7,21 121:23 138:25 144:15 160:2

HB-155 143:11

head 5:10 57:24 123:14

hear 60:16

heard 18:9

hearing 60:15 94:6,7

hearings 92:16 95:2 143:18

hedonic 123:7,21

height 22:16

held 7:8

helpful 161:16

helps 143:3

hey 143:15

hierarchal 105:11

high-quality 126:9

high-voltage 16:7 17:23

higher 24:13 129:10 131:22 137:16,18

highest 47:3 87:9 104:19 105:5,10,16 106:3,8 107:11 110:13,15,16,17 112:7,23 114:21 115:25 120:21 121:9, 14

highly 21:17

Highways 48:19 50:13 53:11 54:5,15 55:5

Hill 139:10

hip 156:20

history 114:23

hold 132:19

holder 49:16 51:17

holding 39:22 46:15 64:14 132:15,20

Holdings 4:22 62:20 74:6

holds 25:6 107:24

home 4:11 137:23 154:4

homeownership 112:13

honestly 64:12

hoped 40:3

hopes 131:15

hotel 95:18

hour 60:5,11,13,18

hourly 60:4,19,22 61:19,22

hours 6:1 59:25

house 111:20 112:4, 7,11,16,18 113:6,13, 16 114:7 116:9,12, 18,24 133:7,11 137:8 154:8

HPT 48:19,23 50:14

huh-uh 5:8

hundred 15:9 21:21

hurdle 129:4,10 132:3,4

hypothetical 82:18, 21,22,23 83:2 84:17, 22 85:14 91:19 93:9, 12 94:21 111:15 112:22 155:9,14 156:24

hypothetically 157:5

hypotheticals 157:4

**I**

i.e. 30:15

idea 5:4

identification 31:10 67:20 121:24

identified 38:18 78:4 84:5 105:2,3 161:13

identities 19:1

II 4:4,11

imagine 44:22

impact 64:23 83:10 85:18 153:16 155:13 156:13,15

impacts 85:8 156:16 157:21 158:6

impairment 156:11

imperfect 109:5

important 129:13 143:9

impossible 30:6

improve 112:8

improved 12:2 99:11 105:22 107:23 113:3 141:16 144:16, 20,23 145:20 146:10 147:9,10,22 148:5 152:6

improvement 84:21 94:22 95:5,8 124:8,9 147:2,18

improvements 40:2,11 41:5 42:20 47:2 50:1 83:24 91:23,25 94:3 125:13 128:10 135:12

inadequacy 162:7

incidental 73:4,9

include 19:19 47:21 55:3 102:16 135:11, 22 160:5

included 26:8 34:7 39:2,8 55:20 69:20

80:21 87:21 100:24 101:9 106:2 121:5 140:13 144:20 160:4, 6,14 163:1,15

includes 85:18 103:6 134:19

including 24:11 104:10 107:6

income 106:19 127:12 131:7,17 132:2 133:24 135:7, 15,17,22,25 136:4,12 140:3 152:17,25 157:12

income-producing 6:23 9:8 130:14,15

incomplete 142:12, 13,14 149:3

incorporate 38:1 71:24 121:13 133:12

incorporated 22:16 61:22 71:8 123:11 127:22 137:20

incorporates 106:9

increase 116:7

incurable 133:10

independent 22:8, 12,17,19,24 23:2 58:7,14,20,25 113:1

Indian 19:21 22:3

indirect 127:19

indirects 127:19,20

individual 132:8

individually 133:21

industrial 6:25 9:2

industries 58:1

industry 23:25

inferior 145:19,25 146:1,5,21 147:16 148:1,6 149:8

inflation 146:3

influenced 151:25

influences 146:4



info 42:19

information 27:11, 12 28:11 39:4,11,16, 18,19,25 40:6,11,12 41:3,7 42:16,18,20 43:3,4,7 45:19 64:22 66:2,17,20 70:16,21, 24 71:10,17,18 75:16,19 76:13,16, 23,24 79:11,19 86:18 96:24 97:4,5,10 102:8 116:19 117:6, 13,14 122:4 125:10 136:1 138:12 139:12 140:16 143:6,7

informed 79:14 87:10 155:24

infrastructure 15:10 17:21 18:2 19:18 47:6

inherent 109:8

initial 32:22,23 43:16,21 79:10 82:24 91:11 124:1,6,18 125:4,11 143:7 152:3 153:10 155:3 160:4, 22,23 161:6 164:5 165:1

initially 44:1 89:24 144:19

inlaid 97:17 98:7

inlaw 72:14,15 73:2, 13 74:20 111:20,24 113:6 114:6 116:1

inn 40:10 61:12 82:6 84:9 90:16 104:12 111:19 112:2,10,14, 17,18 113:3,10,14 114:11,15 115:4 116:6,11,13,21 125:13 130:13 136:1 138:17 142:3,8,19 143:4 145:4 147:9 149:8,17

inn's 112:15 113:15 115:8

inns 95:18 122:4

innshopper 39:15 136:9

innshopper.com 39:2,5,8

input 41:22 123:21

inquiries 72:6

inquiry 88:21

inspect 92:4

inspected 25:17 73:21 92:1,11

inspection 25:17 40:14,15 41:8,10,11, 14,24 42:1 46:15 73:20 84:4 88:7 91:21,22 97:5 124:12 125:11 161:23

inspections 94:2

instance 41:16 43:11 107:22 124:22 137:14 144:4 150:18 155:6 156:25 158:24

Institute 8:25 95:14, 18,20

instructed 62:15

instructive 72:22 141:25 161:11

instructor 9:11

insubstantial 36:24

insufficient 79:12

integrated 110:13, 15,16,17 112:10,19 113:21

integration 115:23

intend 67:4 69:25 70:2,10

intended 87:11 118:21

intends 74:23

intent 64:11 67:7 82:8

interaction 41:24 42:1 154:18

interest 127:7

interested 10:1

Interesting 49:8

interim 46:16,24 128:8

International 57:16

interpretation 66:4 78:21 79:5 103:3,5,9

intervenor 55:8,13

interview 39:16 143:15

interviewed 138:3 157:24

interviews 25:8,23 75:20 81:1 82:2 84:13 138:22 159:10

introduced 30:7,10

introduction 29:17

inverse 12:16,18,25 47:20 53:25

investigations 162:5

investment 130:19 131:4 134:13

investments 17:17

investor 132:1,17,18

investors 52:9 130:15 132:19

invoke 66:10

invoked 66:9

involve 133:23

involved 6:18 7:6 10:6 43:25 58:1 138:25

involvement 18:4

involving 20:23

irrelevant 115:17,20

IRS 59:11,12

issue 30:16 91:24 109:7

issued 75:8 90:1 162:10

issues 88:19 109:8 117:20

italicized 69:10

item 135:13

items 126:22

iteration 78:14

iterative 132:15

**J**

January 122:10 127:15

jobs 81:19

Joe 138:24 139:10

Joe's 24:25

John 11:13 48:25

joined 156:20

joining 99:7

Joseph 23:11,12,15, 21 25:1,11 26:21 27:4,9,17,24 28:12 61:20

Josh 58:23

Josh's 58:22

judge 43:24 52:19

jump 8:7 100:12

June 65:4

junior 5:23

jurisdictional 65:21 66:6,8,11 83:18

jurisdictions 21:8 29:14

jury 52:17 119:9

jury's 50:23

justify 132:2

**K**

Kaiser 21:1

keeping 116:1

Keith 54:12

key 81:13 119:10


ZAHN
COURT REPORTING
www.zahncourtreporting.com

William Harvey - April 26, 2019                    184

**keyed** 147:19

**kilovolts** 17:23,24

**kind** 25:3 28:11
81:13 86:16 97:14

**kitchen** 41:17 88:4
91:8 92:14 94:19,25
115:6 143:25 144:3

**knew** 155:16

**knock** 133:11

**knowledge** 85:16,
17

**Kunze** 4:8,20 12:9
13:1,16 31:11 32:9,
12,16,19 36:14 45:21
46:2,21 51:1,4 53:10
59:15 61:11 62:11,
16,21 67:21 77:17
78:5 79:2,9 80:2,7
94:11 121:25 134:25
135:2 155:25 157:10
160:1 165:15,22

