CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

06/19/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | CASE NO. 3:18-cv-00006 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| 0.07 ACRE, MORE OR LESS, IN NELSON COUNTY, VIRGINIA, ET AL., | SENIOR JUDGE NORMAN K. MOON |
| *Defendants.* | |

This is a condemnation action brought by Atlantic Coast Pipeline, LLC ("ACP") against property in Nelson County, Virginia, and record owner Fenton Family Holdings, LLC ("Fenton"). The condemnation arises in connection with the construction of an approximately 600-mile underground pipeline to transport natural gas from West Virginia to Virginia and North Carolina. A trial is scheduled to determine "just compensation" regarding permanent easements related to the construction and maintenance of the pipeline across a portion of property owned by Fenton. (Dkt. 1 (Complaint ) ¶¶ 1-6).

ACP moves to exclude the opinions and testimony of four of Fenton's designated experts: (1) Paykon H. Sarmadi, an architect, regarding improvements located on the property (dkt. 76); (2) Thomas L. Stokes, Jr., regarding the construction of the project, including safety implications and impacts of construction (dkt.82); (3) Richard Paradis, regarding noise and vibration impacts on the property (dkt. 78); and (4) Matthew P. Ray, an appraiser, regarding just compensation for the taking (dkt. 80).[1]  For the reasons set out below, the Court will (1) deny ACP's motion to

---

[1] Fenton filed a motion *in limine* to exclude the testimony of ACP's expert witness William C. Harvey.  (Dkt. 96).  The Court will address Fenton's motion *in limine* separately.

exclude the opinions and testimony of Sarmadi, (2) grant in part and deny in part ACP's motion to exclude the opinions and testimony of Ray, and (3) will grant ACP's motions to exclude the opinions and testimony of Paradis and Stokes.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This is an eminent domain case in which ACP seeks to acquire permanent and (prior to ACP's June 11, 2019 Amended Complaint)[2] temporary easements across Fenton's property to construct and maintain a natural gas pipeline.  The property contains improvements, including a bed and breakfast (described by Fenton as "a high-end, boutique bed and breakfast").  The easements are on a small portion of a tract of land comprised of approximately 2.922 acres in Nelson County, Virginia.  One issue is whether two adjacent tracts owned by Fenton should be included in determining just compensation.

ACP, the holder of a certificate of public convenience and necessity issued by the Federal Energy Regulatory Commission, has the substantive right to exercise eminent domain over and condemn the easements set out in the Complaint.  Fenton granted access to ACP to exercise its right to immediate entry, access, and possession of the easements, with the determination of just compensation for the easements deferred.  (Dkt. 22 (Stipulation) ¶¶ 2-5).  The permanent easement is approximately 0.04 acre and triangular in shape, consisting of a 50-foot easement from a corner of Fenton's property and running along the adjacent sides.  A temporary easement of

_____

[2] On June 11, 2019, ACP filed an Amended Complaint pursuant to Fed. R. Civ. P. 71.1(f). The amended complaint removed the 0.03 Acre temporary easement from the condemnation, removed reference to temporary easements in paragraph 16 of the original Complaint, removed paragraph 19 (which addressed temporary easements), and removed "Wherefore" clause D (which requested the court ascertain and award just compensation for the temporary easements).  (Dkt. 127 at 1 n.1; *see* Dkt. 128 (Notice of Filing of Amended Complaint)).  A plaintiff in a condemnation action may, without leave of court, amend the complaint at any time before the trial on compensation.  Fed. R. Civ. P. 71.1(f).

approximately 0.03 acre has been deleted from the Amended Complaint. (Dkt. 1-4, Plat (Complaint Ex. 4); Dkt. 127 (Amended Complaint)).

Fenton seeks just compensation, which its appraiser Matthew P. Ray places at $3,156,847. (Dkt. 81-2 (Ray Report) at 80). ACP's proffered expert William C. Harvey places just compensation at $130,300. (Dkt. 97-1 (Harvey Supplemental Report) at 57[3]).

## II.    LEGAL STANDARDS

The Takings Clause of the Fifth Amendment prohibits the taking of private property without just compensation. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005). Just compensation is to be awarded for the value of the taking plus any "severance damages" (i.e., the difference between the market value of the residue before and after the taking). *Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford Cntys., Md.*, 701 F. App'x 221, 228 (4th Cir. 2017) (unpublished). The instant motions challenge Fenton's designated experts pursuant to Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 402, 403, and 702.

Fed. R. Civ. P. 26(a)(2) requires the disclosure of expert testimony during discovery and provides, in part, that each party must disclose to the other party the identity of any witness it may use at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. With respect to an expert witness, the disclosure must "be accompanied by a written report prepared and signed by the witness." The report must include: (1) a complete statement of all opinions to be expressed and the basis and reasons therefor; (2) the facts or data considered by the witness in forming opinions; (3) any exhibits to be used as a summary of or support for the opinions; (4) the qualifications of the witness and list of publications in the previous 10 years; (5)

---

[3] Unless noted otherwise, page references are to CM/ECF page numbers within the indicated docket entry.

a list of other cases in which the witness has testified as an expert within the preceding four years; and (6) the compensation to be paid the witness for study and testimony. Fed. R. Civ. P. 26(a)(2)(B). Fed. R. Civ. P. 37(c)(1) provides that if a party fails to disclose information required by Rule 26(a), the party is not allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, unless such a failure is substantially justified or harmless. To avoid exclusion, the non-disclosing party bears the burden of establishing the failure was substantially justified or harmless. *Gomez v. Haystax Tech., Inc.*, 761 F. App'x 220, 229 (4th Cir. 2019) (unpublished) (per curiam).

Fed. R. Evid. 702 provides that a witness who is qualified as an expert "by knowledge, skill, experience, training, or education, may testify" as to scientific, technical, or other specialized knowledge if it will assist the trier of fact. Such testimony, however, is only admissible if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[A] court may consider whether the expert witness theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation and internal quotation marks omitted); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993). This list of factors is not exhaustive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "[C]ourts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler*, 855 F.3d at 195.

The Supreme Court in *Daubert* concluded that implicit in Rule 702 is a district court's gatekeeping responsibility "to 'ensure that an expert's testimony both rests on a reliable foundation

and is relevant to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597). If the expert meets this threshold, criticisms of his or her testimony will go to its weight, not its admissibility. *See Bresler*, 855 F.3d at 195-96. The approach is not limited to the testimony of scientists but applies "to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141 (applying *Daubert* to the testimony of a mechanical engineer); *see* Fed. R. Evid. 702.

Fed. R. Evid. 402 provides that, with certain exceptions, relevant evidence is admissible. Fed. R. Evid. 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

## III.    ANALYSIS

### A.    PAYKON H. SARMADI

ACP moves to exclude the opinions and testimony of Paykon H. Sarmadi ("Sarmadi"). (Dkt. 76). Fenton's Rule 26(a)(2) Disclosure states that Sarmadi, an architect with Balzer & Associates, Inc., is expected to testify regarding improvements located on the property as well as the cost to reconstruct improvements and site work. The Rule 26(a)(2)(B) Report submitted by Sarmadi consists primarily of an itemized list of materials and related prices as well as labor and specified contingencies, which are used to obtain a cost estimate to reconstruct the Inn. (Dkt. 77-1). The Report does not directly opine on just compensation but is used by Fenton's appraisal expert Matthew P. Ray in his opinion on just compensation.

ACP asserts two reasons for excluding Sarmadi's opinions and testimony: (1) Sarmadi's alleged failure to comply with the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B); and (2) Sarmadi's opinions are inadmissible under Fed. R. Civ. P. 702. The Court will deny ACP's motion to exclude the opinions and testimony of Sarmadi.