---

**L**

**labeled** 64:24

**lack** 124:13 162:3

**lacks** 69:4

**lacquered** 97:18

**land** 6:25 12:1 26:1,3
29:8 33:5,11 36:3
46:15 49:16 52:6
83:23 86:19 110:14
111:20 112:4,5 113:3
116:1 117:8,10,16,18
128:9,11,12,17,18
134:10,11 150:16,17
156:2

**Landholder** 48:10,
11 50:10

**landowner** 45:11
48:7,13,15 49:1,5
51:15,18 54:17

**landowners** 16:2,5,
15 20:9

**Lands** 17:16

**larger** 46:3,7 86:22

**87:6** 110:5,7,25
115:18

**launcher** 18:6

**launchers** 18:2

**law** 10:11,18

**lawyers** 77:13

**lay** 66:4

**lead** 92:3

**leads** 87:7

**learn** 4:25

**learned** 95:19 98:11
100:10 101:24
141:23

**led** 39:13,19 40:8
42:4 88:18

**left** 81:10

**legal** 66:4 78:21

**legally** 75:2,6 90:20
93:4 112:16,17
114:3,12 116:14
133:4,8,12 142:6
148:10

**legislative** 75:4
91:15 92:8,15,18,19
93:7 94:5,6 111:23
143:17

**legislator** 92:20

**legislature** 90:9

**length** 160:8

**Lenhoff** 51:10

**lent** 99:11

**lesser** 21:25 147:18

**letter** 26:8 53:7

**level** 24:14 41:18

**liability** 59:4

**library** 30:8

**license** 6:9,12,13
10:18,19 24:13 94:20

**licensed** 6:5,7 7:15
10:7,11,13,16,17,20,
22 11:1 21:3 22:20,
22 23:16,22 24:3,16,

**21** 34:18 126:16

**licensee** 10:23

**licenses** 6:3,4 24:5

**licensing** 6:14 10:9
24:9

**licensure** 10:20
24:14

**life** 132:13,14,20,21,
22,24

**lift** 110:4

**Light** 18:23

**like-kind** 157:19
158:10,11 159:8

**limit** 100:18 109:15

**limitation** 24:19

**limitations** 24:15
119:2 124:12 143:24

**limited** 28:2 41:10
90:13 124:10 154:13

**limiting** 83:22 100:5

**limits** 88:7 105:25
106:18,19 133:5

**lines** 20:17,23 70:7
83:25 154:20 158:11

**list** 38:24 43:10 44:9,
22 47:15,22 56:14
57:23 102:16 127:6
142:23,25

**listed** 19:24 38:10,12
44:6 76:15 80:12
82:21 95:18 96:3
97:7 102:25 103:2,6,
7,10,12 109:18 128:2
140:11,21 142:18

**listening** 73:25

**listing** 28:6 142:10,
16 144:25 148:5

**listings** 28:10 142:9,
15 148:25

**lists** 27:22 95:16
161:2

**literally** 69:5

**litigation** 18:20

**40:19** 65:21 66:3
67:9 119:6

**live** 139:14,18

**living** 99:12

**LLC** 4:22 44:24,25
47:24 48:3,10,11
49:6 50:10 51:12
52:9 54:6 55:6 56:6
58:16 62:20,22

**LLCS** 39:22

**loan** 127:8

**loan-to-value**
127:13

**located** 45:6 73:4,9,
12 84:6 86:25 108:11
145:1,9

**location** 145:13
146:6 147:23 154:8

**locational** 146:12

**locations** 57:14

**lodging** 39:24 75:12
82:5 89:14 90:4
106:13 113:20
116:13 118:23 141:2

**lodgings** 117:4

**logical** 89:7

**Lollar** 45:13

**long** 10:7 24:1 90:11
91:21 115:25 120:13

**long-lasting** 156:18

**longer** 7:23 21:24
36:17 46:25 49:17,24
64:2,3,13

**longest** 132:17

**lookback** 85:11

**looked** 96:2 124:20
141:3

**loss** 131:18 132:2

**lost** 49:18

**lot** 4:17 25:6 41:3
73:4,9 87:5 103:17
114:8 129:5 138:7
143:20


ZAHN
COURT REPORTING
www.zahncourtreporting.com

**lots** 57:13 114:10 137:4

**Loudoun** 16:11 56:15

**low** 116:9

**lower** 40:25 41:18

**Lyle** 4:20

M

**MA** 20:17

**made** 37:2 41:7 80:12 88:5 97:23,24 98:19 126:1,23 145:12,21 149:7 150:19 165:18

**magistrate** 43:24

**MAI** 9:17,18 23:19 34:23

**main** 73:5,10

**majority** 16:17 30:22

**make** 5:4 15:2 25:14 46:7 65:4 83:7 92:22 94:1 96:1 97:12 98:3, 24 102:20,22 106:12 119:8 124:11 126:4, 19 128:15 130:6 150:10 151:5,12 153:15 155:24 156:14 158:14 164:14 165:6

**making** 9:15

**manager** 41:19

**manual** 120:19

**map** 145:6 160:21,24 161:2,4

**mark** 31:8 115:4 137:15 139:9 142:2, 25

**marked** 31:10 67:20, 22 69:13 121:24 122:3

**markers** 151:16

**market** 21:18 42:11 62:6 85:6,8,17,20

**86:**4,5,10 104:21,24, 25 105:2,25 106:19 107:12,13,21 108:2,3 109:4,5,6,13 110:18 112:1 114:20 115:3, 21,23,24 118:24 127:14 129:3 130:21 132:4 134:8 136:25 137:10 142:3,14 145:3,11,25 146:1,5 150:25 151:2,21,23, 24 152:5 153:3,15,18 154:11,12,15,16,24 156:19 157:17,18 158:9,12,15,21

**market-anticipated** 131:4

**marketplace** 39:6 86:20 101:21 112:20 114:13 120:7 126:18 146:3 154:21 159:2

**markup** 68:6

**Marshall** 121:21 126:11

**Maryland** 5:25 6:6 20:23 21:1,7,10 23:18

**match** 136:11

**material** 141:24 143:20 155:13

**materially** 88:6

**materials** 14:6 65:2 88:1,18,22 98:5,6 99:16 100:7 101:3 104:18 119:16,19 120:6,10 124:25 126:8,17 127:4 140:20 144:7 161:23

**matter** 4:21 10:6 13:9 16:24 31:16,22 48:7,10,13,18,22 49:2 51:13,16 53:8 54:16 55:7,25 56:1 61:12 62:20 67:12 90:25 101:13 102:11, 24 103:22 130:12,13 131:25

**matters** 44:17 47:18 56:9 58:19 103:17

**maximum** 93:5 141:13 159:1

**MB** 20:17

**Mcguire** 11:9,12,17 41:4 45:8 48:25

**MDE's** 53:7

**Meadows** 112:6 113:5

**meals** 90:6,10,11 144:1

**meaning** 129:6 145:17

**meant** 69:19 125:6 162:6

**measured** 151:21 154:21 158:22 159:1

**media** 69:10

**meet** 111:5

**meeting** 132:3 152:1

**membership** 28:7

**memorandum** 34:12

**memory** 16:19 56:15 140:23

**mention** 150:17

**mentioned** 8:23 22:3,22 28:3 53:24 98:23 140:7 159:3

**met** 4:19

**methodology** 108:11 120:18 155:5

**Metro** 57:9

**metropolitan** 57:12 139:24

**middle** 123:8

**millage** 128:13,20

**Miller** 48:5 81:17 89:17 91:20 92:10

**Miller's** 89:9 92:12

**million** 24:22 50:24 51:7,8 143:1,2,4

**million-195** 142:5, 18 143:1

**million-459** 128:3

**million-six** 142:4

**mind** 21:18 57:4,22 66:21 86:5 91:10 96:12 98:24 119:12

**minds** 152:1

**mine** 29:24

**minimum** 24:10 141:12

**minimus** 113:23,24

**MINSON** 12:7,20 13:6 36:10 45:18,24 46:18 50:25 51:3 53:2 61:8 62:9,14,18 77:14,25 78:19,25 79:7 80:3 93:16 155:20 157:3 165:16 166:3