1. **Fed. R. Civ. P. 26(a)(2)(B)**

ACP asserts three grounds for its argument that Sarmadi failed to comply with the requirements of Rule 26(a)(2)(B): (1) he did not "prepare" the Expert Report; (2) he did not include the basis and reasons for his opinions; and (3) he did not include sufficient facts or data to support his opinions.

a. **Rule 26(a)(2)(B): Written Report Prepared by Expert Witness**

Rule 26(a)(2)(B) provides that a party's disclosure must be accompanied by a written report "prepared and signed" by the proffered expert witness. ACP asserts that Sarmadi did not "prepare" the Report, contending the Report was in fact prepared by Sarmadi's estimator Mark D. Pitts, who has not been designated as a testifying expert and who stated in his deposition that after the first three pages of the Report, what followed "all appears from my report." (Dkt. 84 at 4-6; Dkt. 77-4 (Pitts Depo.) at 22:8-11). Fenton counters that Sarmadi prepared his Report and that ACP's argument ignores the extensive work done by Sarmadi in reviewing, editing, and correcting Pitts' initial work. (Dkt. 88 at 2).

"Ghost writing a testifying expert's report is the preparation of the substance writing of the report by someone other than the expert purporting to have written it." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291 (E.D. Va. 2001). "Unquestionably, Rule 26 requires an expert witness to prepare his own Rule 26 report." *Id.* Although an expert witness must "prepare" the report, the expert is permitted to use assistants. The framework the Court uses is summarized in an opinion cited by ACP:

> An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify. The opposing party can depose them in order to make sure they performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was the standard practice in his field. If the

requisite assurances are forthcoming, the assistants' work need not be introduced into evidence. . . .

Analysis become more complicated if the assistants aren't merely gofers and data gatherers but exercise professional judgment that is beyond the expert's ken. (They needn't, of course, be assistants. . . . it would make no difference if they were independent experts.).

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002) (citations omitted).

ACP argues that the evidence shows that Pitts prepared the Report, pointing to Pitts' deposition testimony noted above as well as to Sarmadi's deposition testimony in which he could not remember what several acronyms in the Report stood for, did not know the name of the software program used to prepare the Report, and stated that previous projects Pitts reviewed would be "based on his [Pitts'] data and experience." (*See* Dkt. 77-3 at 169:21-170:1, 170:18-171:1).

ACP relies on *Weitz Co., LLC v. Lloyd's of London*, No. 4:04-CV-90353TJS, 2007 WL 7131908 (S.D. Iowa Sept. 28, 2007), where testimony of a weather expert was excluded when the expert delegated the collection of weather data and the writing of the report to an assistant. ACP argues that this is the same scenario which occurs here. The court in *Weitz*, however, observed that "[i]f the [expert] had been involved, even to some limited extent, in the underlying research, analysis or drafting of the report, the court would view his apparent lack of knowledge as to certain aspects of the report as a matter of weight." *Weitz*, 2007 WL 7131908, at *3 (citing *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*, 356 F.3d 850, 858 (8th Cir. 2004) ("Generally, the factual basis of an expert's opinion goes to credibility of the testimony, not admissibility.")).

In this case, Sarmadi did not completely delegate the task and simply sign the Report but was involved in various aspects of the underlying research and production of the Report. Sarmadi and Pitts spent 4-5 hours at the property site documenting existing conditions, verifying drawings,

determining the quality of finishes and construction techniques, and talking with Fenton Inn personnel. (*See* Dkts. 77-2 at 1-2; 77-3 at 31:3-33:16, 54:9-19). After Pitts inputted the measurements and observations into a program to organize the data, Sarmadi and his team reviewed the information, verified its reasonableness, made edits, and confirmed its accuracy based on measurements and notes Sarmadi (and Pitts) took during the site inspection. (*Id.* at 79:14-80:1, 103:18-104:17).

Sarmadi also testified that he checked "most" of the unit costs using his own data, mainly in an effort to make sure the big ticket items, "the things that would really impact the cost of the project[,] were correct." (Dkt. 77-3 at 174:15-175:19). Although ACP claims that Sarmadi's revisions to Pitts' cost estimate were limited to "a mere ten of more than 200 line items," (dkt. 94 at 2), Sarmadi's review appears to relate to major line items: custom work, exterior calculations, flooring, roofing, concrete walls, door costs, door and window quantities, pavers, and fireplaces. (*See* Dkt. 88-2 at 112-122).

To be sure, Sarmadi used Pitts as a data gatherer but also for his expertise in pricing. (Dkt. 77-3 at 174:15-18 ("The reason Mark [Pitts] is part of the team is because of his expertise and because he's involved in the pricing side of things much more frequently.")). This was disclosed in the Report. (*See* Dkt. 77-2 at 1 (referencing collaboration with a local construction estimator), 5 (profile of Pitts)). But Pitts' work would not appear to be beyond Sarmadi's "ken" (i.e., his expertise). And, as discussed above, Sarmadi was clearly involved to varying degrees in the underlying research, analysis, and drafting of the Report.

The Court concludes, therefore, that Sarmadi's involvement was sufficient to meet Rule 26(a)(2)(B)'s requirement that the expert "prepare" the Report.[4]

### b.     Rule 26(a)(2)(B)(i): Disclosure of Basis and Reasons for Opinions

ACP asserts that even if Sarmadi prepared the Report, he failed to disclose the basis and reasons for his opinions as required by Rule 26(a)(2)(B)(i). "Expert reports must not be sketchy, vague or preliminary in nature. Expert reports must include the 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Brosville Cmty. Fire Dep't, Inc. v. Navistar, Inc.*, No. 4:14-cv-00009, 2014 WL 7180791, at *3 (W.D. Va. Dec. 16, 2014) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)).

ACP argues that the Report itself contains no explanation of how the line item amounts were calculated and that Sarmadi and Pitts admitted the methodologies used to reach various line item amounts were not disclosed in the Report. ACP points to Sarmadi's testimony that he verified several of the line item amounts by comparing them to a project on which he previously worked but that methodology was not in the Report because "[w]e consider most of that just an internal process" and that his use of an aerial survey using Google Earth imagery software was not part of the Report. ACP also faults the Report for not disclosing that Pitts called supply houses and checked his proprietary database to obtain unit prices and for not disclosing Sarmadi's purported comparative analysis based on another project.

---

[4] ACP also asserts in a one-sentence footnote that the cost estimates are not valid because the values were not as of the date of the take, which in this case is the date the Complaint was filed, January 31, 2018. The footnote is in connection with ACP's argument that Sarmadi did not author the Report, contrasting a statement of Pitts that his pricing was as of September or October 2018, (dkt. 77-4 at 61:4-18), while Sarmadi testified that the pricing was as of January 31, 2018, (dkt. 77-3 at 159:1-3). The footnote asserts that this also makes Sarmadi's opinions and testimony unreliable and irrelevant under Fed. R. Evid. 702. ACP does not elaborate on this latter assertion. The footnote does not alter the Court's analysis of whether Sarmadi may be considered to have "prepared" the Report.

"Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client." *Carr v. Dees*, 453 F.3d 593, 605 (4th Cir. 2006). Thus, an expert report should be written in a manner that reflects the testimony the expert is expected to give at trial. *Sharpe v. United States*, 230 F.R.D. 452, 458 (E.D. Va. 2005). ACP contends that it had to depose Sarmadi and Pitts without knowing the basis for their opinions, and had no prior knowledge that Sarmadi employed an aerial analysis, obtained vertical dimensions, or performed a comparative analysis using a prior project.

Fenton characterizes ACP's argument as being extreme as it suggests Sarmadi should have disclosed every document he reviewed and every step he took in completing his Report. Fenton overstates ACP's position. Rather, as stated in one of the opinions cited by Fenton, the expert report must be "sufficiently detailed and complete enough to enable adequate preparation by" the other party. *Sharpe*, 230 F.R.D. at 458. Even so, Sarmadi's Report described the methods he employed in some detail:

> Following our site visit, observations of existing conditions, conversations with Fenton Inn personnel and collaboration with a local construction estimator, we have prepared an estimated cost analysis broken into the various constructions Divisions, in accordance with current industry standards. The cost analysis is based on existing drawings provided by the Fenton Inn ownership, field observations documenting quality of work and deviations from the drawings provided, and quantities of materials taken from the field-verified existing drawings and site observations.