**minute** 72:22 148:22

**minutes** 134:25

**mirror** 147:13

**miscellaneous** 127:16

**misleading** 81:3

**missing** 68:7,17 123:10 133:13

**MLS** 28:6,8

**model** 123:7,22

**modern** 119:19

**modernization** 132:14,22,23,25

**modified** 65:1 66:1 99:5 123:9,22

**modify** 75:13 80:1

**mollify** 42:3

**moment** 135:15

**money** 115:10

**months** 19:10 73:21

**Motel** 95:18


ZAHN
COURT REPORTING
www.zahncourtreporting.com

motion 40:18

motivated 76:20

mountain 107:17 108:3,6

mountains 86:15 107:15 145:8,10 146:8,14 158:1

Moved 5:25

multifaceted 132:16

multiple 12:5 15:23 28:6 34:18 46:6 88:15

Multiple-tiered 54:1

multiplier 123:6 136:12

MWAA 57:12

**N**

named 18:19 19:1 20:7,8 58:2

names 140:15

narrative 28:18,19 29:3,6 77:10 164:25

National 9:1 51:11 57:15

natural 18:15 19:11, 19 20:13

nature 22:1 39:22 58:10 78:3 90:4 94:9 95:1,15 139:20

NCAA 9:24

nebulous 10:24

necessarily 17:25 27:20 38:10 96:11 115:21 151:23 156:22

necessity 18:1 139:14

needed 78:3

negative 47:2

negatively 158:16

negotiated 142:15

Nellysford 86:9 108:8

Nelson 26:18 29:13 81:9,12 86:7,11,13 93:24 107:13 109:17 116:15 128:22 136:19 139:16

Ninety 115:13

Nisource 18:24 19:3 20:1 21:9,13 56:22

nomenclature 28:21

non-designated 23:20

non-form 29:4

non-germane 13:8

north 6:7 54:5,10 145:10

northwest 21:1

notations 99:21

noted 84:1 86:25 147:10

notes 27:23 86:19 139:2 140:25

notice 11:4

November 94:1

now-deceased 92:13

nuances 16:19

number 19:14 20:14 21:17,19 22:14,16 33:23 38:5,22 44:3, 10,20,24 47:23 48:9, 18 49:4 50:3,17 51:11 62:16 70:17,19 72:7,8,20,21,23 73:6, 10 76:3,7 83:21 86:3, 19 102:12 121:23 122:1,4 124:4 127:9, 22,25 135:7 144:5 147:18 148:19

numbered 38:5 68:9 84:25 148:21

numbers 31:9 38:12 67:19 102:25 128:16

134:3,5 153:5

numerous 17:22 56:25

**O**

O'DONNELL 23:11, 14,16 25:3,11,15 26:4,20,24 27:5,16 28:15,25 29:10 30:10,19 31:1 32:1,5 33:6 35:12,14 61:20 77:7,20 117:10 138:25 144:15

oath 64:13 97:8

object 12:7,20 36:10 45:18,24 50:25 51:3 53:2 61:8 62:9 77:14, 25 78:25 93:16 155:20

objection 13:7 46:19 78:19 157:3 161:9

objective 158:5

observable 85:21

observations 124:11

observed 97:22

obsolescence 133:1,2,10,15

obtain 102:8 140:4

obtained 75:17,19 76:19

obvious 153:19 154:1

occupancy 42:25 73:13 81:5 82:6,17 89:1 91:7 93:10 115:13 120:20 121:17 131:9 134:15 137:1,11,17,22 138:1,6,15,18,19 139:13

occupied 43:2 73:5, 9

occur 17:2 68:5,18 89:11

occurred 39:13 70:16 85:6,9

occurring 104:12

occurs 155:12

offensive 18:11

offer 67:8 70:5 78:14 139:17

offered 39:6 95:14 110:19 112:24 139:25

offering 66:4

offerings 136:10

offers 116:9

office 6:24

officer 81:11

official 9:24

officials 72:1 81:13 84:19 90:24

offsite 133:16 139:15

Oklahoma 19:20 54:2

older 147:1,19 148:4,9

Olsen 58:2,8,12

omitted 83:17

ongoing 16:13 18:25

online 82:1

onsite 91:22,25 139:14,18 151:2

opening 92:3

opens 157:25

operate 90:24 115:6

operating 39:22 74:14 131:7,14 134:16 142:6

operation 113:9 129:8

Operational 42:22

operations 40:9



42:22

**operative** 70:4

**operator** 114:19

**operators** 20:10,11

**opine** 8:15 92:18
93:8

**opined** 100:16

**opining** 8:14

**opinion** 5:1 8:12,16,
17 10:15 14:2 34:22,
25 45:22 51:2,5,25
63:5,24 64:1,2,3,4,6,
14,15,24 65:1,16
66:1 80:1 82:15
83:12 84:15,21 85:23
89:23 91:10,14
92:12,23 93:12
94:14,15 97:11 98:10
100:2,16,25 101:2,4,
8,20 103:24 105:12,
18 106:7 107:4,17
111:8 113:8 114:17
116:11 117:17
118:17,21 119:25
120:3,6 129:2 132:12
148:14 154:14
158:15 162:7

**opinions** 34:13
63:22 64:8,18,19
65:9 66:5 67:2,11
69:19,22 70:5,6,9
78:15,23 79:20 83:11
94:12

**opposed** 9:3 16:5
20:9

**opposing** 14:25
15:1 51:7,9

**opposition** 94:8

**optic** 57:16

**oral** 34:13 65:25

**Orchard** 137:22

**ordinance** 93:25

**orient** 118:21

**orientation** 108:3
118:16

**oriented** 146:9,13

**original** 13:18 14:5
17:5 27:10 31:15
32:24,25 33:1,4,16,
19 34:4,7 35:4,23
36:1,20 37:9 39:9
42:6 43:5,17,19 44:9
59:22 61:13 63:2,10,
18 64:1,9 65:1 69:8,
20 70:7,22 71:9,19
77:1 79:21 81:2,20
82:10 87:7,18 88:9,
16 90:1,8,14 95:13,
21 96:2 98:12 99:15
100:16 116:23 118:7
119:16 124:7 125:2
144:22 160:11 162:7
163:24 164:7,9

**originally** 10:22
40:3 41:4 70:16
81:13 84:8 91:6,23
93:3,11 96:10 99:4
131:13

**output** 123:20,23

**overnight** 90:6 93:5
115:13

**oversupply** 109:14
133:19

**owed** 67:11

**owned** 52:6 74:5

**owner** 41:25 42:2
49:15 55:12,14 74:22
88:25 102:6,7 103:15
110:18 112:21
113:23 115:16,22
118:18 130:1

**owner's** 113:11
129:21

**owner-improved**
112:5

**owners** 118:19

**ownership** 111:2,6
113:7 129:6

**owns** 59:5

**P**

**P-O-L-A-N-D** 16:10

**p.m.** 166:5

**pace** 70:14

**package** 110:20
112:24

**packaged** 46:17

**Padalino** 81:9
116:20

**pages** 38:17 117:24
120:4 140:25 145:5

**paid** 135:20 137:7
145:15

**PAll** 39:14 40:8
138:14

**pairings** 158:10

**paragraph** 69:11
85:4 86:7,17 87:14
88:23 89:6 95:4
103:12 109:20,22
116:5 117:1 118:3,7,
13 148:21,22 150:16

**paragraphs** 38:5,8,
15,20 88:10 89:3

**parallel** 86:21

**paraphrase** 103:3

**parcel** 39:23 41:21
46:3,7 72:11,12,14
73:12 74:11,13,14,
18,21 75:1,13 81:6
82:5 84:6,7,9,11
86:22 87:6 106:22
110:5,7,25 113:16
115:18 143:4 161:13,
14

**parcels** 15:23 46:7,
9,14 47:4,8,9 74:6,9
84:16 110:14 111:5,
17,18 112:2,3,24
113:8 114:16

**part** 6:21 29:3 30:8
31:2 34:9 35:8 37:10
42:2 43:11 44:1
51:25 53:20 71:9
106:7,22 107:9
112:5,16 113:15
114:11 139:5,19
141:23 145:11,16
147:14 154:23
161:25 164:4