(Dkt. 88-1 at 1). The Report also discussed the considerations which went in to preparing cost estimates of the contingencies (contractor, design, and owner). (Dkt. 77-2 at 10).

The Court is troubled by Sarmadi's failure to disclose in his Report specifically how the line item amounts were calculated. The Court finds, however, that under the circumstances of this case, including Sarmadi's limited focus on the replacement cost of the Fenton Inn, the disclosure

of steps undertaken in identifying the quantity of materials required, and the itemization of unit costs, is sufficient to avoid exclusion on this ground.

### c. Rule 26(a)(2)(B)(ii): Disclosure of Facts or Data

Rule 26(a)(2)(B)(ii) requires disclosure of "the facts or data considered by the witness" in forming his or her opinions. The phrase "facts or data" is meant to be interpreted broadly to require disclosure of any material considered by the expert, from whatever sources, that contains factual ingredients. Fed. R. Civ. P. 26, advisory committee's notes to 2010 amendments.

ACP argues that Sarmadi failed to disclose the facts or data on which he relied, in violation of Fed. R. Civ. P. 26(a)(2)(B)(ii). ACP asserts that Sarmadi failed to disclose measurements taken during the site visit, sketches allegedly prepared by Sarmadi showing discrepancies between the Fenton Inn as designed and as-built, aerial photographs and other photographs relied on by Sarmadi, and cost data allegedly obtained by Pitts from suppliers and his database. In short, ACP concludes that the "only facts and data" disclosed in the Report are four drawings, drawings which fail to include sufficient information.

Fenton counters by noting that the Report contains more than 200 line items setting forth the number and type of units of each item as well as unit cost and the resulting total costs. Fenton also asserts that the measurements taken during the on-site visit are reflected in the cost estimate in the columns labeled "Quantity" and "Units," and that Sarmadi's hand-written notes from the visitation would not provide any additional information because the information contained in those notes led to the figures given in the Report.

Sarmadi's Report discloses specific "take-off" information (dkt. 77-2 at 20), i.e., information which an estimator "takes off" blueprints and field sketches in order to prepare part of the estimate, including that related to quantities of materials. As noted in the preceding

subsection, the Report states that the cost analysis was based on not only the existing drawings but also on field observations regarding quality of the work and deviations from the provided drawings. The Report then provided descriptive items titles and the quantity of material or the labor or subcontract/equipment estimated costs for each item. (Dkt. 77-2 at 11-19). The Court finds this disclosure is sufficient in this case to satisfy the requirements of Rule 26(a)(2)(B)(ii).

For the foregoing reasons, the Court will deny ACP's motion to exclude the testimony and opinions of Sarmadi based on alleged Rule 26(a)(2)(B) shortcomings.[5]

### 2.    Admissibility of Sarmadi's Opinions Under Fed. R. Evid. 702

ACP next argues that Sarmadi's opinion testimony is inadmissible under Fed. R. Evid. 702, *Daubert* and *Kumbo Tire*. First, ACP argues Sarmadi's opinions are not "based on sufficient facts or data" as required by Rule 702(b). ACP asserts that the only facts and data in Sarmadi's Report are four drawings. ACP points to its architect Peter Forella's opinion that essential information is missing from the Report, including (1) exterior elevations and vertical dimensional information, (2) the basis for the geometric quantities involving the vertical dimensions, and (3) construction document grade wall sections, details or specifications. At his deposition, Sarmadi acknowledged that the Report did not include wall sections or exterior elevations or vertical elevations. (Dkt. 77-3 at 73:5-7, 86:3-8, and 148:17-20). From this, ACP concludes that Sarmadi "failed to provide sufficient facts or data upon which the district court [can] conclude that his opinion was based on reliable principles and methods." (Dkt. 77 at 12 (quoting *Zuckerman v. Wal-Mart Stores E., LP*, 611 F. App'x 138, 138 (4th Cir. 2015) (unpublished per curiam))).

---

[5] ACP asserts Fenton did not address Rule 37(c)(1), which excludes a party's expert witness or information for a party's failure to provide information or identify a witness as required by Rule 26(a) unless the failure was substantially justified or was harmless. (Dkt. 94 at 8). Fenton, however, need not do so provided it chooses to stand on its argument that it complied with the requirements of Rule 26(a)(2)(B) in the first place.

Second, ACP asserts that Sarmadi's opinions are not the product of reliable principles and methods because there is too great an analytical gap between the drawings and line item quantities for Sarmadi's corresponding opinions to be reliable, pointing to Sarmadi's testimony that "very few line items on here are a direct translation from the drawing." (Dkt. 77-3 (Sarmadi Depo) at 148:3-4). With respect to how the 1,200 square feet listed for "Heavy Individual Stacked Stone/Concrete Wall," was calculated, Sarmadi testified that he "could deconstruct the number and give you some approximate values, but I don't know offhand." (Dkt. 77-3 at 68:10-12). ACP claims this inability to "deconstruct" applied to almost all of the quantities within the cost estimate. ACP concludes that as the Report contains no explanation as to how these amounts were determined, the unit costs provided fail to satisfy Rule 702's "requirement that the expert opinion evidence be connected to existing data by something more than the 'it is so because I say it is so' of the expert." (Dkt. 77 at 13 (quoting *Holesapple v. Barrett*, 5 F. App'x 177, 180 (4th Cir. 2001) (unpublished per curiam))).

Fenton's response focuses primarily on general principles related to Rule 702, including the Advisory Committee's observation that: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Civ. P. 702, advisory committee's notes to 2000 Amendment. Fenton asserts that ACP ignores the fact that Sarmadi's opinions were based in large part on his extensive site visit and the many measurements he took in person.

Although ACP's expert Forella points to specific information he asserts is essential but missing from the Report, the Report sets out a detailed list of measurements for building areas, concrete, carpentry, roofing, windows, and a fireplace, which provides facts and data in addition to the drawings attached to the Report. The measurements include square feet and linear feet

measurements. For items such as footings, windows, and doors, the Report includes a description of the item identifying the item type or dimensions. (*See* Dkt. 77-2 at 20 (Fenton Inn Take-Off)). Additional specifics appear in the itemized list of materials required. (*See* Dkt. 77-2 at 11-19). Further, the fact that Sarmadi at deposition did not know the exact numbers for a stone/concrete wall does not itself mean the methods used to produce the testimony are unreliable or that his testimony will be mere *ipse dixit*.

ACP's motion to exclude the testimony and opinions of Paykon H. Sarmadi (dkt. 76) will be denied.

**B.     THOMAS L. STOKES, JR.**

ACP moves to exclude the testimony of Fenton's designated expert Thomas L. Stokes, Jr., an environmental professional. Stokes is expected to testify regarding the construction of the pipeline, the possible safety implications of its construction, and the impacts of the construction and operation of the pipeline on the property. Much of his expert report relates to his opinion on the effect of a pipeline rupture although the report also includes a brief reference to aesthetic impacts and addresses possible noise impacts during construction. (Dkts. 77-1, 82, 83-1). Stokes is expected to opine that the proximity of the pipeline and related construction activity "will have serious negative effects on property" and "[t]he probability of a serious incident resulting in property damages, injury or death is not congruent with the use of the property as a boutique bed and breakfast." (Dkt. 83-1 at 10). Stokes also opines that "other impacts such as aesthetic and noise impacts further impairs the ability of the property to achieve its highest and best use." (*Id.* at 9-10). Stokes has no training, education, or licenses in the design, construction, maintenance, inspection or operation of a natural gas pipeline. (Dkt. 83-2 at 73:20-74:17).