**partial** 43:16 49:7,
19,25 50:11,15
52:12,14 53:22
54:13,18,23 55:16,18
62:2 105:16

**partially** 73:23,24
74:2,12,18

**parties** 20:7,8 25:23
34:18 40:4 79:16
82:1 119:6

**parts** 28:17 42:25
43:1,2

**party** 8:14 14:25
15:1 29:18 52:6
112:17 150:8

**passageway** 99:8

**passed** 81:12,24

**Passenger** 51:11

**past** 19:11 56:10
116:5 117:2

**paucity** 108:10
129:10

**Paul** 54:12,17

**pay** 111:17 149:12
155:18 156:5 159:11

**paying** 132:2

**payment** 134:19

**PDF** 68:5

**peer** 131:11,12

**peers** 159:7

**pending** 5:14 12:12

**people** 18:7,11
39:25 139:13 154:8
157:24 158:1

**percent** 16:18
115:13,15 127:13,17,
18,24,25 128:1,4
129:1,11 131:14,15,
20 135:8 137:15
138:9,10,14 142:5
150:19 151:4,7,19
152:6,24,25 153:1,2,
12,15 155:4 156:23
157:13 158:9,16,23,
24 159:1,5,19



William Harvey - April 26, 2019                                                     188

**perfect** 109:2,4

**perform** 56:8 105:19

**performance** 39:23

**performed** 13:18,20 48:12 65:2

**performing** 12:17

**period** 128:11 132:15,17,18,21

**peripheral** 70:3

**permanent** 82:7 91:2 102:5,15 103:1, 6 104:3,16 152:7,8 155:4 156:9,11,17, 18,20,21 157:8 159:5

**permissible** 75:2,7 112:16,17 114:4 116:14 133:5 142:6 148:11

**permission** 17:19

**permit** 73:20,22 75:8,21 76:4 81:23 84:4 89:24 90:1,15 92:15 95:1 96:12 143:17,24 160:7 161:11,12,17,25 162:1

**permits** 72:11 75:17 162:9

**permitted** 82:17 91:6,24 92:1 93:3,11 96:25 97:2

**perpetual** 104:4

**person** 39:20

**personal** 7:20

**personally** 138:22 139:6

**pet-friendly** 74:25 113:15

**phases** 57:7

**phone** 60:15 76:20

**phrased** 71:22

**physical** 130:24 132:10,21 146:20,24 147:2,15,25 148:6

**physically** 69:7 84:6 97:22 99:23 114:12

**pictures** 99:18

**piece** 97:17

**PIG** 18:2,6

**pigs** 18:7

**pipe** 104:14

**pipe-in-ground** 18:6

**pipeline** 15:13 18:15 19:12 20:9,10,13 21:5 44:24 56:6 60:21,25 61:5 62:22 104:13 151:6,9 153:24

**Pitt** 99:22

**Pitt's** 42:1

**place** 83:13 91:6

**plan** 40:25 47:13 72:11 76:4 81:21,22, 23 90:8 92:16 93:24 99:14,15 115:24 143:17 160:7 161:17

**planned** 49:11 74:25 82:10 83:16

**plans** 41:1 49:13 72:12 98:12,13,16, 18,20 99:20 161:24, 25 162:15,22,25

**plat** 160:10,20 161:10

**plats** 161:7,15

**plots** 154:8

**plug** 131:24

**plumbing** 92:4

**plywood** 97:17

**Poe** 17:1

**point** 72:25 78:24 87:10 100:8 105:22 108:23 121:11 128:9

**Poland** 16:7,10,23

**Poleman** 16:9

**policy** 59:3,4

**Poplar** 133:14

**popularity** 116:7

**population** 146:14, 17

**portion** 40:25 114:3

**portions** 40:21 68:2

**portray** 129:20

**pose** 155:14

**posed** 66:14

**position** 66:19

**positioning** 104:17

**positions** 81:17

**possession** 162:9

**possibility** 111:22

**post** 122:8

**posted** 135:19,20

**potential** 38:6 74:17,20 92:7 154:22,25 155:17 156:5 159:16

**potentially** 92:3 114:10 155:18

**practical** 115:2

**practice** 7:17 8:1 107:24 120:11

**practitioner** 34:18

**practitioners** 7:15

**preceding** 89:3

**preexist** 163:18

**preexisted** 163:12

**preexisting** 97:1

**prefer** 74:6

**premise** 111:12,13

**prepare** 5:1 59:16, 19

**prepared** 154:9

**preparing** 59:25

**preprinted** 28:24

**present** 41:6 87:6 125:1 133:3

**presentation** 89:7

**presented** 29:24 33:19 43:24 88:2 89:7 117:13,14 136:10 152:18

**presenting** 118:20

**presently** 116:14

**president** 39:14 40:9

**pretty** 7:9 20:22 119:3 132:11

**prevailing** 127:14

**previous** 56:16

**previously** 7:7 33:11 34:1 37:10 92:13 113:25 131:10 143:19 163:11,14

**price** 105:25 106:18, 19 123:18 124:6,16, 17 125:17,25 126:1, 20,21 140:19 142:15, 24,25 145:15 165:23

**prices** 106:20

**Pricewaterhouse coopers** 141:5

**pricing** 123:7,22

**primarily** 7:4 29:18 40:9 86:12 99:1 109:23 118:15 148:23

**primary** 147:21

**Prime** 127:14

**Prince** 21:11

**principal** 6:16 48:11,16 50:7 51:21 130:14

**principals** 149:23

**print** 68:20,23

**printed** 68:5,18

**prior** 7:18 29:16 30:25 33:24 34:22 49:12 86:6



private 6:2 57:21

privilege 62:10

privy 103:20

probability 92:17 93:21

probable 82:9,13,16 89:13 91:11,16 92:21,24,25 93:2,13 94:4,21 112:13

problem 4:18 80:16 92:2

proceedings 166:5

process 37:11 41:3 42:3 44:1 79:17 87:5 92:5,6 94:7 98:17 103:18 106:8,23,24 107:3,9 116:4 139:1 145:16 150:5

produce 162:19,23 164:3 165:3

produced 131:8 160:16 162:16 163:13 165:9

produces 142:7

producing 142:19

product 106:20 116:7 163:16

production 22:1

professional 7:16, 17 8:1 35:16 84:20

profit 129:8

programs 97:16

project 11:15,21 15:13,15 17:3,4 23:8 53:14 60:21 61:5 85:9 98:15

projects 14:16,22 15:7,10,14 16:6 18:15,25 19:12

prolific 107:22

prompt 90:21 154:16

prompted 42:16 71:25 88:21 143:8,20

prong 111:9

prongs 111:6

Proofreading 31:4

proper 72:2 94:1 118:25 152:23

properly 120:13 131:2 154:13

properties 7:3 9:9 11:20,24,25 12:4,5 24:16 46:23 48:19,23 50:14 74:5 95:15,17 96:8 109:2 110:19 111:25 136:5 148:16 154:7,19

property 6:24 7:20 8:19 12:1,13 13:11, 14 24:1,25 25:2 30:16 40:22 41:6,20 42:8 45:6 47:1 49:15, 22 52:7 53:5,12 55:3 62:2 73:17 74:3,4,5,7 76:4 81:14 83:25 85:19 86:10 90:12,16 95:9,25 96:4,15,17 97:1,12,13,19 98:4, 24,25 99:5 100:3,15, 24 101:1,9,20 104:12 105:3,22 114:24 115:17 118:22 123:10 126:23 129:7 130:14,16 131:8 132:13 133:3 136:3 142:2,18 145:21 148:16,25 150:25 155:11,15,17 156:6 157:19 158:8,17 160:7,10,14,20 161:2,7 162:20

property's 88:24 107:13,14 109:13 135:17 150:21 152:5 157:15

proprietor 58:14,17 90:12 139:14

proprietor's 99:12, 19

proprietors 138:3, 12,23

protocols 89:16

provide 25:4 27:24 31:1 32:6 34:23,24 81:22 90:10 120:3 143:13 161:24 162:1

provided 28:9 32:1 33:6,21 40:23 41:1, 22 48:6 56:16 71:23 73:19 88:18 97:6 98:12,21 109:10,16 117:6 118:17 119:8 124:25 143:14 144:8 152:21 161:22,24