ACP challenges Stokes' opinions and testimony under Fed. R. Civ. P. 26(a)(2)(B), Fed. R. Evid. 702, and Fed. R. Evid. 402 and 403. (Dkts. 82, 83). The Court will exclude Stokes' testimony for the following reasons.

**1. Stokes' Calculations Based on an Incident Probability Value**

The Stokes Report calculations are problematic. In his Report, Stokes calculated the annual probability of a pipeline incident near the Fenton Inn at 1.8 in a thousand based on the historic incident rate he calculated. (Dkt. 83-1 at 6). This figure is repeated in Fenton expert Michael Ray's appraisal Report, in which Ray states: "Mr. Stokes concluded the probability of a significant incident is 1.8 in 1,000 which is a credible incident pursuant to government regulations." (Dkt. 81-2 at 76).

At his deposition, however, Stokes admitted to a miscalculation of the probability of a pipeline incident under his own method, which should have resulted in a probability of 1 in 2,000. (Dkt. 83-2 at 105:1-7). Neither Stokes nor Ray appear to have supplemented their expert reports in this respect. *See* Fed. R. Civ. P. 26(e)(2).[6] Stokes could not speak to the specifics regarding the data set out in Table 1 of his Report and on which he based his probability calculation. (*See* Dkt. 83-2 at 181:3-184:6).

Critically, this ratio does not reflect the probability of an incident occurring *on* the subject property. (Dkt. 83-2 at 160:18-161:5). Fenton's opposition brief acknowledges that it is improper to consider how off-site incidents may impact the value of the Fenton property. (Dkt. 89 at 10). Thus, any opinion or testimony regarding the probability of an incident occurring outside the

---

[6] Stokes had to make several other corrections to numbers in his Report. For example, and related to the change to 1 in 2000, he stated a hazard model had estimated a likelihood of a gas line rupture resulting in an explosion or deflagration resulting in personal injury, death or property damage for the Fenton Inn to be 0.18%. Stokes corrected this figure at deposition to 0.5%. (*See* Dkt. 83-2 at 101:13 to 105:17).

property is irrelevant and must be excluded on that basis. *E. Tenn. Natural Gas Co. v. 2.93 Acres*, No. 4:02-cv-00179, 2007 WL 2688414, at *2 (W.D. Va. Sept. 13, 2007) ("Where a part of an owner's land is taken for public use, just compensation does not include the diminution in value of the remainder caused by the acquisition and use of adjoining lands of others for the same undertaking." (quotations and citation omitted)). Yet Stokes' figure (1.8 in 1,000) was also used in Ray's Report.[7]

At his deposition, Stokes acknowledged that the probability of an incident occurring on the property itself, the relevant standard, was 2 in one million. (Dkt. 83-2 at 171:6-11). Stokes reports that federal regulations regarding nuclear facilities state that an external event is not a concern if the probability of the event is less than one in a million. (Dkt. 83-1 at 4). Stokes stated the figure was not in his report because "you don't really – you don't do it that way." (Dkt. 82-1 at 173:4-10). However, for purposes of just compensation, it is done that way.

In light of the foregoing, the Court finds the probability of an incident Stokes's calculated for his Report (1.8 in 1,000 or 1 in 2,000) to be irrelevant because it is not tied to the taking occurring on the property. Accordingly, Stokes is not permitted to testify as to the probability of a pipeline incident.

### 2. Nexus to Property Valuation

In determining just compensation, "[c]onsiderations that may not reasonably be held to affect market value are excluded." *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)

---

[7] Stokes's Report includes a map that depicts a "blast zone" resulting from an incident. (Dkt. 83-1 at 3, 19). The blast zone shows a two-mile band (one-mile to each side of the pipeline) showing a 99% mortality rate as well as a three-mile wide band showing a 50% mortality rate. (*Id.* at 19). Stokes states he used the Areal Locations of Hazardous Atmospheres (ALOHA) computer program to make the calculations. (Dkt. 83-1 at 6). The result is a calculated explosive force of 1,176,537 pounds of TNT (which is equivalent to over half a kiloton of TNT). (Dkt. 83-1 at 35).
.

(citation omitted). Expert testimony, therefore, must be relevant to the determination of just compensation because if not relevant, the expert's testimony cannot help the finder of fact. *Daubert*, 509 U.S. at 591.

At his deposition, Stokes was questioned about his Report's conclusion that the pipeline would have serious negative effects on the property. Stokes said that he meant it would affect the property value but admitted that he did not claim to be an appraiser, had no appraisal license, and had never testified about property value in court. (Dkt. 83-2 at 173:18-174:18). When asked about the probability of a pipeline affecting property value, Stokes replied that: "I would say is that I do know from talking to, you know, people who do, you know, academic appraisal people, they have looked at it . . . [a]nd so while I can't testify to it because I don't know it to be a fact, I would expect that it has been looked at and somebody has made a determination but I couldn't testify to it because I haven't seen that." (*Id.* at 176:12-177:2).

Stokes cannot link his analysis to property value and, therefore, cannot aid the trier of fact in determining just compensation. Fed. R. Evid. 403, 702; *see, e.g.*, *Hoekstra v. Guardian Pipeline, LLC*, 726 N.W.2d 649, 662 (Wis. Ct. App. 2006) (party must demonstrate its expert on "the effects of gas pipeline leaks, ruptures, and explosions" is able to tie that information to the effect of the pipeline on the values of the particular properties involved); *Rockies Express Pipeline LLC v. Hopkins*, No. 1:08-cv-00751, 2012 WL 1622532, at *5 (S.D. Ind. May 9, 2012) (expert testimony precluded where expert's report "reveal[ed] no factual data or other bases on which he concluded stigma damages"; court noted that "one would expect that if the presence of an underground natural gas pipeline makes residential development economically non-viable, then some market data would exist to evidence that."); *see also* 469 U.S. at 29 ("Considerations that may not reasonably be held to affect market value are excluded." (citation omitted)).

The Court does not, unlike ACP, consider Fenton's "predicate witness" argument to be "bogus." (*See* Dkt. 95 at 2). Ray stated that his opinion, including total compensation, would not change if he did not have Stokes "confirmation." (Dkt. 92-3 at 53:8-10, 56:1-2). There may be a situation where an expert's testimony in a different field is sufficient when accompanied by an appraiser's opinion. This is not that case. Because of the problems with Stokes' use of underlying data and methods that do not address the limitation to incidents arising on the subject property, the Court will exclude his testimony.[8]

## C.  RICHARD R. PARADIS

Fenton designated Richard R. Paradis to testify regarding the construction of the pipeline and "the impacts of the construction and operation of the pipeline on the subject property including, but not limited to, the noise and vibration impacts on the subject property as a result of the construction and operation." (Dkt. 77-1). Paradis prepared a report "to provide a review of noise related documents to assist in determining the impact on the Fenton Inn by noise and other impacts associated with the construction of the Atlantic Coast Pipeline including the planned horizontal directional drilling for the construction of the pipeline." (Dkt. 79-1 at 2). ACP moves to exclude the opinions and testimony of Paradis pursuant to Fed. R. Evid. 702. (Dkt. 78).

This issue pending before the Court is just compensation, which the Parties agree is determined as of the date of the taking, January 31, 2018, in this case. *See United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984); (Dkt. 87 at 5). "Considerations that may not reasonably

---

[8] Stokes' Report also offered opinions on aesthetic impacts and noise impacts. The Court will exclude any testimony as to aesthetic impacts as the one-sentence statement in the Report says no more than what a lay person could observe. (*See* Dkt. 83-1 at 10). The Court will also exclude Stokes' testimony and opinions regarding noise. Stokes has never done noise monitoring for a pipeline construction project and has not been around underground pipeline construction. (Dkt. 83-2 at 64:21-65:8, 66:1-17, 71:6-11, 120:4-19).

be held to affect market value are excluded." 469 U.S. at 29 (citation omitted). Expert testimony, therefore, must be relevant to the determination of just compensation because otherwise the expert's testimony cannot help the finder of fact. *Daubert*, 509 U.S. at 591.