providing 8:3,5 12:23 40:21 65:25

provision 34:21 49:18

proximate 146:15

proximity 108:7 146:7

public 25:22 92:16 94:6 95:2 109:12

publication 150:7

published 95:20 133:14 136:13,19 149:22 150:6 159:9

publishing 44:18

pull 28:9

pulled 68:15

pulls 27:18

purchase 155:15

purchased 154:3

purchasing 153:24

purpose 69:9 77:23 82:10 99:4

purposes 61:2 65:21 80:13 95:7 102:13 104:17 108:1 122:21

pursuant 72:9 76:19

put 12:24 30:22 46:14,23 49:23,25 72:2 87:22 90:14 93:1 111:25 124:12 142:12,17 143:3 163:21

putting 87:8

## Q

Qualifications 9:14

qualified 81:24 82:14 136:6 162:20

qualifies 81:5

qualify 47:21 68:23 93:22 136:13 138:8 153:17 158:20 163:7

qualitative 145:16 146:22

quality 120:25 121:8,9,13,16 125:6, 7,12,18

quantitative 146:22

quantity 125:3,5

quantum 145:17

Quapaw 22:3

queries 72:1

question 5:3,13 10:24 11:22 12:3,21 13:5 18:18 35:25 49:8 61:9 64:12 66:13 67:5,6 70:3 71:9,22 74:1,8 78:1 93:17 94:9 101:16 105:7 132:11,16 138:7 141:11 154:5 155:21 157:9

questioning 33:12 42:23 46:19 76:12 104:1

questions 4:25 5:8, 18 72:5 87:7 90:23 165:15,16,20

quick 49:4 50:17

Quickbooks 43:12, 14 138:21

Quicken 135:19 138:20,21

Quickly 135:10

quote 165:25



## R

**Railroad** 51:11

**Ralston** 12:14

**Ralston/van** 12:25

**range** 108:6,20,21 141:12 158:6,7

**rate** 42:24 60:4 61:19 127:14 128:14,20 129:4,11 130:21,22 131:20 132:3,4 134:7,8,11,12 136:23 137:4,17,22 138:18 144:5

**rates** 42:25 61:22 133:14 135:20 136:13,17,19,20 137:11 138:1,6 139:13 140:5 141:2, 6,11

**Ray** 41:25

**reach** 149:23 159:11

**react** 158:15

**reacting** 157:18

**reaction** 150:25 151:2,21,23,24 153:3,18,19 154:12, 15,17,24 156:19 157:17 158:3,9,12

**reactions** 158:21

**read** 5:6 102:23 110:8 118:4 148:22 152:13 165:17

**reader** 87:9

**readily** 87:11

**reading** 50:8 106:12 166:4

**ready** 110:9

**Reagan** 57:14

**real** 6:1,5,18 7:6,14 8:19 49:4 50:17 109:4 128:8

**reality** 85:13 157:5

**realtors** 9:1,3 26:18 28:8

**Realty** 44:25

**Realtyrates.com.** 141:5

**reason** 5:17 12:15 69:1 70:14 83:17 103:19 119:4

**reasonable** 92:17 93:20 102:22 126:18

**reasons** 141:22 148:6

**reassessment** 128:23

**rebuttal** 8:9 29:5 59:22 61:14 63:1,10, 11 66:23 69:3,16,20 71:1,20 76:14,25 77:1 79:11 163:6

**recall** 30:10 40:13 42:22 46:3 52:23 55:14,19 57:20,24 125:22 138:4 139:6, 11 141:6,10 143:10 157:6 160:11

**receipt** 100:10

**receive** 9:19 42:21 43:18 72:5,9 91:12 143:8

**received** 39:12 42:16 70:22,25 71:17 72:4 75:17 76:13,16, 21 78:22 118:15 125:10 143:6

**recent** 24:8 55:25 137:14,24 139:8

**recently** 12:15 117:3 130:7 133:16

**recess** 59:14 135:1 159:25

**recession** 146:4

**recognition** 101:21

**recognize** 31:12,19 67:25 68:3 69:12 110:18 112:23 114:20 115:21,24

153:15

**recognized** 9:7 65:20 95:17 120:10 133:25 139:21

**recognizes** 102:22 115:3

**recollection** 113:12

**record** 4:10,20 5:5 6:10 18:12 26:21 27:9 32:20 61:8 82:25 116:25 130:6 151:20 160:9

**recordation** 27:21

**recordkeeping** 34:20

**records** 25:22

**recreation** 114:16

**reduced** 142:4

**reduction** 151:8,19 155:4 158:16 159:6

**reenforced** 143:18

**refer** 32:22,25

**reference** 37:25 38:2,7,15 117:23 120:4 122:1

**referenced** 35:15 37:24 40:12

**referred** 35:1 116:23

**referring** 11:25 28:19,23 31:25 36:11 38:3 85:8,22 109:22

**refinement** 33:15,18 87:12 101:2

**reflect** 150:20 156:2 157:14

**reflected** 72:7 156:19

**reflective** 70:4

**reflects** 155:23

**reformat** 87:4

**reformatted** 87:2

**refresh** 56:14 140:22

**regard** 19:24 29:7 32:5 40:1 42:5,12 47:15 50:3,10,13 66:22 71:4 73:10 99:19 111:4 114:14 153:14

**regional** 86:14 140:8

**regularly** 6:18,20

**regulated** 8:6

**rehabilitation** 49:12

**reinventing** 29:14

**relate** 9:22 10:5 106:19

**related** 17:5,11 18:1 19:18 40:9 80:5

**relates** 151:3

**relating** 26:18

**relation** 23:12

**relative** 73:14

**relevance** 45:24

**relevant** 87:23,24 117:22 118:1 141:9 162:19,22,23

**relied** 67:14,15 71:11,18 76:13,24 117:17,18 121:1

**rely** 119:6

**relying** 119:7

**remainder** 28:20 55:20 157:2

**remained** 49:15

**remains** 18:21

**remember** 17:7,12 20:16 50:8 51:20 52:25 55:10,15,16 96:25 114:8 128:9 137:24 139:8 140:14

**remote** 27:19 138:16

**render** 91:14 93:20 107:4 120:5 145:17

**rendered** 88:20 106:7,17 108:7 142:21



renders 105:12

renew 13:6 46:18 157:3

renovation 49:11 132:25

renovation/ expansion 49:13

rent 43:2 90:19,25 112:16 114:2 131:6 133:8 134:17,18,19

rentable 93:4

rentals 109:14

rented 43:1 111:21, 22 112:15 137:4,5

renting 46:25 114:2

rents 90:20

repeat 37:15

rephrase 35:24

replace 69:19

replacement 82:1 119:7,14,18,19,25 120:10,12,14,22 122:21 126:2,6,7,9 129:20 130:11 131:1

replacements 81:16

replacing 64:19 126:8,9

report 5:22 13:20,22 14:1 26:1,3,25 27:3, 25 28:13,20,22 29:5 31:2,15,17,20,21,23 32:22,23 33:1,2,4,11, 13,15,20 34:4,5,8,10, 13,24 35:4,7,11,15, 20,22,23 36:1,4,6,16, 20,22 37:8,14 39:9, 10 42:6,13,21 43:5, 14,15,19 44:4,10,16, 18 59:22 60:17 61:13 63:1,3,4,10,11,18,19 64:2,9 66:7,11,22,25 67:4,16 69:3,17,19, 20 70:8,23 71:2,14, 20 75:22 76:14,25 77:1,11 79:11,15 80:1,23 81:2 82:15,