Fenton first argues that Paradis' testimony and opinions are relevant to the determination of just compensation as they relate to the "temporary construction easements." (Dkt. 87 at 4, 5). To the extent Fenton literally means "just compensation owed for the temporary construction easements," (dkt. 87 at 5), Paradis' testimony and opinions would not be relevant. The original Complaint sought to acquire "permanent easements" to construct, operate, etc. the ACP Project while the separate "temporary easements," to be condemned for a period not to exceed five years, were to enable ACP to construct the ACP Project and engage in restoration or clean-up activities. (Dkt. 1 (Compl.) ¶¶ 18-19). The permanent easements and temporary easements were located near or adjacent to each other but were not the same land.

Fenton argues that Paradis' opinions and testimony are relevant to just compensation "owed for the temporary construction easements" and, as such, should be admitted to assist the jury in making its determination. (Dkt. 87 at 5). Arguably, the matter has been mooted in light of ACP's amendment to its Complaint, which deleted references to condemnation of temporary easements on the property before construction began. Even so, "[i]n the context of a temporary taking, the proper measure of just compensation is generally recognized to be the rental value of the property . . . over the time it was taken." *Cent. Pines Land Co. v. United States*, 107 Fed. Cl. 310, 328 (2010). Fenton expert Matthew Ray's Report itself states that "[r]ights to temporary workspace easements are considered similar to renting land during the construction period." (Dkt. 81-2 at 79 (setting rent due for workspace easement at $296)). ACP "stipulates" that just compensation for the temporary easements is the higher of the two values provided by Ray and by

its own expert Harvey, the amount of $300. (Dkt. 92 at 6). To the extent Fenton meant just compensation owed for the temporary construction easements, testimony regarding noise and vibration would not assist the trier of fact in that determination and thus would not be admissible. *See* Fed. R. Evid. 702(a).

To the extent Fenton means "owed for the temporary construction easements" to include the permanent easement and/or refer to the severance determination, the threshold question is whether damages caused by temporary construction after the date of the take can be a part of the analysis determining just compensation. In *Ryan v. Davis*, 201 Va. 79 (1959), the lower court instructed the commissioners that any damage the property may have sustained by reason of any wrongful act or negligent acts committed during the course of construction of a highway project was not compensable in the condemnation proceeding but could form the basis of a separate suit. The commissioners were further instructed to disregard evidence of annoyance, inconvenience, or loss of business caused by dirt, noise or temporary obstruction of access caused by the actual carrying on of the construction work. *Ryan*, 201 Va. at 83 n.1. The Virginia Supreme Court found the instruction proper, noting that "the test for fixing the damages to residue land is the fair market value immediately before the taking as compared with the fair market value immediately after the taking," a rule it applied even when the construction occurred before the determination of just compensation. *Id*. at 83.

Fenton points out that the instruction in *Ryan* referenced wrongful or negligent acts committed during construction. Fenton claims that ACP's argument presupposes that Paradis' opinions of the effect of noise and vibration on the property are due to negligent or wrongful acts. (Dkt. 87 at 8). The question before the Virginia Supreme Court in *Ryan*, however, was whether the "trial court err[ed] in excluding evidence of damages after the taking, *or* by instructing the

commissioners relating to negligent acts." 201 Va. 79 (emphasis added). The general test for fixing damages is not limited in *Ryan* but applies to "damages which the [] property sustained in the course of construction of the highway project." *Id.*; *see Columbia Gas Transmission, LLC v. 252.071 Acres, More or Less, in Baltimore Cnty.*, No. ELH-15-3462, 2016 WL 5854104, at *4 (D. Md. Oct. 6, 2016) (denying discovery request for construction and engineering plans because "they do not represent the state of the property at the time of the taking, but rather [the] unexecuted, evolving approach to developing, installing, and operating the [line extension]. As such, construction and engineering plans will not shed light on the value of the property taken or its remainder *at the time of the taking*." (emphasis in original)). To the extent that potential damages might arise after the taking due to construction, under *Ryan* the noise and vibration effects resulting from construction would be irrelevant to the issue before the Court (i.e., just compensation), and any such testimony and opinions from Paradis should be excluded.

Authority on which Fenton relies for the proposition that temporary takings are compensatory does not apply here. For example, Fenton quotes the Supreme Court for the proposition that "[o]rdinarily, [] if government action would qualify as a taking when permanently continued, temporary actions of the same character may also qualify as a taking." *Arkansas Game & Fish Com'n v. United States*, 568 U.S. 23, 26 (2012). The Court in that case, however, held that *recurrent* floodings, even if of definite duration, are not categorically exempt from Taking Clause liability. *Id.* The question in *Arkansas Game & Fish* was whether repeated encroachments might be considered as a taking. The Supreme Court did not address, as in *Ryan*, construction contemplated by the easement.

Even if testimony and opinions regarding possible construction noise and vibration are properly considered, for example, for severance purposes, just compensation is measured by the

market value of the property at the day of taking.  Paradis had no opinion himself regarding how potential noise and vibration would impact the market value of the property.  As he noted at his deposition, it was not his "role in this project" to have an opinion on how the noise impact of construction affects the fair market value of the property nor did he attach any economic values to noise and vibration reaching the Fenton Inn.  (Dkt. 79-2 at 119:19-22, 120:9-14).  Thus, the opinions and testimony of Paradis would provide no direct link between any sound or vibration generated during construction and the issue before the Court, the effect of the taking on market value and, ultimately, just compensation.  As such, his testimony and opinions would not help the trier of fact determine a fact in issue and should be excluded under Fed. R. Evid. 702(a).

Fenton, however, asserts that Paradis is a "predicate witness" intended to help Ray establish his opinion on severance damages.  (Dkt. 87 at 11).  However, Ray made clear at his deposition that his opinion, including his total compensation calculation, would not change if he did not have Paradis' Report.  (*See* Dkt. 92-3 at 53:11-13 (Ray's opinion would not change if he did not have Paradis' confirmation), 56:4-6 (Ray's opinion on total compensation due would not change if he did not have Paradis' confirmation)).  At oral argument, Fenton's counsel argued that Ray simply meant that he relied on several foundations (including the testimony of Paradis), and that removal of one foundation would not necessarily alter his opinion.  Even so, Ray made clear that his opinion stood without Paradis' Report and opinion.  The Court therefore finds that Paradis' opinion had little, if any, impact on Ray's determination of severance damages.  This is consistent with just compensation being measured by market value differences before and immediately after the project is completed.  (*See* Dkt. 79-6 at 14 (Ray Report) (appraisal based, in part, on hypothetical condition that estimates the market value of the subject property after the taking "based on the premise that the project is completed as of the effective date of the appraisal")).

Furthermore, Paradis' Report is based on the bed and breakfast being "located approximately 200 feet from the construction area where ACP will be conducting directional drilling." (Dkt. 79-1 at 2). Paradis at deposition stated that he understood that the distance between the drilling rig and the Fenton Inn was 200 feet and that he had obtained the distance by Google mapping the Fenton Inn and seeing "how it was laid out." (Dkt. 79-2 at 55:1-22). Paradis did not include a confirmation of his Google Map result in his Report. In fact, the drilling rig is approximately 392 feet from the Fenton Inn. (*See* Dkt. 79-9, Figure 1). The distance was originally given as 600 feet in ACP's Updated Noise Analysis Supplemental Filing, Appendix B, page 26, dated November 17, 2016. (Dkt. 79-4 at 28). This is a document, and even a specific page, reviewed by Paradis in preparing his report. (Dkt. 79-1 at 2 (Paragraph 2)).