19,24 84:2 87:1,4,7, 18,25 88:9,16 89:8 93:2 95:11,13 99:21 100:14,15,16 106:12 107:1 117:11,15 118:8,22 121:2 122:1 123:16 124:1,7,17,18 125:1,2,4,12 131:10 138:14 140:21,25 143:7 144:19,22 150:6 152:3,19,20 153:10,13,14 154:9 155:3 160:3,4,15,22, 23 161:2,6,7 163:6, 21,24 164:4,6,7,8,9, 11,18,25 165:2

reporter 5:10 165:20,24

reporting 8:20,22 29:4

reports 8:9 29:1,4,8 36:4,11,12 37:17,20 42:4 43:13 60:14 61:15 65:18,20,25 66:12 76:10 77:3,9 78:10,18 79:18,22 81:20 87:6 97:7 101:11 149:22,24 164:10,12,22 165:8

represent 16:4 38:9 50:9 133:19

representation 57:1 161:3

representations 88:5

representative 57:25 160:13

represented 19:21 56:11 57:12

representing 16:23 49:5

represents 70:20 134:22

reproduction 119:6,14,16 120:1,3, 6 126:7 129:21 130:1,12 131:2

request 43:16,17 72:10 75:18 76:20

143:12

requested 70:16

requesting 89:5

require 88:25 95:1 111:23 113:17 114:5, 9

required 34:15 75:4 79:6 92:15 155:2

requirements 24:11 34:14 65:24 78:21

requires 34:19,21 143:17

reread 59:20

research 29:10 86:12 96:6 129:3 148:15

researched 29:12 96:22

reservation 22:4 54:2 136:14

reserved 159:18

reside 90:11

residence 73:11 74:21 96:14

residential 9:3,6 12:2 21:18,20,22,23 24:7,21,23,24 46:24 47:12 90:3,4 96:13, 17 116:10 154:7

residue 45:15 49:22, 23 52:1,3 150:22 156:6,23 157:15

resolved 56:24

resort 108:4 118:24 139:21 146:9

respective 122:9

responded 43:10

respondents 141:14

response 43:17 143:14 161:22 162:3

responses 70:15

rest 47:15

restate 11:22

restaurant 137:19 142:6 143:10,11,21 148:10,11

restaurants 110:3

restoration 155:12

restriction 90:5

result 45:15 155:7 156:7

retail 6:24 57:17 127:11

retain 117:25

retained 102:6,7 103:14 112:6

retired 7:21 8:2

retrofit 94:19

retrospective 85:4 91:3

return 43:18,22 130:22 131:4 134:7, 13

returns 43:11,20 134:17 135:17 136:7 138:20

revenue 109:15,17 112:1,15 115:7,8,13 137:19,20 142:8,19, 24

revenues 136:9

reversion 130:18

review 8:9,11,13,16, 21,22 30:1 37:4 62:25 72:12 76:4 80:13 118:5 159:7 160:7 161:18

reviewed 26:14 37:14,17 43:9 81:1 135:18 138:21 141:25

reviewing 161:19

revision 14:2,5 63:24

rezoning 46:17 47:7



Rick  58:2

Ridge  86:15 107:15, 18 108:4,6 139:25 145:7,8 146:7,10

right-of-way  15:11 17:25

rights  51:17,24 52:4, 5 102:4,6,7,14,17,21, 25 103:1,5,10,14,22 104:4,8 112:6 145:22 154:22 159:23

road  4:14 16:7,23 53:14 57:15 131:16

role  24:18,19

room  41:17 88:4 94:25 111:25 112:18 133:13,14

rooming  116:8,12, 18

rooms  41:19 89:15, 21 90:19,21,25 93:4 133:6,7,12 137:5 147:19 151:7,18

Roseland  86:8 108:8

Route  53:15

rule  34:10,14 42:9 62:5,6 64:21,25 65:22,24 66:4 78:21 79:6 159:9

rules  4:24 65:23 70:18

ruling  52:25 53:4

rural  47:12 118:24 138:15 146:11 147:24

**S**

sale  110:19 140:17, 19 142:10 143:8,9 144:24 145:1,13,20, 25 146:11,20 147:7, 9,10,13,17,22 148:5 155:18

sales  6:11 26:8,16 29:11,21,25 30:11,19

37:3,5,8 106:20 107:22 108:11,12 117:16,19 127:12 132:5 134:9 140:8,13 141:3,15,16 142:11, 12,21 144:16,20 146:15 148:24 149:7, 16,19 150:11,18 152:17 153:2 158:11

salesperson  6:7,12 154:6

sample  57:25

Sandy  81:16 88:11

Sarmadi  42:1 99:21, 22 120:2 126:16 130:3

satisfied  111:9

sawmill  113:20 114:1

scenario  91:1 151:1 158:7 159:3

scenarios  158:21

schedule  129:23

scope  17:20 37:25 38:2,12 40:14 41:24, 25 79:21 92:1 133:22 159:9

screening  27:11

screw  161:23

scrutiny  27:15

SE-1  115:4 142:7

seaboard  108:22

search  100:20 108:1,12,15

seasonal  139:23

SEC  15:25 16:11 17:1,2,3

secondary  103:19

section  85:4 87:9

sections  87:1

security  109:7

seek  115:24

select  29:21 30:19

sell  142:18

seller  85:15 111:15 112:22 151:25 153:19

sellers  154:19

seminar  95:13

send  60:7 72:19

sentence  86:7

sentences  40:24 148:23

separate  14:3,22 35:6 63:12,13,20 106:21

separately  110:22

September  31:18 36:2,13 164:9 165:4, 8

series  4:25

serve  112:17 114:25 149:3

served  90:7

service  8:5 28:6,10 139:17

services  48:6,12 49:1 56:8 60:19

servicing  17:6

set  25:17 40:13 66:7 67:12,17 89:16 93:24 121:1 148:24

sets  142:10 165:5

settled  45:5

settlement  45:19,22

seventh  133:7

Shackelford  81:16 88:11,15,19 89:11,17 92:9

shake  5:9

shape  113:13,22 160:13

share  77:13 136:7,8 138:13

shared  77:15,16

sharing  77:23

shell  49:10

shoes  85:14

short  44:15

short-term  109:14 117:4 133:17

shortfall  134:14,21 135:7

show  87:20 118:10

shown  123:7

Shreve  54:15

side  21:20,23,24 40:17 107:4

Siegel  51:20,21

sign  163:20 165:18

signature  35:17,18, 19 36:17 163:18,20 164:11 166:4

signed  35:14 134:16 161:12 164:1,2,3,5, 19,21,24 165:3

significant  133:19 157:21

significantly  137:16

silent  65:19

silhouette  97:16

silver  57:7,8,10,11

similar  15:14 30:16, 18,20 35:22 69:22 136:5,14 145:21,24 146:6 149:1 159:8 162:13

similarities  12:1

simplistic  111:10

simply  146:7

single  63:8 137:7

single-families  137:6

single-family  73:11 74:21 75:12 90:3 96:13,14,16 111:20


ZAHN
COURT REPORTING
www.zahncourtreporting.com

112:4,7,9,11 113:6
137:8

**singular** 77:5,12
152:2

**sir** 85:2

**sit** 67:10 69:25 78:12
82:3 100:13,22,25
101:7 141:10

**site** 27:6,19 41:8,9,
10,13 49:11 50:6
54:4 59:4 92:16
135:11 143:17

**sits** 142:14

**situations** 159:8

**size** 125:2 146:23
147:3,17,18 160:13

**ski** 110:3

**skiing** 139:22

**Sky** 54:20,22

**slight** 147:11

**slightly** 137:18
145:25 146:1 158:18

**slope** 110:3

**smaller** 124:8,9
148:2,4,9

**SMJB** 44:25 55:25
56:17

**soccer** 50:5

**software** 69:6
126:11

**sold** 6:24 110:20,21
112:14 113:1

**sole** 58:14,17

**solely** 154:13

**son** 25:1

**sons** 23:13

**sophisticated**
154:25

**Sound** 53:20

**source** 39:16

**sources** 150:7

**south** 17:15 138:13
145:10

**southern** 131:11

**speak** 32:17 87:17

**speaking** 34:1 155:5
156:24

**speaks** 79:22

**special** 95:22 96:17
126:5

**special-design**
96:9,11 97:4 99:2
100:18,23,24 101:1,
5,8

**special-purpose**
95:8,15,17,24 96:4,8,
9,11,15,20 97:3,13
98:4,25 99:2,3,12
100:3,5,15 101:5,19,
24 102:1 118:22
126:23