Paradis did not conduct his own noise or vibration studies of ACP's proposed activities or visit the subject property. (Dkt. 79-2 at 109:15-19). Nor had Paradis performed a noise analysis of pipeline construction previously. (*Id.* at 36:13-15). At his deposition, Paradis stated that a 3 decibel decrease would equal a reduction in sound intensity by half and a doubling of distance was around a six decibel reduction. (*Id.* at 79:5-7, 112:13-14). Thus, Paradis' use of 200 foot distance compared to the present 392 foot distance means that the sound intensity at the distance he used would be four times that at the present drilling rig. This disparity presents an error of a material nature, rendering Paradis' opinion unreliable and therefore excludable under Fed. R. Evid. 702.

The Court finds that Paradis' noise and vibration testimony and opinions related to construction are, respectively, irrelevant and unreliable and will be excluded.

## D.    MATTHEW P. RAY

Fenton designated Matthew P. Ray ("Ray") to testify "to the value of the easements at issue in this litigation and the just compensation due to the Defendant, which includes the damages to

the residue of the property." (Dkt. 77-1, 81-2 (Ray Report)). Ray defines the property as consisting of approximately 20.915 acres (the 2.922 acres noted above and two additional parcels owned by Fenton). (Dkt. 81-2 at 4, 15).

In preparing his Report, Ray used the Sales Comparison Approach to value the underlying land and an Innkeeper's House but, with respect to the Fenton Inn, determined that the Cost Approach was required because the Inn represented a "special use property." (Dkt. 81-2 at 9). Ray relied upon Fenton's designated expert Sarmadi to estimate the "replacement cost new" of the Fenton Inn, which Sarmadi estimated to be $3,274,813. (Dkt. 81-2 at 48). A copy of Sarmadi's report was included in the Ray Report but ACP asserts that no other facts, data, or analysis are included to support Ray's adoption of Sarmadi's cost estimate. (Dkt. 81 at 4). At his deposition, Ray testified that he "checked" Sarmadi's cost estimate with "information that I have in my office per the subscription I have to Marshall Valuation Service." (Dkt. 81-3 at 102:9-18). ACP asserts the Ray Report does not mention or reference this "check." (Dkt. 81 at 4).

In addition to Sarmadi's "cost new" for the Fenton Inn, Ray also included a cost estimate for an under-construction cabin located on the property and for wells and a septic system on the property. Ray estimated the cost of the uncompleted cabin by taking the cost per square foot Sarmadi calculated for the Fenton Inn, multiplied by the square footage of the cabin, and then reduced by 50% "to reflect the unfinished condition of the cabin." (Dkt. 81-2 at 49). Ray also added an additional $100,000 for "3 wells and 6 tank septic system." (*See id.*).

Ray then calculated severance damages. (Dkt. 81-2 at 78, 80). Ray undertook an analysis of "paired sales," with the goal of comparing properties encumbered by an interstate natural gas pipeline easement with properties that were not so encumbered. (Dkt. 81-2 at 61). In addition, the Report's severance damages analysis included a section titled "market perception/physical

constraints" in which Ray referenced and relied upon the opinions of Fenton experts Paradis, Stokes, and R.D. Deaver.[9]

ACP argues that: (1) Ray failed to comply with Rule 26(a)(2)(B) and industry standards by failing to include a "Larger Parcel Theory Analysis"; (2) Ray's testimony regarding severance damages should be excluded because it is not based on sufficient data and is not reliably applied; (3) Ray's "cost approach" to the valuation of the Fenton Inn and certain other improvements is unreliable; and (4) Ray's testimony regarding the value of the permanent easement should be excluded.

### 1. Rule 26(a)(2)(B)(i) and Industry Standards: The Larger Parcel Analysis

ACP asserts that Ray failed to include, or even perform, a "larger parcel analysis" which, ACP argues, violates Rule 26(a)(2)(B)(i) and the Uniform Standards of Professional Appraisers ("USPAP"). The Virginia Real Estate Appraiser Board requires all licensed Virginia appraisers to comply with the provisions of the USPAP. *See* Va. Code Ann. § 54.1-2012.1(2)(i); 18 Va. Admin. Code § 130-20-180. One of the working rules to do substantial justice in eminent domain proceedings "is that a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it." *United States v. Miller*, 317 U.S. 369, 374-75 (1943). "The larger parcel may be all of one parcel, part of a parcel, or several parcels, depending to varying degrees on unity of ownership, unity of use, and contiguity." (Dkt. 81-6 (Harvey Report) at 20 (quoting Michael McKinley, *Review Theory and Procedures: A Systematic Approach to Review in Real Property Valuation*, at 56 (Chicago Appraisal Institute 2015))). In condemnation, the larger parcel is "the tract or tracts of land which are under the beneficial control of a single individual or entity and have the same, or an integrated, highest and

---

[9] Defendant has since withdrawn expert witness R.D. Deaver.

best use." (Dkt. 90 at 3 (quoting J.D. Eaton, *Real Estate Valuation in Litigation*, at 76 (2d ed. The Appraisal Institute 1995))).

ACP asserts that Ray failed to comply with the USPAP requirement that reports "summarize the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions."[10]  ACP complains that Ray defined the subject property as consisting of 20.915 acres but his Report did not include any analysis as to why two parcels in addition to the parcel identified in the Complaint were included. At deposition, Ray admitted that he did not include a larger parcel analysis in his Report.  (Dkt. 81-3 at 66:9-12).

In his Report, Ray included a section titled "Identification of the Subject Property."  In that section, the Report states the subject property is approximately 20.915 acres, consisting of three parcels.  An overhead view provided in the section shows the three parcels adjoining one another (i.e., showing they are contiguous).  The Report also stated that the property (i.e., the three tracts) were owned by Fenton and that the property was owner-operated as the Fenton Inn (i.e., unity of ownership).  (Dkt. 81-2 at 16).  As to unity of use, the Report states that the highest and best use is as a bed and breakfast, referencing the Fenton Inn (on one parcel), the Innkeeper's House (on a second parcel), along with supporting land area and potential for future development of the bed and breakfast (which would include all three contiguous parcels).  (Dkt. 81-2 at 4, 16, 40).

Although ACP describes this approach as "an attempt to cobble together a larger parcel analysis" (dkt. 93 at 4), Ray's Report defines the "subject property" as including the three parcels

---

[10] Although ACP asserts that the Ray Report violates the USPAP due to a failure to include the larger parcel analysis, ACP does not cite a specific provision of the USPAP requiring the larger parcel analysis.  Rather, ACP's argument is that, like Rule 26(a)(2)(B)(i), USPAP requires disclosure of the basis and reasons for an expert's opinions.

and, in doing so, provides the basis and reasons, which is consistent with a larger parcel analysis. The Court finds that, to the extent Ray was required to present reasons for his identification of the property affected, the Report satisfies Rule 26(a)(2)(B)(i).

### 2. Severance Damages Testimony and Opinions

ACP asserts that Ray's testimony regarding severance damages for injury to the property not taken should be excluded because his "paired sales analysis" is flawed and because his reference to purported "blast zones" is inflammatory and unduly prejudicial.

### a. Paired Sales Analysis

In a paired sales analysis, the appraiser identifies two properties that are as similar as possible except for one factor. When the sales are compared, the difference in price is best explained by the one factor that is different. *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 626 (2013). In this case, the pairs would be property with an interstate gas pipeline easement and a similar property without such an easement.

ACP asserts that Ray's analysis is flawed in that: (1) the Ray Report utilized the Milum Lane, Suffolk, property (Paired Parcels 1-3) as the "Impact Sale" (i.e., property with an interstate natural gas pipeline easement) but failed to consider that this property contained wetlands and also failed to make proper adjustments for that element in comparing three "Non-Impact Sales"; (2) the other pairs, Paired Parcels 4-7, are flawed because they utilized Joyners Bridge Road property as the "Impact Sale" with the Non-Impact Sales fifteen miles away despite closer properties identified by ACP's expert; and (3) the Ray Report used a total of seven pairs, which ACP claims is statistically too small a sample size to reliably estimate any impact to the subject property. (Dkt. 81).