**special-use** 92:15
95:1 143:16

**specialized** 6:1
97:21

**specially** 95:5

**specific** 15:6 25:24
38:9 155:8

**specifically** 40:6
116:22 133:18

**specifications**
119:17 120:23

**speculate** 94:13

**speculating** 120:8
126:19

**speculative** 93:6,8,
19 94:8,9,14 114:4
145:15

**spend** 59:25

**spirit** 64:25

**split** 19:4

**spot** 26:17

**spreadsheet** 130:7

**spruced-up** 116:8,
12,18

**square** 123:18
124:6,16,17 125:17,
25 126:20,21 127:2
149:12,13,14

**stabilized** 131:8,9
134:15 138:15,17

**stadium** 50:5,6

**staff** 95:20

**stages** 43:21

**staging** 104:17
113:19 114:1

**stamp** 68:4,17,23
69:5,9 115:23

**stamped** 161:25

**stand** 8:24 9:13
85:14

**standard** 7:11 8:2,
18 62:6

**standards** 7:16,17,
18 8:1 35:16

**stark** 41:23

**start** 14:12 93:9

**started** 76:11 81:14
125:17 142:4

**starting** 5:22 72:24
89:9 121:10 128:9

**starts** 116:5

**state** 4:9 20:23

**statement** 95:12
106:13 152:13,15
153:5,9 155:1 158:14
163:15

**statements** 135:19

**states** 52:9 53:25
123:8 131:12 140:8,
11

**Station** 51:23

**statistics** 109:12,15,
21

**Stealer** 58:23

**stems** 18:2

**steps** 75:14 107:6

**Steve** 12:13

**stock** 109:5

**storage** 41:19

**straddle** 84:19,20

**straddled** 84:16

**straddling** 84:21

**straightforward**
132:11 134:6

**strange** 16:21

**street** 17:16 50:10
51:12 109:3 110:1

**strike** 110:24

**structure** 6:14 39:23
73:1,7,16 74:2,12,18,
23 75:1,11 81:6,24
112:9 113:2,4,19,20
119:17 120:22

**structures** 47:1

**stucco** 98:8 124:20

**study** 104:23 105:4,
8

**style** 28:22 29:1,4

**subcategories**
145:18

**subcategory** 72:24

**subdivision** 112:6
113:5

**subgroup** 147:14

**subheading** 105:15

**subject** 59:4 76:4
86:4,10 108:8 109:24
123:9 135:24 143:18,
23 144:6 146:16
147:11 148:16 160:6,
14,20 161:2,6

**subjective** 158:3,4

**submarket** 109:24
137:5

**submarkets** 86:9,13

**submitted** 98:18
130:2,8

**subordinate** 73:3,8


ZAHN
COURT REPORTING
www.zahncourtreporting.com

subsequent 43:14 76:20 80:25 84:12 88:21 90:8 95:19 97:10 98:11,18 99:16 101:3 121:15 130:19 141:24 147:8

subsequently 96:6 98:10 99:10 100:9 160:16

subsidiary 17:16

substance 67:8 69:8 79:2,4 83:8,9

substantial 36:23

substation 17:15

substitute 119:20

substituted 160:20 161:5

subsumed 157:23

suburban 147:24

Suffolk 45:7

suggest 109:12

suite 72:14,15 73:2, 13 74:20 111:20,24 113:6 114:6 116:2

sum 67:7 69:8

summarized 33:16 34:10 109:19 140:24 141:12

summary 122:23 123:25 125:16 127:5 135:11 152:11,14 153:4,6,10 163:15 164:4

super 16:17

superadequate 133:8

superior 50:9 145:19 146:13 148:11 149:10 150:20,24 152:9

superseded 65:22

supersedes 156:12

supervisor 24:18

Supervisors 56:11, 13,15

supervisory 24:17, 19

Supper 54:4

supplement 13:24 36:21 64:22 66:1 70:19,23 71:21 162:6

supplemental 13:20,22 14:6 31:20, 21 32:24 33:2,13,17 35:7,11 39:9 42:13, 21 44:16 59:21 61:14,15 63:4,11,19 64:15,20,24 65:1,18, 19 66:11,12 67:3,16 69:16,18 70:8,13 71:1,13 72:4 76:14, 25 78:17,22 79:15 87:24 88:1,17 95:11 97:20 98:2 100:11,14 101:13 103:17 124:17 125:1 143:20 144:23 152:20 153:14 160:3,15 164:11,13,18

supplemented 30:24 65:15 70:7

supplementing 64:18

supply 105:1 133:16

support 100:2 142:20

supporting 140:20

supports 34:12

surprised 65:4

surprises 5:2

surrounding 29:13

survey 86:4,16,18 141:14 160:14

surveyed 141:2

surveys 141:4

survives 156:12

suspended 10:10, 18,24

SW 48:10,11 50:10

Swift 121:18

Swiftestimator 120:20

sworn 4:6

synopsis 89:9

---

T

TA 48:19,23 50:14

table 140:4

takes 151:2

taking 54:3 62:2 123:3 125:16 150:14 152:5,7,8 155:5,7

talk 8:8 70:25 86:16 88:23 91:17 104:3 118:2 129:15 132:8 135:15,16 141:15 150:13

talked 26:17,19 42:18 61:24 70:21 71:3 76:12 80:4 117:9 147:22

talking 10:2 33:7 73:16 80:14 129:25

talks 110:13

tape 25:6

Tar 54:4

target 137:10

tasked 12:22 27:1

tasting 88:4 94:25

tax 28:10 43:11,18, 20,21 134:17 135:17 136:7 138:19 160:21, 24 161:2,4

taxes 128:7,8,12,24

team 23:9

technically 10:25 12:23 62:23

telephone 25:7,22

temporary 82:7 91:1 102:5 103:11 104:16

117:4 155:7,9,12,16, 23 156:1,4,7,12,17, 20,22,25 157:1,7

ten 7:18 115:15 132:19

tenant 55:9,13

term 18:9 26:6 32:24 65:19 73:22 74:7 95:23 96:18 115:25

terminate 130:18

terms 103:17

Terpak 54:12,17

Terry 54:15

test 136:12

testified 4:6 16:10 42:24 44:7,17 47:16 50:18 56:2 58:19 65:12 84:18,20 90:20 97:8 111:21 113:12, 17,25 114:22 117:12 136:22 143:10,19 145:6 161:14 163:12 164:2

testify 70:1,10 118:19

testifying 58:24 64:4,10 65:10 92:25 93:1

testimony 39:21 45:4 52:15 56:16 65:5 71:3,5,23 74:24 81:1 84:13 88:3,22 99:16,22 100:22 131:12 138:19 141:24 144:7 160:11 161:20

tests 105:11 159:8

text 117:2

then-governor 10:10

then-vacant 49:16

thereof 110:22

thing 28:11 91:3 95:15 103:14 141:1

things 18:3 25:10,24



William Harvey - April 26, 2019                                          195

38:24 39:24 41:12
80:4 100:11 103:7,11
114:16 117:4 140:2
141:23

**Thomas** 87:15

**Thompson** 81:11,24
92:12,13 116:20

**thought** 10:19 40:15
43:11 84:8 118:12
141:25 143:21

**thousands** 109:6

**thread** 116:22

**threshold** 129:4

**throwing** 18:7,12

**Thursday** 165:22
166:1

**tied** 75:9 81:21
103:24 153:19

**Tim** 81:9

**timbered** 47:10

**time** 7:22 13:10 18:9
22:15,17 29:15 34:24
44:15 46:22 47:6
66:16 87:10 88:8
90:12 102:20 104:7
107:24 108:14,23
115:1 123:3 130:8,18
135:21 138:6 155:18
163:15,23