ACP does not argue that the paired sales analysis method itself (1) has not been tested, (2) has not withstood peer review and publication, (3) has excessive rates of error, (4) has no standards for their application, or (5) has not been accepted in the field. *See TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (concluding challenge in that case not a true *Daubert* challenge). As noted by ACP's expert Harvey, comparable sales using paired data analysis is one of the most commonly used and reliable methods of estimating damages. (Dkt. 81-6 at 32 (citing *Real Property Valuation in Condemnation*, 171)). To the extent ACP is challenging whether the property sales are truly comparable, doing so is insufficient to state a true *Daubert* challenge. *See Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Baltimore & Harford Cntys., Md.*, 701 F. App'x 221, 229-30 (4th Cir. 2017) (unpublished); *E. Tenn. Nat. Gas Co. v. 7.74 Acres in Wythe Cnty., Va,*, 228 F. App'x 323 (4th Cir. 2007) (unpublished).

ACP asserts, rather, that it is challenging the particular methodology Ray employed in his paired sales analysis. ACP points to *Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake City*, No. 5:16-cv-178, 2017 WL 9939115 (M.D. Fla. Oct. 23, 2017), a condemnation case in which Ray's paired sales testimony was excluded. The court in *3.921 Acres* found that Ray's opinion lacked sufficient data to show that the paired sales he studied were similar. The court noted that Ray provided information only for location, land use, land size, and sales price but did not differentiate between upland and wetland or between cleared land and completely unimproved land. *3.921 Acres*, 2017 WL 9939115, at *9.

Here, Ray did provide information on site improvements (wooded versus cleared or partially cleared) and uplands versus wetlands, and addressed any differences in a "comparability" evaluation. Paired Parcels 1-3 used the same impact sale, wooded property on Milum Lane in

Suffolk. The paired parcels compared to the impact sale were partially cleared, cleared, and cleared, respectively. The Report noted this difference in the "comparability" evaluation.

The Milum Lane property was listed in the Report as Uplands, as were the three parcels to which it was paired. (Dkt. 81-2 at 61-67). Yet, at his deposition, Ray was presented with the National Wetlands Inventory database public records for the impact sale property, which Ray had not previously researched. Ray admitted that according to the database, the impact sale property was listed as containing wetlands. (Dkt. 81-3 at 174:14-176:6). ACP's concern is that in not taking into account the differences between uplands and wetlands, the Ray Report might erroneously attribute differences in prices for Paired Parcels 1-3 to the underground gas line easement which might instead be due, in whole or in part, to the presence of wetlands on the impact sales property. The National Wetlands Inventory for the impact sale property states that it is for general reference only. (Dkt. 81-6 (Harvey's Expert Rebuttal Report) at 49). This is not sufficient to exclude Ray's testimony with respect to Paired Parcels 1-3, but is a matter of weight.

With respect to the impact sale property used in Paired Parcels 4-7, Ray noted that the property contained "minimal wetlands" compared to uplands for the non-impact sale property. In his "comparability" notation for Paired Parcels 4-7 Ray concluded that the minimal wetlands and uplands in the properties compared were similar. (Dkt. 81-2 at 68-75). Ray took into account the difference in his analysis. For non-impact sales in Paired Parcels 4-7, ACP argues that Ray should have considered non-impact sale comparison properties closer to the impact sale property in distance and date of sale. (Dkt. 81 at 12; *see* Dkt. 81-6 (Harvey Rebuttal Report) at 34 (pointing to two apparently adjacent parcels sold in April 2016)). The Court it is not required to determine whether the comparable sales on which Ray relied were "certainly correct" measurements or whether better ones might exist. *See 76 Acres*, 701 F. App'x at 229-30. The Court concludes

ACP's argument regarding its expert's preferred non-impact sale properties goes to the weight Ray's analysis would be afforded, not to its admissibility.

Of greater concern, ACP argues that Ray's testimony and opinions should be excluded because he "only identified seven pairs" of sales in his paired sales analysis. ACP asserts that "[i]t is plain that this is statistically too small a sample size to reliably estimate any impact on the subject property's value." (Dkt. 81 at 12); *see* Appraisal Institute, The Appraisal of Real Estate 317 (13th ed. 2008 (quoted by ACP) ("Although paired data analysis is a theoretically sound method, it may be impractical when only a narrow sampling of sufficiently similar properties is available.")). ACP's brief, however, does not cite authority providing specific guidance on numbers of paired sales considered sufficient or insufficient. The Court, therefore, concludes that this issue, too, goes to the weight to be given Ray's analysis.

### b.    Application of a Specific Percentage of Impact

ACP argues that Ray's opinion is unreliable because he applies a specific percentage of impact (negative 55%) to the subject property without factual or methodological support. Ray's paired-sales analysis produced impact percentages ranging from negative 15% to negative 84% (a 69% range in value) with a mean of -55%. (Dkt. 81-2 at 75). In reaching his percentage of impact, Ray looked at Market Perception/Physical Constraints, which included Paradis' sound and vibration analysis regarding drilling expected to take place 24-hours a day for at least one year. Ray also relied on Stokes' incorrect probability of a significant incident of 1.8 in 1,000, which Ray found to be a credible incident pursuant to government regulations. He also relied on Stokes' blast zone radius calculations. Further, Ray relied on the analysis of Don Deaver, a pipeline safety expert now withdrawn by Defendant as an expert witness. (Dkt. 81-2 at 77).

Ray also considered the impact of aesthetics, stating that the pipeline easement would result in a clear-cut path through the property visible from the guest rooms at the Fenton Inn. Ray also concluded that as "some properties" are improved with mature trees and the route crosses a number of streams, the overall appearance of the property taken and the remaining property will change. (*Id.* at 77). Ray concluded, that in light of the foregoing impacts, "including the opinions of the previously identified experts," constraining the use of the property and the aesthetic damage caused by the clear-cutting within the easements and which is visible from the subject improvements, and given the negative impacts "we have researched and found applicable to natural gas transmission pipeline easements, we conclude that a severance damage of 55% to the property is reasonable based on the foregoing qualitative analysis which we observed in the paired sales within our empirical study." (*Id.* at 78).

ACP argues that Ray offered no factual or methodological support for his ultimate decision to apply the specific impact of negative 55% to the property other than indicating that the mean of the impact percentages identified in his paired sales analysis is -55%. (Dkt. 81 at 14). ACP also notes that the court in *3.921 Acres* found Ray's parcel sales analysis to be unreliable where the results of Ray's 45 pairs of sales ranged from indicating a pipeline easement had a 28% positive effect to a negative 92% effect. Because Ray offered no explanation for such a wide range, the court concluded Ray's results showed that the paired sales analysis was unreliable. *3.921 Acres*, 2017 WL 9939115, at *9.

As to methodology, the Ray Report, at pages 6-8, sets out a detailed approach to determining severance damages. The methodology includes consideration of physical constraints, market reaction and stigma, uses of property taken, aesthetics, and damages studies. (Dkt. 81-2 at 7-9 (pages 6-8 of the Report)). ACP is correct that the negative 55% is not referenced in these

pages but the purpose at this early point of the Report was undoubtedly to set out the methodology which would be followed. Ray supported his empirical paired sales analysis to qualitative considerations. (*See* Dkt. at 81-2 at 78). *See Sabal Trail Transmission, LLC v. 1.76 Acres of Land in Levy Cnty., Fla.*, No. 1:16cv73, et seq., 2018 WL 649990, at *2 (N.D. Fla. Sept. 26, 2018) (issues raised in Ray's paired sales analysis and application of specific impact percentages in that case did not render Ray's testimony so unreliable that it should be excluded). In this case, the concerns raised by ACP go to the weight of Ray's testimony.