**Time/location**
123:6

**timed** 132:15

**times** 12:6 20:24
25:6 59:11 103:17
127:13 128:13 129:5
134:7,12 135:14
138:7

**title** 49:16 154:9

**TLM** 123:4,5,10,12,
19 125:20,22,23,25

**today** 4:16 5:4,17
10:4 11:3,5 28:22
44:21 59:17,21 60:6
61:3,6,16 67:10,15
69:25 72:21 77:10
78:12 82:3 91:2

**today's** 9:22 70:4
71:4 72:7,24 76:8

**told** 43:7

**Toll** 57:15

**Tom** 143:14,15

**top** 57:24 102:13
105:23 122:5 123:13
129:19 135:6 136:25
140:7 142:14

**topic** 105:17

**topics** 38:6

**total** 49:20 52:4 61:1,
5,15 134:3,23 135:7

**totally** 11:23 13:4

**tour** 115:12

**Town** 17:14

**townhouses** 137:6

**tracts** 110:14

**traffic** 139:24

**trainee** 23:22,24
24:4,9,16

**training** 109:9

**transact** 148:18,19,
20

**transaction** 85:21
142:13 157:23

**transactional** 9:8
24:22 25:21 151:22
158:22

**transactions** 6:19,
23 7:6 25:23 26:19
149:2,3

**Transcanada** 18:23
19:25 20:13,25

**transcript** 5:9 83:5

**transcripts** 40:7
76:18

**transient** 39:23
75:12 82:4 89:14
90:4,5,11 106:13

**transmission** 16:8
17:22 151:1 154:20
158:10

**trash** 117:25

**treated** 158:8 163:14

**treaties** 96:7

**treatise** 96:3

**treatises** 95:20
96:22 101:22,24
159:9

**tree** 84:5 97:17

**tremendous** 116:7

**trespass** 84:1

**trial** 5:1 45:4 47:16
50:18 52:15,17 54:25
65:3,10 67:4 70:5
78:14 103:21 104:1
138:20

**tribe** 19:21 54:2

**triggers** 154:12

**trust** 9:15 47:20
48:20,23 50:14 54:3

**truth** 64:13

**turn** 35:17 38:4
68:16 72:23 136:18

**Twelve** 23:6

**Twofold** 108:14

**type** 7:12 11:25
17:18 24:19 25:2
28:9 38:15,18 40:19
43:3 57:25 83:16
106:20 118:24
122:18,20 129:5
139:17 160:25

**types** 24:15,25 132:8
138:15

**typical** 30:18 132:17
133:22

**typo** 83:4

**typos** 78:2,9

## U

**U.S.** 62:4

**ultimately** 94:4

**um-hum** 5:8 145:23

**umbrella** 7:10 59:1,
2 61:19

**unable** 5:18

**underground** 99:8
151:1 153:24 154:20
158:10

**underneath** 98:9

**understand** 11:23
13:4 15:13 35:24
41:5 49:21 56:20
65:5 72:2 74:8 89:20
94:12 105:7 106:11
119:9 135:5 151:5
155:1 158:14 164:15,
17,23

**understanding**
40:20 74:11,22 79:24
88:6 98:1 104:4,11
118:16,19 163:8

**understating**
128:24

**understood** 5:5
87:11 124:13 161:3

**undertaken** 94:2,23
106:23

**undertakes** 106:10

**undertaking** 93:19

**unequivocally**
101:25

**unfolded** 44:2

**Uniform** 7:17

**uniformly** 139:16

**Union** 17:16 51:23

**unique** 50:2 95:6

**uniqueness** 129:9

**unit** 4:14 99:12
110:20 112:12 114:6
120:18 126:2 145:15


ZAHN
COURT REPORTING
www.zahncourtreporting.com

William Harvey - April 26, 2019                                                          196

**United** 52:9 53:25
123:8 131:11

**units** 24:23 109:24,
25 110:2 133:9

**unity** 111:1,6,8
114:17

**unreliable** 108:25

**updated** 44:3 100:14
124:16 161:7

**updating** 30:24
44:22

**USPAP** 7:25 8:6,10
9:11 24:11 26:7
34:20,21 63:8,16,20
65:18,19,20,22 66:9,
13 69:9

**USPAP's** 159:9

**utility** 14:16 15:6,7,
14,24 17:7 20:5
119:18 127:3 154:4

**utility-related**
15:10,18

**utilization** 83:16,23
126:10

**utilized** 71:1 117:19
124:19 159:20

**V**

**vacant** 47:1 111:19
112:4,5 113:3 116:1
128:9

**valuation** 8:5 12:23
13:2 37:11 106:2,8,
24 107:3,9 116:4
117:8,11 118:20
122:8 150:14,16
152:4,16 159:4

**valuation-wise**
49:19

**values** 24:22 36:25
127:6 157:11

**valuing** 55:3 159:13

**valve** 18:2

**Van** 12:14

**variable** 21:17 22:14

**vary** 158:21

**VCC** 90:2

**VDOT** 57:5

**VEPCO** 56:18,19

**verdict** 50:21,23

**verification** 27:15
28:2 150:8

**verifications** 25:7,
19 27:17 138:11

**verified** 25:21 26:6,
24 27:2 29:15 137:15
139:7 143:14

**verify** 25:25 26:9,11,
15 29:19

**version** 78:14

**versions** 165:8

**versus** 12:2 41:25
44:25 48:19 55:25
62:22 90:19 130:22
139:15 147:24 153:6

**vested** 15:25 49:17,
18 115:5

**vesting** 16:25 50:1

**vicinity** 30:5

**view** 52:9,11 151:3,
6,22 152:2 153:21
154:1,10,13,14
157:25

**views** 150:20,24
152:9 153:16

**village** 95:6

**violates** 73:22

**Virginia** 4:15 6:6,8
7:15 10:8 17:24 21:2,
3,7 23:17,18,22 24:5
34:19 90:2,9 145:1

**visibly** 124:23

**visit** 27:7

**vista** 108:3

**W**

**wait** 5:3

**waived** 166:4

**Waldo** 4:20

**walk** 115:10,11

**Walker** 4:14

**walls** 92:3 97:23,24
98:3 124:21

**Walsh** 53:18,19

**wanted** 83:7 119:7
160:4

**warrant** 47:6

**warrants** 151:7,19

**wash** 54:20,22 55:3

**Washington** 18:23
19:25 20:15 21:5,6
56:21 57:12

**waste** 49:20

**Waverly** 52:9,11

**WBX** 20:17

**website** 39:8 135:21

**websites** 136:14

**wedding** 114:25
115:1

**weddings** 88:3
114:16,23,25 115:7
144:5

**Wednesday** 165:22
166:1

**weeks** 5:6

**Wesley** 5:23,24

**west** 6:6 21:1,3
145:10

**whatsoever** 41:22

**wheel** 29:15

**wholly-owned**
17:17

**wife** 6:10

**Wilburn** 11:13 48:25

**Wilder** 10:10

**Wilhelm** 133:7,11

**Wilkes** 48:17

**William** 4:4,11 21:11
23:11,14 59:1,8

**Winchester** 146:11,
17

**wine** 94:25

**winery** 88:4

**wings** 99:7,8

**Wintergreen** 30:4
86:9 108:9 110:2
133:18 137:6,8
139:21

**Wintergreen's** 83:5

**wiring** 92:4

**withdrew** 143:12

**Woodbridge** 53:11,
13,16

**woods** 11:9,12,18
41:4 45:8 48:25
113:21

**word** 69:6 100:20

**words** 15:22 24:21
25:16,20 33:16 56:23
77:6 81:4 85:11
91:15 117:6 119:13
121:10 123:6 124:24
127:21 152:24
155:12 164:9

**work** 4:12,13 8:14
14:7,11,12,17 15:8,
15 17:8 18:14 20:5
25:5,15 26:11 28:18
29:5,20 35:1,3,22
36:6 37:13,16,23
38:1,2,8,11,13,16
57:5,14 58:4,12
65:13,14 79:16,21
117:21,23,24,25
123:14 140:15 159:9
163:16,25 164:1,3

**workbook** 95:16

**worked** 18:5,14
19:9,12,15 58:19



**working** 19:7,9 22:6
  23:3 58:24 59:6

**world** 109:2,3

**worse** 158:22

**worst-case** 158:7
  159:3

**worthless** 49:24

**write** 152:4

**write-up** 119:3

**wrong** 65:13 68:15

---

### Y

**year** 21:16,21 22:4
  24:2 58:9

**years** 10:10,24
  14:15,19 44:7 47:17
  55:24 56:1,9,11,25
  57:6,11,18 132:19,23
  142:3 155:17 156:8
  157:6

**yellow** 145:8

**yield** 87:23 94:2,7
  110:19 111:18

**yielded** 39:15,17
  94:17 97:20 99:2
  123:24 134:9

---

### Z

**ZIP** 123:9

**zoning** 27:12 28:11
  47:11 72:25 73:2
  75:15 81:9 88:19
  93:25 115:5 116:16
  143:23 148:10,13


ZAHN
COURT REPORTING
www.zahncourtreporting.com