### c. Use of Term "Blast Zone"

ACP notes that in his severance damage analysis, Ray included a "market perception/physical constraints" section in which he referenced and included the opinions of Paradis, Stokes, and Deaver to bolster his evaluation of the natural gas pipeline's negative impact on the property. (Dkt. 81-2 at 75). The discussion, ACP asserts, is "riddled" with "inflammatory and irrelevant references" to an apparent "blast zone" and apparent noise, construction, and safety concerns. (Dkt. 81 at 15-17). Specifically, ACP argues that Ray's use of the term "blast zone" in support of his conclusion that ACP's taking will cause the value of the property to diminish, is improper. (Dkt. 81 at 15; *see* Dkt. 81-2 at 75).

The authority cited by ACP relates primarily to hypothetical setback requirements and government action to which the cited opinions excluded testimony. The Ray Report does not appear to talk about setbacks although reference is made to building in "blast zones" would not be prudent. (Dkt. 81-2 at 8).

The Court concludes that Ray's use of the term "blast zone" does not warrant granting ACP's motion to exclude his testimony and opinions. The Court will, however, determine whether

references to blast zones, explosions, and community fear should be excluded at trial when it addresses ACP's motion in limine on the issue. (*See* Dkt. 119).

### 3.     Ray's Cost Approach Valuation

Ray used "elements of the Cost Approach to value the Fenton Inn." (Dkt. 81-2 at 9). ACP asserts that the valuation is not reliable and should be excluded under Rule 702. ACP also challenges Ray's separate valuation of an unfinished cabin, wells, and a septic system.

#### a.     Valuation of the Fenton Inn

ACP argues that Fenton's proffered expert Sarmadi, who valued the Fenton Inn, failed to prepare the report that Sarmadi now espouses, failed to disclose the basis and reasons for his proffered opinions or any of the underlying facts and data, and that even if he had, Sarmadi's lack of sufficient facts and reliable methodology render the Sarmadi opinions which Ray used unreliable. This argument turns on the disposition of ACP's motion to exclude the opinions and testimony of Sarmadi. Because the Court will deny ACP's motion to exclude the testimony and opinions of Sarmadi, this argument fails.

#### b.     Valuation of the Cabin.

ACP argues that Ray improperly valued the stand-alone, unfinished cabin located on the property in reaching an estimate of $220,000. Ray testified that he applied the cost per square foot for the Fenton Inn as found by Sarmadi and multiplied that figure by the square footage of the cabin, and then deducted 50% to reflect its unfinished status. ACP points to Sarmadi's apparently contradictory testimony that the Fenton Inn cost per square foot ($327.35) could not be applied to any other building in Virginia, stating that today price fluctuations and market conditions change so wildly that "[y]ou have to go through the exercise by pricing everything out." (Dkt. 81-4 at

155:7-19). ACP concludes that Sarmadi's testimony makes clear that Ray improperly extracted the estimated cost per square foot of the Fenton Inn to come up with an estimate for the cabin.

The Court notes that although Sarmadi responded "No" when asked if his calculated price per square foot could "be applied to any building in Virginia," he went on to say that cost per square foot varies wildly from "project to project." (Dkt. 81-4 at 155:7-19). In this case, the Report states that the additional guest house (i.e., cabin) was being constructed for use with the existing bed and breakfast. (Dkt. 81-2 at 16). Although the Inn and cabin are separate buildings, they do appear to be part of the same project and intended to operate together. As to the 50% reduction for the unfinished nature of the cabin, the Report notes that as of the date of the taking, all framing, roofing, exterior wood working, windows, and plumbing were completed and the cabin had been connected to the well and septic system on the property. (Dkt. 81-2 at CM/ECF 49).

Application of the Inn's cost per square foot to the cabin and the reduction of 50% related to the unfinished nature of the cabin, therefore, do not appear to be a product of an unreliable method or based on insufficient facts for purposes of the gatekeeping function of Rule 702. ACP's motion will be denied in this respect.

### c. Valuation of the Wells and Septic System.

ACP asserts that Ray's conclusion that the "cost new" of the well and septic system is $100,000 is not supported by any breakdown of this figure or further analysis in his Report. ACP also points to Sarmadi's testimony that wells and septic systems are unique and that the depth, type of soil, soil capacity, and type of system impact cost, which is "very difficult to price." (Dkt. 81-4 at 29:11-30:14). Sarmadi did not perform that analysis. (Dkt. 81-4 at 29:11-30:17). This,

ACP concludes, shows Ray's valuation of the well and septic system is not the product of reliable principles and methods and, therefore, should be excluded under Fed. R. Evid. 702.

Ray makes clear that his valuation of the three wells and six tank septic system was separate from the replacement cost estimate provided by Sarmadi. Ray estimated the cost new of the wells and septic system "[b]ased on consultations with the property owners and education and experience." (*See* Dkt. 79-1 at 48). To be sure, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, advisory committee's notes to 2000 Amendment. Here, however, Ray provides no data regarding how the figure of $100,000 was reached, such as prices of subcomponents and associated labor or equipment costs. The Court concludes that Fenton has not demonstrated that Ray's estimate of $100,000 is based on reliable principles or methods or supported by sufficient facts.

The Court, therefore, will grant ACP's motion to exclude the opinions and testimony of Ray to the extent they are based on a valuation of the wells and septic system.

### 4. Valuation of the Effect of the Permanent Easement

ACP argues that Ray's opinion that the fee simple value of the permanent easement to Fenton is reduced by 95% by the taking does not meet the requirements of Rule 702. ACP asserts that Ray fails to provide adequate factual or methodological support and merely states that given ACP's and Fenton's respective rights to and restrictions regarding the easement after taking, Defendant will lose approximately 95% of the utility of the land within the easement, which opinion ACP describes as mere *ipse dixit*. (Dkt. 81-2 at 59).

"Presenting a summary of a proffered expert's testimony in the form of a conclusory statement devoid of factual or analytical support is insufficient to lay the proper foundation for the

admission of that testimony." *SunTrust Banks, Inc. v. M.G. Robertson*, No. 2:09CV197, 2010 WL 11566593, at *3 (E.D. Va. Aug. 10, 2010) (citation omitted). Here, however, Ray provided extensive reasons for his decision with respect to the 95% reduction. Indeed, the Report sets out the rights ACP would have in the property subject to the permanent easement and the extremely limited rights Fenton would enjoy over the property. (*See* Dkt. 81-2 at 59).

The Court finds that Ray's opinion regarding the effect of the permanent easement on fee simple value is based on sufficient facts and a reliable methodological approach for purposes of Rule 702. *See Sable Trail Transmission, LLC v. 3.921 Acres of Land in Lake Cnty., Fla.*, No. 5:16-cv-178, 2017 WL 9939115, at *7 (M.D. Fla. Oct. 23, 2017) ("Ray explained what rights [the plaintiff] would have in the property, and then explained how those rights affected what a property owner could do with the easement.") (permitting Ray to testify on rebuttal although not on direct because of a prior court ruling).

The Court, therefore, will grant in part ACP's motion to exclude the opinions and testimony of Ray to the extent they are based on a valuation of the wells and septic system. Thus, Ray may not express an opinion as to the value of the wells and septic system nor include a value in calculating just compensation. ACP's motion is denied in all other respects.

## V. CONCLUSION

For the foregoing reasons, the Court will (1) deny ACP's motion to exclude the testimony and opinions of Paykon H. Sarmadi (dkt. 76), (2) grant in part ACP's motion to exclude the testimony and opinions of Matthey P. Ray to the extent they are based on valuation of the water and septic system on the property but will deny the motion in all other respects (dkt. 80), (3) grant ACP's motion to exclude the testimony and opinions of Richard Paradis (dkt. 78); and (4) grant ACP's motion to exclude the testimony and opinions of Thomas L. Stokes, Jr. (dkt. 82).

An appropriate Order will be entered.

This 19th day of June, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE